# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| J. ALEX HALDERMAN, | |
| Plaintiff, | |
| | Case No. _____ |
| v. | |
| | Judge: _____ |
| HERRING NETWORKS, INC., D/B/A ONE AMERICA NEWS NETWORK, CHARLES HERRING, ROBERT HERRING, SR., and CHANEL RION, | Mag. Judge: _____ |
| Defendants. | |

## DECLARATION OF MARK S. DEMOREST

I, Mark S. Demorest, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

1. I am over the age of 18 and competent to make this declaration. I am the founder and managing member of DEMOREST LAW FIRM, PLLC and am admitted to practice law in the State of Michigan and before multiple federal courts of appeals and district courts, as well as the United States Supreme Court. I represent Plaintiff in the above-captioned matter. I submit this Declaration to provide to the Court true and correct copies of certain documents submitted in support of Plaintiff's

Motion to Quash or Modify Non-Party Subpoena to Testify at a Deposition in a Civil Action or in the Alternative for Protective Order and Brief in Support.

2.    Exhibit 1-A is a true and correct copy of the subpoena titled "Notice of Oral Deposition of Alex Halderman and Subpoena to Testify at a Deposition in a Civil Action," dated July 24, 2024. The subpoena was addressed to Professor J. Alex Halderman and was served in connection with the action bearing the caption *US Dominion, Inc. v. Herring Networks, Inc.,* Civ. Act. No. 1:21-cv-02131 (CJN) (D.D.C.).

3.    Exhibit 1-B is a true and correct copy of the amended subpoena titled "Amended Notice of Oral Deposition of Alex Halderman and Subpoena to Testify at a Deposition in a Civil Action," dated August 14, 2024.

4.    Exhibit 1-C is a true and correct copy of email correspondence between Adam Sparks and John Edwards regarding the Subpoena and Amended Subpoena, sent during the period of July 24, 2024 through September 9, 2024.

5.    Exhibit 1-D is a true and correct copy of <u>Complaint</u>, ECF No. 1, *US Dominion, Inc. v. Herring Networks, Inc.*, No. 1:21-cv-02131(CJN) (August 10, 2021).

6.    Exhibit 1-E is a true and correct copy of <u>Order Granting Respondent Dr. J. Alex Halderman's Motion to Quash Or In The Alternative To Modify Out-Of-</u>

4879-4614-6787, v. 1

State Subpoena to Non-Party, *Fox NewsNetwork, LLC v. Halderman*, No. 18-000100-ZZ (Washtenaw County Circuit Court,Apr. 4, 2023).

7.     Exhibit 1-F is a true and correct copy of the Subpoena Duces Tecum dated April 5, 2024, served on Professor Alex Halderman by Herring Networks, Inc. d/b/a One America News Network with connection to the action *US Dominion, Inc. v. Herring Networks, Inc.,* Civ. Act. No. 1:21-cv-02131 (CJN) (D.D.C.).

8.     Exhibit 1-G is a true and correct copy of correspondence from Adam Sparks to John Edwards dated May 15, 2024 conveying Halderman production.

9.     Exhibit 1-H is a true and correct copy of Memorandum Opinion, ECF No. 126, *US Dominion, Inc. v. Byrne*, No. 1:21-cv-02130 (CJN) (Aug. 13, 2024).

10.     Exhibit 1-I is a true and correct copy of ICS Advisory No. 22-154-01, "Vulnerabilities Affecting Dominion Voting Systems  ImageCast  X," (June  3, 2022).

FURTHER DECLARANT SAYETH NOT, this 10th day of September, 2024.

MARK S. DEMOREST, ESQ.

3

# EXHIBIT 1-A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., et al., *Plaintiffs,* v. SIDNEY POWELL, et al., *Defendants.* | Civil Action No. 1:21-cv-00040 (CJN) |
| US DOMINION, INC., et al., *Plaintiffs/Counter-Defendants,* v. MY PILLOW, INC., et al., *Defendants/Counter-Plaintiffs, and Third-Party Plaintiffs,* v. SMARTMATIC USA CORP., et al., *Third-Party Defendants.* | Civil Action No. 1:21-cv-00445 (CJN) |
| US DOMINION, INC., et al., *Plaintiffs,* v. PATRICK BYRNE, *Defendant.* | Civil Action No. 1:21-cv-02131 (CJN) |

41047240v.1

US DOMINION, INC., et al.,

*Plaintiffs/Counter-Defendants,*

v.

HERRING NETWORKS, INC., et al.,

*Defendants/Counter-Plaintiffs*

Civil Action No. 1:21-cv-02130 (CJN)

## NOTICE OF ORAL DEPOSITION OF ALEX HALDERMAN

Please take notice that pursuant to Federal Rules of Civil Procedure 30 and 45, Defendant Herring Networks, Inc., d/b/a One America News Network ("OAN"), Charles Herring, Robert Herring, Sr., and Chanel Rion (collectively, the "Herring Defendants"), by and through undersigned counsel, will take the oral and videotaped deposition of Alex Halderman on **September 26, 2024** beginning at 9:30 AM EDT, at Regus Center - South State Commons, 2723 South State Street, Suite 150, Ann Arbor, Michigan 48104, or other such location on such other date and time as are agreed upon by the parties or ordered by the Court. The deposition will be stenographically and/or video recorded and conducted by an officer authorized by law to administer oaths.

41047240v.1

Dated: July 24, 2024

By: */s/ John K. Edwards*

**JACKSON WALKER LLP**
Charles L. Babcock
(admitted *pro hac vice*)
Nancy W. Hamilton
(admitted *pro hac vice*)
John. K. Edwards
(admitted *pro hac vice*)
Joel R. Glover
(admitted *pro hac vice*)
Bethany Pickett Shah
(admitted *pro hac vice*)
Christina M. Vitale
(admitted *pro hac vice*)
1401 McKinney Suite 1900
Houston, TX 77010
Tel: (713) 752-4200
Fax: (713) 308-4110
cbabcock@jw.com
nhamilton@jw.com
jedwards@jw.com
jglover@jw.com
bpickett@jw.com
cvitale@jw.com

Jonathan D. Neerman
D.C. Bar No. 90003393
Carl C. Butzer
(admitted *pro hac vice*)
Minoo Sobhani Blaesche
(admitted *pro hac vice*)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Tel: (214) 953-5664
Fax: (214) 661-6899
jneerman@jw.com
cbutzer@jw.com
mblaesche@jw.com

**BOYDEN GRAY PLLC**
R. Trent McCotter
D.C. BAR NO. 1011329
801 17th St NW, #350
Washington, DC 20006

(202) 706-5488
tmccotter@boydengray.com

*Counsel for the Herring Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 24th day of July, 2024, I served the foregoing document on the following counsel of record by electronic mail:

Laranda Walker
Mary K. Sammons
Jonathan Ross)
Elizabeth Hadaway
**SUSMAN GODFREY L.L.P.**
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

Stephen Shackelford, Jr.
Eve Levin
Mark Hatch-Miller
Christina Dieckmann
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl. New York, NY 10019
Tel: (212) 336-8330

Davida Brook
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100

Edgar Sargent
Katherine Peaslee
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880

John F. Lauro, Esq.
Gregory M. Singer, Esq.
**LAURO & SINGER**
400 N. Tampa St., 15th Floor

William C. Haggerty
**FORD, WALKER, HAGGERTY & BEHAR, LLP**
One World Trade Center, 27th Floor
Long Beach, CA 90831

Marc J. Eisenstein
**COBURN GREENBAUM & EISENSTEIN PLLC**
1710 Rhode Island Ave, NW
2nd Floor
Washington, DC 20036
Tel: (703) 963-7164

Christopher I. Kachouroff, Esq.
Robert J. Cynkar, Esq.
**MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**
13649 Office Place, Suite 101
Woodbridge, VA 22192
703.621.3300

Joshua A. Mooney
**KENNEDYS CMK LLP**
1600 Market Street, Suite 1410
Philadelphia, PA 19103
Tel: 267-479-6700

Marc Casarino
**KENNEDYS CMK LLP**
222 Delaware Avenue, Suite 710
Wilmington, DE 19801
Tel: 302-308-6647

Michael J. Tricarico
**KENNEDYS CMK LLP**

41047240v.1

Tampa, FL 33602
(813) 222-8990

570 Lexington Avenue, 8th Floor
New York, New York 10022
Tel: (646) 625-3952

Stefanie Lambert Junttila
**LAW OFFICES OF STEFANIE L.**
**LAMBERT, PLLC**
400 Renaissance Drive, Floor 26
Detroit, MI 48243

*/s/ John K. Edwards*
John K. Edwards

41047240v.1

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| US DOMINION INC., et al., | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:21-cv-02130-CJN |
| HERRING NETWORKS, INC., et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        J. Alex Halderman, 713 West Liberty Street, Apt. 3, Ann Arbor, Michigan 48103
c/o Halsey G. Knapp, Jr., Krevolin & Horst, LLC, 1201 W Peachtree Street, NW, Atlanta, GA 30309

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:   Regus Center - South State Commons
2723 South State Street, Suite 150
Ann Arbor, Michigan 48104 | Date and Time:
09/26/2024 9:30 am |
|---|---|

| The deposition will be recorded by this method:   stenographically and/or video recorded |
|---|

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   07/24/2024

       *CLERK OF COURT*

                                        OR

                                                          /s/ John Edwards
_____              _____
     *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Defendant
Herring Networks, Inc. d/b/a One America News Network         , who issues or requests this subpoena, are:
John Edwards, jedwards@jw.com,1401 McKinney Ave, Suite 1900, Houston, TX 77010

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:21-cv-02130-CJN

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                              *Server's signature*

                                                              _____
                                                              *Printed name and title*

                                                              _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTORNEYS OF RECORD

Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Mark Hatch-Miller
MHatch-Miller@susmangodfrey.com
Zachary Savage
zsavage@susmangodfrey.com
Eve Levin
elevin@susmangodfrey.com
Christina Dieckmann
cdieckmann@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330

Davida Brook
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
dbrook@susmangodfrey.com

Jonathan J. Ross
Mary K. Sammons
Laranda Walker
Elizabeth Hadaway
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
jross@susmangodfrey.com
ksammons@susmangodfrey.com
lwalker@susmangodfrey.com
ehadaway@susmangodfrey.com

Edgar Sargent
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 516-3880
esargent@susmangodfrey.com

*Attorneys for Plaintiffs*

Charles L. Babcock
cbabcock@jw.com
Nancy Hamilton
nhamilton@jw.com
John Edwards
Jedwards@jw.com
Joel Glover
jglover@jw.com
Bethany Pickett Shah
bpickett@jw.com
JACKSON WALKER LLP
1401 McKinney
Suite 1900
Houston, TX 77010

Jonathan Neerman
jneerman@jw.com
Carl Butzer
cbutzer@jw.com
Minoo Blaesche
mblaesche@jw.com
JACKSON WALKER LLP
2323 Ross Avenue
Suite 600
Dallas, TX 75201

R. Trent McCotter
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
tmccotter@boydengray.com

*Attorneys for Defendants*

# EXHIBIT 1-B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., et al.,

*Plaintiffs,*

v.

SIDNEY POWELL, et al.,

*Defendants.*

Civil Action No. 1:21-cv-00040 (CJN)

US DOMINION, INC., et al.,

*Plaintiffs/Counter-Defendants,*

v.

MY PILLOW, INC., et al.,

*Defendants/Counter-Plaintiffs, and
Third-Party Plaintiffs,*

v.

SMARTMATIC USA CORP., et al.,

*Third-Party Defendants.*

Civil Action No. 1:21-cv-00445 (CJN)

US DOMINION, INC., et al.,

*Plaintiffs,*

v.

PATRICK BYRNE,

*Defendant.*

Civil Action No. 1:21-cv-02131 (CJN)

US DOMINION, INC., et al.,

*Plaintiffs/Counter-Defendants,*

v.

HERRING NETWORKS, INC., et al.,

*Defendants/Counter-Plaintiffs*

Civil Action No. 1:21-cv-02130 (CJN)

## AMENDED NOTICE OF ORAL DEPOSITION OF ALEX HALDERMAN

Please take notice that pursuant to Federal Rules of Civil Procedure 30 and 45, Defendant Herring Networks, Inc., d/b/a One America News Network ("OAN"), Charles Herring, Robert Herring, Sr., and Chanel Rion (collectively, the "Herring Defendants"), by and through undersigned counsel, will take the oral and videotaped deposition of Alex Halderman on **September 25, 2024** beginning at 9:00 AM ET, at Regus Center - South State Commons, 2723 South State Street, Suite 150, Ann Arbor, Michigan 48104, or other such location on such other date and time as are agreed upon by the parties or ordered by the Court. The deposition will be stenographically and/or video recorded and conducted by an officer authorized by law to administer oaths.

Dated: August 14, 2024

By: */s/ John K. Edwards*

**JACKSON WALKER LLP**
Charles L. Babcock
(admitted *pro hac vice*)
Nancy W. Hamilton
(admitted *pro hac vice*)
John. K. Edwards
(admitted *pro hac vice*)
Joel R. Glover
(admitted *pro hac vice*)
Bethany Pickett Shah
(admitted *pro hac vice*)
Christina M. Vitale
(admitted *pro hac vice*)
1401 McKinney Suite 1900
Houston, TX 77010
Tel: (713) 752-4200
Fax: (713) 308-4110
cbabcock@jw.com
nhamilton@jw.com
jedwards@jw.com
jglover@jw.com
bpickett@jw.com
cvitale@jw.com

Jonathan D. Neerman
D.C. Bar No. 90003393
Carl C. Butzer
(admitted *pro hac vice*)
Minoo Sobhani Blaesche
(admitted *pro hac vice*)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Tel: (214) 953-5664
Fax: (214) 661-6899
jneerman@jw.com
cbutzer@jw.com
mblaesche@jw.com

**BOYDEN GRAY PLLC**
R. Trent McCotter
D.C. BAR NO. 1011329
801 17th St NW, #350
Washington, DC 20006

(202) 706-5488
tmccotter@boydengray.com

*Counsel for the Herring Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of August, 2024, I served the foregoing document on the following counsel of record by electronic mail:

Laranda Walker
Mary K. Sammons
Jonathan Ross)
Elizabeth Hadaway
**SUSMAN GODFREY L.L.P.**
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666

Stephen Shackelford, Jr.
Eve Levin
Mark Hatch-Miller
Christina Dieckmann
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl. New York, NY 10019
Tel: (212) 336-8330

Davida Brook
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100

Edgar Sargent
Katherine Peaslee
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880

John F. Lauro, Esq.
Gregory M. Singer, Esq.
**LAURO & SINGER**
400 N. Tampa St., 15th Floor

William C. Haggerty
**FORD, WALKER, HAGGERTY & BEHAR, LLP**
One World Trade Center, 27th Floor
Long Beach, CA 90831

Marc J. Eisenstein
**COBURN GREENBAUM & EISENSTEIN PLLC**
1710 Rhode Island Ave, NW
2nd Floor
Washington, DC 20036
Tel: (703) 963-7164

Christopher I. Kachouroff, Esq.
Robert J. Cynkar, Esq.
**MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**
13649 Office Place, Suite 101
Woodbridge, VA 22192
703.621.3300

Joshua A. Mooney
**KENNEDYS CMK LLP**
1600 Market Street, Suite 1410
Philadelphia, PA 19103
Tel: 267-479-6700

Marc Casarino
**KENNEDYS CMK LLP**
222 Delaware Avenue, Suite 710
Wilmington, DE 19801
Tel: 302-308-6647

Michael J. Tricarico
**KENNEDYS CMK LLP**

Tampa, FL 33602
(813) 222-8990

570 Lexington Avenue, 8th Floor
New York, New York 10022
Tel: (646) 625-3952

Stefanie Lambert Junttila
**LAW OFFICES OF STEFANIE L.
LAMBERT, PLLC**
400 Renaissance Drive, Floor 26
Detroit, MI 48243

*/s/ John K. Edwards*
John K. Edwards

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| US DOMINION INC., et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   1:21-cv-02130-CJN |
| HERRING NETWORKS, INC., et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:          J. Alex Halderman, 713 West Liberty Street, Apt. 3, Ann Arbor, Michigan 48103
c/o Halsey G. Knapp, Jr., Krevolin & Horst, LLC, 1201 W Peachtree Street, NW, Atlanta, GA 30309
*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Regus Center - South State Commons | Date and Time: |
|---|---|
| 2723 South State Street, Suite 150 Ann Arbor, Michigan 48104 | 09/25/2024 9:00 am |

The deposition will be recorded by this method:   stenographically and/or video recorded

❏ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   08/14/2024

| *CLERK OF COURT* | |
| | OR |
| | /s/ John Edwards |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendant
Herring Networks, Inc. d/b/a One America News Network                      , who issues or requests this subpoena, are:
John Edwards, jedwards@jw.com,1401 McKinney Ave, Suite 1900, Houston, TX 77010

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:21-cv-02130-CJN

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ 0.00 _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTORNEYS OF RECORD

Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Mark Hatch-Miller
MHatch-Miller@susmangodfrey.com
Zachary Savage
zsavage@susmangodfrey.com
Eve Levin
elevin@susmangodfrey.com
Christina Dieckmann
cdieckmann@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330

Davida Brook
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
dbrook@susmangodfrey.com

Jonathan J. Ross
Mary K. Sammons
Laranda Walker
Elizabeth Hadaway
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
jross@susmangodfrey.com
ksammons@susmangodfrey.com
lwalker@susmangodfrey.com
ehadaway@susmangodfrey.com

Edgar Sargent
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 516-3880
esargent@susmangodfrey.com

*Attorneys for Plaintiffs*

Charles L. Babcock
cbabcock@jw.com
Nancy Hamilton
nhamilton@jw.com
John Edwards
Jedwards@jw.com
Joel Glover
jglover@jw.com
Bethany Pickett Shah
bpickett@jw.com
JACKSON WALKER LLP
1401 McKinney
Suite 1900
Houston, TX 77010

Jonathan Neerman
jneerman@jw.com
Carl Butzer
cbutzer@jw.com
Minoo Blaesche
mblaesche@jw.com
JACKSON WALKER LLP
2323 Ross Avenue
Suite 600
Dallas, TX 75201

R. Trent McCotter
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
tmccotter@boydengray.com

*Attorneys for Defendants*

# EXHIBIT 1-C

**Daniella P. Stucchi**

| | |
|---|---|
| **From:** | Edwards, John <jedwards@jw.com> |
| **Sent:** | Thursday, August 15, 2024 1:25 PM |
| **To:** | Adam M. Sparks |
| **Cc:** | Halsey G. Knapp, Jr. |
| **Subject:** | RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.) |

Thanks.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Wednesday, August 14, 2024 8:37 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution:** **External Email.

Received. Here is a link to the publication I referred to:
https://www.usenix.org/system/files/usenixsecurity24-crimmins.pdf

Thanks,



**KREVOLIN  HORST**

www.khlawfirm.com

Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com

ADAM M SPARKS          2024
**Best Lawyers**
RECOGNIZED BY

Chambers
RANKED IN
**USA**
2024
Krevolin & Horst, LLC

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Wednesday, August 14, 2024 4:32 PM

**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Here's the amended notice.  Thanks.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Wednesday, August 14, 2024 3:08 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** Re: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

   **Caution: **External Email.**

You noticed for Ann Arbor, I recall. That should work.

   **Adam M. Sparks**
   Litigation, Regulation, Election Law
   Tel: 404-835-8067
   Email: sparks@khlawfirm.com

   **Krevolin | Horst**

   One Atlantic Center
   1201 West Peachtree Street, NW
   Suite 3250 | Atlanta, GA 30309
   Tel: 404-888-9700
   www.khlawfirm.com

   *Sent from my mobile; please forgive typos, shorthand, misspellings, etc.*

   *A Member of Primerus International Society of Law Firms*

   *The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.*

   *Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

On Aug 14, 2024, at 4:04 PM, Edwards, John <jedwards@jw.com> wrote:

Thanks – is there a preferred location?

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Wednesday, August 14, 2024 3:00 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution:** **External Email.

Please plan on September 25.

Also, Dr. Halderman has published a new paper about an aspect of Dominion Voting. I will forward it or a link when I am back at my desk.

**Adam M. Sparks**
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com

**Krevolin | Horst**
One Atlantic Center
1201 West Peachtree Street, NW
Suite 3250 | Atlanta, GA 30309
Tel: 404-888-9700
www.khlawfirm.com

*Sent from my mobile; please forgive typos, shorthand, misspellings, etc.*

<image002.png>
<image005.jpg>

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.*

*Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Tuesday, August 13, 2024 1:38 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Hi Adam - would 9/25 or 9/27 work?  If not, let us know as soon as you can - calendar is filling up quickly as you can imagine.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Friday, August 9, 2024 3:22 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution:** **External Email.

Hi John,

My apologies for the delay. Have been facing down hearings and briefing deadlines all week.

I have not been able to confirm proposed dates, only that he is scheduled to teach on at least Sept. 24, 26, and 30. I will keep trying to get that information, including for September 25 or 27.

Best regards,


<image010.png>
Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com
www.khlawfirm.com


<image002.png>
<image012.jpg>

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Monday, August 5, 2024 3:03 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>

**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Following up on proposed dates - please advise.  Thanks!

**From:** Edwards, John
**Sent:** Monday, July 29, 2024 9:15 AM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Thanks Adam.  Let me know what firm dates can be offered. - John

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Monday, July 29, 2024 7:05 AM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution:** **External Email.

John,

Thank you for letting me know. My turn to apologize – out of the office on Friday and traveling thereafter.

We will accept service on Dr. Halderman's behalf, effective today, of the deposition subpoena you emailed to us. There is no need to proceed with formal service.

Dr. Halderman is scheduled to teach in the middle of the day on September 26, but not on the day before or after so far as I know. We will be in touch.

Best regards,


<image013.png>
Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com
www.khlawfirm.com


<image002.png>
<image015.jpg>

*A Member of Primerus International Society of Law Firms*

5

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Thursday, July 25, 2024 9:13 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** Re: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Sorry, was in a long deposition today.  Discovery is consolidated in all the captioned cases, and one depo is considered taken in all of them.  Thus, no other deposition subpoenas will be issued by any party to these cases.

I have a short depo in the morning but available to talk tomorrow afternoon if needed.

Sent from my iPhone

> On Jul 25, 2024, at 9:24 AM, Adam M. Sparks <sparks@khlawfirm.com> wrote:

**Caution:** **External Email.

John,

Thank you for your email. One question: is this subpoena issued on behalf of all defendants in the four cases included in the caption to the notice, or otherwise meant to demand a deposition for use in each of those cases? Or can we expect additional subpoenas from the other defendants named?

My understanding of the orders in this case is that three of the cases are consolidated and all four are coordinated for discovery purposes, with Mr. Giuliani's case having been previously consolidated and now stayed. You can understand my concern, if I am wrong about how those orders apply to this subpoena, about surprise follow-on requests to accept service of additional deposition subpoenas for these other cases or service attempts of the same.

Best regards,

<image002.png>
Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com
www.khlawfirm.com

<image004.png>
<image005.jpg>

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Wednesday, July 24, 2024 11:14 AM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Adam/Halsey, please see attached deposition subpoena for Dr. Halderman.  Let me know if you can accept service or we should proceed with formal service.

Happy to discuss date/location, but it will have to occur before September 30th (discovery deadline).

Thanks. - John

John K. Edwards | Partner
**1401 McKinney Suite 1900 | Houston, TX | 77010**
V: (713) 752-4319 | C:  (713) 553-7951 | F: (713) 308-4117
 John Edwards - Houston Litigation Attorney - Jackson Walker (jw.com) | jedwards@jw.com
<image006.jpg>

7

**Daniella P. Stucchi**

| | |
|---|---|
| **From:** | Adam M. Sparks |
| **Sent:** | Monday, September 9, 2024 1:32 PM |
| **To:** | Edwards, John |
| **Cc:** | Halsey G. Knapp, Jr.; Mark Demorest |
| **Subject:** | RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.) |

John,

I appreciate your time on our conferrals this past week. I have spoken with Dr. Halderman since you and I conferred last Thursday.

Unfortunately, I do not see us reaching agreement. I understand you conceive of this deposition as a way to investigate the facts of what Dr. Halderman did and learned in the course of writing his March 2021 report in *Antrim County v. Bailey* (published as peer-reviewed research in August 2022) and his July 2021 report in *Curling v. Raffensperger* (unsealed in June 2023), to answer your questions about them in terms a jury may understand better, and that you can more easily attempt to admit into evidence in your case against Dominion.

But that is just seeking Dr. Halderman's expert opinion in the guise of a fact deposition. He performed retained expert work in researching, analyzing, writing, and testifying about both of these reports. You fundamentally are seeking expert testimony without retaining Dr. Halderman as an expert. And you cannot compel him to provide that, certainly not on the showing so far.

Further, as we've discussed several times now, the respective protective orders in these cases and others apply to the expert work performed in each case. I sent those to you amidst our conferrals back in May and placed them atop your email queue last week. I will take your stated intentions to avoid asking after privileged material – with Patrick Byrne and his disqualified attorney of record still active in discovery and notified of both of your testimonial subpoenas – and to live with objections to questions, albeit only "to some extent" unknown to me, at face value.

Even so, disputes over where the boundaries of these protective and confidentiality orders lie in the face of questions you will ask are material and inevitable. The example I provided about portions of Dr. Halderman's *Curling* testimony remaining under seal to this day illuminates our concerns: he would need not only to answer sensitive, perhaps intricate and technical, questions truthfully but also to recall in the moment what is and is not still under seal after over seven years of litigation without any prior guidance from the court holding that testimony under seal. That is untenable and unduly burdensome.

We think you have it backwards – rather than wait until our client is under oath and taking questions for several counsel to object and negotiate and do battle, we think you should have approached each of these courts ahead of time to declare what was and was not off limits in this deposition about this very sensitive material, often the subject of disinformation in a contentious election year involving credible threats and actual attempts at political violence, to protect all stakeholders involved and some who are not.

To that end, to protect Dr. Halderman and his expertise from the undue burdens imposed by the testimonial subpoenas, and inferring from our discussions this week that your clients will not withdraw the Amended Subpoena, we will soon file a motion to quash or modify. I will send you a courtesy copy as soon as I have a file-stamped version available. We also intend to let other parties in these consolidated/coordinated matters know of the dispute should they feel compelled to comment.

Best regards,





Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com

www.khlawfirm.com

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party. Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Adam M. Sparks
**Sent:** Tuesday, September 3, 2024 12:26 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Thank you,





Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com

www.khlawfirm.com

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party. Internal Revenue Service regulations require that certain types*

*of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Tuesday, September 3, 2024 12:24 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Heading into a meeting but will call you in about an hour.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Tuesday, September 3, 2024 11:07 AM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution: **External Email.**

Hi John,

I hope you had a restful weekend. I tried both numbers I have for you just now, but was unable to reach you. Will you please give me a call when you have five minutes?

Thank you,



KREVOLIN   HORST

www.khlawfirm.com

Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com



ADAM M. SPARKS · 2024
Best Lawyers · RECOGNIZED BY

Chambers
RANKED IN
USA
2024
Krevolin & Horst, LLC

**A Member of Primerus International Society of Law Firms**

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Thursday, August 15, 2024 1:25 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Thanks.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Wednesday, August 14, 2024 8:37 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution:** **External Email.

Received. Here is a link to the publication I referred to:
https://www.usenix.org/system/files/usenixsecurity24-crimmins.pdf

Thanks,



KREVOLIN HORST

www.khlawfirm.com

Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com



*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party. Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Wednesday, August 14, 2024 4:32 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>

**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Here's the amended notice.  Thanks.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Wednesday, August 14, 2024 3:08 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** Re: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

   **Caution:** **External Email.

You noticed for Ann Arbor, I recall. That should work.

   **Adam M. Sparks**
   Litigation, Regulation, Election Law
   Tel: 404-835-8067
   Email: sparks@khlawfirm.com

   **Krevolin | Horst**
   One Atlantic Center
   1201 West Peachtree Street, NW
   Suite 3250 | Atlanta, GA 30309
   Tel: 404-888-9700
   www.khlawfirm.com

   *Sent from my mobile; please forgive typos, shorthand, misspellings, etc.*

   *A Member of Primerus International Society of Law Firms*

   *The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.*

   *Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

On Aug 14, 2024, at 4:04 PM, Edwards, John <jedwards@jw.com> wrote:

Thanks – is there a preferred location?

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Wednesday, August 14, 2024 3:00 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution:** **External Email.

Please plan on September 25.

Also, Dr. Halderman has published a new paper about an aspect of Dominion Voting. I will forward it or a link when I am back at my desk.

> **Adam M. Sparks**
> Litigation, Regulation, Election Law
> D: 404-835-8067
> Email: sparks@khlawfirm.com
>
> **Krevolin | Horst**
> One Atlantic Center
> 1201 West Peachtree Street, NW
> Suite 3250 | Atlanta, GA 30309
> Tel: 404-888-9700
> www.khlawfirm.com
>
> *Sent from my mobile; please forgive typos, shorthand, misspellings, etc.*

<image002.png>
<image005.jpg>

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.*

*Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Tuesday, August 13, 2024 1:38 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Hi Adam - would 9/25 or 9/27 work?  If not, let us know as soon as you can - calendar is filling up quickly as you can imagine.

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Friday, August 9, 2024 3:22 PM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution: **External Email.

Hi John,

My apologies for the delay. Have been facing down hearings and briefing deadlines all week.

I have not been able to confirm proposed dates, only that he is scheduled to teach on at least Sept. 24, 26, and 30. I will keep trying to get that information, including for September 25 or 27.

Best regards,


<image010.png>
Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com
www.khlawfirm.com


<image002.png>
<image012.jpg>

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Monday, August 5, 2024 3:03 PM
**To:** Adam M. Sparks <sparks@khlawfirm.com>

**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Following up on proposed dates - please advise.  Thanks!

**From:** Edwards, John
**Sent:** Monday, July 29, 2024 9:15 AM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Thanks Adam.  Let me know what firm dates can be offered. - John

**From:** Adam M. Sparks <sparks@khlawfirm.com>
**Sent:** Monday, July 29, 2024 7:05 AM
**To:** Edwards, John <jedwards@jw.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** RE: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

**Caution: **External Email.

John,

Thank you for letting me know. My turn to apologize – out of the office on Friday and traveling thereafter.

We will accept service on Dr. Halderman's behalf, effective today, of the deposition subpoena you emailed to us. There is no need to proceed with formal service.

Dr. Halderman is scheduled to teach in the middle of the day on September 26, but not on the day before or after so far as I know. We will be in touch.

Best regards,


<image013.png>
Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: sparks@khlawfirm.com
www.khlawfirm.com

<image002.png>
<image015.jpg>

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <<u>jedwards@jw.com</u>>
**Sent:** Thursday, July 25, 2024 9:13 PM
**To:** Adam M. Sparks <<u>sparks@khlawfirm.com</u>>
**Cc:** Halsey G. Knapp, Jr. <<u>hknapp@khlawfirm.com</u>>
**Subject:** Re: Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Sorry, was in a long deposition today.  Discovery is consolidated in all the captioned cases, and one depo is considered taken in all of them.  Thus, no other deposition subpoenas will be issued by any party to these cases.

I have a short depo in the morning but available to talk tomorrow afternoon if needed.

Sent from my iPhone

> On Jul 25, 2024, at 9:24 AM, Adam M. Sparks <<u>sparks@khlawfirm.com</u>> wrote:

**Caution:** **External Email.

John,

Thank you for your email. One question: is this subpoena issued on behalf of all defendants in the four cases included in the caption to the notice, or otherwise meant to demand a deposition for use in each of those cases? Or can we expect additional subpoenas from the other defendants named?

My understanding of the orders in this case is that three of the cases are consolidated and all four are coordinated for discovery purposes, with Mr. Giuliani's case having been previously consolidated and now stayed. You can understand my concern, if I am wrong about how those orders apply to this subpoena, about surprise follow-on requests to accept service of additional deposition subpoenas for these other cases or service attempts of the same.

Best regards,

<image002.png>
Adam M. Sparks
Litigation, Regulation, Election Law
D: 404-835-8067
Email: <u>sparks@khlawfirm.com</u>
<u>www.khlawfirm.com</u>

&lt;image004.png&gt;
&lt;image005.jpg&gt;

*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.  Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

**From:** Edwards, John <jedwards@jw.com>
**Sent:** Wednesday, July 24, 2024 11:14 AM
**To:** Adam M. Sparks <sparks@khlawfirm.com>
**Cc:** Halsey G. Knapp, Jr. <hknapp@khlawfirm.com>
**Subject:** Deposition Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.)

Adam/Halsey, please see attached deposition subpoena for Dr. Halderman.  Let me know if you can accept service or we should proceed with formal service.

Happy to discuss date/location, but it will have to occur before September 30th (discovery deadline).

Thanks. - John


John K. Edwards | Partner
1401 McKinney Suite 1900 | Houston, TX | 77010
V: (713) 752-4319 | C: (713) 553-7951 | F: (713) 308-4117
John Edwards - Houston Litigation Attorney - Jackson Walker (jw.com) | jedwards@jw.com
&lt;image006.jpg&gt;

# EXHIBIT 1-D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION c/o Cogency Global 1025 Vermont Ave, NW, Ste. 1130 Washington, DC 20005, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. _____ |
| HERRING NETWORKS, INC., d/b/a ONE AMERICA NEWS NETWORK 101 Constitution Ave., NW Washington, DC 20001, | ) ) ) ) ) ) |
| CHARLES HERRING 17353 Circa Oriente Rancho Santa Fe, California 92067, | ) ) ) ) |
| ROBERT HERRING, SR. 4289 Rancho Las Brisas Trail San Diego, California 92130, | ) ) ) ) |
| CHANEL RION 3211 Cherry Hill Lane, NW Washington, DC 20007, | ) ) ) ) |
| and | ) ) |
| CHRISTINA BOBB 565 Pennsylvania Ave., NW Apt. 803 Washington, DC 20001, | ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### April 18, 2021:

"'The majority of people [at OAN] did not believe the voter fraud claims being run on the air.' . . . Mr. Golingan, the producer, said some OAN employees had hoped Dominion would sue the channel. 'A lot of people said, "This is insane, and maybe if they sue us, we'll stop putting stories like this out,"' he said."

*Former OAN Producer Marty Golingan,*
*quoted in the New York times, and fired by OAN the day after the statements were published*

1.      On the actual facts, the November 2020 election was a huge success for Dominion. In jurisdiction after jurisdiction, in 28 states, in the midst of a highly disruptive pandemic, Dominion's voting machines facilitated efficient and reliable voting with accurate tallying of votes. Dominion machines created an auditable and verifiable paper trail. Over literally thousands of hand audits across the country, those paper ballots confirmed the accuracy of the Dominion machines' tallies. Dominion emerged from the election with arguably the most-tested, most-scrutinized, and most-proven voting technology in recent history. What should have been a triumph, however, turned to disaster—not because of anything Dominion did, but because of the lies that influential media companies like One America News Network (OAN) promoted. OAN helped create and cultivate an alternate reality where up is down, pigs have wings, and Dominion engaged in a colossal fraud to steal the presidency from Donald Trump by rigging the vote.

2.      During and after the November 2020 election, OAN saw a business opportunity. Spurred by a quest for profits and viewers, OAN—a competitor to media giant Fox—engaged in a race to the bottom with Fox and other outlets such as Newsmax to spread false and manufactured stories about election fraud. Dominion quickly became the focus of this downward spiral of lies, as each broadcaster attempted to outdo the others by making the lies more outrageous, spreading them further, and endorsing them as strongly as possible.

3.      Over the course of several months, OAN manufactured, endorsed, repeated, and broadcast a series of verifiably false yet devastating lies about Dominion. These outlandish and far-fetched fictions included that: (1) Dominion committed election fraud by rigging the 2020 Presidential Election; (2) Dominion's software and algorithms manipulated vote counts in the 2020 Presidential Election; (3) Dominion is owned by or owns a company founded in Venezuela to rig elections for the dictator Hugo Chávez; and (4) Dominion was involved with alleged voting irregularities in Philadelphia and Dallas—cities where its voting system is not even used. On their own, these lies would have been more than enough to irreparably harm Dominion. But OAN did not stop there.

4.      OAN spread these lies by broadcasting and promoting interviews with discredited figures such as Sidney Powell, Rudolph Giuliani, Patrick Byrne, and Mike Lindell. But OAN went further, helping create and nurture the false and fabricated Dominion narrative by endorsing, promoting, and manufacturing these known falsehoods, including by pointing to the so-called "evidence" OAN was broadcasting in support of these lies and by falsely claiming the lies had corroborated "all of our investigations."

5.      To capitalize on the interest its target audience had in the false Dominion narrative, OAN effectively deputized its Chief White House Correspondent, Chanel Rion, as an in-house spokesperson for all Dominion-related content. After priming its viewers with a steady diet of post-election programming falsely claiming Dominion rigged the 2020 election, OAN and Rion began producing an entire line of programming exclusively devoted to defaming Dominion, descriptively named "***Dominion-izing the Vote***," which branded OAN's disinformation and defamation campaign against Dominion into a single catchy phrase that is now synonymous with fraudulently flipping votes.



6.      Rion was not the only one to spread lies about Dominion on the air at OAN. She was joined by Christina Bobb, another OAN personality who, while also falsely accusing Dominion of rigging the election and stealing it from Trump, was simultaneously and covertly moonlighting as a Trump Campaign advisor.

7.      The OAN lies did not stop in 2020. Desperate to conform facts to its false preconceived narrative that Dominion stole the 2020 election from Trump, OAN made up new facts, including that Dominion provided election equipment and services in Dallas, Texas in 2018—it did not—and in Philadelphia County in 2020—it did not. And when OAN ran out of actual (though wholly unreliable) sources to help it spread lies about Dominion, it manufactured a new source—a convicted felon with no college degree whom OAN put forward as an "expert mathematician"—for a January 2021 segment to demonstrate that Dominion machines flipped votes in Georgia.

8.      Then, in February 2021, months after the 2020 election, OAN enlisted MyPillow CEO Mike Lindell to broadcast a series of multi-hour-long "documentaries" spreading disinformation about Dominion. Lindell falsely claimed that Dominion was behind "the biggest cyber-attack in history," and that Lindell had "absolute proof." OAN and Lindell knew no such

"cyber-attack" occurred and that there was certainly no proof of one. Yet OAN and Lindell recklessly disregarded the truth—that the 2020 election was safe and secure and the results tabulated by Dominion voting machines were accurate—and made the conscious decision to manufacture and spread the fantastical lie that Dominion stole the election from Donald Trump. The day before OAN aired the "documentary," OAN promised its viewers that the film would be "a never-before-seen report breaking down election fraud evidence & showing how the unprecedented level of voter fraud was committed in the 2020 Presidential Election." OAN— repeatedly throughout the first half of 2021—continued to broadcast the lies about Dominion as truth and to conceal the true facts from its viewers.

9.      Not content with creating hours and hours of a special line of programming specifically aimed at defaming Dominion, OAN went further. At some point between November 2020 and January 2021, OAN, Bobb, and Rion began raising money to fund movements aimed at hiring sham "auditors" to attack and harm Dominion's business. These efforts resulted in a sham "audit" of the 2020 Presidential Election in Maricopa County, Arizona, generating additional fodder for OAN to use in its defamatory campaign against Dominion—with OAN given the exclusive right to broadcast the proceedings.

10.      Throughout this time, OAN recklessly disregarded the truth; indeed, OAN *knew* the statements it repeatedly broadcast about Dominion were lies, as former OAN producer Marty Golingan confirmed to the New York Times. Specifically, OAN knew the vote tallies from Dominion machines had been confirmed by numerous independent audits and hand recounts of paper ballots following the election. OAN also knew the lies it was promoting and endorsing about Dominion had been debunked by an increasingly long list of bipartisan election officials, election security experts, judges, then-Attorney General William Barr, then-Director of the U.S.

Cybersecurity and Infrastructure Security Agency Chris Krebs, Election Assistance Commissioner Ben Hovland, Republican Georgia Governor Brian Kemp, Republican Georgia Secretary of State Brad Raffensperger, and Republican former Colorado Secretary of State Wayne Williams, to name several. OAN also knew or recklessly disregarded that there was no evidence whatsoever to support its claims that Dominion was created in Venezuela by Hugo Chavez for the purpose of rigging elections.

11. How did OAN deal with the fact that independent experts, loyal Trump supporters, and Trump Administration officials alike had completely debunked its lies about Dominion? OAN added even more far-fetched flourishes to its fantastical story, claiming that Trump's own allies were in on the "steal," and sold this inherently improbable scenario to its viewers.

12. OAN made the intentional and knowing choice to depict—and then publicize, endorse, and fuel—the lies about Dominion as truth, creating and promoting an alternate reality that duped millions of Americans into believing that Dominion stole the 2020 election from President Trump. It repeatedly broadcast the lies of facially unreliable sources—lies which OAN itself adopted, endorsed, promoted, and manufactured. And it acted this way because the lies attracted Trump's public stamp of approval, attention, and admiration, along with huge ratings boosts and profit windfalls. OAN used its lie-filled broadcasts to court President Trump, and was rewarded by President Trump retweeting the lies—along with his personal endorsement of OAN—to his tens of millions of followers.

13. OAN's coverage of Dominion was dishonest and false. OAN caused tremendous harm to Dominion. OAN paid no mind to the consequences of its disinformation campaign, choosing profits and increased viewership over truth. And when Dominion confronted OAN with the verifiable facts disproving OAN's lies, OAN refused to retract the lies. OAN continues to

amplify and promote these fictions, betting that its path to profitability and relevancy runs through the false narrative that Dominion rigged the 2020 election—at the expense not just of Dominion but of democracy. Dominion brings this lawsuit to set the record straight, to vindicate its rights, to hold OAN accountable, and to recover damages for the devastating economic harm done to its business.

## PARTIES AND RELEVANT NON-PARTIES

14.     Plaintiff US Dominion, Inc. is a for-profit Delaware corporation with its principal place of business in Denver, Colorado. It is majority-owned by a private equity firm whose principal place of business is in New York, New York.

15.     Plaintiff Dominion Voting Systems, Inc. is a for-profit Delaware corporation with its principal place of business in Denver, Colorado, and has maintained an office in New York since July 2009. It is a wholly owned subsidiary of US Dominion, Inc.

16.     Plaintiff Dominion Voting Systems Corporation is a for-profit Ontario corporation with its principal place of business in Toronto, Ontario. It is a wholly owned subsidiary of US Dominion, Inc. (US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation are collectively referred to as "Dominion.")

17.     Defendant One America News Network ("OAN") is a for-profit company wholly owned by Herring Networks Inc., which is wholly owned by the Herring family (including Defendants Robert Herring and Charles Herring). OAN also refers, where appropriate, to Defendants Robert Herring and Charles Herring (collectively, "the Herrings"), as well as to both Defendant Bobb and Defendant Rion, except to the extent that Bobb and Rion did not broadcast or publish statements by other OAN personalities. OAN is headquartered in San Diego, California, but it maintains a substantial operation in Washington, D.C., including its Washington, D.C. news bureau. OAN has a studio at 101 Constitution Avenue, Northwest in Washington, D.C., according

to the company's LinkedIn profile.[1] OAN's LinkedIn page describes the location as its "Washington, D.C. Bureau" and is one of two locations listed by the company. Much of OAN's star on-air talent resides and works in Washington, D.C., including Rion and Bobb. OAN operates not only a cable news channel, but also its website OANN.com, and its company and individual personalities' social media accounts. OAN makes its content available on its website, OANN.com, on digital platforms such as YouTube and Rumble, and through the subscription streaming service, KlowdTV. OAN's Dominion-related content was produced and broadcast through OAN's Washington, D.C. office, bypassing OAN's editorial team in California.

18.     Defendant Robert Herring is the CEO of OAN, and his son Defendant Charles Herring is the President. According to a former OAN anchor, Robert Herring "'is the network . . . [h]e is in control of absolutely everything he wants to be, and if someone doesn't like it they're fired.'"[2] "[Robert] Herring's grip on the network's coverage gets even tighter when it comes to stories of greater importance."[3] According to another former OAN producer, Robert Herring "'became the de facto news director'" for the network, and "'has a ton of influence over every aspect of the newscast,'" with "'stories written on his whim.'"[4] According to another OAN employee, "'It was his way or no way.'"[5] OAN employees who run afoul of the Herrings' directives have been publicly scolded and fired.

---

[1]     One America News Network, LinkedIn (last visited June 15, 2021), https://www.linkedin.com/company/one-america-news-network/about.

[2] Andrew McCormick, *One America News was desperate for Trump's approval. Here's how it got it*, Columbia Journalism Review (May 27, 2020), https://www.cjr.org/the_profile/one-america-news-oan-trump-herring.php.

[3] *Id.*

[4] Marc Fisher, *An inside look at One America News, the insurgent TV network taking 'pro-Trump' to new heights*, Wash. Post (July 5, 2017), https://www.washingtonpost.com/lifestyle/style/an-inside-look-at-one-america-news-the-insurgent-tv-network-taking-pro-trump-to-new-heights/2017/07/05/7475f0a4-4fa2-11e7-91eb-9611861a988f_story.html.

[5] *Id.*

19.     The false Dominion stories were examples of what were referred to internally at OAN as "H stories"—that is, stories that the Herrings personally approved and required OAN to run, with the Herrings exercising control over their content, and without the California editorial team (or anyone else) fact checking the stories or vetting sources. For his part, Charles Herring reviewed drafts, and approved final drafts for broadcasting, of at least some of the false Dominion stories accused in Count One, below. According to Charles Herring himself, "the fact-checking process at OAN . . . 'includes management review.'"[6]

20.     Charles Herring's Twitter and LinkedIn locations place him in Washington, D.C.[7] At the very least, he regularly travels to OAN's Washington, D.C. bureau as part of his oversight and control of its operations. The Herrings both regularly send information to and receive information from the Washington, D.C. bureau as part of their close oversight and editorial supervision of the work done by the reporters there, particularly regarding "H stories." In addition, the Herrings negotiated and executed a partnership between Herring Broadcasting and *The Washington Times* in May 2013, upon OAN's launch, to "'provide[] [OAN] a powerful reporting and analytical capability to help [OAN's] viewers make sense of developments in an increasingly complex, and polarized capital city.'"[8]

---

[6] Jean Guerrero, *Column: How San Diego incubates white extremism with One America News*, Los Angeles Times (July 22, 2021), https://www.latimes.com/opinion/story/2021-07-22/one-america-news-network-politics-san-diego-trump.

[7]     Charles Herring (@CharlesPHerring), Twitter (last visited Aug. 7, 2021), https://twitter.com/CharlesPHerring; Charles Herring, LinkedIn (last visited Aug. 7, 2021), https://www.linkedin.com/in/charlesherring.

[8] Press Relations, *One America News Cable News Network Announces Debut in Collaboration with The Washington Times*, Wash. Times (May 30, 2013), https://www.washingtontimes.com/blog/marketing/2013/may/30/one-america-news-cable-news-network-announces-debu/.

21.     Defendant Chanel Rion is the Chief White House Correspondent for OAN. She is a Washington, D.C. resident and works in and operates out of OAN's Washington, D.C. bureau, as evidenced by the geotag on Rion's Twitter account.[9] Rion tweets from the Twitter handle @ChanelRion, which is controlled by OAN, as evidenced by Chanel Rion's name on the account, listed as "Chanel Rion OAN," and that @OANN is tagged in the biography. Rion also operates the website ChanelRion.com. On her LinkedIn page, Rion boasts that she graduated from Harvard University and links to Harvard University's LinkedIn page.[10] However, Rion was actually admitted to the Harvard Extension School, at which anyone can enroll in classes and admission into a degree program only requires that a student obtain a B or higher in three courses.[11] Along with OAN's Christina Bobb, Rion crossed journalism ethical lines and raised funds for the sham audit in Arizona of Dominion's machines.[12]

22.     Defendant Christina Bobb is the host of "Weekly Briefing" on OAN, which airs weekdays at 2pm Eastern Time, and which is recorded in and broadcast from Washington, D.C. She is a Washington, D.C. resident and works in and operates out of OAN's Washington, D.C. bureau, as evidenced from the geotag on Bobb's Twitter profile.[13] Bobb tweets from the Twitter handle @christina_bobb, which is controlled by OAN, as evidenced by Christina Bobb's bio on the account, which references and tags OAN. Bobb is the former Executive Secretary for the

---

[9] Chanel Rion (@ChanelRion), Twitter (last visited June 15, 2021), https://twitter.com/chanelrion.
[10] Chanel Rion, LinkedIn (last visited July 9, 2021), https://www.linkedin.com/in/chanel-rion-19320490/.
[11] Mark J. Drozdowksi, *Harvard Extension School: Is It Really Harvard?*, Best Colleges (June 11, 2021), https://www.bestcolleges.com/blog/harvard-extension-school-really-harvard/.
[12] Sarah Mimms, *Pro-Trump OAN Reporters Are Blatantly Raising Money For A Bogus Election "Audit" In Arizona*, BuzzFeed News (May 18, 2021), https://www.buzzfeednews.com/article/sarahmimms/arizona-election-results-oan-reporters-fundraising.
[13] Christina Bobb (@christina_bobb), Twitter (last visited June 15, 2021), https://twitter.com/christina_bobb.

Department of Homeland Security, former civil litigation attorney, and former U.S. Marine Corps Judge Advocate. At the same time Bobb was peddling her and OAN's lies about Dominion after the 2020 election, she was consulting with the Trump campaign and specifically with Rudolph Giuliani and the Trump legal team,[14] including on January 6, 2021 while insurrectionists stormed the United States Capitol.[15] And most recently, Bobb has likewise spearheaded OAN's funding of the sham audit in Arizona.[16]

23. Sidney Powell is an attorney and the author of a self-published book that purports to be a seminal work in "exposing 'the Deep State.'"[17] Powell briefly pursued spurious litigation challenging the 2020 Presidential Election beginning on November 25, 2020 but her cases had all been summarily dismissed by federal judges by December 9, 2020. Those judges called Powell's lawsuits "nothing but speculation and conjecture,"[18] and "largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections."[19] They likewise concluded that even those witnesses and so-called "experts" "reach implausible conclusions, often because they are derived from *wholly unreliable sources*."[20] Powell was also the attorney for Michael Flynn, and in that

---

[14] Asawin Suebsaeng, Maxwell Tani & Sam Stein, *An OAN Host Has Been Helping Rudy With Trump's Legal Efforts*, The Daily Beast (Nov. 23, 2020), https://www.thedailybeast.com/oan-host-christina-bobb-has-been-helping-rudy-giuliani-with-trumps-legal-efforts.

[15] Seth Abramson, *Sixth January 6 Willard Hotel "War Room" Member Confirmed; Revelation May Implicate Trump's Department of Homeland Security in the Insurrection*, Proof on Substack (June 14, 2021), https://sethabramson.substack.com/p/breaking-news-sixth-january-6-willard; Michael Farris, *Christina Bobb #223*, Coffee and a Mic (Jan. 12, 2021), https://player.fm/series/coffee-and-a-mike/christina-bobb-223.

[16] Sarah Mimms, *Pro-Trump OAN Reporters Are Blatantly Raising Money For A Bogus Election "Audit" In Arizona*, BuzzFeed News (May 18, 2021), https://www.buzzfeednews.com/article/sarahmimms/arizona-election-results-oan-reporters-fundraising.

[17] Sidney Powell, https://www.sidneypowell.com/shop (last visited Aug. 5, 2021).

[18] Op. & Order at 34, *King v. Whitmer*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

[19] Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].

[20] *Id.*

capacity sought to have President Trump pardon him. President Trump pardoned Flynn on November 25, 2020—on literally the same day that Powell filed the first of her baseless lawsuits challenging the 2020 Presidential Election results.[21] (According to Powell, President Trump himself told her the news that the pardon was forthcoming.)[22] OAN repeatedly hosted and replayed Powell on its programming in the weeks and months following the 2020 Presidential Election to promote falsehoods about Dominion. As a result of Powell's repeated lies about Dominion and her frivolous election fraud lawsuits, she currently faces sanctions in Michigan.[23] During a hearing on the sanctions motion, the presiding federal judge observed that the "volume" of Powell's purported evidence did not "equate with legitimacy or veracity" and that Powell had submitted "fantastical" evidence in support of her claims.

24.     Rudolph Giuliani is the former mayor of New York City who has more recently found work as a YouTube podcast host, a radio show host, and an attorney to President Donald Trump and the Trump Campaign. Giuliani never signed any complaint concerning the 2020 election—whether for the Trump Campaign or anyone else—that contained any allegations about Dominion. OAN broadcast false statements by Giuliani on its programming in the weeks following the 2020 Presidential Election to promote falsehoods about Dominion. On June 24, 2021, New York suspended Giuliani's law license for making "***knowing*** false and misleading factual

---

[21] Spencer S. Hsu & Ann E. Marimow, *Michael Flynn judge says pardon doesn't mean ex-national security adviser is innocent*, Wash. Post (Dec. 8, 2020), https://www.washingtonpost.com/local/legal-issues/michael-flynn-case-dismissed/2020/12/08/31abb5de-0975-11eb-a166-dc429b380d10_story.html.

[22] https://talkingpointsmemo.com/news/trump-announces-pardon-for-mike-flynn

[23] Brent Kendall & Alexa Corse, *Trump 2020 Election Lawsuits Lead to Requests to Discipline Lawyers*, Wall St. J. (May 9, 2021, 10:00 AM), https://www.wsj.com/articles/trump-2020-election-lawsuits-lead-to-requests-to-discipline-lawyers-11620568801.

statements to support his claim that the presidential election was stolen from his client [Donald Trump]."[24] On July 7, 2021, Washington, D.C. suspended Giuliani's law license as well.[25]

25.    Michael Lindell is the founder and CEO of My Pillow, Inc. ("MyPillow"),[26] one of OAN's biggest sponsors. Beginning in 2004, when Lindell founded the MyPillow company, Lindell personally starred in MyPillow's infomercials, which claimed that MyPillow would help people suffering from fibromyalgia, insomnia, migraines and headaches, sleep apnea, snoring, TMJ, and restless leg syndrome.[27] In 2016, prosecutors alleged that these claims were "untrue or misleading."[28] Rather than defend the truthfulness of MyPillow's claims in court, Lindell opted to pay $995,000 in civil penalties.[29] Similarly, the Better Business Bureau revoked the accreditation of MyPillow and lowered its rating to "F" based on a pattern of complaints by customers.[30] In the first three quarters of 2020, MyPillow spent more than $62 million on TV ads, with nearly 99% of it going to cable channels like OAN.[31]

---

[24]    Order, *In re Giuliani*, No. 2021-00506 (N.Y. Sup. Ct. June 24, 2021), https://www.nycourts.gov/courts/ad1/calendar/List_Word/2021/06_Jun/24/PDF/Matter%20of%20Giuliani%20(2021-00506)%20PC.pdf; Jim Mustian, *New York Court Suspends Rudy Giuliani's law license*, Associated Press (June 24, 2021), https://apnews.com/article/rudy-giuliani-new-york-law-license-suspended-c67f4504a22f8642d6096f29e3a5c51e.

[25] Katelyn Polantz, *Rudy Giuliani suspended from practicing law in Washington, DC*, CNN (July 7, 2021), https://www.cnn.com/2021/07/07/politics/rudy-giuliani-suspended-law-washington/index.html.

[26] *Mike's Story*, My Pillow, https://www.mypillow.com/mikes-story (last visited Aug. 5, 2021).

[27] *See* Complaint, *California v. MyPillow, Inc.*, No. HG16836619 (Ca. Super. Ct., Alameda Cty. Oct. 26, 2016).

[28] *Id.*

[29] *See* Final Judgment, *California v. MyPillow, Inc.*, No. HG16836619 (Ca. Super. Ct., Alameda Cty. Oct. 31, 2016).

[30] *My Pillow*, Better Business Bureau, https://www.bbb.org/us/mn/chaska/profile/pillows/my-pillow-inc-0704-96152336 (last visited Aug. 5, 2020).

[31] Tiffany Hsu, *As Corporate America Flees Trump, MyPillow's C.E.O. Stands by Him*, N.Y. Times, https://www.nytimes.com/2021/01/12/business/media/mypillow-mike-lindell-trump.html (Feb. 22, 2021).

26.     Lindell has been called "one of the most prominent peddlers of bogus conspiracy theories" about the 2020 election, including the lies about Dominion.[32] Mike Lindell has used at least 30 hours of OAN airtime to broadcast lies about Dominion through his "documentaries" Absolute Proof, Scientific Truth, Absolute Interference, and Absolutely 9-0. OAN knowingly broadcast lies about Dominion to a global audience by inviting Lindell on the air, where it knew he would repeat those lies. OAN and Lindell began with Absolute Proof, a two-hour "documentary" centered on spreading lies about Dominion, which OAN aired 13 times on its network over a span of four days.[33] And Lindell has continued to spread these lies—working in tandem with OAN—even after Dominion filed a defamation lawsuit against him on February 22, 2021, in this Court.[34] Lindell has lied about Dominion rigging the election on the very footsteps just outside of this Court[35] and promised his supporters that Trump will be reinstated as President by "August 13."[36]

27.     Ron Watkins is the 33-year-old former administrator of 8chan (now 8kun), who some consider the "Q" of QAnon. Regardless whether Q in fact was Watkins, 8chan was the exclusive venue for many posts by Q. Q has claimed that, based on inside knowledge within the Trump administration, a cabal of Satanic pedophiles exists that is conspiring to take down American democracy, including Hillary Clinton and Chief Justice John Roberts. OAN and OAN's

---

[32] Matt Gertz, *Pillow Fight: The Right-Wing Media Competition for Mike Lindell's Affection (and Money)*, Media Matters for America (Feb. 5, 2021), https://www.mediamatters.org/fox-news/pillow-fight-right-wing-media-competition-mike-lindells-affection-and-money.

[33] *Id.*

[34] *US Dominion Inc. v. My Pillow, Inc.*, No. 21-cv-00445 (D.D.C. Feb. 22, 2021).

[35] *Breaking News Mike Lindell uncut in front of the Courthouse MustangMedic asking questions*, YouTube (June 25, 2021), https://www.youtube.com/watch?v=kUOo5cNPirU.

[36] Mia Jankowicz, *Mike Lindell Set August 13 as the Date in His Bonkers Theory that Trump Will Be Reinstated as President*, Insider (July 6, 2021, 4:53 AM), https://www.businessinsider.com/mike-lindell-claims-august-13-trump-reinstatement-2021-7.

Chanel Rion hosted Watkins as an alleged data specialist on November 14, 2020, to peddle lies about Dominion.

28.     Ed Solomon was portrayed by OAN on its network as an alleged "expert mathematician." In reality, however, he is a convicted felon who, at the time he was interviewed by OAN, was working as an "installer" at a swing set construction company in Long Island.

29.     Patrick Byrne is the former CEO of the internet discount retailer Overstock.com, and is yet another self-styled "expert" whom OAN brought on its network to lie about Dominion and the 2020 election. Byrne has a long prior history of fabricating fantastical stories without ever providing a shred of evidence to support their truth, in order to serve his own personal interests. For instance, Byrne was previously ordered to pay an approximately $1 million defamation judgment for falsely accusing a Canadian businessman of being connected to "Osama bin Laden's favorite financier," the Colombian drug cartel, the Russian mafia, and al Qaeda's Golden Chain.[37] The court concluded that Byrne and his collaborators had "engaged in a calculated and ruthless campaign to inflict as much damage on [his victim's] reputation as they could achieve. It is clear on the evidence that their intention was to conduct a vendetta in which the truth … was of no consequence. Their mission was to expose what they conceive to be corrupt business practices … [Their victim] became a convenient means to that end, even when he himself could not be demonstrated to be corrupt."[38]

---

[37] *Nazerali v. Mitchell*, No. S116979, 2016 BCSC 810, Corrected Judgment at 97 (Sup. Ct. of British Columbia May 6, 2016), available at https://www.canlii.org/en/bc/bcsc/doc/2016/2016bcsc810/2016bcsc810.pdf.
[38] *Id.*

30.     Byrne has publicly admitted that he had already committed back in **_August 2020_** to the narrative that the 2020 Presidential Election was going to be rigged.[39] In public media appearances, Byrne refers to this narrative as the "last act" of a fantastical storyline that he first started to spread in August 2019,[40] after it was revealed that he had had a romantic affair with the now-notorious Russian agent, Maria Butina, who was sentenced to 18 months in prison after being indicted by federal prosecutors for trying to infiltrate powerful political circles in the United States at the direction of the Russian government.[41]

31.     This storyline began when Byrne abruptly resigned his board seat and position as CEO at Overstock in August 2019 after his affair with Butina was revealed, and Overstock found itself unable to renew its insurance policy as long as Byrne remained in charge.[42] In an apparent attempt to rationalize his relationship with Butina—to portray himself as a patriotic American rather than an asset of a Russian agent—Byrne began to claim that the FBI had directed him to

---

[39] Patrick Byrne, *How DJT Lost the White House, Introduction: Why I Was Involved Before November 3 & What I Learned Because I Was (1.3)*, Deep Capture (Jan. 24, 2021), https://www.deepcapture.com/2021/01/how-djt-lost-the-white-house-introduction-why-i-was-involved-before-november-3-and-what-i-learned-by-doing-so/; *Tech Millionaire Funds Hacking Team 2020 Election was 100% Rigged*, OAN (Nov. 20, 2020), *previously available at* https://www.oann.com/tech-millionaire-funds-hacking-team-20-election-100-rigged/ [https://app.criticalmention.com/app/#clip/view/67795b8f-2934-4361-81bd-710b2250575a?token=37f52d99-127d-4b48-b8dc-e5e99babfaaa]; *Patrick Byrne: Dissecting The Electronic Steal*, Operation Freedom (Nov. 24, 2020), www.youtube.com/watch?v=5fs3tKtmiEA.

[40] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

[41] Michael Corkery, *Overstock C.E.O. Takes Aim at 'Deep State' After Romance With Russian Agent*, N.Y. Times (Aug. 15, 2019), https://www.nytimes.com/2019/08/15/business/overstock-paul-byrne-maria-butina-affair.html.

[42] Abha Bhattarai, *Inside Overstock.com, where a firebrand CEO and 'Deep State' intrigue took center stage*, Washington Post (Sept. 27, 2019), https://www.washingtonpost.com/business/2019/09/26/inside-overstockcom-where-firebrand-ceo-deep-state-intrigue-took-center-stage/.

engage in a romantic relationship with Butina.[43] This is a claim that former FBI Director James Comey said was "'ridiculous,'" adding "'[t]he FBI doesn't work that way.'"[44] Similarly, another former FBI agent with knowledge of FBI procedures called Byrne's claims "absolutely outrageous and impossible to believe," and "maybe he is going to be facing some serious criminal problems and now he's trying to create a smokescreen. . . . It's absolutely ludicrous."[45]

32.     As if this storyline were not strange enough, Byrne would later publicly claim that the FBI eventually told him to quit his affair with Butina, and instead asked him to facilitate an $18 million bribe of Hillary Clinton, which Byrne claims to have done on January 14, 2016.[46] Byrne made these claims publicly as early as October 6, 2020, on his personal blog, deepcapture.com,[47] and then added to the claims in later public media appearances. The $18 million bribe was supposedly (according to Byrne) part of a plot by then-President Obama to ensure that he could "control" Clinton once she became President.[48] Byrne claims the "operation" was called "Project Snowglobe,"[49] and that he has seen "the bank record" to show the bribe was

---

[43] David Shortell and Caroline Kelly, *Former officials deny ex-CEO's claim FBI asked him to pursue Maria Butina*, CNN (Aug. 23, 2019), https://www.cnn.com/2019/08/23/politics/patrick-byrne-maria-butina-fbi-relationship-cnntv/index.html.

[44] *Id.*

[45] *Former FBI Special Agent John Iannarelli Says Patrick Byrne's Claims Are "Impossible to Believe,"* Fox News (Aug. 23, 2019), https://video.foxnews.com/v/6076376906001#sp=show-clips.

[46] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

[47] Patrick Byrne, *The Hillary Clinton Bribery-&-Blackmail & Maria Butina Intoxicate-Rape-&-Murder Deep State Stings Finale*, Deep Capture (Oct. 6, 2020), https://www.deepcapture.com/2020/10/finale-the-deep-states-hillary-clinton-bribery-blackmail-sting-the-maria-butina-rape-murder-gambit/.

[48] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

[49] *Id.*

paid.[50] In his nonsensical storyline, Byrne further claims that President Obama's ultimate goal was to ensure that then-First Lady Michelle Obama would serve as President after Clinton.[51] Also according to Byrne, this was the *second* bribe accepted by Hillary Clinton—a follow-up to an initial $20 million bribe Clinton had supposedly already accepted from Turkey by the time Byrne claims the FBI enlisted him in the "sting."[52] And in another ridiculous twist, Byrne claims that he used information about proper entrapment methodologies that he learned from his "FBI handlers" to entrap former leaders at the CIA and FBI, including former FBI Director James Comey and former CIA Director John Brennan, into approving the rape and murder of Maria Butina (which Byrne then declined to carry out), in some sort of scheme to give Byrne leverage over those officials.[53] Finally, according to Byrne, former Attorney General William Barr "knows" about "Project Snowglobe," and the entire plot will eventually be disclosed in the report of DOJ special counsel John Durham's investigation into the origins of the FBI's Russia investigation—because, as Byrne claims, "I know what's in the Durham Report."[54]

---

[50] *Dr Corsi NEWS 12-24-20: Patrick Byrne Explains Trump Path To Victory*, Rumble (Dec. 24, 2020), https://rumble.com/vc5kbh-dr-corsi-news-12-24-20-patrick-byrne explains-trump-path-to-victory.html.

[51] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

[52] *Id.*

[53] Patrick Byrne, *The Hillary Clinton Bribery-&-Blackmail & Maria Butina Intoxicate-Rape-&-Murder Deep State Stings Finale*, Deep Capture (Oct. 6, 2020), https://www.deepcapture.com/2020/10/finale-the-deep-states-hillary-clinton-bribery-blackmail-sting-the-maria-butina-rape-murder-gambit/.

[54] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

33.    Byrne has publicly claimed that this set of alleged experiences somehow tipped him off that the 2020 election would be rigged back in August 2020,[55] at which time he set out to hire a group he calls the "Bad News Bears" to "reverse-engineer" the supposed election-rigging to come.[56] (Elsewhere, Byrne has claimed he "knew" since October 2018 that the 2020 Presidential Election was going to be rigged.)[57] As part of his "Bad News Bears" efforts, Byrne takes credit for personally funding and working closely with Russell Ramsland, who was peddling lies back in 2018 about a Dallas congressional election—lies about a competitor of Dominion's whose equipment was used in that election, that were debunked but that ended up being very similar to the lies spread about Dominion in the 2020 Presidential Election. To fit his preconceived narrative, Byrne falsely accused Dominion of rigging the 2018 Dallas election, even though Dominion's machines were not used in the Dallas election, and then transposed those same discredited theories onto Dominion and the 2020 Presidential Election. Byrne has also boasted about working closely with Ramsland's team to create a so-called "forensic report" about the 2020 vote in Antrim County,

[55] Patrick Byrne, *How DJT Lost the White House, Introduction: Why I Was Involved Before November 3 & What I Learned Because I Was (1.3)*, Deep Capture (Jan. 24, 2021), https://www.deepcapture.com/2021/01/how-djt-lost-the-white-house-introduction-why-i-was-involved-before-november-3-and-what-i-learned-by-doing-so/; *Tech Millionaire Funds Hacking Team 2020 Election was 100% Rigged*, OAN (Nov. 20, 2020), *previously available at* https://www.oann.com/tech-millionaire-funds-hacking-team-20-election-100-rigged/ [https://app.criticalmention.com/app/#clip/view/67795b8f-2934-4361-81bd-710b2250575a?token=37f52d99-127d-4b48-b8dc-e5e99babfaaa]; *Patrick Byrne: Dissecting The Electronic Steal*, Operation Freedom (Nov. 24, 2020), www.youtube.com/watch?v=5fs3tKtmiEA. *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.
[56] *See* Patrick Byrne, *How DJT Lost the White House, Introduction: Why I Was Involved Before November 3 & What I Learned Because I Was (1.3)*, Deep Capture (Jan. 24, 2021), https://www.deepcapture.com/2021/01/how-djt-lost-the-white-house-introduction-why-i-was-involved-before-november-3-and-what-i-learned-by-doing-so/.
[57] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

Michigan. That report falsely accused Dominion of switching votes in Antrim County to Joe Biden from Donald Trump, and Byrne and others published and promoted that false report to spread further disinformation and lies about Dominion (as discussed in more detail below).

34.     Byrne's partnership with other promoters of the false Dominion election fraud narrative has not been limited to Ramsland. For instance, Byrne has also boasted of having sent documents and information to Mike Lindell after Byrne lost access to President Trump in late 2020. And Byrne served as CEO of Defending the Republic, the organization launched by Sidney Powell to help fund her own efforts to falsely accuse Dominion of rigging the 2020 election.

35.     Using the same playbook that was used for the false "forensic report" in Antrim County, Byrne has partnered with OAN, Sidney Powell, and others to fund the sham election "audit" in Arizona. In addition, he has published a book, *The Deep Rig*, and a feature film of the same name, in which he uses some of the same false and manufactured "evidence" he has presented in his blog posts and media appearances to further promote lies about Dominion rigging elections.

36.     Finally, apparently in anticipation of the U.S. Supreme Court declining to hear a case seeking to throw out the 2020 election results, Byrne falsely claimed in early December 2020 that Chief Justice John Roberts "may be compromised," because his name according to Byrne appears on the flight manifest of the notorious Jeffrey Epstein's private jet.[58] (Byrne has also implicated several U.S. agencies in allegedly assassinating Epstein.[59]) And in yet another of his fantastical lies, Byrne has falsely asserted that DNC staffer Seth Rich had been murdered not as part of a robbery, but because Rich's "role" "in the DNC" had "put him in a position to have known

---

[58] Patrick Byrne & Dave Janda, *Patrick Byrne: Dissecting The Election Fraud*, Operation Freedom (Dec. 9, 2020), available at https://rumble.com/vbpgi7-patrick-byrne-dissecting-the-election-fraud.html.
[59] *Id.*

. . . that the Dominion servers had been used in the [2016 Democratic] primaries to steal from Bernie [Sanders] to give to Hillary [Clinton]"; according to Byrne, "[t]hey could not have let a guy who had the kind of knowledge that we're now talking about, to walk around. They couldn't let him walk around if he was not on board."[60]

37.     Joe Oltmann is a Twitter-banned "political activist" who has devoted himself to de-masking alleged Antifa members because he believes they want to "behead or harm other Americans."[61] Oltmann appeared on OAN to falsely claim that he had "infiltrated Antifa" and witnessed a Dominion executive supposedly assuring "Antifa" that he would rig the election. Oltmann has never provided any evidence of that call or any other proof that anyone at Dominion has ever made such claims.

38.     Russell Ramsland is a failed Republican congressional candidate and conspiracy theorist who has publicly claimed, among other things, that George Soros—who was born in 1930—helped form the "Deep State" in Nazi Germany in the 1930s along with President George H.W. Bush's father, the Muslim Brotherhood, and "leftists."[62] Well before the 2020 election, Ramsland had publicly peddled a false story about the 2018 U.S. congressional election in Dallas, Texas, and the 2019 gubernatorial election in Kentucky, falsely claiming that those elections had been rigged by voting machines with links to Smartmatic and using Venezuelan election-stealing software controlled by a George Soros operative, and that votes had been sent to

---

[60] *Patrick Byrne: Blowing Open the Election Steal*, Operation Freedom (Dec. 8, 2020), https://www.youtube.com/watch?v=8lGdRb8IZKA (Ex. 365).

[61] Erik Maulbetsch, *Dominion Election Conspiracy Originated in Part During Conservative's Hunt for 'Antifa Journalists'*, Colorado Times Recorder (Jan. 14, 2021), https://coloradotimesrecorder.com/2021/01/dominion-election-conspiracy-originated-in-part-during-conservatives-hunt-for-antifa-journalists/33652/.

[62] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sep. 20, 2018), https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories.

CIA-funded databases in Spain where they were changed and sent back to the United States. Ramsland's false claims went nowhere. Even the Republican Attorney General of Texas, Ken Paxton—a staunch ally of President Trump—rejected Ramsland's claims about the 2018 Dallas congressional election, explaining in a public statement: "In this case, after a thorough investigation by our office with the assistance of election systems experts, cybersecurity experts, and the FBI, we found the claims in this case were unverifiable, and an audit of the voting records confirmed the outcome of the election."[63]

39.     Despite Ramsland's claims having been debunked, Patrick Byrne, Sidney Powell, Rudolph Giuliani and others took the lies Ramsland had tried to peddle in 2018 and promoted them to a massive global audience, working with Newsmax, OAN, Fox and other media outlets to give them far greater reach than they had before.  Some (including Byrne) even took it one step further, revising Ramsland's false story about the Dallas 2018 congressional election to promote the new lie that it was Dominion that had rigged that 2018 election—even though Dominion machines were not used in that election.

40.     Ramsland filed numerous affidavits recycling and repurposing his absurd 2018 election fraud stories in support of lawsuits brought by Sidney Powell and others seeking to throw out 2020 presidential election results in several states that Joe Biden won. No court found any of Ramsland's affidavits submitted in those cases to have any merit, and in fact Ramsland was judicially determined to have provided "materially false information" in support of his claims of

---

[63] Emma Brown, Aaron C. Davis, Jon Swaine and Josh Dawsey, *The making of a myth* (May 9, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-election-fraud-texas-businessman-ramsland-asog/.

vote manipulation[64] in one of these cases when he referenced and cited locations in Minnesota when alleging voter fraud in Michigan.[65]

41.     Ramsland's crowning "achievement" in the 2020 election, however, was when he was brought in by Patrick Byrne, Rudolph Giuliani and others to write up a purportedly independent "report" on the election results in Antrim County, Michigan, that fed the preconceived Dominion election fraud narrative by falsely claiming that Dominion machines were designed to and did switch votes from Trump to Biden. Despite being falsely touted as the conclusions of an independent "audit," the report was from the start a transparent attempt by Ramsland, at the behest of Byrne and Giuliani others, to falsely fit what actually happened in Antrim County into the preconceived false election fraud narrative. Antrim County officials quickly explained that Ramsland's Antrim County report was "riddled with false and unsupported claims, baseless attacks, and incorrect use of technical terms,"[66] and the former acting director of the Election Assistance Commission's Voting System Testing and Certification program—who is actually an expert in election voting systems—said the report demonstrated a "grave misunderstanding" of Antrim County's voting system and "a lack of knowledge of election technology and process."[67] Michigan's Attorney General and Secretary of State issued a joint statement that Ramsland's report

---

[64] Rule to Show Cause, *Page v. Oath Inc.*, No. S20C-07-030 (Del. Super. Ct. Dec. 18, 2020).

[65] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/.

[66] *See* Ali Swenson, *Report spreads debunked claims about Dominion machines in Michigan county*, AP News (Dec. 15, 2020), https://apnews.com/article/fact-checking-afs:Content:9847904839.

[67] *See* Todd Spangler, *Former election security chief for Trump knocks down Antrim County report*, The Detroit Free Press (Dec. 16, 2020), https://www.freep.com/story/news/politics/elections/2020/12/16/antrim-county-report-debunked-by-former-trump-election-official/3923499001/.

was "critically flawed, filled with dramatic conclusions without any evidence to support them."[68] And the Republican-led Michigan Senate Oversight Committee released a 55-page report, which stated that "The Committee found no evidence of widespread or systemic fraud in Michigan's prosecution of the 2020 election" and specifically called out individuals like Ramsland for their false claims about systemic fraud in Michigan, stating that they "have been utilizing misleading and false information about Antrim County to raise money or publicity for their own ends" and recommending that the Michigan Attorney General investigate such misconduct.[69] Nonetheless, knowingly or with reckless disregard for the truth, OAN broadcast this known peddler of lies and promoted his false Antrim County report to amplify its defamatory campaign against Dominion, conforming to the pre-conceived false narrative that Dominion had rigged the election.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy as to each Plaintiff exceeds $75,000.00, exclusive of interest and costs.

43.     This Court has personal jurisdiction over OAN pursuant to § 13-423 of the District of Columbia Code because OAN (i) transacted business within the District of Columbia, including by maintaining and operating a news bureau in the District of Columbia and its primary offices for covering the 2020 election in the District of Columbia; producing, reviewing, editing, and broadcasting programming from within the District of Columbia, including and specifically the

---

[68] *AG. SOS: Plaintiff's Report in Antrim County Election Lawsuit Demonstrates Lack of Credible Evidence in Widespread Fraud or Wrongdoing*, Michigan Dep't of Attorney General (Dec. 14, 2020), https://www.michigan.gov/ag/0,4534,7-359-92297_47203-547422--,00.html.

[69] Mich. S. Oversight Comm., Report on the November 2020 Election in Michigan (Apr 9, 2021), https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport.pdf.

programming featuring the defamatory statements at issue in this case; employing the specific D.C.-resident reporters who made many of the defamatory statements in the District of Columbia; and offering services to, broadcasting to, and maintaining television and digital platform subscribers in the District of Columbia; (ii) caused tortious injury by acts committed within the District of Columbia, including and specifically by making false and defamatory statements about Dominion on broadcasts within the District of Columbia; and (iii) caused tortious injury by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of Columbia.

44.     This Court has personal jurisdiction over Robert Herring, Sr. pursuant to § 13-423 of the District of Columbia Code because Robert Herring (i) transacted business within the District of Columbia, including supervising and exercising editorial control over broadcasting from within the District of Columbia, and supervising and directing OAN staff working in the District of Columbia; (ii) caused tortious injury by acts committed within the District of Columbia, including and specifically by knowingly participating in the making of false and defamatory statements about Dominion on broadcasts within the District of Columbia, including while supervising and exercising editorial control while present in the District of Columbia; and (iii) caused tortious injury by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of Columbia.

45.     This Court has personal jurisdiction over Charles Herring pursuant to § 13-423 of the District of Columbia Code because Charles Herring (i) on information and belief, based upon his Twitter and LinkedIn locations, is a resident of the District of Columbia; (ii) transacted business

within the District of Columbia, including supervising and exercising editorial control over broadcasting from within the District of Columbia, and supervising and directing OAN staff working in the District of Columbia; (iii) caused tortious injury by acts committed within the District of Columbia, including and specifically by knowingly participating in the making of false and defamatory statements about Dominion on broadcasts within the District of Columbia, including while supervising and exercising editorial control while present in the District of Columbia; and (iv) caused tortious injury by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of Columbia.

46. This Court has personal jurisdiction over Chanel Rion pursuant to § 13-423 of the District of Columbia Code because Rion (i) is a resident of the District of Columbia; (ii) transacted business within the District of Columbia, including broadcasting from within the District of Columbia; (iii) caused tortious injury by acts committed within the District of Columbia, including and specifically by making false and defamatory statements about Dominion on broadcasts within the District of Columbia; and (iv) caused tortious injury by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of Columbia.

47. This Court has personal jurisdiction over Christina Bobb pursuant to § 13-423 of the District of Columbia Code because Bobb (i) is a resident of the District of Columbia; (ii) transacted business within the District of Columbia, including broadcasting from within the District of Columbia; (iii) caused tortious injury by acts committed within the District of Columbia, including and specifically by making false and defamatory statements about Dominion on broadcasts within the District of Columbia; and (iv) caused tortious injury by acts committed

outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of Columbia.

48. Requiring Defendants to litigate these claims in the District of Columbia does not offend traditional notions of fair play and substantial justice and is permitted by the Due Process Clause of the United States Constitution. Dominion's claims arise in part from defamatory statements that the Defendants made about Dominion from within the District of Columbia. Defendants avail themselves of numerous privileges in the District of Columbia, including those set forth above.

49. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and, as discussed above, because Defendants are subject to the Court's personal jurisdiction in this District.

## **FACTUAL ALLEGATIONS**

### *John Poulos Founds and Builds a Technology Company That Allows Local Election Officials to Easily Audit Paper Ballots*

50. Until the defamatory attacks starting after the 2020 election, Dominion was a thriving voting technology company. In 2002, Dominion CEO John Poulos came up with an idea to help people with vision impairments vote independently on paper ballots, so he founded a business out of his basement in Toronto as Dominion Voting Systems Corporation. From the beginning, Dominion's objective has been accurate, transparent, and accessible elections. All Dominion systems are capable of producing paper records and are 100% auditable, with testing, reviews, audits, and recounts subject to oversight and verification by all political parties. Indeed, Dominion has been at the forefront of developing the technology to produce auditable paper records. Dominion was, until recently, one of the fastest-growing technology companies in North

America. While Dominion was known within the voting machine industry and supplied machines in 28 states, it was little-known to the public at large.

51.     As it grew, Dominion developed technology to solve many of the technical and voter-intent issues that came to light as a result of the 2000 election. Its systems are certified under standards promulgated by the U.S. Election Assistance Commission ("EAC"), which is located in Washington, D.C., reviewed and tested by independent testing laboratories accredited by the EAC, and were designed to be auditable and include a paper ballot backup to verify results.

52.     Dominion Voting Systems Corporation procured its first U.S. contract in July 2009, to provide voting machine technology to over 50 counties in the state of New York. After procuring that contract, Dominion Voting Systems Corporation established a New York office, hired 20 employees, set up a manufacturing supply in New York, and by the end of July, incorporated a subsidiary company, Dominion Voting Systems, Inc., in Delaware. Poulos voluntarily worked with the Committee on Foreign Investment in the United States ("CFIUS") to ensure it knew who he was and who was invested in Dominion. For the next several years, Dominion's systems were manufactured in the State of New York.

53.     In June 2010, Dominion relocated its headquarters to Denver, Colorado. Dominion continues to maintain an office and significant operations in New York to this day, and the State of New York remains Dominion's longest-standing and second most valuable customer (behind Georgia).

54.     Today, Dominion's business is organized as US Dominion, Inc. and its two wholly-owned subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.

55.     Dominion contracts with state and local governments to provide its voting systems and services in a majority of states across the country. Those contracts typically have multi-year

terms and range in value from tens of thousands of dollars to over a hundred million dollars, depending on the jurisdiction and scope of the contract. Given the nature of the U.S. election system and the voting services industry, Dominion's contracts have historically been long-term with high renewal rates. As of the 2020 election, Dominion had contracts to provide voting machine technology in 28 states including, for example, the more than 50 counties in New York.

56.     Dominion does not run elections—local election officials run them. Dominion voting machines are used by election officials to accurately tabulate votes from county-verified voters using a durable paper ballot controlled and secured by those local election officials. In other words, what Dominion voting machines do is ***count paper ballots***, and in that process ***create a fully auditable paper trail*** that allows for complete hand recounts to confirm and verify election results.

57.     By objective measures, the performance of Dominion's machines was a huge success in the 2020 election because they accurately counted the votes in literally thousands of different jurisdictions in challenging circumstances. Across the jurisdictions using Dominion voting machines—in the midst of a pandemic—hand audits conducted as part of the vote certification process repeatedly confirmed the accuracy of the Dominion machine vote tallies. As President Trump's own Attorney General William Barr stated, Dominion's machines were just "counting machine[s], and they save everything that was counted. So you just reconcile the two. There had been no discrepancy reported anywhere, and I'm still not aware of any discrepancy."[70]

---

[70] Jonathan D. Karl, *Inside William Barr's Breakup with Trump*, The Atlantic (June 27, 2021), https://www.theatlantic.com/politics/archive/2021/06/william-barrs-trump-administration-attorney-general/619298/.

### The Run-Up to the 2020 Presidential Election:
### OAN Establishes Itself as a Pro-Trump Network
### and Sees an Opening to Convert Fox Viewers

58.     Founded in 2013 by Robert Herring, Sr., OAN to this day promises its viewers "straight news, no opinion."[71] Leading up to and after Donald Trump's election to the presidency in 2016, OAN "rallied behind Mr. Trump," and "its coverage increasingly shifted to cheerleading on behalf of the president and his administration."[72] Trump took notice. On Twitter and at public events, Trump began promoting OAN "as a preferable alternative to Fox News."[73] In the cable news market, OAN was a new player, and it leaned into its symbiotic relationship with Trump to gain viewers. In 2019, the press called OAN "something of a surprise competitor for Trump's long-touted favorite and massive conservative mainstay, Fox News."[74]

59.     To attract even more viewers, OAN began airing even more content aligned with President Trump's views. OAN regularly airs specials and commercials honoring President Trump and publicizing his political stances. For example, in October 2019, OAN aired a "Special Report" with Correspondent Pearson Sharp that was described in the press as "30-minute commercial that presents cherry-picked pictures and talking points to tout how Trump is apparently leading the

---

[71] Marc Fisher, *An Inside Look at One America News, the Insurgent TV Network Taking 'Pro-Trump' to New Heights*, Wash. Post (July 5, 2017), https://www.washingtonpost.com/lifestyle/style/an-inside-look-at-one-america-news-the-insurgent-tv-network-taking-pro-trump-to-new-heights/2017/07/05/7475f0a4-4fa2-11e7-91eb-9611861a988f_story.html.

[72] Michael Grynbaum, *One America News, the Network That Spreads Conspiracies to the West Wing*, N.Y. Times (June 9, 2020), https://www.nytimes.com/article/oann-trump.html.

[73] *Id.*

[74] Ellen Cranley, *Trump Favorite One America News Has Been Called 'Paid Russian Propaganda' — This Is What Happened When I Watched It For A Week*, Business Insider (Oct. 28, 2019), https://www.businessinsider.com/one-america-news-donald-trump-news-network-2019-10.

most victorious administration in US history."[75] Another 48-minute OAN special titled "Trump: Legacy of a Patriot" is featured on oann.com and OAN's streaming platforms.[76]

60.     As one former OAN employee put it: "In short order, it became the rule — we run all favorable Trump stories, and we carry all Trump rallies live in their entirety."[77] This created a news network that was "tailored" to the Trump Presidency: "a platform to defend the president against his critics, air grievances against his opponents, and launch a whirlwind of misleading claims that feed a far-right 24-hour news cycle."[78]

61.     OAN's strategy worked. As OAN touted more and more President Trump-inspired content, President Trump continued to promote OAN on social media and at public events. In 2019, the year before the Presidential Election, OAN was "poised to take the spot of Trump's favorite" cable news network.[79]

62.     The election was a turning point for OAN. Prior to the 2020 Presidential Election, President Trump would occasionally criticize Fox for what he perceived as insufficient support, such as for Fox polls showing him behind in the Presidential race or Fox airing an interview with a Democrat. On January 28, 2020, President Trump tweeted, "So, what the hell has happened to @FoxNews. Only I know! Chris Wallace and others should be on Fake News CNN or MSDNC.

---

[75] *Id.*

[76] *Trump – Legacy Of A Patriot*, One America News Network (Jan. 20, 2021), https://www.oann.com/trump-legacy-of-a-patriot/.

[77] Alex Woodward, *Behind the scenes at OAN: The TV network where Trump is always right*, The Independent (Oct. 9, 2020), https://www.independent.co.uk/news/world/americas/us-election/oan-trump-chanel-rion-one-america-news-network-journalists-b860699.html.

[78] *Id.*

[79] Ellen Cranley, *Trump Favorite One America News Has Been Called 'Paid Russian Propaganda' — This Is What Happened When I Watched It For A Week*, Business Insider (Oct. 28, 2019), https://www.businessinsider.com/one-america-news-donald-trump-news-network-2019-10.

How's Shep Smith doing? Watch, this will be the beginning of the end for Fox, just like the other two which are dying in the ratings."[80]

63.     "Shep Smith" refers to Shepard Smith, a former Fox anchor who left the network in 2019 in the middle of his long-term contract after criticism from Trump.

64.     As the 2020 Presidential Election approached, President Trump repeatedly asserted that either he would win, or the election would be stolen from him via fraud. In President Trump's own words: "the only way we're gonna lose this election is if the election is rigged"[81] and there "is massive fraud."[82]

65.     President Trump also drew a line in the sand: if he lost, his supporters must either agree with him that the election was rigged or else face the consequences. For example, President Trump would later fire Christopher Krebs, whom he had appointed as director of the Cybersecurity and Infrastructure Security Agency ("CISA") in charge of overseeing online security for the election, when Krebs dared to rebut President Trump's claims of fraud in the 2020 election.[83] Later, Trump Campaign attorney Joe DiGenova stated that Krebs "should be drawn and quartered.

---

[80] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 28, 2020, 10:44 AM), *previously available at* https://twitter.com/realdonaldtrump/status/1222183788924502017 [https://www.thetrumparchive.com].

[81] Morgan Chalfant, *Trump: "The only way we're going to lose this election is if the election is rigged"*, The Hill (Aug. 17, 2020, 7:22 PM), https://thehill.com/homenews/administration/512424-trump-the-only-way-we-are-going-to-lose-this-election-is-if-the.

[82] The Hill, *Trump: "The only way we can lose in my opinion is massive fraud"*, YouTube (Oct. 26, 2020), https://www.youtube.com/watch?v=Rt6nCZRKChE.

[83] Christopher Krebs, *Opinion: Trump fired me for saying this, but I'll say it again: The election wasn't rigged*, Wash. Post (Dec. 1, 2020, 5:23 PM), https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html.

Taken out at dawn and shot."[84] Trump also raised firing Attorney General William Barr in a December 12, 2020 meeting,[85] just days after Barr publicly announced that the Department of Justice had found "no voter fraud that could overturn election."[86] Three days after that meeting, Barr resigned.[87] Other Republicans and Trump supporters like Georgia Secretary of State Raffensperger and Georgia Governor Kemp who dared to defy Trump and acknowledge the true reality—that President Trump lost the 2020 election fair and square—likewise felt Trump's public wrath.[88]

66.     At the same time that President Trump was laying the groundwork for a preconceived "fraud" narrative to excuse an election loss, news organizations—including OAN—widely reported that election officials were expecting record-shattering mail-in voting because of concerns over the ongoing coronavirus pandemic. News organizations—again including OAN—also reported that this mail-in voting was widely expected to be much more heavily weighted in favor of Democrats than the overall electorate, in significant part because prominent Republicans, including President Trump, were consistently encouraging supporters to avoid voting by mail and instead vote in person on Election Day.

---

[84] Jim Acosta et al., *Trump attorney issues call for violence against truth-telling former election cybersecurity official*, CNN (Dec. 1, 2020), https://www.cnn.com/2020/11/30/politics/joe-digenova-attorney-trump-campaign-chris-krebs-violence/index.html.
[85] *Id.*
[86] Anthony Zurcher, *US attorney general finds 'no voter fraud that could overturn election'*, BBC (Dec. 2, 2020), https://www.bbc.com/news/world-us-canada-55153366.
[87] Noah Feldman, *Bill Barr Quit. What Finally Spooked Him?*, Bloomberg (Dec. 15, 2020), https://www.bloomberg.com/opinion/articles/2020-12-15/william-barr-has-resigned-what-finally-spooked-him.
[88] Amara Walker, *Family of Georgia's Secretary of State Was Still Getting Death Threats Months After Election, Report Says*, CNN (June 11, 2021, 8:46 PM), https://www.cnn.com/2021/06/11/politics/georgia-raffensperger-family-death-threats-election/index.html; Jacob Knutson, *Georgia Gov. Kemp Says Pro-Trump Conspiracy Theorists Have Threatened His Family*, Axios (Dec. 18, 2020), https://www.axios.com/georgia-gov-kemp-trump-death-threats-19be75f5-0b03-417f-b55a-0a72ec9ac193.html.

67.    On Election Day morning—before any votes had even been tallied—OAN broadcast a segment featuring Sidney Powell, in which Powell claimed that Democrats were trying to "steal the vote" from Trump and that "they ha[d] developed a computer system to alter votes electronically."[89]

68.    In other words, well before any false claim that Dominion machines had switched votes, OAN predicted and understood precisely what would actually happen during the first week of November 2020: early vote tallies would lean in favor of then-President Trump, whereas later vote tallies would favor now-President Joe Biden. However, OAN would, with the help of those like Powell, flip the script on that reality to push its preconceived narrative that Biden's predicted comeback was the result of Dominion rigging the election.

69.    OAN seized a prime opportunity to brag about and capitalize on its burgeoning status as the favored network of President Trump and his loyalists on Election Day when Fox News became the first major news network to project that President Trump had lost the battleground state of Arizona.

70.    President Trump was reportedly "fuming" when he learned that Fox had called Arizona for Biden, and his camp was quick to turn against Fox. Almost immediately after Fox's Arizona call, President Trump's son-in-law Jared Kushner called Fox founder and Chairman Rupert Murdoch to complain. Less than thirty minutes after Fox had called Arizona, President Trump's political advisor Jason Miller attacked Fox on Twitter, writing: "@FoxNews is a complete outlier in calling Arizona, and other media outlets should not follow suit. There are still

---

[89] *Sidney Powell: Dems will use 'lawfare' to alter election*, One America News Network (Nov. 3, 2020), available at https://www.youtube.com/watch?v=Vh5U_6apzvI&feature=emb_logo.

1M+ Election Day votes out there waiting to be counted — we pushed our people to vote on Election Day, but now Fox News is trying to invalidate their votes!"[90]



71.    Republican National Committee spokesperson Liz Harrington similarly attacked Fox on Twitter: "Call GA, NC, and TX, you HACKS! Retract AZ!"[91]

72.    This changed media dynamic—that Fox was losing viewers and that its rivals were trying to capitalize—was evident immediately. The morning after the election, Newsweek reported: "Conservatives and the Trump administration have railed against Fox News after the

---

[90]    Jason Miller (@JasonMillerinDC), Twitter (Nov. 3, 2020, 11:47 PM), https://twitter.com/JasonMillerinDC/status/1323849305917186050.
[91]    Liz Harrington (@realLizUSA), Twitter (Nov. 3, 2020, 11:52 PM), https://twitter.com/realLizUSA/status/1323850485699432450.

network called Arizona for Joe Biden."[92] As was widely reported, Fox News was "facing real, sustained competition from the right," including from OAN, "for the first time in its history."[93]

**November 5-7, 2020:**
**Independent Evidence Confirms an Accurate Count**
**Even as False Claims of Election Fraud Begin to Emerge**

73.     As it became evident in the days after the election that President Trump might lose, false (though vague) claims of election fraud began to emerge. At this early point, these claims did not yet expressly connect Dominion to the false allegations.

74.     The media began to widely report that the preconceived narrative about election fraud had not come true—and that any suggestions otherwise were based on misinformation. Thus, before Fox, OAN, or anyone else began broadcasting defamatory false statements about Dominion, OAN knew that no credible claim of fraud existed.

75.     As early as November 5, the *Wall Street Journal* reported about the "misinformation about vote counting" that was "coming from prominent public figures with massive followings" and the "wild allegations" that "the election is being stolen."[94] These false conspiracy theories led Facebook "to limit the spread of false and possibly dangerous content," taking down the "Stop the Steal" group that had amassed hundreds of thousands of members

---

[92] Emma Nolan, *Conservatives Turn Against Fox News Over Election Coverage, Change Channel to Newsmax*, Newsweek (Nov. 4, 2020, 3:55 AM), https://www.newsweek.com/fox-news-arizona-biden-filpped-newsmark-trump-1544688.

[93] Alex Shepard, *Fox News Is in Trouble*, The New Republic (Dec. 10, 2020), https://newrepublic.com/article/160505/fox-news-met-match.

[94] Jeff Horwitz et al., *Facebook Imposes Limits on Election Content, Bans 'Stop the Steal' Group*, Wall St. J. (Nov. 5, 2020, 10:26 PM), https://www.wsj.com/articles/facebook-takes-down-group-organizing-protests-of-vote-counting-11604603908.

around false claims of election fraud.[95] The article also noted that CISA "tweeted earlier Thursday about the robust safeguards in place to ensure a fair and accurate election."[96]

76.     Even the Trump Administration made clear early on that no election fraud took place. That same day of November 5, CISA posted a fact check in its "Election Security Rumor vs. Reality" section to debunk the "rumor" that a "bad actor could change election results without detection." Instead, CISA stated: "Reality: Robust safeguards including canvassing and auditing procedures help ensure the accuracy of official election results."[97]

> ✔️ **Reality: Robust safeguards including canvassing and auditing procedures help ensure the accuracy of official election results.**
>
> ❌ Rumor: A bad actor could change election results without detection.

CISA then stated: "**Get the Facts**: The systems and processes used by election officials to tabulate votes and certify official results are protected by various safeguards that help ensure the accuracy of election results. These safeguards include measures that help ensure tabulation systems function as intended, protect against malicious software, and enable the identification and correction of any irregularities." And CISA then explained in detail that "[e]very state has voting system safeguards to ensure each ballot cast in the election can be correctly counted" and "[e]very state also has laws and processes to verify vote tallies before results are officially certified," including "robust chain-of-custody procedures, auditable logs, and canvass processes. The vast majority of votes cast in this election will be cast on paper ballots or using machines that produce a paper audit trail, which

---

[95] *Id.*
[96] *Id.*
[97] *Election Sec. Rumor vs. Reality Post Election*, U.S. Cybersecurity & Infrastructure Sec. Agency (Nov. 5, 2020), https://www.cisa.gov/rumorcontrol#rumor17.

allow for tabulation audits to be conducted from the paper record in the event any issues emerge with the voting system software, audit logs, or tabulation."[98]

77.     State and local officials likewise released statements confirming that the vote tallies were accurate and that the election was not rigged. On November 6, just days after the election, Michigan Secretary of State Jocelyn Benson issued a statement in response to "false claims made by Republican National Committee chairwoman Ronna McDaniel" that Dominion machines had malfunctioned in Antrim County, Michigan—a jurisdiction that used Dominion voting machines for the election. In the original unofficial count, user error caused a mistaken vote count in Antrim County that was quickly corrected and was not due to the Dominion machines—Dominion's tabulation of votes in Antrim County were in fact accurate right from the very first tabulation.[99] Benson's statement made that clear: "The erroneous reporting of unofficial results from Antrim county was a result of accidental error on the part of the Antrim County clerk. The equipment and software did not malfunction and all ballots were properly tabulated. . . . Because the clerk did not update software, even though the tabulators counted all the ballots correctly, those accurate results were not combined properly when the clerk reported unofficial results. . . . The software did not cause a misallocation of votes; it was a result of user human error."[100]

78.     From there, public information continued to pour in confirming that the vote counts were accurate, and thus any allegations against Dominion were based on lies and misinformation. On November 7, 2020, the Associated Press reported that Dominion was not to blame for the

---

[98] *Id.*

[99] MICH. S. OVERSIGHT COMM., REPORT ON THE NOVEMBER 2020 ELECTION IN MICHIGAN (Apr 9, 2021), https://misenategopcdn.s3.us-east-1.amazonaws.com/99/documents/20210623/SMPO_2020ElectionReport.pdf.

[100] *False claims from Ronna McDaniel have no merit*, The Office of Sec'y of State of Mich. (Nov. 6, 2020), https://www.michigan.gov/sos/0,4670,7-127-93094-544676--,00.html.

human error in Antrim County, Michigan. Rather, the Associated Press correctly reported that a "clerk's error" led to the reporting of unofficial voting results that favored Biden.[101]

79.     Also on November 7, 2020, Chris Krebs, the CISA head nominated by President Trump, urged Americans to stop spreading baseless claims that minor vote counting issues indicated fraud. Krebs tweeted: "Seeing #disinfo that some isolated voting day issues are tied to some nefarious election hacking and vote manipulation operations. Don't fall for it and think twice before sharing!"[102]

80.     OAN, however, understood that its growing viewer base of Trump loyalists wanted it to continue to propagate the storyline that the election had been stolen. President Trump had made the litmus test clear: either accept his narrative of election fraud, or lose his long-sought support. So OAN set about to further secure those viewers—including President Trump himself—by concocting its own alternate reality and embracing its preconceived narrative falsely blaming Dominion for President Trump's loss by rigging the election.

81.     On November 7, most networks—including Fox—projected that President Trump lost the 2020 Presidential Election. But OAN refused, and instead took ownership of the alternate reality that the election was stolen from Trump despite the mountains of evidence it had that completely debunked that fantasy. OAN founder Robert Herring later trumpeted the claim—after all of the states had certified their results and Biden had won the election—that "their

---

[101] *Officials: Clerk error behind county results favoring Biden*, Associated Press (Nov. 7, 2020) https://apnews.com/article/joe-biden-donald-trump-technology-voting-michigan-6beeef230376e75252d6eaa91db3f88f.

[102] Ali Swenson, *Posts falsify ties between election tech firm and Democrats*, Associated Press (Nov. 10, 2020) https://apnews.com/article/election-2020-joe-biden-us-news-media-michigan-43bdaa186e3b8d9d897cae3bd0c6cdc0?utm_medium=APFactCheck&utm_campaign=SocialFlow&utm_source=Twitter.

investigations indicate there was fraud in the voting" and promised OAN's viewers that "There

will be no decision until Jan. 6, 2021"—the date the U.S. Congress would certify the election. [103]



82.    The underlying reason for OAN's decision was clear: while Fox News faced

backlash and lost viewers after it called the election for President Biden, OAN *gained* viewers by

creating and spreading its alternate reality about the 2020 election.

### *November 8-10, 2020:*
### *Fox Connects Dominion with the False Claims of Fraud*
### *Even as Recounts and Hand Audits Further Confirm the Accuracy of the Count*

83.    Fox realized that in order to stem the tide and try to recover lost viewers—including

the most important viewer of all, President Trump himself—it needed to go all in on the alternate

reality that Trump lost because of massive election fraud.

84.    Recognizing the mortal threat to its viewership and profits, Fox acted. The morning

of November 8—the day after it had called the election for Joe Biden—Fox began connecting

---

[103]   Robert   Herring   (@RobHerring),   Twitter   (Dec.   16,   2020,   11:49   AM)
https://twitter.com/RobHerring/status/1339266480429416448.

Dominion with the false election fraud narrative. Fox started by inviting Sidney Powell onto a broadcast of *Sunday Morning Futures* on Fox News Channel, where Powell declared that there was "a massive and coordinated effort to steal this election from We the People of the United States of America, to delegitimize and destroy votes for Donald Trump, to manufacture votes for Joe Biden,"[104] and that "the Dominion software" was to blame.[105] According to Powell: "That is where the fraud took place, where they were flipping votes in the computer system or adding votes that did not exist."[106]

85.     Dominion became a convenient scapegoat precisely because 28 states used Dominion machines—including many of the contested battlegrounds. And even in jurisdictions that did not use Dominion machines—such as in Philadelphia—Dominion became an easy target because its machines were used in so many other highly contested jurisdictions—including in Georgia, Michigan, Wisconsin, Arizona, and other parts of Pennsylvania. Casting Dominion as the perpetrator of the fraud provided a way to explain why President Trump lost.

86.     Even as Fox began to connect Dominion with the false claims of fraud, the facts continued to demonstrate the accuracy of the Dominion machines. On November 9, 2020, Maricopa County, Arizona, completed a hand audit of paper ballots as required by state law that showed a 100% match with the counts from the Dominion machines used in Maricopa County.

---

[104] Morgan Phillips, *Trump Decries Lead that 'Miraculously' Disappeared, Urges Biden Not to 'Wrongfully Claim' White House*, Fox News (Nov. 6, 2020), https://www.foxnews.com/politics/trump-initial-lead-miraculously-disappeared-urges-biden-not-to-wrongfully-claim-white-house.
[105] *Id.*
[106] *Id.*

The count was overseen by Republican, Libertarian, and Democratic officials.[107] The results were widely reported.

87.     Also on November 9, 2020, Georgia Voting System Implementation Manager Gabriel Sterling held a press briefing where he rebutted inaccurate claims made about an update to machines on the eve of the election, confirming that "nothing was done to the . . . system after [October 31]," when voter files were updated as part of normal procedure. He explained that claims of voter fraud were "nonsense. Don't buy into these things. Find trusted sources."[108]

88.     On November 10, 2020, the *New York Times* reported: "Election officials in dozens of states representing both political parties said that there was no evidence that fraud or other irregularities played a role in the outcome of the presidential race . . ." The *Times* contacted the offices of the top election officials in every state. Notably, all 29 Republican secretaries of state were surveyed, most responding directly to the *Times*. None reported any major voting issues, refusing to back up claims of a fraudulent election.[109]

89.     Also on November 10, the Associated Press reported in a Fact Check: "As poll workers tallied votes from the U.S. presidential election, many social media users interpreted a clerk's error in a small, Republican-leaning Michigan county as vote-rigging because it wrongly favored Joe Biden before being fixed. A week later, that misinterpreted mistake has snowballed

---

[107] *2020 General Election Hand Count Results Summary of Hand Count Audits – 2020 General Election*, Sec'y of State of Ariz. (Nov. 17, 2020, 4:54 PM), https://azsos.gov/election/2020-general-election-hand-count-results.

[108] Georgia Voting System Implementation Manager Gabriel Sterling, *News Conference on Georgia Vote Count*, C-SPAN (Nov. 9, 2020), https://www.c-span.org/video/?477943-1/news-conference-georgia-vote-count.

[109] Nick Corasaniti et al., *The Times Called Officials in Every State: No Evidence of Voter Fraud*, N.Y. Times (Nov. 10, 2020) https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

*into a deluge of false claims* that Democrats have deep ties to Dominion Voting Systems, the company that supplies election equipment to Michigan and dozens of other states nationwide."[110]

90.     In that same "Fact Check," the Associated Press again reported that "Dominion was not to blame" for the initial user error in the Antrim County, Michigan count, "according to the Michigan Department of State." Antrim County Clerk Sheryl Guy confirmed there was no malfunction of the Dominion machines in Antrim County: "There was no malice, no fraud here, just human error."[111]

91.     Also on November 10, 2020, Kansas Secretary of State Scott Schwab declared: "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems . . . . We are very pleased with how the election has gone up to this point."[112] Kansas used Dominion machines during the 2020 election.

92.     In short, in the days following the election, the public record was replete with evidence confirming that the election was a success, that there was no fraud, and that Dominion did not "rig" the election or "switch" any votes. This information was echoed by state and local officials, confirmed by recounts and audits, reported widely by the media, and even endorsed by the Trump Administration.

---

[110] Ali Swenson, *Posts falsify ties between election tech firm and Democrats*, Associated Press (Nov. 10, 2020) https://apnews.com/article/election-2020-joe-biden-us-news-media-michigan-43bdaa186e3b8d9d897cae3bd0c6cdc0?utm_medium=APFactCheck&utm_campaign=SocialFlow&utm_source=Twitter (emphasis added).
[111] *Id.*
[112] Sonja Pickles (@PicklesSonja), Twitter (Nov. 10, 2020, 4:29 PM), https://twitter.com/PicklesSonja/status/1326321159651135488.

*November 9-12, 2020:*
*OAN Joins the Race to the Bottom and Zeroes in on Dominion as the Villain*

93.     For Fox, the false narrative about Dominion provided a lifeline. It allowed Fox to reassert itself in its viewership battle with OAN and Newsmax. So in the following days, Fox only increased the intensity and frequency of its defamation campaign. Despite the highly publicized mountain of evidence proving that the 2020 election was safe, secure, and accurately tabulated, including specifically by Dominion machines, Fox persisted in forming and perpetuating its alternate reality that Dominion rigged the election and stole it from Trump.

94.     At this point, OAN faced a choice. It could engage in a battle of lies with Fox and Newsmax—each attempting to outdo the other with outlandish and false statements. Or it could tell the truth by rejecting these demonstrably false claims about Dominion.

95.     OAN chose to prioritize its profits over the truth. For OAN, the facts did not matter. What mattered was feeding the audience the alternate reality OAN had helped create and its audience now expected—even if it was spreading false information. And the race to the bottom began in earnest, dragging Dominion down with it.

96.     Specifically, on November 9, 2020 Chanel Rion, OAN's Chief White House Correspondent tweeted—and OAN retweeted—the false claim likening Dominion's role in the 2020 Presidential Election to one of the most significant corporate scandals in recent memory: "INVESTIGATING — Alas, just like Volkswagen would NEVER manipulate software code to FAKE low diesel emissions, Dominion would NEVER upload a last-minute software code to voting machines to FAKE low Trump votes. Just a 'glitch!'"[113]

---

[113]     Chanel Rion (@ChanelRion), Twitter (Nov. 9, 2020, 9:13 AM), https://twitter.com/chanelrion/status/1325818841402912768?lang=en.



97.     Indeed, Herring had routinely emphasized that OAN was covering these false claims of fraud even when Fox was not. As early as November 10, Herring tweeted: "The MSM and @FoxNews want you to believe the election is over, but the number aren't adding up." He then shared a video of a discredited analysis from "Dr. Shiva" that falsely accused Dominion machines of rigging the vote.



The MSM and @FoxNews want you to believe the election is over, but the number aren't adding up.

MIT PhD Analysis of Michigan Votes Reveals Unfortunate Truth of U.S. Voting Systems youtu.be /Ztu5Y5obWPk via @YouTube @OANN @realDonaldTrump

This claim about election fraud is disputed

98.     The next day, Herring tweeted: "I would like to thank all the people who are moving over to @OANN. We will do our best to bring you the very best in REAL news. We may not have the financial backing that @FoxNews does, but we're very proud of our employees and all their hard work bringing you the truth. #OANN"[114]

99.     And on November 12, OAN President Charles Herring tweeted: "If you're suffering from "FOXED UP Beyond All Recognition"* syndrome, or FUBAR, @OANN is here for you! @OANN's mgmt has NOT changed. Our vision has NOT changed. Our red, white & blue logo WILL NEVER change. We are stepping up for you! Join us at @OANN."[115]

---

[114]   Robert Herring (@RobHerring), Twitter (Nov. 10, 2020, 4:12 PM), https://twitter.com/RobHerring/status/1326271449045241856.

[115] Charles Herring (@CharlesPHerring), Twitter (Nov. 12, 2020, 8:07 PM), (an archive of the tweet can be found here: https://web.archive.org/web/20201112150935if_/https://twitter.com/CharlesPHerring/status/132 6904347301699590).



> **Charles**
> @CharlesPHerring                                    ...
>
> If you're suffering from "FOXED UP Beyond All
> Recognition"* syndrome, or FUBAR, @OANN is here for
> you! @OANN's mgmt has NOT changed. Our vision has
> NOT changed. Our red, white & blue logo WILL NEVER
> change. We are stepping up for you! Join us at @OANN
> (*Credit to Jay Whig of AG).
>
> 9:07 AM · Nov 12, 2020 · Twitter Web App

100.    In the wake of these tweets, neither OAN, nor Powell, nor Giuliani, nor anyone else, came out with any credible evidence that Rion's statement accusing Dominion of fraud was true. To the contrary, on November 11, 2020, the *New York Times* published an article titled, "No, Dominion voting machines did not delete Trump votes," which quoted an election-technology expert who explained that "[m]any of the claims being asserted about Dominion and questionable voting technology is misinformation at best and, ***in many cases, they're outright disinformation***."[116] And by November 12, 2020, CISA—the federal agency overseeing online security for the elections and led at the time by Trump appointee Chris Krebs—confirmed that there was "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[117] This widely-reported public announcement from the Trump Administration's own experts and other independent officials on election security clearly disproved the election-rigging lies being spread by OAN and others about Dominion.

---

[116] Jack Nicas, *No, Dominion voting machines did not delete Trump votes*, N.Y. Times (Nov. 11, 2020, 12:25 PM), https://www.nytimes.com/2020/11/11/technology/no-dominion-voting-machines-did-not-delete-trump-votes.html.

[117] U.S. CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY, JOINT STATEMENT FROM ELECTIONS INFRASTRUCTURE GOV'T COORDINATING COUNCIL & THE ELECTION INFRASTRUCTURE SECTOR COORDINATING EXEC. COMM. (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.

101.    Also on November 12—the same day that OAN and the rest of the country saw CISA's publicly released its findings—OAN published a report claiming that *"Election systems across the country are found to have deleted millions of votes cast for President Trump."*[118] The report was based on "an unaudited analysis of data obtained from Edison Research," which OAN said showed that Dominion switched "as many as 435,000 votes from President Trump to Joe Biden" and that "another 2.7 million Trump votes appear to have been deleted by Dominion, including almost 1 million Trump votes in Pennsylvania alone." But in actuality, the "analysis" was completely made up by an entirely unreliable and noncredible blog from the dark corner of the internet and had absolutely no basis in fact or reality. And while OAN acknowledged on the air that those results could be "verified by hand recounts" conducted in those states, OAN rejected every single actual hand recount conducted across the country in the months after the election that proved no such vote flipping or deleting happened, and certainly not by Dominion.



---

[118] Colby Hall, *Trump Goes ALL Caps Promoting OAN's Voter Fraud Conspiracy Debunked By the NY Times and Others*, Mediaite (Nov. 12, 2020), https://www.mediaite.com/election-2020/trump-goes-all-caps-promoting-oans-voter-fraud-conspiracy-debunked-by-the-ny-times-and-others/ (Ex. 378).

48

102.     Even though this report was complete fiction, it caught the eye of President Trump, as OAN expected it would. Seeing this report, President Trump quickly tweeted out OAN's false report to his more than 88 million followers as evidence that Dominion rigged the election and stole it from him. Indeed, President Trump tagged Rion and OAN in the tweet so that they got credit for it. This was not the last time that OAN manufactured a false narrative condemning Dominion for stealing the election from Trump, nor was it the last time that Trump heavily publicized OAN-manufactured "evidence" that Dominion rigged the election.



103.     The report was immediately and publicly discredited. Edison Research President Larry Rosin immediately stated that the firm had never created any report or made any statements about "anomalies in the voting data," and declared that "There is no evidence to support claims of widespread fraud." As Rosin himself put it: "Edison Research created no such report and we are not aware of any voter fraud."[120]

---

[119] *Id.*

[120] Alec Dent, *Did Edison Research Find That Dominion Deleted Trump Votes or Switched Votes to Biden?*, The Dispatch (Nov. 12, 2020), https://factcheck.thedispatch.com/p/did-edison-research-find-that-states.

104.    That same day, the Associated Press published a Fact Check reporting as false this claim that Dominion "deleted" Trump votes or "switched" votes from Trump to Biden, including a statement by Open Source Election Technology Institute voting technology expert Eddie Perez that there was no "systemic issue related to problems with Dominion software that would affect the tabulation of results" that he was aware of."[121]The report also quotes election officials, including in Pennsylvania, saying "no factual basis" exists for these charges. As the Associated Press story stated, "There's no evidence of widespread fraud in the 2020 election, or of major problems with Dominion's systems. Election officials from both political parties have stated publicly that the election went well."[122] The Associated Press asked OAN to comment on its false report, and they refused.

105.    The non-existent Edison "report" OAN referenced was actually an anonymous post on the pro-Trump web forum, TheDonald.com, and had no basis in reality.[123] To this day, *OAN has not publicly acknowledged the falsity of this report, nor has it ever retracted it*. The only action OAN took was secretly removing the broadcast segment from its website. But by then, the damage had already been done through Trump's (and others) retweets—which were entirely foreseeable and intended by OAN—and OAN moved on to other lies and debunked claims that Dominion flipped votes from Trump to Biden.[124]

---

[121] Ali Swenson & Amanda Seitz, *AP FACT CHECK: Trump Tweets a Tall Tale of 'Deleted' Votes*, Associated Press (Nov. 12, 2020), https://apnews.com/article/fact-check-trump-tweets-tall-tale-votes-13c104367924b8192b4fcecf334f7806.

[122] *Id.*

[123] Ali Breland, *Trump's Latest False Fraud Claim Came From an Anonymous Internet Poster*, Mother Jones (Nov. 12, 2020), https://www.motherjones.com/politics/2020/11/trump-dominion-fraud-oann/.

[124] Sarah Burris, *OAN forced to delete fake story about voter fraud — after Trump promotes the conspiracy theory*, Raw Story (Nov. 12, 2020), https://www.rawstory.com/2020/11/oan-forced-to-delete-fake-story-about-voter-fraud-after-trump-promotes-the-conspiracy-theory/.

106.    That night of November 12, seeing OAN's aggressive campaign of lies against Dominion and the attention it was getting, Fox responded by renewing its defamation campaign against Dominion.

107.    Meanwhile, the mountain of evidence debunking the lies about Dominion continued to pile up. The next day, on November 13, 2020, Michigan Chief Judge Timothy Kenny made clear that the attempts to allege fraud in the election were "***not credible.***" Chief Judge Kenny rejected an attempt by Trump allies to block the certification of the vote in Wayne County, Michigan, in *Constantino v. City of Detroit.* Chief Judge Kenny rejected the plaintiffs' claims of election fraud and unequivocally concluded: "Plaintiffs' interpretation of events is incorrect and not credible."[125]

### November 13-16, 2020:
### OAN Pushes Dominion Disinformation through,
### Chanel Rion, alongside a Host of Facially Unreliable "Experts"

108.    Undeterred by having had its knowingly false claims about faking Trump votes, not to mention its reliance on the Edison "report," exposed as untrue, OAN continued peddling lies about Dominion. In fact, it took its efforts to the next level by seeking out wholly unreliable sources from the deep dark corners of the internet to help push those lies. And when OAN did not feature an unreliable outside source to perpetrate lies about Dominion, it relied on its own reporters to fabricate lies. In fact, OAN transformed its own Chanel Rion into one of the country's most prominent voices perpetuating falsehoods about Dominion.

109.    OAN's campaign against Dominion entered its next level on November 13, 2020. That day, OAN CEO Herring continued to make explicit his motivations. Herring invited President

---

[125] Op. & Order, *Constantino v. City of Detroit*, No. 20-014780-AW (Mich. 3rd Cir. Wyatt Cty. Nov. 13, 2020).

Trump to join forces against Fox: "Mr. President, instead of launching your own media company, I invite you to join forces with @OANN. Conservative-friendly and dependable news is sure to 'TRUMP' Fox. @realDonaldTrump. #OANN #RealNews"



> **Robert Herring**
> @RobHerring   ...
>
> Mr. President, instead of launching your own media company, I invite you to join forces with **@OANN**. Conservative-friendly and dependable news is sure to 'TRUMP' Fox. **@realDonaldTrump #OANN #RealNews**
>
> 1:13 PM · Nov 13, 2020 · Twitter Web App [126]

110.    OAN's broadcasts followed suit. That same night on November 13, OAN and its host Chanel Rion falsely asserted that Dominion had been "proven" to have switched votes in favor of Biden in at least three states. After the Trump Administration forced two top Homeland Security officials to resign on November 12, 2020, in the wake of the election, OAN reported on the "major shake-ups" at the DHS Cybersecurity Division.[127] OAN and Rion used this latest development as an opportunity to defame Dominion. When OAN's anchor Elma Aksalic asked Rion whether the resignations had any connection to Dominion, Rion was quick to blame Dominion for rigging the election:

> Elma Aksalic: So let me ask you this, Chanel. Do these resignations have anything at all to do with the White House's latest look into Dominion Voting Systems? We know that there's been a lot of reporting about that specifically. Is there any connection there?
>
> Chanel Rion: They certainly seem tied, but they're not necessarily tied to

---

[126]    Robert Herring (@RobHerring), Twitter (Nov. 13, 2020, 1:13 PM), https://twitter.com/robherring/status/1327328825865244672?lang=en.

[127] *The Tipping Point: Election Results in Question*, One America News Network (Nov. 13, 2020), https://app.criticalmention.com/app/#clip/view/518987a5-d292-4001-bde0-95a8b9bb2999?token=e1bb29b2-fc08-4587-be57-88dd81ea7a3a (Ex. 379).

any one specific voting system. ***When we talk about Dominion, you're talking about a system that exists—that has been operating in 28 states, proven to have actually glitched in favor of Biden in at least three states***, and so that's just one system. [128]

111.     OAN and Rion recklessly disregarded the mountain of widely reported evidence that Dominion never switched votes in favor of Biden, and recklessly disregarded (and indeed knew) what it was reporting was false. Yet OAN kept broadcasting defamatory lies.

112.     The very next day, on November 14, 2020, OAN host Chanel Rion interviewed Ron Watkins for a segment titled, "Cyber Analyst On Dominion Voting: Shocking Vulnerabilities."[129]



113.     Ms. Rion introduced Mr. Watkins as a "large systems technical analyst" in order to spread the lie that Dominion has "a pattern of switching votes from Trump to Biden."

> Rion: Dominion Voting Systems is one such software that seemed to have a pattern of switching votes from Trump to Biden. How easily could bad actors have used Dominion to switch thousands of votes and alter an election? County by county, the answer is shocking. One American News

---

[128] *Id.*
[129] *Cyber Analyst On Dominion Voting: Shocking Vulnerabilities*, One America News Network (Nov. 14, 2020), *previously available at* https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/ (an archive of the video can be found here: https://www.youtube.com/watch?v=eKcPoCNW8AA).

spoke with Ron Watkins, a large systems technical analyst who has been pouring over the Dominion Systems manual. [130]



114. But as explained above, Ron Watkins is the farthest thing from an expert or a reliable source.

115. OAN and Rion then indulged yet another obvious lie about Dominion—the suggestion that Dominion machines in Philadelphia were improperly tampered with in such a way that the *"entire election should be illegitimate"*—despite knowing, or at a minimum recklessly disregarding, that Dominion has never supplied a voting machine used in the city of Philadelphia. As OAN and Rion put it:

> Rion: Working off the Dominion manual and public request documents from Pennsylvania's secretary of state, Watkins says the vulnerabilities of Dominion reside in the fact that administrative access is so easy to attain. With administrative access comes direct access to ballots and how they are counted.
> . . .
>
> Watkins: . . . [I]f say Philadelphia was storing these keys in a warehouse and they were robbed, and the only thing stolen were these keys and a laptop, *then you should consider their entire election to be illegitimate* because they have lost the physical security of the system, which is the most important, uh, part of information security.

---

[130] *Id.*

> <u>Rion:</u> ***And that's exactly what happened in Philadelphia just one month before the election.*** USB drives and a laptop had been stolen from a key precinct in Philadelphia. On election day, Biden overtook Trump's 800,000 vote lead in the dark of night. According to these tabulating machines, Biden surpassed Trump by nearly 60,000 votes statewide, a lead found in one county, the county from which a thief stole USB keys and a laptop to the precinct's ballot machines the month prior.[131]

116.    Again, it was public knowledge that Dominion could have had nothing at all to do with ballot tabulation or any other aspect of the 2020 election in Philadelphia—indeed, its machines were not used in that city.[132]

117.    OAN's and Rion's lies did not stop there. Instead, OAN kept spreading lies about Dominion through Rion, who by mid-November had become the face of OAN's viral disinformation campaign about Dominion. In another segment OAN aired on November 14, OAN and Rion continued to defame Dominion, accusing it of a ***"massive swapping of data."***[133] OAN's Dan Ball hosted Rion as his guest on a segment called ***"Exposing Voter Fraud with Chanel Rion."*** Rion continued her and OAN's campaign to destroy Dominion:

> Dominion really popped onto our radar because, just like your whistleblower exhibited in your previous interview, there are some irregularities when it comes to the data that they are sharing. ***And one thing that we're noticing is this massive swapping of data, and we're not talking about 50 votes here or there. We're talking about swaps in the hundreds of thousands range***, we're talking about votes that only go one direction. They go from Biden to Trump, and there's a direct correlation, and we're seeing this in data that is just absolutely alarming
>
> . . .

---

[131] *Cyber Analyst On Dominion Voting: Shocking Vulnerabilities*, One America News Network (Nov. 14, 2020), *previously available at* https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/ (an archive of the video can be found here: https://www.youtube.com/watch?v=eKcPoCNW8AA).

[132] Ali Swenson, *Philadelphia does not use Dominion Voting Systems technology*, Associated Press (Nov. 22, 2020), https://apnews.com/article/fact-checking-afs:Content:9798361760.

[133] *Real America with Dan Ball: Investigating Voter Fraud with Chanel Rion,* One America News Network (Nov. 14, 2020), https://app.criticalmention.com/app/#clip/view/1ce55142-8ca2-4e8f-9af7-089bf5edf9d9?token=39a0275b-e88a-4da1-b06b-de6723ac765c (Ex. 380).

*The bottom line is votes were switched from President Trump to President—to now Joe Biden, and it happened in dozens of states, and it's a Dominion System software glitch that we are going to dig into*.[134]



118.     But once again, as OAN, Rion, and Ball were all well aware, there was no "massive swapping of data" anywhere—let alone in "dozens of states." By this point in time, the press was flooded with reports that Dominion had no role in any sort of election fraud. On November 15, 2020, the Associated Press published a report debunking the false claim that election servers connected to Dominion were seized in Germany.[135] And by November 16, 2020, fifty-nine specialists in election security had publicly and forcefully rebutted the lies about Dominion, explaining that they "have never claimed that technical vulnerabilities have actually been exploited to alter the outcome of any US election."[136] They further explained that "*no credible evidence* has been put forth that supports a conclusion that the 2020 election outcome in any state has been

---

[134] *Id.*

[135] Jude Joffe-Block, *False reports claim election servers were seized in Germany*, Associated Press (Nov. 15, 2020), https://apnews.com/article/fact-checking-9754011363.

[136] *See* Tony Adams et al., *Scientists Say No Credible Evidence of Computer Fraud in the 2020 Election Outcome, But Policymakers Must Work with Experts to Improve Confidence*, Matt Blaze (Nov. 16, 2020), https://www.mattblaze.org/papers/election2020.pdf.

altered through technical compromise."[137] "Anyone asserting that a U.S. election was 'rigged' is making an extraordinary claim, one that must be supported by persuasive and verifiable evidence . . . .We are aware of alarming assertions being made that the 2020 election was 'rigged' by exploiting technical vulnerabilities. However, in every case of which we are aware, these claims either have been unsubstantiated or are technically incoherent."[138] That same day, though, President Trump tweeted: "Try watching @OANN. Really GREAT!"[139] OAN's Dan Ball and Chanel Rion both retweeted President Trump's tweet. Dan Ball added: "Plus, our own @ChanelRion has explosive details about Dominion! Must see!"[140]



119.    Rion likewise added: "Tune in this this weekend for my upcoming special on #Dominion."[141]

---

[137] *Id.*

[138] *Id.*

[139] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 16, 2020, 9:06 AM), *previously available at* https://twitter.com/realdonaldtrump/status/1328338630679597056 (an archive of President Trump's tweets can be found here: Trump Twitter Archive, https://www.thetrumparchive.com (last visited June 15, 2021)).

[140] Chanel Rion (@ChanelRion), Twitter (Nov. 16, 2020, 9:15 AM) (an archive of the tweet can be found here: http://web.archive.org/web/20201116205424/https:/twitter.com/chanelrion).

[141] *Id.*



120.    OAN continued manufacturing a flurry of content centered on defaming Dominion, featuring Rion. On November 17, OAN's Dan Ball again hosted Rion to continue airing falsehoods about Dominion.[142] Ball opened the segment by explaining the lies OAN told about Dominion the day before:

> [A] guy who tried to infiltrate Antifa and during his undercover operation, figuring out more about Antifa, he learns about ***this guy who's the head of security for Dominion and how he's connected with Antifa and pretty much says he's got an insurance plan to make sure Trump doesn't win.***

121.    That statement, about former Dominion employee Eric Coomer, is completely false and baseless, as OAN's rival network Newsmax admitted in an apology to Coomer in late April 2021.[143] Rion also addressed Dan Ball's allegations regarding Eric Coomer, noting that Coomer's profile had been deleted and reporting that Dominion employees were "scrubbing their affiliation

---

[142] *Democrats in Bed with Dominion*, One America News Network (Nov. 17, 2020), https://app.criticalmention.com/app/#clip/view/2bc3020e-2f14-4525-b635-36b0e39e0934?token=77d8b679-c7d2-4315-9468-5a13188bd472.

[143] *Statement About Dr. Eric Coomer, Director of Product Strategy and Security at Dominion Voting Systems*, Newsmax (Apr. 30, 2021), *previously available at* https://www.newsmax.com/newsfront/eric-coomer-dominion-voting-systems/2021/04/30/id/1019671/ (an archive of the statement can be found here: https://web.archive.org/web/20210430220349/https://www.newsmax.com/newsfront/eric-coomer-dominion-voting-systems/2021/04/30/id/1019671/).

with Dominion right now, know that we are looking into this this very second." By concealing the material fact that Dominion employees were deleting or locking down their public profiles *because they had been receiving death threats as a result of the Defendants' lies*, OAN intended to and did deceive its viewers into thinking that Dominion employees were "scrubbing their affiliation with Dominion" because they had done something wrong. Ball closed the segment by asserting that OAN's coverage of Dominion *"should scare the living hell out of every American out there period that this election and this voting system were compromised at the highest level by people put in charge of making it a free election."*



122.    As OAN was spinning its alternate reality, the evidence repeatedly disproved the story OAN was telling. On November 17, 2020, Clint Hickman, the Republican chairman of the Maricopa County Board of Supervisors, sent a letter to voters in Maricopa County, which unlike Philadelphia does use Dominion machines. Hickman's letter confirmed that "[m]ore than 2 million ballots were cast in Maricopa County and *there is no evidence of fraud or misconduct or malfunction.*" On the contrary, "the evidence overwhelmingly shows" the results were accurate, and the Dominion equipment "met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election." The

Chairman also stated that "after each of these 2020 elections, ***the hand count audit showed the machines generated an accurate count***."[144]

123.    Also on November 17, *The Wall Street Journal* reported that "Dominion Voting Systems Corp., a little-known voting-machine supplier that has come under criticism from President Trump, was a linchpin in the 2020 election that federal and state officials praise as being free from tampering."[145] The article continued: "A phalanx of federal agencies, state officials across the country overseeing elections and voting-equipment vendors said last week that 'there's no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.'"[146]

124.    That same day, the Editorial Board for *The Wall Street Journal* published a piece that refuted false claims about Dominion and stated, "there's no good evidence of voting problems that would come close to" calling into question Biden's leads in the swing states.[147]

<div align="center">

***November 17-December 18, 2020:***
***OAN Airs Numerous Dominion-Themed Specials,***
***Beginning with "Dominion-izing the Vote"***

</div>

125.    Unsatisfied with its one-off segments featuring its own Chanel Rion—not to mention such disreputable guests as Watkins—spreading lies that Dominion rigged the election,

---

[144] 12 News, *Republican Maricopa County Chairman Says 'No Evidence of Fraud or Misconduct' in Presidential Election*, Fox 61 (Nov. 17, 2020), https://www.fox61.com/article/news/politics/elections/maricopa-county-chairman-says-no-evidence-of-fraud-or-misconduct-in-presidential-election/75-6aba1803-850a-460f-8f86-b185a41f4708; Letter from Clint Hickman to Maricopa County Voters (Nov. 17, 2020), https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters.

[145] Alexa Corse, *Voting Machine Supplier Criticized by Trump in Spotlight on Election Integrity*, Wall St. J. (Nov. 17, 2020, 9:46 AM), https://www.wsj.com/articles/voting-machine-supplier-criticized-by-trump-in-spotlight-on-election-integrity-11605624361?mod=searchresults_pos17&page=2.

[146] *Id.*

[147] The Editorial Board, *Rage Against the Voting Machine*, Wall St. J. (Nov. 17, 2020, 6:33 PM), https://www.wsj.com/articles/rage-against-the-voting-machine-11605656036.

OAN decided to repackage its prior Dominion segments into a new 30-minute program featuring Chanel Rion entitled ***Dominion-izing the Vote***. While the lies OAN had aired about Dominion to date would have been enough to irreparably harm Dominion, "Dominion-izing the Vote" marked an entirely new chapter in OAN's defamation campaign. In short, OAN moved from simply lying about Dominion, to creating a brand out of it.

126.     OAN and Rion began to promote "Dominion-izing the Vote" on November 17, 2020, promising viewers that it would answer the question, "How compromised was the 2020 election?" It likewise promised its viewers that the answer lay with "Dominion Voting Systems, which is used in 29 states." OAN also promised its viewers ***"undeniable data"*** showing that Dominion was responsible for compromising the election.[148]

---

[148]     One America News (@OANN), Twitter (Nov. 17, 2020, 9:03 am), https://twitter.com/OANN/status/1328715483701395458.



127.   Yet again, OAN's disinformation campaign about Dominion caught the eye of its most important and influential viewer, Trump, and his more than 88 million Twitter followers. On November 19, 2020, Trump promoted "Dominion-izing the Vote" on Twitter and gave OAN the publicity it so aggressively sought.

**Donald J. Trump**
@realdonaldtrump

*"Dominion-izing the Vote" https://t.co/ZOFsgDXsuH*

Nov 19th 2020 - 12:41:14 AM EST · Twitter for iPhone · View on Twitter

128.    As OAN went to work producing the "Dominion-izing the Vote" special, more and more evidence was mounting debunking OAN's lies about Dominion. For example, on November 19, 2020, Georgia Secretary of State Brad Raffensperger released a statement confirming the results of a "historic first statewide audit," a "full manual tally of all votes cast" in Georgia that "reaffirmed the outcome of the presidential race in Georgia as originally reported." As Secretary Raffensperger's statement explained, this audit "upheld and reaffirmed the original outcome produced by the machine tally of votes cast. Due to the tight margin of the race and the principles of risk-limiting audits, this audit was a full manual tally of all votes cast. The audit confirmed that the original machine count accurately portrayed the winner of the election."[149] This hand recount verified the accuracy of the Dominion machine counts and conclusively disproved the accusations against Dominion.[150] The next day, on November 20, 2020, the *Wall Street Journal* once again reported that the Dominion allegations were false and that the Georgia recount had confirmed the accuracy of Dominion's voting machines.[151]

129.    Also on November 20, Fox's Tucker Carlson publicly called out Sidney Powell for failing to produce any evidence to support the outlandish and incredible claims she had been making about Dominion on Fox over the previous week.[152] Despite his invitation to Powell to appear on his show and present her evidence, "she never sent [] any evidence, despite a lot of

---

[149] *Historic First Statewide Audit Of Paper Ballots Upholds Result Of Presidential Race*, Georgia Secretary of State (November 19, 2020) (last visited Aug. 5, 2021), https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race.

[150] Kate Brumback, *Georgia officials certify election results showing Biden win*, Associated Press (Nov. 20, 2020), https://apnews.com/article/georgia-certify-election-joe-bidenea8f867d740f3d7d42d0a55c1aef9e69.

[151] The Editorial Board, *Georgia Certifies: Donald Trump Lost*, Wall St. J. (Nov. 20, 2020), https://www.wsj.com/articles/georgia-certifies-donald-trump-lost-11605915757?page=2.

[152] *Tucker Carlson Tonight*, Fox News (Nov. 19, 2020), https://www.foxnews.com/opinion/tucker-carlson-rudygiuliani-sidney-powell-election-fraud.

requests … not a page." When he and his staff kept pressing Powell to present evidence, "she got angry" and told them stop to contacting her. So Carlson and his staff checked with others in and around the Trump campaign and people in positions of authority, who said that Powell had "never given them any evidence either." Carlson concluded that Powell "never demonstrated that a single actual vote was moved illegitimately by software from one candidate to another. Not one."

130.    OAN, however, persisted with its lies, despite knowing or recklessly disregarding that its contentions about Dominion were entirely false. On November 21, OAN and Rion posted a video to Twitter promoting the "Dominion-izing the Vote" program. In her tweet, Rion asked the rhetorical questions, ***"Why are Dominion employees scrambling, hiding, and emptying out offices? Do they know they've been caught?"***[153] The 30-second promotional video embedded in her tweet has been viewed over 835,000 times. Rion recklessly disregarded the fact that baseless tweets like this endangered employees' lives, forcing the company to take additional security measures to protect their employees' security, which Rion would then mischaracterize to use as more fuel in her defamatory campaign against Dominion.

---

[153]    Chanel Rion (@ChanelRion), Twitter (Nov. 21, 2020, 11:10 am), https://twitter.com/ChanelRion/status/1330196983966019586?s=20 (Ex. 382).



131.    The same day, in response a question on Twitter—"Why aren't you complaining about Dominion software in states that Trump won? Are those corrupt too?"—Rion replied: "Yes, they are. They thought they had NC fixed… Trump beat the algorithm by such overwhelming margins there they couldn't fix it fast enough. Ask: Why did NC take so long to call after 98% precincts were reporting a Trump win? ALL votes processed by Dominion must be audited."[154] Dominion machines were not used anywhere in North Carolina in the 2020 Election.

---

[154] Chanel Rion (@ChanelRion), Twitter (Nov. 16, 2020) (an archive of the tweet can be found here: http://web.archive.org/web/20201121213935/www.twitter.com/chanelrion).



132.   Finally, on November 21, 2020, OAN aired its first 30-minute long "***Dominion-izing the Vote***" special, during which it broadcast more lies about Dominion. OAN's Rion, appearing in Washington, DC, opened the segment:

> In this edition of One American News Investigates, we look at Dominion Voting Systems and its role in the 2020 presidential elections, glitches, errors, money trails to powerful Democrats. Dominion is just one of three major companies providing voting systems to America. ***But Dominion captured headlines when it was discovered it had glitched 6,000 votes, giving Biden a fraudulent win. This was not an isolated event.***[155]

133.   Right out of the gate, OAN and Rion lied about Dominion. There was no "glitch" and Biden was never given "a fraudulent win" in Antrim County (or anywhere). By November 21, it had been reported for more than two weeks that what occurred in Antrim County was the result

---

[155] *Dominion-izing the Vote*, One America News Network (Nov. 21, 2020), available at https://www.youtube.com/watch?v=746HTjhFifA (Ex. 383).

of human error by the Republican County Clerk—an error that was swiftly corrected, and no official results of a Biden win in Antrim County were ever reported anywhere.[156]

134.    OAN and Rion similarly falsely claimed that Dominion was connected with "what happened in Philadelphia" when keys and a laptop were reportedly stolen from a Philadelphia precinct one month before election day. Contrary to OAN's and Rion's claims, it was public knowledge that Philadelphia does not use Dominion voting machines. During the segment, OAN also replayed verbatim its Ron Watkins segment, along with a clip of Sidney Powell exclaiming, "There should never be another election conducted in this country, I don't care if it's for local dog catcher, using a Dominion machine and Smartmatic software."



135.    Rion also hosted Joe Oltmann to spread more lies about Dominion during the half-hour special. Rion claimed that Oltmann "had infiltrated Antifa to uncover journalists who are active members of the Antifa." She claimed that Oltmann "infiltrated an Antifa conference call this past September and accidentally came upon a top Dominion Voting Systems executive named

---

[156] Jocelyn Benson, *False Claims from Ronna McDaniel Have No Merit*, The Office of Michigan Secretary of State Jocelyn Benson (Nov. 6, 2020), https://www.michigan.gov/sos/0,4670,7-127-93094-544676--,00.html.

Eric Coomer." Oltmann falsely claimed that Coomer told the group: "Don't worry about the election. Trump is not going to win. I made effing sure of that." [157]

136.    As with the Edison Research fabricated story and others, this set of OAN lies was garnering the attention it sought. On November 21, 2020, President Trump tweeted links to all three parts of the "Dominion-izing the Vote" special, and then retweeted himself to promote the lies even more on November 22, 2020.

> **Donald J. Trump**
> @realdonaldtrump
>
> *RT @realDonaldTrump: "Dominion-izing the Vote" Part One via @OANN @ChanelRion https://t.co/7OtrKfoj6q*
>
> Nov 22nd 2020 - 3:35:55 PM EST · Twitter for iPhone · View on Twitter

137.    On November 22, 2020, Charles Herring tweeted his own personal endorsement of the "Dominion-izing the Vote" program, calling it "MUST WATCH," saying that "ALL AMERICANS should be concerned about OUR voting integrity and the numerous known irregularities," and inviting viewers to watch a rebroadcast of the program that night.[158]

138.    OAN's defamatory broadcasts aside, people on both sides of the political aisle knew the truth about Dominion. On November 22, 2020, during an interview on ABC News's *This Week*, Trump ally Chris Christie gave an interview in which he called out Powell and Giuliani and stated: "If you've got the evidence of fraud, present it. … The conduct of the President's legal team has

---

[157] *Dominion-izing the Vote*, One America News Network (Nov. 21, 2020), available at https://www.youtube.com/watch?v=746HTjhFifA (Ex. 383).

[158]    Charles    Herring    (@CharlesPHerring),    Twitter    (Nov.    22,    2020) https://twitter.com/CharlesPHerring/status/1330585340424323072.

been a national embarrassment. … If you're unwilling to come forward and present the evidence, it must mean the evidence doesn't exist."[159]

139. Around this same time, several Republican senators also called the White House, warning that Powell seemed "unhinged" and that the Trump Campaign should distance itself from her.[160]

140. On November 22, 2020, the Trump Campaign itself disavowed Sidney Powell by issuing the following statement: "Sidney Powell is practicing law on her own. She is not a member of the Trump Legal Team. She is also not a lawyer for the President in his personal capacity."[161]

---

[159] Paul Kane & Felicia Sonmez, *Chris Christie Calls the Conduct of Trump's Legal Team a 'National Embarrassment,'* Wash. Post (Nov. 22, 2020), https://www.washingtonpost.com/politics/republicans-christie-trump-concede/2020/11/22/05c28 0e6-2cda-11eb-bae0-50bb17126614_story.html.

[160] Aaron C. Davis, Josh Dawsey, Emma Brown & Jon Swaine, *For Trump Advocate Sidney Powell, A Playbook Steeped in Conspiracy Theories*, Wash. Post (Nov. 28, 2020), https://www.washingtonpost.com/investigations/sidney-powell-trump-kraken-lawsuit/2020/11/28/344d0b12-2e78-11eb-96c2-aac3f162215d_story.html.

[161] Maggie Haberman & Alan Feuer, *Trump Team Disavows Lawyer Who Peddled Conspiracy Theories on Voting*, N.Y. Times (Nov. 22, 2020), https://www.nytimes.com/2020/11/22/us/politics/sidney-powell-trump.html.



**- November 22, 2020 -**

## Trump Campaign Statement on Legal Team

"Sidney Powell is practicing law on her own. She is not a member of the Trump Legal Team. She is also not a lawyer for the President in his personal capacity."

- Rudy Giuliani, Attorney for President Trump, and Jenna Ellis, Trump Campaign Senior Legal Adviser and Attorney for President Trump

141. However, while the Trump Campaign disavowed Powell, OAN host Christina Bobb was advising the Trump Campaign on how to overturn the 2020 election, while at the same time hosting OAN's *Weekly Briefing*, spreading lies about Dominion and sowing doubt in the repeatedly confirmed 2020 election results.[162] Bobb's "legal work in her personal capacity" for the Trump campaign was confirmed by Trump campaign attorney Jenna Ellis. Neither Bobb nor

---

[162] Asawin Suebsaeng, Maxwell Tani & Sam Stein, *An OAN Host Has Been Helping Rudy With Trump's Legal Efforts*, The Daily Beast (Nov. 23, 2020), https://www.thedailybeast.com/oan-host-christina-bobb-has-been-helping-rudy-giuliani-with-trumps-legal-efforts.

OAN disclosed this fact to OAN's viewers in November or December 2020 while it broadcast Bobb's and OAN's lies about Dominion.

142.    OAN and Rion were back at it again the very next day after the Trump Campaign disavowed Powell. On November 23, 2020, Rion "interviewed" a guest who, according to Rion, "***put together a group of individuals who are trying to crack down on the fraud that is Dominion.***" That guest was Patrick Byrne.[163]



143.    During an interview entitled "Tech Millionaire Funds Hacking Team; '20 Election 100% Rigged," Byrne peddled lies that Dominion had rigged the 2020 election. Byrne elsewhere described this so-called election rigging as the "last act" in the same purported long-running "deep state" conspiracy that he claimed had earlier involved him facilitating an $18 million bribe to

---

[163] *Tech Millionaire Fund Hacking Team: "2020 Election 100% Rigged"*, One America News Network (Nov. 23, 2020), https://app.criticalmention.com/app/#clip/view/67795b8f-2934-4361-81bd-710b2250575a?token=37f52d99-127d-4b48-b8dc-e5e99babfaaa (Ex. 384).

Hillary Clinton.[164] As described above, Byrne had gone public with absurd "deep state" conspiracy theories long before OAN invited him to peddle his Dominion lies on its air.

144. Rion stated that Byrne had been "on Dominion's trail for over two years" because Dominion's machines had caused "irregularities" in the 2018 congressional election in Dallas.[165] Yet again, there was a huge problem with the story: As OAN and Rion well knew—or at a minimum recklessly disregarded—in the 2018 election, Texas (including Dallas) used machines made by one of Dominion's competitors—***not Dominion***.

> Chanel Rion: Patrick Byrne, founder and former CEO of Overstock.com has long considered himself a libertarian tech entrepreneur. Byrne now finds himself more than entrepreneur. He's on a mission to save the Republic from a deadly virus, widespread machine and software election fraud. He's doing this by funding a niche group of experts and the Trump legal team has been listening. ***You've put together a group of individuals who are trying to crack down on the fraud that is Dominion.*** Tell us more about what you've been doing.

> Patrick Byrne: Yes. Well, I'm, I funded a team of hackers and cyber sleuths and other people with odd skills. We've been on this since August, uh, one side store to be pursued someday is this, the DHS was warned of all this in August and September. We tried very hard and it was all crammed down. And I mean, from high levels.

> Rion: ***The experts Byrne is funding is an elite cyber security team that has been hired by the state of Texas to investigate a series of irregularities in the Dallas elections of 2018. The team consisted of members with backgrounds in military intelligence and federal law enforcement. Byrne says the election irregularities in Dallas, 2018 was rooted in Dallas's use of Dominion voting machines. This group has been on Dominion's trail over two years.***

> Byrne: I've been up there since with them since August and expanding and, and, and funding further and deeper investigations. So we really, I felt kind of had the answer when everyone woke up November 4th and saying what

---

[164] *Patrick M. Byrne (CEO of Overstock.com) EXPOSES Deep State Election Fraud*, Rumble (Dec. 23, 2020), https://rumble.com/vc4l9j-patrick-m.-byrne-ceo-of-overstock.com-exposes-deep-state-election-fraud.html.

[165] *Tech Millionaire Fund Hacking Team: "2020 Election 100% Rigged"*, One America News Network (Nov. 23, 2020), https://app.criticalmention.com/app/#clip/view/67795b8f-2934-4361-81bd-710b2250575a?token=37f52d99-127d-4b48-b8dc-e5e99babfaaa (Ex. 384).

happened? We couldn't quite believe we couldn't get anyone to listen to us.

> <u>Rion</u>: ***Their findings included detailed list of impossibilities, Dominion machines processing more ballots than is physically possible, real-time data showing Biden vote dumps that are statistically impossible, and dozens of backdoor ways in which votes by the thousands could be changed, manipulated or deleted.*** [166]

145. At a minimum, OAN and Rion recklessly disregarded the truth, and in fact knew that these statements about Dominion were false. They had been debunked time and time again. But OAN continued to spread these lies to feed its new line of Dominion specials and to please its audience, including President Trump, promoting Rion's Dominion-themed special on Twitter:



146. The same day, OAN's Chanel Rion took to Twitter to spread these lies about Dominion, tweeting: "My interview with @PatrickByrne — the tech investor behind the elite

---

[166] *Id.*

shadow cyber security team digging up incontrovertible evidence of Election Fraud. This is the cyberdata behind the #Kraken."[167]



147.    In response to OAN's lies about Dominion, President Trump gave OAN what he had promised: his continued support. On November 28, 2020, for instance, Trump encouraged his supporters to tune into OAN for more lies about Dominion, tweeting:

---

[167] Chanel Rion (@ChanelRion), Twitter (Nov. 25, 2020) (an archive of the tweet can be found here: http://web.archive.org/web/20201127105623/www.twitter.com/chanelrion).

> .@*FoxNews* daytime is virtually unwatchable, especially during the weekends. Watch @*OANN*, @*newsmax*, or almost anything else. You won't have to suffer through endless interviews with Democrats, and even worse!
>
> — Donald J. Trump (@realDonaldTrump) November 28, 2020

[168]

148.    OAN President Herring responded in kind, highlighting the mutually beneficial relationship OAN had developed with Trump by spreading lies about the election: "Thank you, President Trump. We encourage everyone to join us @OANN on AT&T U-Verse, AT&T TV, DirecTV, Frontier Communications and other cable providers. LIVE streaming available on the OAN App on AppleTV, Amazon Fire TV, http://KlowdTV.com, & Roku. Join @OANN for REAL news."



**Charles** @CharlesPHerring · 28 Nov 2020

Thank you, President Trump. We encourage everyone to join us @OANN on AT&T U-Verse, AT&T TV, DirecTV, Frontier Communications and other cable providers. LIVE streaming available on the OAN App on AppleTV, Amazon Fire TV, KlowdTV.com, & Roku. Join @OANN for REAL news.

> **Donald J. Trump** ✔ @realDonaldTrump
>
> .@FoxNews daytime is virtually unwatchable, especially during the weekends. Watch @OANN, @newsmax, or almost anything else. You won't have to suffer through endless interviews with Democrats, and even worse!

---

[168] Natalie Colarossi, *Trump Calls Fox News 'Virtually Unwatchable,' Points Followers to OANN and Newsmax*, Newsweek (Nov. 28, 2020), https://www.newsweek.com/trump-calls-fox-news-virtually-unwatchable-points-followers-oann-newsmax-1550945.

149. Meanwhile, public officials continued to debunk OAN's lies. On November 29, 2020, Chris Krebs appeared on 60 Minutes and declared: "[Election] Day was quiet. There was no indication or evidence that there was any evidence of hacking or compromise of election systems on, before, or after November 3."[169]

150. On November 30, OAN President Herring thanked President Trump for watching OAN and its coverage of the sham Arizona hearings that involved Dominion machines: "Mr. President, THANK YOU for tuning into @OANN for LIVE commercial free coverage from Arizona. The voter irregularities should be concerning to all Americans. You won't find continuous coverage on any other cable network. Thank you for tuning in."



151. On December 1, 2020, President Trump tweeted again endorsing OAN: "Hope everybody is watching @OANN right now. Other media afraid to show. People are coming forward like never before. Large truck carrying hundreds of thousands of fraudulent (FAKE) ballots to a voting center? TERRIBLE - SAVE AMERICA!"[170]

---

[169] Scott Pelley & Chris Krebs, *Fired director of U.S. cyber agency Chris Krebs explains why he says vote was "most secure in American history"*, 60 Minutes (Nov. 29, 2020), https://www.youtube.com/watch?v=YzBJJ1sxtEA.

[170] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 1, 2020, 3:31 pm), previously available at https://twitter.com/realdonaldtrump/status/1333856259662077954 (an archive of President Trump's tweets can be found here: Trump Twitter Archive, https://www.thetrumparchive.com (last visited Aug. 7, 2021)).

152.     By this time, even some of President Trump's once staunch supporters had begun to admit that OAN's lies about Dominion were completely baseless. On December 1, 2020, Trump appointee and then-U.S. Attorney General William Barr confirmed what was widely known to the public at this point: there was no evidence of fraud in the 2020 Presidential Election, including related to Dominion. Specifically, Barr stated: "There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, we haven't seen anything to substantiate that."[171] As Barr told the AP, he had "not seen fraud on a scale that could have effected a different outcome in the election."[172] OAN knew about Barr's statement and the DHS and DOJ's findings. But that didn't stop it from continuing to broadcast the false narrative about Dominion.

153.     Indeed, OAN CEO Herring at a minimum recklessly disregarded Barr's statement. He said on Twitter: "William Barr hasn't seen any 'evidence?' He should be watching @OANN, we've been running all the evidence he needs for the last several days." He then tagged President Trump.[173]

---

[171] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.

[172] Matt Zapotosky, Rosalind S. Helderman, Amy Gardner, & Karoun Demirjian, *'Pure insanity': How Trump and his allies pressured the Justice Department to help overturn the election*, Wash. Post (June 16, 2021), https://www.washingtonpost.com/politics/interactive/2021/trump-justice-department-2020-election/.

[173] Robert Herring (@RobHerring), Twitter (Dec. 1, 2020, 4:54 PM), https://mobile.twitter.com/robherring/status/1333907361128357888.



**Robert Herring**
@RobHerring
· · ·

William Barr hasn't seen any "evidence?" He should be watching @OANN, we've been running all the evidence he needs for the last several days.

@realDonaldTrump

4:54 PM · Dec 1, 2020 · Twitter Web App

154.   As more and more third-party, verifiable evidence continued to mount, OAN recklessly disregard that evidence and, in an effort to justify its refusal to acknowledge reality, even turned on those Trump allies who deigned to tell the truth about the 2020 election. And of course, OAN continued to give its audience what it was demanding in an effort to keep up with the race to the bottom: more lies about Dominion.

155.   On December 1, 2020, OAN and Dan Ball aired a clip featuring Alex Bruesewitz to continue OAN's campaign against Dominion. OAN introduced Bruesewitz as a "political consultant." But 24-year-old Bruesewitz is actually one of the organizers of Stop the Steal, the organization linked to high-profile MAGA personalities that helped organize the January 6 rally and storming of the Capitol in Washington.[174] On November 21, 2020, Bruesewitz spoke at a March for Trump rally, where he chanted that he was "never going to accept Joe Biden as president of the United States."[175]

---

[174] Tina Nguyen, *MAGA activists plot revenge on Republican 'traitors'*, Politico (Jan. 5, 2021), https://www.politico.com/states/florida/story/2021/01/05/maga-activists-plot-revenge-on-republican-traitors-1352479.

[175] *Quote of the Week: Ripon High School graduate speaks at Trump rally, appears on NBC Nightly News*, Commonwealth Ripon Press (Nov. 21, 2020), https://www.riponpress.com/editorial/quote-of-the-week-ripon-high-school-graduate-speaks-at-trump-rally-appears-on-nbc/article_4d51fcc2-2c1f-11eb-8009-db90825396c4.html.



156.     In the December 1, 2020 OAN segment, Bruesewitz, while in Washington, DC, claimed that Dominion software "is incredibly corrupt" and "should worry every person across the world."[176]

---

[176] *Continuing The Fight For Election Integrity*, One America News Network (Dec. 1, 2020), https://app.criticalmention.com/app/#clip/view/74aabd82-76ea-4a4e-8bfa-e3645cf52de9?token=9667991d-a9cf-4554-89fc-7585a7734f37.



157.    OAN continued broadcasting and promoting its special programming targeted at Dominion, on December 3, 2020, once again advertising its re-airing of the "Dominion-izing the Vote" special on Twitter:



158.    And yet again, this promotion and the rebroadcast of Dominion-izing the Vote

caught the eye of OAN's most important viewer, Trump, who predictably retweeted the promotion

to his more than 88 million followers.[177]

---

[177] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 6, 2020, 1:05 am), *previously available at* https://twitter.com/realdonaldtrump/status/1335465325069017088 (an archive of President

159.     Then, on December 7, 2020, OAN aired an entirely new segment to promote lies about Dominion called the **"Dominion 'Vote Flip.'"** OAN claimed that Dominion voting machines were "forensically analyzed" and "reported 87% for Trump and 113% for Biden," when they should have reported 100% for each.[178] OAN's own Chanel Rion claimed that **"votes were indeed flipped from Trump to Biden"** by Dominion voting machines.



160.     That same day, OAN spread yet more lies about Dominion on a segment called **"The Fight for Election Integrity."** OAN's Dan Ball hosted former Arizona State Senator and Chair of the Arizona Republican Party Kelli Ward to continue the disinformation campaign. Ball opened the segment, "We've heard all about Dominion last week on the show." OAN then broadcast Ward's statements that:

> Dominion would be terrifying to all Americans because it isn't about the number of votes that are cast, whether they were cast legally or illegally; it's about who's tabulating those votes, what's going on inside that machine, and who are the people that have control of these elections, these Dominion employees. . . . It is a very nefarious process going on.

---

Trump's tweets can be found here: Trump Twitter Archive, https://www.thetrumparchive.com (last visited June 15, 2021)).

[178] *Dominion 'Vote Flip', Fact Vs. Fiction In Ware County, Ga.*, One America News Network (Dec. 7, 2020), https://app.criticalmention.com/app/#clip/view/ae277748-ff62-44d3-8dec-6e441f8c8d8a?token=9667991d-a9cf-4554-89fc-7585a7734f37.

Ball replied by fully endorsing Ward's statements: *"Yeah. I agree with you, Kelli."*[179]

161.    On December 11, OAN CEO Herring tweeted: "After the last two weeks, if you have any doubts about President Trump winning the election then you haven't been watching @OANN. @realDonaldTrump #OANN"



162.    On December 16, 2020, OAN aired yet another Dominion disinformation segment titled *"Dominion Forensic Audit Proves Errors"* where OAN and Dan Ball continued to spread lies about Dominion.[180] Ball falsely claimed that "the Dominion voting systems indeed had technical errors and was set up for systematic fraud. That's it. . . . What this proves is that the Dominion software was fraudulent." But the "forensic audit" OAN referred to was actually the widely debunked report produced by Russell Ramsland and his biased, non-independent organization Allied Security Operations Group, which had released the "report" three days earlier, on December 13. As OAN and Ball knew or recklessly disregarded, the "audit" was in no way an official or independent exercise. Indeed, as OAN and Ball had to know, or at the very least recklessly disregarded, Ramsland had publicly peddled these same sorts of lies about the 2018

---

[179] *Real America with Dan Ball: The Fight for Election Integrity*, One America News Network (Dec. 7, 2020), https://app.criticalmention.com/app/#clip/view/51bc86d4-612d-4482-81c1-4cb56171811c?token=9667991d-a9cf-4554-89fc-7585a7734f37.

[180] *Real America with Dan Ball: Dominion Forensic Audit Proves Errors*, One America News Network (Dec. 16, 2020), https://app.criticalmention.com/app/#clip/view/6817e2c2-baf2-4d82-a7d1-113987de15f7?token=ae575e6a-a10c-4124-8254-c4f88f05daec.

Dallas congressional election and 2019 Kentucky gubernatorial election. Moreover, as OAN and

Ball had to know, or recklessly disregarded, Ramsland had also provided Sidney Powell and Lin

Wood with affidavits that had been discredited in numerous courts.



163.     The details of just how deeply flawed and untrustworthy Ramsland's Antrim

County report was had been publicly known and readily available since at least November 7, and

would later likewise be explained by Michigan's Republican-controlled Senate Oversight

Committee.

164.     For example, in his report, Ramsland references the "allowable election error rate

established by the Federal Election Commission." The Federal Election Commission regulates

campaign finance, not voting machines or software. The EAC—Election Assistance

Commission—certifies voting machines and software, and of course had certified Dominion's

technology well in advance of the 2020 election.[181]

---

[181] *How the U.S. Election Assistance Commission Facilitates Fair and Secure Elections*, U.S.
Election Assistance Commission (Dec. 3, 2020), https://www.eac.gov/news/2020/12/03/how-us-
election-assistance-commission-facilitates-fair-and-secure-elections/; *Certificate of
Conformance*, U.S. Election Assistance Commission (Sept. 14, 2018),
https://www.eac.gov/sites/default/files/voting_system/files/DSuite55_CertConf_Scope%28FINA
L%29.pdf.

165.     Ramsland's report also claims that his "forensics team" "perform[ed a] forensic duplication of the Antrim County Election Management Server running Dominion Democracy Suite 5.5.3-002." But there is no Democracy Suite 5.5.3-002. Instead, 5.5.3-002 refers to the ImageCast Precinct machine, which scans, tabulates, and stores the paper ballots, not the election management server or software.

166.     And Ramsland's report falsely claims that "all adjudication log entries for the 2020 election cycle are missing" and must have been "manually removed." But Antrim County neither purchased nor used—nor possessed the hardware required to use—Dominion's adjudication software, so obviously no "log entries" had been "removed." They never existed in the first place because Antrim County did not use them.[182] Indeed, it was widely known by at least November 7 that Dominion machines had not caused the original unofficial error in the Antrim County tally.

167.     The very same day the bogus Antrim report was released, Michigan Attorney General Dana Nessel and Secretary of State Jocelyn Benson released a press statement confirming that the report contained unsubstantiated lies.[183] Nevertheless, three days after Michigan disavowed the report, OAN was still spreading these lies. In the segment, Ball went on fuming about Dominion: "I am disgusted and I am really hot under the collar to keep it PC here. Talk about your findings and tell people, cause that's going to get them upset even more, but they got to know the truth."

---

[182]     *See* Declaration of Ryan Macias, FactCheck.org, https://cdn.factcheck.org/UploadedFiles/Rebuttal_ASOG-Antrim_Report.pdf (last visited Aug. 6, 2021).

[183]  *False Claims from Ronna McDaniel Have No Merit*, The Office of Michigan Secretary of State Jocelyn Benson (Nov. 6, 2020), https://www.michigan.gov/sos/0,4670,7-127-93094-544676--,00.html.

168.     Even Trump ally Ed McBroom, the Michigan State Senator and Chairman of the Republican-led Michigan Senate Oversight Committee, acknowledged the truth that OAN refused to report. On June 23, 2021, he released the results of an investigation by the Committee that again confirmed the accuracy of the vote counts in Dominion's machines in Antrim County, determined that the conclusions in the sham Ramsland report were "indefensible" and based on "willful ignorance or avoidance" of the proof, and recommended that the Michigan Attorney General consider investigating "those who have been utilizing misleading and false information about Antrim County to raise money or publicity for their own ends."[184] McBroom also told the Washington Post in May 2021: "I don't see how anybody can take Mr. Ramsland and his group seriously as genuine purveyors of fact. It's very clear they're beyond mistaken and misrepresenting what actually happened."[185]

169.     In the middle of the night on December 16, 2020, President Trump tagged OAN in a tweet responding to OAN's recent reporting, claiming that "Dominion Machines shifted 2-3% of Trump votes to Biden. Far more votes than needed to sway election." @OANN retweeted the statement the next day.

---

[184] MICH. S. OVERSIGHT COMM., REPORT ON THE NOVEMBER 2020 ELECTION IN MICHIGAN (Apr 9, 2021), https://misenategopcdn.s3.us-east-1.amazonaws.com/99/documents/20210623/SMPO_2020ElectionReport.pdf.

[185] Emma Brown et al., *The Making of a Myth*, Wash. Post (May 9, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-election-fraud-texas-businessman-ramsland-asog/.



***December 18-31, 2020:***
***Dominion Sends OAN its First of Many Retraction Demand Letters, but OAN Refuses to***
***Retract and Instead Ramps Up its Defamatory Campaign Against Dominion***

170.     On December 18, 2020, Dominion sent a retraction demand letter to OAN and the Herrings putting them on formal written notice of facts—which OAN already knew from the countless facts and statements from experts, Trump administration officials, appointees, and allies in the public domain—that demonstrated that the claims OAN had been broadcasting, publishing, rebroadcasting, and republishing about Dominion were false.[186] These facts had also been publicly available on Dominion's website since November 11, 2020. The retraction demand letter specifically referenced OAN's planned December 19, 2020 rebroadcast of "Dominion-izing the Vote" and of the specific verifiable facts debunking the false claims in that special.

---

[186] *See* Dec. 18, 2020 Ltr. From T. Clare and M. Meier to R. Herring, C. Herring, and B. Littman (Ex. 370).

171.   Dominion's December 18 retraction demand letter to OAN included and detailed numerous verifiable facts with citations to direct sources disproving OAN's and its featured guests' lies about Dominion, including:

- Dominion did not rig the 2020 Presidential Election or "switch" any votes.

- The vote counts from Dominion's machines have been verified by independent audits and recounts of paper ballots.

- Dominion was awarded a contract in Georgia to implement a verified paper ballot system after a competitive bidding process, in which it directly competed with Smartmatic and another company for the contract.

- Dominion's founder never claimed he could "change a million votes, no problem at all," and he cannot, in fact, do so.

- Dominion is not Smartmatic and it has no connection to Hugo Chavez, Venezuela, China, or George Soros.

- The Michigan Secretary of State, CISA, 59 specialists in election security, the Chairman of the Maricopa County Board of Supervisors, Georgia Republican Secretary of State Brad Raffensperger, Attorney General Bill Barr, Trump ally Chris Christie, and federal judges including one from the Eastern District of Michigan had completely debunked OAN's and others' false claims that Dominion rigged the election.

- The serious flaws and outright lies in Ramsland's Antrim County Report.

- OAN's sources such as Powell, Giuliani, Oltmann, Watkins, and Ramsland—as well as the individuals those sources purported to rely on—were proven liars and entirely unreliable.[187]

172.   Dominion's December 18 letter also attached its 15-page retraction demand letter it had sent to Powell two days earlier concerning the nearly identical lies about Dominion she had been spreading since Election Day. That letter included even more facts detailing the complete falsity of her lies about Dominion and more evidence of why Powell and her sources were completely unreliable and proven liars, including:

---

[187] *Id.*

- Powell lied about having a Dominion employee "on tape" saying he "rigged the election for Biden" when she knew no such tape exists.

- Federal judges in Michigan and Arizona had called her filings "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden," "were largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and that her so-called experts—including Ramsland—"reach implausible conclusions, often because they are derived from wholly unreliable sources."[188]

- Election and government officials—including Republicans and Trump allies—in Michigan, Arizona, and Georgia had explicitly debunked her election claims about Dominion.[189]

- Even Tucker Carlson called Powell out for failing to provide any evidence to support her assertions.[190]

- Powell deliberately misrepresented Joshua Merritt—aka, "Spyder"—as a "military intelligence expert" even though he had no such expertise, drafted nearly identical affidavits for two separate witnesses, and had doctored the official Georgia Secretary of State certification for Dominion in order to falsely claim it was undated. (It would later be reported by the *Washington Post* that Merritt had formerly worked for Russell Ramsland at ASOG—another critical fact that Powell failed to disclose.[191])

---

[188] *See* Op. & Order Den. Pl.'s Emer. Motion. For Decl., Emerg., and Inj. Relief at 34, *Whitmer v. City of Detroit*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62]; Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].

[189] Nick Corasaniti, Reid J. Epstein & Jim Rutenberg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, The N. Y. Times (Nov. 10, 2020), https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html; Letter from Clint Hickman to Maricopa County Voters (Nov. 17, 2020), https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters; Georgia Secretary of State Brad Raffensperger, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race* (Nov. 20, 2020), https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race.

[190] *Tucker Carlson SLAMS Sidney Powell for not Providing Evidence Election was Taken from Trump*, YouTube (Nov. 19, 2020), https://www.youtube.com/watch?v=57l56J47xhk.

[191] Emma Brown et al., *The Making of a Myth*, Wash. Post (May 9, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-election-fraud-texas-businessman-ramsland-asog/.

The December 18 letter to OAN also included a copy of the December 9, 2020 order and opinion by United States District Judge for the District of Arizona dismissing Powell's last lawsuit with prejudice.[192]

173.    OAN did not respond to Dominion's December 18 letter. Instead, the very next day, it rebroadcast, for at least the third time, the "'Dominion-izing' the Vote" program, which again included lies about Dominion peddled by Ron Watkins, Joe Oltmann, and Sidney Powell—individuals that Dominion had specifically discredited in its December 18 letter.[193]

174.    On December 19, 2020, President Trump gave OAN more motivation to continue its lies about Dominion, tweeting: "The lie of the year is that Joe Biden won! Christina Bobb @OANN."

> **Donald J. Trump**
> @realdonaldtrump
>
> *The lie of the year is that Joe Biden won! Christina Bobb @OANN*
>
> Dec 19th 2020 - 2:59:20 PM EST · Twitter for iPhone · View on Twitter

175.    By then, Attorney General Barr had publicly rebutted lies of election fraud numerous times, including on December 1, 2020 as discussed above. He did so again on December 21, 2020, stating "at a news conference that he saw no basis for the federal government seizing voting machines. He also said that he did not intend to appoint a special counsel to investigate allegations of voter fraud."[194] As Barr told the Associated Press, "If I thought a special counsel at

---

[192] *See* Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].

[193] *Dominion-izing the Vote*, One America News Network (rebroadcast Dec. 19, 2020) (transcript of original at Ex. 383).

[194] Matt Zapotosky, Rosalind S. Helderman, Amy Gardner, & Karoun Demirjian, *'Pure insanity': How Trump and his allies pressured the Justice Department to help overturn the election*, Wash.

this stage was the right tool and was appropriate, I would name one, but I haven't, and I'm not going to."[195] Other Trump advisors had privately admitted by mid-December that these theories regarding Dominion rigging the election were "bat-shit insane."[196]

176.    After OAN doubled down on its lies about Dominion despite receiving the December 18 retraction demand letter, Dominion sent another retraction demand letter on December 22, 2020 to OAN and the Herrings.[197] This letter detailed the specific harm OAN's false reporting had caused Dominion and notified OAN specifically of the explicit death threats Dominion's employees had received. The letter also attached an appendix of several OAN broadcasts in which OAN made demonstrably false statements about Dominion, including the several broadcasts of "Dominion-izing the Vote," and demanded that OAN retract these articles and broadcasts. OAN acknowledged receipt of the letters the next day but declined to take any action at all about its false reporting.

177.    Despite OAN's receipt of multiple retraction demands from Dominion, OAN continued to perpetuate its lies about Dominion. On December 24, 2020, OAN's Patrick Hussion claimed that ***"recent forensic audits found Dominion voting machines were programmed to give Joe Biden an automatic advantage over any number of Trump votes."*** OAN also rebroadcast a clip of Giuliani's November 19, 2020 press conference,[198] where Giuliani claimed that Dominion

---

Post (June 16, 2021), https://www.washingtonpost.com/politics/interactive/2021/trump-justice-department-2020-election/.
[195] *Id.*
[196] Emma Brown et al., *The Making of a Myth*, Wash. Post (May 9, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-election-fraud-texas-businessman-ramsland-asog/.
[197] *See* Dec. 22, 2020 Ltr. From T. Clare and M. Meier to R. Herring and C. Herring (Ex. 371).
[198] Jonah Bromwich, *Whatever It Is, It's Probably Not Hair Dye*, N.Y. Times (Nov. 19, 2020), https://www.nytimes.com/2020/11/19/style/rudy-giuliani-hair.html.

voting machines were programmed "to give somewhere between a 2 and 5 percent advantage" to Joe Biden.[199]

178.    OAN knew, at a minimum because Dominion had specifically noted as much in its December 18 letter, that Giuliani had never made any of these claims about Dominion in any court filing he was associated with. Nonetheless, OAN promoted the same story and lies on Twitter the next day.



[200]

179.    On December 24, the same day OAN aired the lies that Dominion machines were set to give Biden a 2-5% lead, Dominion received another letter from OAN's outside counsel that declined to engage on the falsity of OAN's reporting. Instead, the letter doubled down on OAN's

---

[199] *OAN Breaking News Live With Patrick Hussion: President Trump: Election Fraud Is A Proven Fact*, One America News Network (Dec. 24, 2020), https://app.criticalmention.com/app/#clip/view/edd92632-4c80-4830-9322-cc20537255e2?token=945b87c9-0c2d-4595-99ec-c9c83da5b728 (Ex. 386).

[200]*Giuliani: Dominion Machines Set To Give Biden 2-5% 'Lead'*, One America News Network (Dec. 24, 2020), *previously available at* https://www.oann.com/giuliani-dominion-machines-set-to-give-biden-2-5-lead/ (an archive of the article can be found here: https://web.archive.org/web/20210107141017/https://www.oann.com/giuliani-dominion-machines-set-to-give-biden-2-5-lead/).

lies about Dominion, even demanding that **Dominion preserve Smartmatic's documents**. Dominion's prior letters to OAN had provided OAN with verifiable evidence that Dominion and its competitor Smartmatic were completely separate companies with no ownership or controlling interests in one another, and were in fact competitors.

180.     OAN also continued to barrel forward in its Dominion disinformation campaign, continuing to create and broadcast new content spreading known lies. On December 29, 2020, OAN hosted a "one-on-one" conversation with Rudy Giuliani—who OAN's Christina Bobb had been working with to overturn the 2020 election, and who would later have his New York and District of Columbia bar licenses suspended for making "***knowing*** false and misleading factual statements to support his claim that the presidential election was stolen from his client [Donald Trump]"[201]—and Chanel Rion in Washington, DC, during which OAN continued to spread and broadcast Giuliani's lies about Dominion.[202] Giuliani compared Dominion voting machines to "swiss cheese" and falsely claimed that he had "photographs of Dominion machines connected to the internet" and "internet traffic from their machines." Bobb, Rion, and OAN knew that Giuliani had no such photographs or evidence.

---

[201] *See* Order, *In re Giuliani*, No. 2021-00506 (N.Y. Sup. Ct. June 24, 2021), https://www.nycourts.gov/courts/ad1/calendar/List_Word/2021/06_Jun/24/PDF/Matter%20of%20Giuliani%20(2021-00506)%20PC.pdf.

[202] *One-On-One With Rudy Giuliani On Election Fight*, One America News Network (Dec. 29, 2020), https://app.criticalmention.com/app/#clip/view/0e6482f8-0f33-4473-89db-7a296915c6c7?token=3e9c75c0-6f76-413d-baf8-14659794f3ff.



181.    Also on December 29, 2020, Dominion responded to OAN's counsel's letter demanding that Dominion preserve Smartmatic's documents and communications.

### OAN Continues Its Dominion Disinformation Campaign Into the New Year

182.    Despite Dominion's multiple retraction letters detailing OAN's false statements, OAN refused to retract or apologize. Instead, OAN doubled down and barreled forward with its Dominion-specific content. On December 30, OAN published and broadcast more lies about Dominion, including statements from Sidney Powell that **"The flipping of votes by Dominion is even advertised on their ability to do that, to run a fraction, to make a Biden vote count 1.26% and a Trump vote to only count 0.74%"** and that Dominion has **"done it in Venezuela, they've done it in other foreign countries, they've done it in this country."** OAN then published a tweet from its @OANN account with the Powell clips and the headline, **"Powell: Election fraud now obvious because President Trump's landslide victory broke Dominion 'vote-switch' algorithm."**[203]

---

[203] One America News (@OANN), Twitter (Dec. 30, 2020, 10:28 AM), https://twitter.com/OANN/status/1344304328333377536.



183. On January 1, 2021, OAN broadcast yet more lies about Dominion. OAN rebroadcast statements from Giuliani's podcast Common Sense, claiming that "meddling" with the 2020 presidential election was accomplished with "phony ballots and the hacking of Dominion machines." As OAN's Emily Finn put it, "Giuliani says the high number of fake votes overloaded election systems, causing key states to stop their counts on election night." In short, OAN continued to repeat and promote Giuliani's lie that "***the Democrat Party ran a nationwide***

***conspiracy plot together with Dominion and China and other foreign countries and companies to steal President Trump's victory.***"[204]

184.   On January 2, 2021, OAN broadcast from Washington, DC an interview of Giuliani by OAN news reporter and host of "Weekly Briefing" Christina Bobb, in which Bobb extracted from Giuliani and the lie, which she endorsed, that in Michigan there were "more votes than voters" because "the Dominion machines, which are the machines that we use, ***are basically built to cheat.***"[205]



185.   At the outset of the January 2 segment with Giuliani, OAN finally notified its viewers—after more than two months of her covert work for the Trump campaign—that Bobb had in fact been working hand-in-hand with the Trump campaign to overturn the election.

---

[204] *OAN News 8am with Stephanie Myers: Giuliani: State & U.S. Lawmakers Must Reverse Election Fraud*, One America News Network (Jan. 1, 2021), https://app.criticalmention.com/app/#clip/view/27981d65-ed66-4cee-8cd1-a7ac77b85891?token=76f4002c-113c-4d95-b318-3fe81b0c8b5 (Ex. 388).
[205] *Weekly Briefing: Christina Bobb Interviews with Rudy Giuliani*, One America News Network (Jan. 2, 2021), https://app.criticalmention.com/app/#clip/view/74ed09be-0f2b-4c14-b9de-0ca0ad59952b?token=76f4002c-113c-4d95-b318-3fe81b0c8b5 (Ex. 389).

186.    In addition to endorsing lies from knowingly unreliable sources, OAN's own personalities continued to peddle those and similar lies themselves. For example, on January 5, 2021, OAN's own Mike Dinow falsely claimed that "432,000 votes were removed from President Trump's results in Pennsylvania" and that this "illegal subtraction could be a result of electronic tampering with Dominion machines." Dinow and OAN put up a graphic showing that this "illegal subtraction" allegedly occurred most prominently in Lehigh, Chester, and Allegheny county. But of course, as OAN and Dinow knew (or recklessly disregarded), Dominion machines were not used in those Pennsylvania counties.



***Incited by OAN's and Other Conservative Media's Disinformation Campaign,
a Violent Mob Storms the United States Capitol and Disrupts
the Certification of the 2020 U.S. Presidential Election***

187.    Some OAN viewers believed the lies about Dominion with such devotion that they took the fight to the United States Capitol on January 6, 2021, and at rallies across the country to #StopTheSteal, inflicting violence, terror, and death along the way.[206] "[C]rucially, supportive media outlets amplified [Trump's] claims, from wholehearted cheerleading on Newsmax and One

---

[206] Bill Keveney & Maria Puente, *How Conservative Media Stoked Baseless Election-Fraud Claims that Motivated DC Rioters*, USA Today (Jan 13, 2021).

America News Network (OAN) to credulous acceptance of gossamer-thin (and failed) legal challenges."[207] "And in the minds of millions, including some of those who sacked the Capitol, those outlets helped legitimize the groundless fraud claims."[208] An OAN flag was seen among the flags flown by the rioters at the Capitol on January 6.[209]



Another banner at the Capitol on January 6 read: "No Machines Dominion Steals!"



---

[207] *Id.*

[208] *Id.*

[209] Jordan Klepper, *Jordan Klepper Sees It All at The Capitol Insurrection*, The Daily Show with Trevor Noah (Jan. 12, 2021), https://www.youtube.com/watch?v=YVDJqipoohc.

188.    One such insurrectionist, David Blair, who was charged with swinging a "lacrosse stick attached to a confederate flag" at capitol officers and striking one in the chest, stated through his attorney that he stormed the Capitol on January 6 because he had been "sold a bill of goods" after "watching Fox and Newsmax and OANN."[210] Mr. Blair was also found on the U.S. Capitol grounds on January 6 with a "bag that contained a knife."

189.    While insurrectionists, including some OAN viewers, stormed the Capitol at the urging of OAN, Giuliani, Trump, and others, OAN reporter Christina Bobb went to the Willard Hotel in Washington, DC—located near the White House and the site of the Stop the Steal rally—to meet with Giuliani, Ramsland, Oltmann, Trump Campaign attorney Joe Eastman, and other individuals pushing the lies that Dominion rigged the 2020 election.[211]

---

[210] Justin Fenton, *Maryland man hit Capitol officers with lacrosse stick attached to Confederate flag, challenged cops, a search warrant says*, Baltimore Sun (Feb. 2, 2021), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-blair-capitol-search-warrant-20210202-x4uzotfxhng5ddglhnl5npeonu-story.html.

[211] Seth Abramson, *Sixth January 6 Willard Hotel "War Room" Member Confirmed; Revelation May Implicate Trump's Department of Homeland Security in the Insurrection*, Proof on Substack (June 14, 2021), https://sethabramson.substack.com/p/breaking-news-sixth-january-6-willard; Michael Farris, *Christina Bobb #223*, Coffee and a Mic (Jan. 12, 2021), https://player.fm/series/coffee-and-a-mike/christina-bobb-223.



***January 2021:***
***OAN Quietly Removes Many of Its Broadcasts***
***Airing and Endorsing Lies About Dominion From Its Website***

190.     At some point on or after January 14, 2021—after the insurrection at the U.S.

Capitol fueled by the very same false claims of election fraud OAN had been pushing for more

than two months and after Dominion had sued Sidney Powell for defamation for spreading those

very same lies—OAN quietly and discreetly removed stories about Dominion from its website.[212]

The stories OAN deleted from its website included articles and broadcasts featuring Sidney

Powell, Rudy Giuliani, and Joe Oltmann. OAN also deleted tweets from its Twitter accounts,

including @OANN and @ChanelRion.

---

[212] Jacob Shamsian, *Trump-ally media outlet OAN quietly deleted articles about Dominion despite publicly doubling down on election conspiracy theories*, Business Insider (Jan. 20, 2021), https://www.businessinsider.com/oan-deletes-articles-about-dominion-voting-election-conspiracy-2021-1.

191.    Despite it being common practice for legitimate news organizations to issue retraction notices or editors' notes when stories have been removed or significantly corrected, OAN did not give any public notice of those actions. Instead, the landing pages for those deleted articles simply noted "Page Not Found (404)."[213]

192.    However, "OAN's purge of articles about Dominion" was not "comprehensive" and many articles peddling lies about Dominion remained available on OAN's website. OAN also made no effort whatsoever to remove any videos from its social media accounts or digital platforms such as YouTube or Rumble.[214] To this day, OAN has never retracted any of its statements about Dominion or tried to notify its viewers that the alternate reality it created in which Dominion stole the 2020 election from Trump is an outright lie.

193.    In fact, seemingly unsatisfied with the proven liars, conspiracy theorists, and other disreputable sources it had previously marched onto its airwaves, in late January 2021 OAN turned to a previously untapped resource willing to lie about Dominion rigging the 2020 election: an uncredentialed convicted felon.

194.    On January 27, 2021, OAN broadcast a segment hosted by Trump Campaign affiliate Christina Bobb in which she interviewed a supposed "expert mathematician" named Ed Solomon who claimed he had uncovered mathematical evidence proving that the November 2020 election results were "impossible" and that therefore "computer software must have used an algorithm to change the votes."[215] Solomon claimed that the results "can only have been done by an algorithm, it can't be done by humans" after he supposedly analyzed the results in Fulton

---

[213] *Id.*

[214] *Id.*

[215] *Mathematician: Election Numbers Don't Add Up*, One America News Network (Jan. 27, 2021), https://www.oann.com/recall-effort-against-calif-governor-gavin-newsom-approaches-1-5-million-signatures/ (Ex. 390).

County, Georgia—where Dominion machines were used to tabulate votes. He then claimed that the odds of those results occurring naturally were "1 over 10 to an exponent so large there's not enough stars in the universe, there aren't enough atoms in the universe, to explain the number."



195.    Solomon's claims were ludicrous. OAN knew it, and at a minimum recklessly disregarded the truth. OAN knew Solomon's claims were false because Dominion had expressly notified OAN of independent evidence debunking them, because former President Trump's own administration had debunked them, and because OAN itself had effectively acknowledged it by secretly removing several articles and broadcasts from its own website that made similar claims. OAN also knew Solomon's claims were bogus because Solomon was the farthest thing imaginable from an "expert mathematician"—he was in fact a convicted felon with no college degree. Nonetheless, OAN broadcast and endorsed as its own Solomon's preposterous and baseless allegations that the 2020 election was rigged through computer algorithms Solomon claimed were implemented in voting machines in the very counties and jurisdictions that used Dominion machines.

196.    On February 4, 2021, Dominion sent OAN yet another retraction demand letter, this time demanding that OAN retract the January 27 Solomon interview and broadcast. In that

letter, Dominion notified OAN that Solomon was no "expert mathematician" and the he was actually a convicted drug dealer who never graduated college and whose current job was setting up swing sets in Long Island, New York. At some point thereafter, OAN quietly removed the video and story from its originally published location on its website, but the video remains available on OAN's Rumble page and on another landing page on its main website.[216]

<div align="center">

**February-April 2021:**
**Mike Lindell Agrees to Allow OAN to Broadcast His Sham "Docu-movie,"**
**Which OAN Broadcasts Knowing Full Well That the Film is Full of Lies About Dominion**

</div>

197.   In February 2021, months after the Presidential Election—after OAN received multiple retraction demands from Dominion, including additional demands on December 29, 2020, and February 4, 2021,[217] and well after any claims of election fraud had been entirely and publicly debunked—OAN enlisted yet another facially unreliable source to defame Dominion: the CEO of MyPillow, Mike Lindell. Beginning in 2004, when Lindell founded the MyPillow company, Lindell personally starred in MyPillow's infomercials, which claimed that MyPillow would help people suffering from fibromyalgia, insomnia, migraines and headaches, sleep apnea, snoring, TMJ, and restless leg syndrome.[218] In 2016, prosecutors alleged that these claims were "untrue or misleading."[219] Rather than defend the truthfulness of MyPillow's claims in court, Lindell opted to pay $995,000 in civil penalties.[220] Similarly, the Better Business Bureau revoked the accreditation of MyPillow and lowered its rating to "F" based on a pattern of complaints by

---

[216] *Id.*

[217] *See* Dec. 29, 2020 Ltr. from T. Clare to E. Early; Feb. 4, 2021 Ltr. from T. Clare to E. Early (Ex. 411).

[218] *See* Compl., *California v. MyPillow, Inc.*, No. HG16836619 (Ca. Super. Ct., Alameda Cty. Oct. 26, 2016).

[219] *Id.*

[220] *See* Final J., *California v. MyPillow, Inc.*, No. HG16836619 (Ca. Super. Ct., Alameda Cty. Oct. 31, 2016).

customers.[221] In the first three quarters of 2020, MyPillow spent more than $62 million on TV ads, with nearly 99% of it going to cable channels like OAN.[222] By this time, OAN was well aware of the lies Lindell would spread. Indeed, Lindell had established himself as a prime purveyor of false stories of election fraud. In addition, on January 15, 2021, Lindell was seen at the White House with notes that "appeared to suggest the president was considering invoking the Insurrection Act, a law that lets the president deploy military and National Guard troops to the streets and the use of 'martial law if necessary.'"



---

[221] *My Pillow*, Better Business Bureau, https://www.bbb.org/us/mn/chaska/profile/pillows/my-pillow-inc-0704-96152336 (last visited July 7, 2021).

[222] Tiffany Hsu, *As Corporate America Flees Trump, MyPillow's C.E.O. Stands by Him*, N.Y. Times (Jan. 12, 2021), https://www.nytimes.com/2021/01/12/business/media/mypillow-mike-lindell-trump.html.

198.     Despite OAN's knowledge of the truth—or at minimum reckless disregard of it—OAN invited Lindell to broadcast a series of "documentaries" spreading lies about Dominion. Specifically, between February 5 and June 5, OAN broadcast Lindell's first two-hour "docu-movie" entitled Absolute Proof for a total of 26 hours of airtime, which constituted 13 separate broadcasts; his first follow-up to Absolute Proof entitled Scientific Proof; another follow-up "docu-movie," which suggests Dominion interfered in the election just by its name: Absolute Interference; and most recently, yet another "docu-movie" entitled , in which Lindell claimed he would get the Supreme Court of the United States to overturn the election by a 9-0 vote.

199.     Before Lindell's first "docu-movie," Absolute Proof, aired on February 5, 2021, Lindell had previously announced that his movie would premiere on OAN and had detailed exactly what he would include in it. For example, Lindell had made it publicly known that he would be relying heavily on "evidence" he found on a conspiracy theory blog called The American Report, which is run by people identified as "Mary Fanning" and Alan Jones, who are facially unreliable for multiple reasons, including that neither "Mary Fanning" nor Alan Jones have any apparent background in cybersecurity or intelligence and that there were numerous major flaws in the analytics underlying the report.[223]

200.     In the February 4, 2021 retraction demand letter it sent regarding the bogus Solomon segment—and before OAN aired Absolute Proof—Dominion also notified OAN that Lindell's Absolute Proof movie was demonstrably false.[224] Dominion referenced and attached a letter of the same date it sent to Lindell, which detailed numerous red flags and fatal flaws in the "raw data analytics" from The American Report conspiracy theory blog he claimed he would

---

[223]   Mary Fanning Kirchhoefer, LinkedIn, (last visited June 16, 2021), https://www.linkedin.com/in/mary-fanning-kirchhoefer-583a181b/.

[224]   See February 4, 2021 Ltr. from M. Meier & T. Clare to E. Early (Ex. 372).

include in the movie and numerous specific facts discrediting sources such as Russell Ramsland and his bogus "forensics report" on Antrim County, Michigan. The letter also referred Lindell to Dominion's defamation complaint against Rudy Giuliani, which set forth the flaws in Ramsland's Antrim County report in greater detail and also explained in detail how a series of human errors by the Antrim County Clerk—not machine fraud—had caused the unofficial result in that county to indicate a win for Biden before the mistake was promptly caught as part of the normal canvass process.[225]

201.  After receiving Dominion's letter, OAN began to aggressively promote its line of original Dominion-themed programming, including Lindell's movie. Late in the evening on February 4, 2021—the day before the movie first aired on OAN—OAN tweeted out a thirty-second trailer for Absolute Proof and promised its viewers "a never-before-seen report breaking down election fraud evidence & showing how the unprecedented level of voter fraud was committed in the 2020 Presidential Election." OAN noted at the end that the movie was "Only on #OANN."[226]

---

[225] *Id.*
[226] One America News (@OANN), Twitter (Feb. 4, 2021, 10:38 pm), https://twitter.com/OANN/status/1357533963707842560.



202.    In another tweet featuring OAN's trailer for the film, OAN also promised its viewers "Growing evidence of election fraud reveals that the Presidency of the United States has been stolen from the American people." Just a few minutes later, OAN tweeted the same video again, this time noting the exact dates and times the movie would be available "Only on #OANN."[227] In the short video promoting the movie, OAN told its viewers that "growing evidence of election fraud reveals that the presidency of the United States has been stolen from the American

---

[227]   One America News (@OANN), Twitter (Feb. 4, 2021, 10:42 pm), https://twitter.com/i/web/status/1357535145574559746.

people," and described the movie as "showing exactly how this unprecedented level of voting fraud was committed."[228]



203.    OAN broadcast the film thirteen times from February 5 to February 8, 2021. In addition, OAN broadcast Absolute Proof again, interspersed with an interview of Lindell by Steve Bannon, on February 11, 2021.

204.    OAN was fully aware that Lindell's "docu-movie" was full of lies and recklessly disregarded the truth about the 2020 election but deceived its viewers nonetheless. Why? At least

---

[228] *Id.*

in part to please Lindell, who was (and remains) one of OAN's biggest advertisers. And it also allowed OAN to curry favor with President Trump.

205. In a calculated attempt to try to avoid defamation liability for the lies it was about to knowingly broadcast to a global audience, OAN played a disclaimer effectively admitting that OAN knew Lindell's claims were false but trying to pass them off as "opinions" and brazenly claiming—contrary to months of OAN's false reporting on Dominion, which had caused millions of Americans to question the results of the Presidential election—that the assertions in the sham "docu-movie" were not adopted or endorsed by OAN. The disclaimer read:

### DISCLAIMER

> Michael James Lindell has purchased the airtime for the broadcast of this program on One America News ("OAN") network. Mr. Lindell is the sole author and executive producer of this program and is solely and exclusively responsible for its content. The topic of this broadcast is the 2020 election. OAN has undertaken its own reporting on this topic. This program is not the product of OAN's reporting. The views, opinions and claims expressed in this program by Mr. Lindell and other guests, presenters, producers, or advertisers are theirs, and theirs alone and are not adopted or endorsed by OAN or its owners. In particular, OAN does not adopt or endorse any statements or opinions in this program regarding the following entities or people: US Dominion, Inc. (and any related entities); Smartmatic USA Corp; Brian Kemp; Brad Raffensperger; or Gabriel Sterling. Further, the statements and actions expressed in this program are presented at this time as opinions only and are not intended to be taken or interpreted by the viewer as established facts. The results in the 2020 Presidential election remain disputed and questioned by millions of Americans who are entitled to hear from all sides in order to help determine what may have happened. [229]

206. But OAN's "disclaimer" was nothing more than a ploy—a hollow attempt to try to avoid liability for what it knew to be a film about the very same false and utterly baseless allegations OAN itself had created, endorsed, and spread for almost four months. The disclaimer

---

[229] *Absolute Proof* (2020), previously available at https://rumble.com/vdlbl7-absolute-proof-mike-lindell-election-documentary-full.html (Ex. 391).

itself demonstrates that OAN knew or recklessly disregarded the falsity of the broadcast. Indeed, the fine-print disclaimer it flashed at the beginning of the film was completely belied by its tweets and commercials just the day before promising its viewers that Absolute Proof was proof that Dominion rigged the election and that the film would be "a never-before-seen report breaking down election fraud evidence & showing how the unprecedented level of voter fraud was committed in the 2020 Presidential Election." OAN would not provide any such disclaimer for any of Lindell's other films it broadcast repeatedly through the first half of 2021, and continued to broadcast the lies about Dominion as truth and to conceal the true facts from its viewers.

207.    OAN's broadcasts of Absolute Proof start with Lindell saying that the "deviations that happened on election night" did not "ma[ke] any sense," despite the fact that Lindell (and OAN) knew that Trump had discouraged his supporters from voting by mail while Democrats had done the opposite, and that there had been human error by the county clerk—not machine fraud—in Antrim County.[230]

208.    Then—despite the fact that Dominion had previously written to OAN and specifically pointed out red flags and errors in the fake "raw data analytics" screenshot Lindell downloaded from the conspiracy theory blog—OAN knowingly lied to its audience about that document, broadcasting Lindell's claim that it was "a piece of evidence that's 100% proof, it's like a print of inside the machine with the timestamp that showed other countries attacking us, hacking into our election through these machines, and it shows the votes flipped."[231]

209.    And, despite the fact that Dominion had previously written to OAN (and Lindell) and pointed out specific facts from the public domain thoroughly discrediting the "Deep State"

---

[230] *Id.*
[231] *Id.* at 1:19-35 (Tr. at 3:5-9).

conspiracy theorist Russell Ramsland, Lindell's "docu-movie" also featured Ramsland claiming—against a backdrop of ominous music—that it was a "stolen election."[232]



210.    Notably, Russell Ramsland appears to be one of the earliest promoters of the kinds of lies that are now being told about Dominion: as described in detail above, he began making similar claims years before the 2020 election, when Pete Sessions—a staunch Trump supporter—lost to a Democrat in a 2018 election in Dallas, Texas. While Ramsland had in 2015 been the leading contender to challenge Pete Sessions in a Republican primary for a congressional seat,[233] in 2018, Ramsland began alleging that his former rival had been deprived of his rightful seat in Congress by vote-flipping machines in that Dallas election. ***That 2018 Dallas election did not use Dominion equipment, but rather equipment provided by Dominion's competitor, ES&S.***

211.    In the OAN/Lindell "docu-movie," Ramsland repeats the story he began telling years ago—that voting machines in Texas flipped votes and stole the election from Pete Sessions

---

[232] *Id.* at 31:15-22 (Tr. at 31:15-19).
[233] Gromer Jeffers Jr., *Tea party activists mobilize for another shot at Pete Sessions*, Dallas Morning News (July 9, 2015), https://www.dallasnews.com/news/politics/2015/07/09/tea-party-activists-mobilize-for-another-shot-at-pete-sessions/.

in Dallas in 2018—and then claims that voting machines improperly purged votes in Dallas and Harris County just before the 2020 election. In the film, though, Lindell and Ramsland fail to address the fact that Ramsland's story about the Texas voting machines actually ***undermines*** their current claim that Trump won the 2020 election: if Ramsland's story were true, that would cast doubt on Trump's wins in Texas and several swing states that used the same machines as Texas (and which, again, were ***not*** Dominion machines). But the OAN/Lindell film does not attack the results in states that Trump won, of course; doing so would have undermined their false preconceived narrative.

212. The "docu-movie" also features Ramsland claiming "[w]e developed huge, tons of absolute proof on this, but no court case was ever allowed, ever allowed it to be presented… But it does exist. It's out there. It's unbelievable. It's massive." Instead of displaying the "huge, tons of absolute" "unbelievable" "massive" "proof" or referring to a website where the public and experts could scrutinize the "proof" for themselves, at this point, the film features animated graphics of green text moving quickly across a black screen and a stylized image of Earth from space, along with a claim from Ramsland that he had seen undisclosed "data that is supposedly representative."[234] As one *Rolling Stone* reporter told Lindell: an "unnamed hacker spoke in sentences that used English to make an indecipherable word salad."[235] Lindell replied: "Oh, those numbers were just b-roll."[236] In other words, Lindell himself acknowledged that what he was

---

[234] *Absolute Proof* at 31:15-52 (Tr. at 32:23-33:3), previously available at https://rumble.com/vdlbl7-absolute-proof-mike-lindell-election-documentary-full.html (Ex. 391).
[235] Stephen Rodrick, *Diamond and Sulk: A Weekend With Mike Lindell and the MAGA Zombies*, Rolling Stone (June 14, 2021), https://www.rollingstone.com/politics/politics-features/mypillow-mike-lindell-2020-election-1183676/.
[236] *Id.*

showing was untrue and designed to mislead the viewer into thinking that the movie was showing

actual evidence of hacking.




Graphics from the "docu-movie" Absolute Proof.

213.    Despite the fact that OAN was well aware from Dominion's prior correspondence

of the publicly available sources documenting what had really happened in Antrim County,

Michigan (human error, not corrupt vote-flipping machines), and of numerous errors by Ramsland

thoroughly debunking his supposed credentials and his so-called "forensics report" on Antrim

County, OAN broadcast Lindell's "docu-movie," which deliberately deceives viewers by calling

Ramsland's debunked report "a perfect report," falsely holding Ramsland out as a "forensic expert

on these particular machines," and deliberately lying about what had actually happened in Antrim

County, Michigan, falsely claiming that "7,060" votes "were flipped from Trump to Biden… by

the machines."[237]

214.    Later in the "docu-movie," Lindell states: "This Dominion. These machines are the

biggest fraud in election—they stole this, but now the truth is all going to be revealed."[238] An hour

and a half into the program, Lindell states: "Well, everyone, this is the moment you've all been

---

[237] *Absolute Proof* at 33:02-35:48, 1:16:54-56, 1:21:39-41, 1:13:24-35 (Tr. at 35:10-25, 87:9, 92:17, 82:16-83-4), Rumble (Feb. 5, 2021), previously available at https://rumble.com/vdlbl7-absolute-proof-mike-lindell-election-documentary-full.html (Ex. 391).
[238] *Id.* at 1:30:55-31:04 (Tr. at 102:22-25).

waiting for. What you're going to see now is 100% proof that we had upon our country, the biggest cyber-attack in history. And I'm going to bring on Mary Fanning to explain how it all happened and then show you the 100% proof."[239]

215.　　In the Absolute Proof "docu-movie" that OAN broadcast, Lindell and "Fanning" claim that they have "thousands of pages," "100% proof," and "historic proof" of "election fraud," "foreign intrusion into our election," and that Dominion "stole" the election.[240] But rather than posting the "proof" in native spreadsheet form on a website where it—and its metadata—could be scrutinized by the public and real experts in election security, Lindell and "Fanning" chose to have the "docu-movie" show scrolling footage of the fake "raw data analytics" that "Fanning" had previously excerpted on her conspiracy theory blog, and a purported representation of those "analytics"—a multi-colored cartoon animation of a world map, purporting to show votes being sent overseas and stolen in real-time. Even putting aside the fake data, the claim is itself Alice-in-Wonderland-level absurd, given that the votes allegedly manipulated were all recorded by voters ***on paper ballots stored by local election officials in the United States***, and thus beyond any possible reach of such "foreign intrusion."



Scenes of the "100% proof" and "historic proof" from Absolute Proof

---

[239] *Id.* at 1:36:3-20 (Tr. at 108:12-18).
[240] *Id.* at 1:42:1-2, 1:43:06, 1:43:31-39 (Tr. at 113:13, 114:17, 115:3-5).

216.    Toward the end of OAN's broadcast, Lindell implores his audience: "Now, you've all seen absolute proof of the biggest cyber-attack in history. We right now, it's a takeover of our country. We all see it happening. And now you see the proof, where it came from, what happened. We all need to go out now each and every one of you and tell your friends, family, people, your social media, spread this out everywhere."[241]

217.    OAN's broadcast of Absolute Proof was inexcusable. OAN was fully aware of the lies Lindell would spout about Dominion during the program. And yet OAN invited Lindell to appear on the program and called it Absolute Proof, not "Absolute Opinion" or any other name suggesting anything less than certain belief in Lindell's lies.

218.    The reach of Absolute Proof was expansive. On February 19, 2021, Lindell appeared on Rudy Giuliani's podcast to tout "Absolute Proof," boasting that it had been seen by 100 million people worldwide, with an average view time of one hour and 53 minutes, bolstered by OAN's broadcast of the film more than a dozen times and the fact that the film remains available today on OAN's various digital platforms and social media websites.[242]

219.    Absolute Proof was so successful, in fact, that OAN and Lindell decided to continue their line of original programming aimed specifically at defaming Dominion. The next installment in the series of lies pointed at Dominion was a three-part "docu-movie" called Scientific Proof with Mike Lindell, which OAN heavily promoted and aired three times on April 3 and another three times on April 4, 2021.[243] In Scientific Proof, Lindell and OAN invited Dr. Douglas Frank

---

[241] *Id.* at 1:57:44-58:04 (Tr. at 128:4-11).

[242] Rudy Giuliani & Mike Lindell, *CANCEL CULTURE: Return Of The Salem Witch Trials?*, Rudy Giuliani's Common Sense (2021), https://podcasts.apple.com/mw/podcast/cancel-culture-return-salem-witch-trials-rudy-giuliani/id1505388703?i=1000509866620 (last visited June 6, 2021).

[243] *Scientific Proof Promo*, One America News Network (Apr. 2, 2021), https://rumble.com/vfb7fh-mike-lindell-scientific-proof-promo.html.

to appear to spread lies about Dominion. Dr. Frank is "a part-time math teacher who is currently visiting Colorado to push an eye-popping election fraud conspiracy at events across the state."[244] Dr. Frank has been put on a forced sabbatical by the school he previously taught at "for an undetermined amount of time" and has since been removed from the school's faculty website.[245] Dr. Frank also admitted to the Ohio Secretary of State that "he does not currently possess any evidence to prove his theories about irregularities in the 2020 election."[246] Both Lindell and Dr. Frank again falsely claimed that Dominion flipped votes in the 2020 Presidential Election to steal the election for President Biden.

> Mike Lindell: But what you're going to see just speaks for itself. For him to even get in and figure out the algorithms and then to have absolute proof.
>
> What we have over here, **what you're going to see when this is down, when I showed you in Absolute Proof, the first documentary we did with all the cyber attack in our country**, who did it, when they did it, why they did it. We know the IP addresses, the IDs of the computers, everything. Now you're going to see that this was nationwide, and these two come together and it absolutely fits like a glove. So why don't we just get right into it. What do you have?
>
> Douglas Frank: I found where the algorithms that control how many registrations and how many ballots you need in every county to control an election.· That's what I figured out.
>
> Lindell: Right.
>
> Frank: **And it's widespread. It's in every state that I've checked so far in magnificent parts per million detail, so I know it's not an accident.**
>
> Lindell: **Right.**

---

[244] Erik Maulbetsch, *Election Fraud Conspiracies Still Abound Among Colorado Republicans*, Colorado Times Recorder (Apr. 24, 2021), https://coloradotimesrecorder.com/2021/04/election-fraud-conspiracies-still-abound-among-colorado-republicans/35621/.

[245] Haley BeMiller, *Cincinnati area chemist takes stage at Trump rally to tout false claims about 2020 election*, Cincinnati Enquirer (July 1, 2021), https://www.cincinnati.com/story/news/2021/07/01/ohio-trump-rally-featured-cincinnati-teacher-false-election-claims/7812156002/.

[246] *Id.*

Frank: *It has to be done by an algorithm.*

Lindell: It could not be done by humans.

Frank: It could not be done.

Lindell: I want everybody to know that.

Frank: Yes.

Lindell: *What you're going to see is impossible to be done by humans. It had to be done by machines, i.e. computers.*

Frank: Absolutely.

Lindell: *And they had to be online?*

Frank: *Absolutely, the whole time, beforehand, during and after.*

Lindell: Before, during, and after.[247]

. . .

Lindell: *So it couldn't be done by humans.*

Frank: No, no, no.

Lindell: It's a hundred percent impossible.

Frank: No, no.

Lindell: *Had to be machines?*

Frank: *Yes.*

Lindell: *And they had to be online.*

Frank: *Constantly online.*

Lindell: *Constantly online, everybody.*

Frank: Beforehand getting the registrations in place so you can use the phantom ballots.

---

[247] *Scientific Proof* (Mike Lindell 2021) (clip 1 of 3), https://app.criticalmention.com/app/#clip/view/cc413279-f89b-4782-8c2a-bf49f142b45f?token=d01c5f60-581f-4664-b4ad-0a738ec4f5cb (Ex. 393).

**Lindell**: Right.

**Frank**: Because if you think about it, you can have all if machines in the world changes ballots all you want. The problem is that afterwards if they count the ballots, it's got to match.

**Lindell**: It's got to match.[248]

…

**Lindell**: It's impossible one hundred percent. It can only be done by machines. I can't stress that enough.

**Frank**: Absolutely.

**Lindell**: And ***they all rhyme with Dominion***, there's others, Smartmatic, ES&S, you know, all of these, and it's just—you know, I sit here. I want to bring this up. When you found all this—

**Frank**: Yes.

**Lindell**:—I mean, what went through your mind? I want people to know.[249]

220.    But OAN did not stop there, either. Instead it added a third "docu-movie" to its line of Dominion-branded programming. On April 22, 2021, Lindell appeared on OAN with yet another "docu-movie", this time entitled "Absolute Interference," which OAN heavily promoted before its air date. Lindell and OAN hosted Michael Flynn, among others, to promote and spread more disinformation about Dominion. Lindell again asserted that Dominion had Venezuelan ties, and that Dominion had been "cheating over the decades and centuries." Flynn agreed: "not just the foreign side of it, but how they are working with people inside of our own system."[250]

---

[248]    *Scientific Proof* (Mike Lindell 2021) (clip 2 of 3), https://app.criticalmention.com/app/#clip/view/5e93ce97-870f-4c2a-b146-afa157771044?token=d01c5f60-581f-4664-b4ad-0a738ec4f5cb (Ex. 394).
[249]    *Scientific Proof* (Mike Lindell 2021) (clip 3 of 3), https://app.criticalmention.com/app/#/report/98d0f6fd-e2b7-4363-b980-ad881adf294a (Ex. 395).
[250]    *Id.*

221.    OAN still did not stop there. Just over a week later, on April 29, 2021, OAN aired a "One-on-One with Mike Lindell," giving Lindell yet another platform to spread lies about Dominion. Lindell called the election "an attack by China" through Dominion voting machines. Lindell also accused Dominion of "the biggest attack" and "one of the biggest crimes against humanity in history." Lindell claimed to have "absolute scientific proof" of these claims, despite Lindell's and OAN's knowledge of their patent falsity.

222.    Four days later, on May 3, 2021, OAN and OAN's Pearson Sharp yet again hosted Mike Lindell to spread falsehoods about Dominion in a segment titled "Mike Lindell Tackles Election Fraud:"

> Mike Lindell: These machines where it got hacked, Dominion, Smartmatic, hell all of them are the same, ES&S. You just say Dominion, but it's all machines. China hacked into our election and flipped millions upon millions of votes.
>
> We have a hundred percent evidence, so I put out the two—three movies now, Absolute Proof, Scientific Proof—
>
> …
>
> Lindell: Did you hear about Dominion and China attacking our country. So I put the voice out there. What these guys were, the evidence was already there, you know, but there were other people trying to get this out there but they didn't have a voice.
>
> …
>
> Lindell: Now, what happened was, though, all these people after January 9th when I went public with that piece that these guys have gotten me, that piece, Dominion, the cyber attack, when I did that, then these guys trusted me. These guys are whistleblowers. These guys that work inside the government and used to work for the government, these are the guys that have all this information and so they had this. They can't just go out there. They're in danger, but they trusted me, so they brought it to me.[251]

---

[251] *Mike Lindell Tackles Election Fraud*, One America News Network (May 3, 2021), https://app.criticalmention.com/app/#clip/view/73f40fb5-a9ab-4c8b-aa1b-c038474c608f?token=78421a00-fd36-4024-80e9-790adf35eb22 (Ex. 401).

Patrick Byrne has confirmed he was the one who sent "these guys" to Lindell, and that he sent them to Lindell specifically because he (Byrne) had lost access to President Trump, but knew Lindell still had such access.[252] In other words, the "sources" Lindell was touting were the same discredited sources Byrne had been using for months to generate lies about Dominion for use, among other places, in the failed "Kraken" litigation and in Ramsland's debunked Antrim County report.

223.    All told, ***OAN has willingly and knowingly provided Lindell with its platform to falsely defame Dominion over a dozen times since the end of January 2021.*** OAN, its on-air talent, its executives, and its ownership know that these are lies. These claims about Dominion are not improbable; they are impossible. These lies have all been debunked, not just by Dominion's numerous previous letters sent to OAN, but by the various public agencies and officials responsible for running and overseeing the elections on a national and local level.

224.    Yet OAN has refused to retract the lies it has broadcast. Instead, OAN continues to spread these lies—months and months after the election—through an entire segment of its programming specifically targeted at Dominion.

### April 18-19, 2021:
### OAN Fires Producer who Dares to Speak Up about OAN's Lies

225.    On April 18, 2021, an OAN producer named Marty Golingan confirmed the obvious: that all this while, OAN ***knew*** these falsehoods about Dominion were not true. On that day, Golingan, who joined OAN as a producer in 2016, was interviewed by the New York Times for a story about OAN. Golingan conceded that "he and others at OAN disagreed with much of the channel's coverage. '***The majority of people did not believe the voter fraud claims being run***

---

[252] *See Steel Truth with Ann Vandersteel*, Rumble (Dec. 22, 2020), https://rumble.com/vc5rtr-ann-vandersteel-and-patrick-byrne-12-22-2020-steel-truth.html.

*on the air*,' Mr. Golingan said in an interview, ***referring to his colleagues***." Mr. Golingan also "said some OAN employees had hoped Dominion would sue the channel. 'A lot of people said, "This is insane, and maybe if they sue us, we'll stop putting stories like this out."'"[253]

226. The next day, on April 19, 2021, in plain retaliation for the interview and for speaking out about OAN's lies about Dominion, OAN fired Mr. Golingan.[254]



227. With Mr. Golingan gone and any remaining naysayers at OAN scared into silence, OAN continued to broadcast its false stories about Dominion.

<div align="center">

*April-June 2021:*
*Unsatisfied with Dominion Disinformation Specials,*
*OAN Supports a Sham Audit*

</div>

228. By mid-February 2021, OAN reporter Christina Bobb had been advising the Trump Campaign in trying to overturn the election for more than four months, all the while pushing and recycling debunked claims that Dominion had rigged the 2020 election. For example, on February

---

[253] Rachel Abrams, *One America News Network Stays True to Trump*, N.Y. Times (Apr. 18, 2021), https://www.nytimes.com/2021/04/18/business/media/oan-trump.html.
[254] Jake Lahut, *OAN fires staffer who called out the network over voter fraud lies*, Business Insider (Apr. 19, 2021), https://www.businessinsider.com/oan-network-staffer-fired-election-fraud-lies-2021-4.

10, 2021, Bobb retweeted a false story that Dominion machines had "shorted EVERY REPUBLICAN candidate in Windham, New Hampshire" by "300 Votes!" as a "HUGE DEVELOPMENT." In reality, that was a more than three-month old story and those claims had been debunked back in November by New Hampshire's Secretary of State, on November 12, 2020.[255]

229.    Dominion sent Bobb a retraction demand letter on February 12, 2021, which put her on notice not only of those false claims, but also of her many earlier lies that Dominion "orchestrated one of the most coordinated attempts to steal a presidential election in American history," that "Dominion has ties to Venezuela," and that "Dominion is not safe — and it appears to be intentionally not to be safe." Dominion's February 12, 2021 retraction demand letter to Bobb also provided Bobb with the same evidence Dominion had already provided OAN demonstrating the many red flags with Ramsland's Antrim County report and the fact that Bobb and OAN put forth Ed Solomon as an "expert mathematician" even though he was a convicted felon with no college degree.[256] Bobb never responded to Dominion's February 12 retraction demand.

230.    Bobb's and OAN's false reporting on Dominion did not stop at just endorsing and spreading lies promoted by Trump affiliates like Powell and Giuliani. Taking their false reporting yet another step forward, OAN and Bobb are now **helping fund** activities designed to generate more false claims about Dominion. For example, although multiple audits in Maricopa County, Arizona, have confirmed that there was no voting machine fraud in that county, Arizona has proceeded with an audit "unprecedented in American politics" that began in April 2021. "Election

---

[255] *See* Christopher Maidment, *NH Election Recount Update – Thursday November 12*, New Hampshire Journal (Nov. 12, 2020), https://insidesources.com/nh-election-recount-update-thursday-november-12.
[256] See Feb. 12, 2021 Ltr. From T. Clare and M. Meier to C. Bobb (Ex. 406).

experts are watching the unfolding effort with deep alarm, pointing out that officials are not using

a reliable methodology — they hesitate to even label it an audit — and will produce results that

will give more fodder for conspiracy theorists."

231.     Republican chairman of the Maricopa County Board of Supervisors, Jack Sellers,

rightly called the audit in Arizona "a grift disguised as an audit."[257] It was a total sham for reasons

beyond the bias and complete lack of experience of the private companies performing the audit,

including:

- There were no "bipartisan counting boards" set up for the hand counts, as required.

- The private group conducting the "audit" implemented forensic reviews of ballots for watermarks (based on the false belief that actual ballots in Arizona have watermarks—they do not), bamboo fibers (based on the false belief that 40,000 ballots were flown in from China and would therefore have bamboo fibers in them), and for folds or other markings (on the false belief that if a ballot has a fold or a food or coffee stain, it is invalid).

- The group falsely claimed that "Maricopa County deleted a directory full of election databases from the 2020 election cycle days before the election equipment was delivered to the audit," when in fact the group was just too incompetent to "locate files on a copy they made of the County's server."

- The group claimed that the "chain of custody of ballots" had been broken, when in fact the Republican former Arizona Secretary of State Ken Bennett had approved the actual Chain of Custody Document that demonstrated it had never been broken.

- Vote counters were given blue pens—which "can be read by ballot marking devices and could be conceivably used to ruin or falsify ballots"—to mark ballots rather than red pens, breaking a cardinal rule of election audits that Cyber Ninjas' head Doug Logan did not know.

- The group left security gates and ballots unattended and brought

---

[257] Michael Wines, *In Arizona, G.O.P. senators defend their vote review but retract claims of deleted election data*, N.Y. Times (May 18, 2021), https://www.nytimes.com/2021/05/18/us/arizona-election.html.

unauthorized pens and cell phones near the ballot counting areas.

    o   The group refused to publicly disclose its procedures for ensuring voter privacy, despite being ordered by a Maricopa County Superior Court to do so.[258]

232.    Unsurprisingly, actual Republican and independent election experts have completely discredited the audit as a sham. For example, former Kentucky Republican Secretary of State Trey Grayson and Dr. Barry C. Burden of the Elections Research Center at the University of Wisconsin-Madison—both "eminent election experts"—declared as follows:

> The ongoing review of ballots from the November 2020 general election in Maricopa County as ordered by the Arizona State Senate and executed by their inexperienced, unqualified contractor, Cyber Ninjas, does not meet the standards of a proper election recount or audit. Although the scope of the undertaking is notable, the private firms conducting it are ill-equipped to conduct it successfully and produce meaningful findings about the 2020 election. In contrast to official procedures in Arizona and best practices around the country, the Cyber Ninjas review suffers from a variety of maladies: uncompetitive contracting, a lack of impartiality and partisan balance, a faulty ballot review process, inconsistency in procedures, an unacceptably high level of error built into the process, and insufficient security. A general lack of transparency and communication also makes it difficult to evaluate the review fully as one would an official recount or audit, and it undermines rather than establishes confidence in the election system and the review itself. Because it lacks the essential elements of a bona fide post-election analysis, the review currently underway in Maricopa County will not produce findings that should be trusted.[259]

233.    And most recently, an independent analysis by the Associated Press determined that "out of more than 3 million ballots cast in last year's presidential election" in Arizona, the "Arizona county election officials have identified fewer than 200 cases of potential voter fraud,"

---

[258] *See* Ralph Neas, et. al., *How the Arizona Senate Audit in Maricopa County Is an Assault on Voting Rights*, The Century Foundation (July 1, 2021), https://tcf.org/content/report/arizona-senate-audit-maricopa-county-assault-voting-rights/?session=1.

[259] Barry C. Burden, *Report on the Cyber Ninjas Review of the 2020 Presidential and U.S. Senatorial Elections in Maricopa County, Arizona*, States United Democracy Center (June 22, 2021), https://statesuniteddemocracy.org/wp-content/uploads/2021/06/6.22.21-SUDC-Report-re-Cyber-Ninjas-Review-FINAL.pdf.

only four of which "have led to charges"—"two involved Democratic voters and two involved Republicans"—and "No person's vote was counted twice."[260] None of these cases had anything to do with purported (and nonexistent) voting machine fraud.

234.    Incredibly, despite the publicly documented and fatal flaws of this sham audit and while purporting to be a news organization, OAN launched a campaign to *raise money* for this sham Arizona audit. On April 9, 2021, Bobb tweeted to advertise a 501(c)(4) organization, Voices & Votes, that Bobb created to raise money for "the fight for the AZ Election audit."[261]



OAN's own Chanel Rion is also involved with the "Voices and Votes" fundraising organization, which operates as a kind of organization that is not required to disclose its donors:

> According to its website, Voices and Votes is run by Bobb as the CEO and president, as well as OAN's White House correspondent Chanel Rion, who is listed as the chief marketing officer, and Courtland Sykes, Rion's fiancé, who is listed as the group's chief operations officer. The group's website also says that Voices and Votes is registered as a 501(c)(4) organization,

---

[260] Bob Christie & Christina A. Cassidy, *AP: Few AZ voter fraud cases, discrediting Trump's claims*, AP News (July 16, 2021), https://apnews.com/article/business-government-and-politics-arizona-election-2020-e6158cd1b0c6442716064e6791b4c6fc.

[261] Jeremy Duda, *A conspiracy theorist pro-Trump cable news host is raising money to fund the election audit*, AZ Mirror (Apr. 9, 2021), https://www.azmirror.com/blog/a-conspiracy-theorist-pro-trump-cable-news-host-is-raising-money-to-fund-the-election-audit/.

meaning its donors will never be made public. [262]

As the media reported on Bobb and Rion: "Two reporters from One America News, a far-right TV station, are running a dark money organization that they say is helping fund a counter-reality 'audit' that former president Donald Trump and his supporters believe will overturn Arizona's 2020 election results in his favor."[263] Bobb and two fellow OAN employees also run the website that brought in cash for Trump allies' failed legal fight to overturn the 2020 election results.[264]

235.    A few hours after her initial tweet, Bobb announced again on Twitter that OAN and Bobb had met its $150,000 fundraising goal for the sham Arizona audit.[265]

---

[262] Sarah Mimms, *Pro-Trump OAN Reporters Are Blatantly Raising Money For A Bogus Election "Audit" In Arizona*, BuzzFeed News (May 18, 2021), https://www.buzzfeednews.com/article/sarahmimms/arizona-election-results-oan-reporters-fundraising.

[263] *Id.*; Christina Bobb (@christina_bobb), Twitter (Apr. 9, 2021, 11:55 AM), https://twitter.com/christina_bobb/status/1380549835980484609?s=20.

[264] Brahm Resnik, *Promoter of false election fraud claims is raising money for Arizona Senate GOP's election audit. Is that even legal?*, ABC 12 News (Apr. 11, 2021), https://www.12news.com/article/news/politics/sunday-square-off/promoter-of-false-election-fraud-claims-is-raising-money-for-arizona-senate-gops-election-audit-is-that-even-legal/75-a00e4e89-20d8-4588-b91d-50a32abbe9e8.

[265] *Id.*; Christina Bobb (@christina_bobb), Twitter (Apr. 9, 2021, 10:32 PM) https://twitter.com/christina_bobb/status/1380710253696856066.



236.    Voices and Votes has purportedly raised at least $605,000 to fund the sham Arizona audit.[266]

237.    On April 16, 2021, after OAN and its reporters had been promoting and funding the sham Arizona audit for more than a week, Dominion sent OAN yet another retraction demand letter—by this point its fifth letter—notifying it of its lies about Dominion in an April 13 broadcast and in broadcasts it had been promoting for April 17 and 18. The letter included a link to Dominion's lawsuit it had filed against MyPillow, Inc. and Lindell on March 26, 2021, which included details about how Lindell knowingly relied on fake "raw data analytics" that was comprised of doctored and fraudulent data—including fake MAC addresses that had been fabricated out of whole cloth.[267] OAN responded on April 21, 2021, refusing to retract, correct, or apologize for its defamatory statements. Instead, OAN, after having engaged in a six-month-long

---

[266] Mia Jankowicz, *Cyber Ninjas says it has received $5.7 million in private donations to fund the Arizona ballot audit*, Business Insider (July 29, 2021), https://www.businessinsider.com/cyber-ninjas-says-received-private-donations-fund-arizona-ballot-audit-2021-7.

[267] *See* Apr. 16, 2021 Ltr. From S. Shackelford to E. Early (Ex. 373).

disinformation campaign against Dominion and refusing to broadcast or report on the true facts of the 2020 election, tried another ploy—it invited Dominion on the air to give "its side" of the story. But Dominion, knowing that appearing on OAN would only give undeserving credibility to OAN's false claims, and unwilling to help OAN reframe the situation as some sort of political debate when the truth was and had long been clear to OAN, declined.

238.    In addition to funding the sham audit, in April and May 2021, Bobb became "the network's most visible correspondent covering the very 'audit' that she is helping scare up money for on OAN's airwaves."[268] Indeed, "OAN has a deal as the exclusive livestream partner for the audit,"[269] which OAN has leveraged to continue to inflate its ratings and rake in advertising cash.

239.    By participating publicly in fundraising for and facilitating this sham audit, OAN has gone where no news outlet has gone before: playing a direct role as a principal in the story it is ostensibly covering, in order to generate more material—more lies—to broadcast. All told, OAN, Bobb, and Rion broadcast at least 22 separate OAN segments in which they specifically solicited funds from OAN viewers for their sham audit.[270]

240.    From OAN's perspective, its strategy has succeeded tremendously in meeting its goal of winning the support of Trump and his supporters alike. On May 15, 2021, former President Trump released a statement on the Maricopa County audit set off by OAN, its reporting, and fundraising. In the statement, Trump spread more lies about the Maricopa County election,

---

[268] Sarah Mimms, *Pro-Trump OAN Reporters Are Blatantly Raising Money For A Bogus Election "Audit" In Arizona*, BuzzFeed News (May 18, 2021), https://www.buzzfeednews.com/article/sarahmimms/arizona-election-results-oan-reporters-fundraising.

[269] *Id.*

[270] Bobby Lewis, *Watch how one OAN host relentlessly fundraises to spread the fraudulent Arizona "audit" nationwide*, Media Matters (July 6, 2021), https://www.mediamatters.org/one-america-news-network/watch-how-one-oan-host-relentlessly-fundraises-spread-fraudulent-arizona.

claiming that the entire database of votes in Maricopa County had been deleted.[271] But of course, it had not been deleted—the sham auditors were simply too incompetent to find the files on the server. Trump then went on to praise OAN over the conservative alternatives Fox News and Newsmax: "One America News (OAN), one of the fastest growing networks on television, and the 'hottest', is doing a magnificent job of exposing the massive fraud that took place. The story is only getting bigger. . . . Thank you to OAN and other brave American Patriots. It is all happening quickly!"[272]

> ## Statement by Donald J. Trump, 45th President of the United States of America
>
> The entire Database of Maricopa County in Arizona has been DELETED! This is illegal and the Arizona State Senate, who is leading the Forensic Audit, is up in arms. Additionally, seals were broken on the boxes that hold the votes, ballots are missing, and worse. Mark Brnovich, the Attorney General of Arizona, will now be forced to look into this unbelievable Election crime. Many Radical Left Democrats and weak Republicans are very worried about the fact that this has been exposed. The DELETION of an entire Database and critical Election files of Maricopa County is unprecedented. Many other States to follow. The Mainstream Media and Radical Left Democrats want to stay as far away as possible from the Presidential Election Fraud, which should be one of the biggest stories of our time. Fox News is afraid to cover it— there is rarely a mention. Likewise, Newsmax has been virtually silent on this subject because they are intimidated by threats of lawsuits. One America News (OAN), one of the fastest growing networks on television, and the "hottest", is doing a magnificent job of exposing the massive fraud that took place. The story is only getting bigger and at some point it will be impossible for the weak and/or corrupt media not to cover. Thank you to OAN and other brave American Patriots. It is all happening quickly!

---

[271]   Stephen   Richer   (@stephen_richer),   Twitter   (May   15,   2021,   3:19   PM), https://twitter.com/stephen_richer/status/1393662268542386178?s=21.
[272] *Id.*

*May and June 2021:*
**Dominion Repeatedly Demands that OAN Retract Its Lies and Set the Record Straight, Even
More Evidence That Dominion Did Not Rig the 2020 Election Emerges, and Yet OAN Still
Refuses to Retract—And Even Calls for the "Execution" of Dominion's Executives**

241.    Following more than a month of OAN fueling the sham Arizona audit and
continuing to give Lindell and other proven liars unfettered access to OAN's airwaves, Dominion
wrote to OAN yet again—for the seventh time—on May 12, 2021 demanding that it stop lying
about Dominion and retract its numerous broadcasts falsely accusing Dominion of rigging the
2020 election.[273] This letter specifically noted the four broadcasts since April 4 featuring Lindell
and his lies about Dominion.

242.    On May 23, OAN responded to Dominion's May 12, 2021 letter. In its May 23
letter, OAN again refused to retract its statements and stated that "even false speech is protected
by the First Amendment." Indeed, OAN's lawyer stated specifically that OAN would not retract
its statements under any circumstances because it believed the First Amendment protects even
OAN's "offensive and 'shameful' journalism."[274] OAN's response then disclaimed any
responsibility for the January 6 storming of the Capitol or the deaths that occurred there, despite
the fact that individuals like David Blair specifically cited OAN has having provoked him to storm
the Capitol that day.

243.    Less than two weeks after OAN refused to accept responsibility for its lies and
retract them, even more information surfaced regarding OAN's role in the Arizona audit. On June
4, 2021, emails related to the sham audit released by the Arizona Senate showed that that OAN's
Christina Bobb was not only working with the Trump Campaign to generally overturn the election,

---

[273] *See* May 12, 2021 Ltr. From S. Shackelford to E. Early (Ex. 374).
[274] See May 23, 2021 Ltr. From B. Rhodes to S. Shackelford (Ex. 407).

*but was working directly with Giuliani to encourage and facilitate the sham Arizona audit.*[275]

Specifically, on December 4, 2020, Bobb emailed affidavits to Arizona Senate President Karen Fann that Bobb said Giuliani asked her to send: "Mayor Giuliani asked me to send you these declarations. He will follow up with you as well. I will have one more email to follow this one."[276]



244.     Meanwhile, on June 3, 2021, Lindell released this latest film, "Absolutely 9-0," in which Lindell claims—yet again—that he has evidence that the 2020 election was stolen from Trump "through the machines, the Dominion machines, the Smartmatic and other machines," that he is going to present this evidence to the Supreme Court of the United States at some later date, and that when he does, the Supreme Court would rule 9-0 to overturn the election.[277] In the film, Lindell interviews a blurred-out individual who he claims is "one of his cybersecurity experts" and reuses the same fabricated raw data analytics with made-up MAC addresses and irrelevant IP addresses he used in his earlier films. Lindell also claims he has "cyber packets," "packet captures," or "PCAPs" proving the election was hacked. These so-called PCAPs are not PCAPs at

---

[275] *Arizona Senate Releases Emails Related to Election Audit to American Oversight*, American Oversight (June 4, 2021), https://www.americanoversight.org/arizona-senate-releases-emails-related-to-election-audit-to-american-oversight.
[276] *Id.*
[277] Mike Lindell, *Absolutely 9-0*, Lindell TV (June 3, 2021), https://lindelltv.com/mike-lindell-presents-absolutely-90/ (Ex. 404).

all, but instead readily available voter database information simply rendered into hexadecimal digits.[278]

245.    Lindell's latest film was immediately discredited and called out for blatant fabrications of data and gross misunderstandings of both cybersecurity and legal principles. Experts quickly noted that Lindell's claims in that film were "technically incoherent and wrong" and that the only possible source for Lindell's data, if it were real, would have to be "someone inside the NSA," which "would be a felony violation of U.S. law."[279] Then, in a rare moment of honesty, Lindell admitted the same day Absolutely 9-0 first aired that the data he presented in his film was in fact fake, stating "I have the actual election PCAPs[280] but for security we did not put them in the video."[281]

246.    Even though Absolutely 9-0 was immediately and publicly debunked, on June 4, 2021 OAN announced that it would be broadcasting the movie.[282]

---

[278] Philip Bump, *Mike Lindell's 'fraud' allegations are more ridiculous than you think*, Wash. Post (June 4, 2021), https://www.washingtonpost.com/politics/2021/06/04/mike-lindells-fraud-allegations-are-even-more-ridiculous-thanyou-might-think/.

[279] Khaya Himmelman, *Fact Checking 'Absolutely 9-0,' the Latest Documentary From Mike Lindell*, The Dispatch (June 14, 2021), https://factcheck.thedispatch.com/p/fact-checking-absolutely-9-0-the.

[280] "PCAP" is a common abbreviation for "pocket capture" in the field of computer network administration.

[281] Maarten Schenk, *Fact Check: Mike Lindell's 'Absolutely 9-0' Movie Does NOT Present Credible Evidence of Election Fraud*, Lead Stories (June 3, 2021), https://leadstories.com/hoax-alert/2021/06/fact-check-mike-lindells-absolutely-9-0-movie-des-not-present-credible-evidencehttpshomefrankspeechcomtvvideomike-lindell-presents-absolutely-9-0.html.

[282] One America News (@OANN), Twitter (June 4, 2021, 3:35 PM), https://twitter.com/OANN/status/1400944413283471364?s=20.



247. That night, OAN brought Lindell back to promote Absolutely 9-0 on *The Real Story with Natalie Harp*. According to Harp's own LinkedIn account, she had been an "Advisory Board Member for Donald J. Trump for President" and had "served as a media surrogate for the Trump campaign during the 2020 presidential election" prior to joining OAN in February 2021 and receiving her own show in March 2021.[283]

248. Before bringing Lindell on the air, Harp led the segment by flipping the script, claiming that the "big lie" was actually the fact that "Biden actually won fair and square in November," and exclaimed "we will find fraud, election-changing amounts of fraud."[284] OAN and Harp then turned to Lindell, who claimed that the "evidence" he had of election fraud was like having a "film of them robbing the bank" before talking about the "irrefutable" evidence of

---

[283] Natalie Harp, LinkedIn (last visited July 9, 2021), https://www.linkedin.com/in/nataliejharp/.
[284] *The Real Story - OAN Absolutely 9-0 with Mike Lindell*, One America News Network (June 7, 2021), https://rumble.com/vi6w7p-the-real-story-oan-absolutely-9-0-with-mike-lindell.html (Ex. 403).

"machine fraud" evidence he has, specifically about the "Dominion machines." He then told Harp and OAN's viewers to watch Absolutely 9-0 to see and hear more about the "crime of the century" and the "biggest crime against humanity, I think, in history." Harp closed the segment by reminding viewers that OAN would be broadcasting Absolutely 9-0 that weekend and by thanking Lindell for "the work that you're doing to expose what happened in the last election."



249.    OAN then aired Absolutely 9-0 twice, on the mornings of June 5 and June 6, 2021.

250.    CNN later broadcast a report further debunking the lies told in Lindell's so-called "docu-movies." The report quoted multiple election officials—Democrats and Republicans alike—stating that no basis existed for Lindell's spurious claims of hacking and fraud.[285] One Republican election official stated that she was "unable to convince [her] constituents of the simple fact that the election wasn't stolen: 'They are like, "Well, Mike Lindell says this."'" She elaborated that Lindell's claims "'made me angry. . . . He has created a lot of doubt in a lot of peoples' minds even though the count was accurate.'"[286] Lindell himself acknowledged that he wants his viewers

---

[285] Casey Tolan et al., *MyPillow magnate Mike Lindell's latest election conspiracy theory is his most bizarre yet*, CNN (Aug. 5, 2021), https://www.cnn.com/2021/08/05/politics/mike-lindell-mypillow-ceo-election-claims-invs/index.html.
[286] *Id.*

to believe his movies. When asked, "The people who have watched your video believe what you say?" Lindell responded: "100 percent."[287] After Lindell sent "a snippet of data in one of his videos" to CNN, CNN examined it and sent it to multiple independent experts. The conclusion: "Lindell's claims don't hold water." As evident since the videos first became public—and as OAN well knew before airing—the data presented in "Absolutely 9-0" was not evidence of hacking. "When the data is converted to text, it becomes clear that it is not evidence of hacking but a version of Pennsylvania's voter file, listing every registered voter in the state—a copy of which can be purchased from the state government for $20."[288] Lindell also sent other snippets, which according to these multiple independent experts, also did not show any evidence of hacking. "Experts agree that Lindell's fanciful claims are fanciful and unsupported—and are eroding trust in our democracy."[289]

251.   On June 18, 2021, Dominion sent OAN's its eighth retraction demand letter, demanding that OAN retract additional false claims made on various broadcasts in May and June.[290]

### More and More Evidence Emerges Disproving OAN's and Others' Lies About Dominion, While OAN Still Refuses to Retract—And Even Calls for the "Execution" of Dominion's Executives

252.   Since Dominion sent OAN its eighth retraction demand letter on June 18, even more evidence has emerged completely debunking OAN's—and its cohort of unreliable sources'—lies about Dominion. On June 23, 2021, the Republican-led Michigan Senate Oversight

---

[287] *Id.* (quoting embedded video).

[288] *Id.*; Philip Bump, *Mike Lindell's 'fraud' allegations are even more ridiculous than you might think*, Wash. Post (June 4, 2021), https://www.washingtonpost.com/politics/2021/06/04/mike-lindells-fraud-allegations-are-even-more-ridiculous-than-you-might-think/.

[289] Casey Tolan et al., *MyPillow magnate Mike Lindell's latest election conspiracy theory is his most bizarre yet*, CNN (Aug. 5, 2021), https://www.cnn.com/2021/08/05/politics/mike-lindell-mypillow-ceo-election-claims-invs/index.html.

[290] *See* June 18, 2021 Ltr. From S. Shackelford to B. Rhodes (Ex. 375).

Committee—Chaired by Trump ally Senator Ed McBroom—released a 55-page report, which stated that "The Committee found no evidence of widespread or systemic fraud in Michigan's prosecution of the 2020 election" and expressed total confidence that the state's 2020 election outcome—that Biden defeated Trump by about 155,000 votes, or 2.8%—"represent[s] the true results of the ballots cast by the people of Michigan."[291] The report specifically called out individuals like Lindell and Ramsland for their false claims about systemic fraud in Michigan, stating that they "have been utilizing misleading and false information about Antrim County to raise money or publicity for their own ends" and calling for the Michigan Attorney General to investigate them for their conduct.[292] Senator McBroom and the Committee thoroughly debunked the Antrim County Report, providing the actual ballot counts and details demonstrating that Dominion's machines had it right all along and were the reason the results were ultimately accurate—a Trump victory by almost 4,000 votes in Antrim County.

253.  On June 24, 2021, the Supreme Court of the State of New York, Appellate Division, First Judicial Department, suspended Rudolph Giuliani from the practice of law after it determined that he had "made *knowing* false and misleading factual statements to support his claim that the presidential election was stolen from his client [Donald Trump]," based on "uncontroverted

---

[291] MICH. S. OVERSIGHT COMM., REPORT ON THE NOVEMBER 2020 ELECTION IN MICHIGAN (Apr 9, 2021), https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport.pdf.; David Eggert, *Michigan Senate GOP probe: No systemic fraud in election*, ABC News (June 23, 2021), https://abcnews.go.com/Politics/wireStory/michigan-senate-gop-probe-systemic-fraud-election-78445547; Clara Hendrickson & Dave Boucher, *Michigan Republican-led investigation rejects Trump's claim that Nov. 3 election was stolen*, Detroit Free Press (June 23, 2021), https://www.freep.com/story/news/politics/elections/2021/06/23/michigan-senate-investigation-election-trump/5035244001/.
[292] MICH. S. OVERSIGHT COMM., REPORT ON THE NOVEMBER 2020 ELECTION IN MICHIGAN (Apr 9, 2021), at 19, https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport.pdf.

evidence" that he made such "demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer for former President Donald J. Trump and the Trump campaign in connection with Trump's failed effort at reelection in 2020."[293]

254.    On June 27, 2021, even more evidence emerged demonstrating that former Attorney General William Barr's public statement on December 1, 2020 that the U.S. Department of Justice "had uncovered no evidence of widespread voter fraud that could change the outcome of the 2020 election" was just the tip of the iceberg. Further reporting revealed that Barr had "received two briefings from cybersecurity experts at the Department of Homeland Security and the FBI" about the allegations of rigged voting machines, after which he and his team at the Department of Justice "realized from the beginning it was just bullshit." Barr further disclosed that "even if the machines somehow changed the count, it would show up when they were recounted by hand" and that Dominion's machines were just "counting machine[s], and they save everything that was counted. So you just reconcile the two. There had been no discrepancy reported anywhere, and I'm still not aware of any discrepancy."[294]

255.    On August 3, 2021, a federal judge in Colorado disciplined two lawyers who filed a frivolous lawsuit based on lies against Dominion following the election, concluding that the case was frivolous and brought in bad faith. In his 68-page opinion, Judge N. Reid Neureiter concluded: "Albeit disorganized and fantastical, the Complaint's allegations are extraordinarily serious and,

---

[293]    Order, *In re Giuliani*, No. 2021-00506 (N.Y. Sup. Ct. June 24, 2021), https://www.nycourts.gov/courts/ad1/calendar/List_Word/2021/06_Jun/24/PDF/Matter%20of%20Giuliani%20(2021-00506)%20PC.pdf; Jim Mustian, *New York Court Suspends Rudy Giuliani's law license*, Associated Press (June 24, 2021), https://apnews.com/article/rudy-giuliani-new-york-law-license-suspended-c67f4504a22f8642d6096f29e3a5c51e.
[294]    Jonathan D. Karl, *Inside William Barr's Breakup with Trump*, The Atlantic (June 27, 2021), https://www.theatlantic.com/politics/archive/2021/06/william-barrs-trump-administration-attorney-general/619298/.

if accepted as true by large numbers of people, are the stuff of which violent insurrections are made."[295]

256.    OAN, which had spent more than eight months since the election ramping up its lies about Dominion, remained undeterred. Indeed, when it was reported that Dominion employee Eric Coomer—who had filed defamation lawsuits against OAN, Rion, Newsmax, and other media outlets and individuals who had spread false claims about him and the 2020 election—had settled his case with Newsmax, OAN issued its own story misleadingly titled "Newsmax Settles Dominion Lawsuit," even though Dominion had not sued Newsmax, let alone settled with it. In that story, OAN reported that "Newsmax caved to left-wing pressure by reversing all stories covering fraud in the 2020 election."[296] Even though Newsmax had carefully (and wrongly) avoided retracting its many lies about Dominion, OAN falsely implied that Newsmax had retracted all its lies about Dominion, and contrasted that false characterization of Newsmax's retractions with its own announcement that OAN would not and has "not caved." In other words, OAN lied to its viewers about a Newsmax-Dominion settlement that did not exist, in order to falsely imply to its viewers that OAN had stood up to a Dominion lawsuit against it that also did not exist.

257.    But OAN went far beyond only refusing to retract—it began to call for violent action against those like Dominion who it claimed stole the election from Trump. Ignoring all of the evidence debunking its lies, in late June OAN broadcast a segment by presenter Pearson Sharp

---

[295] Order Granting Defendants' Motions for Sanctions, at 6, *O'Rourke et al. v. Dominion Voting Systems, Inc., et al.*, No. 20-cv-03747 (D. Colo. Aug. 3, 2021), available at https://context-cdn.washingtonpost.com/notes/prod/default/documents/779f6d9a-5696-4bdf-8d1b-a63d7f08d51a/note/892ae5bb-664f-4125-af38-1cb1151ba5d0.#page=1.

[296] *Newsmax Settles Dominion Lawsuit, Issues Retraction On 2020 Coverage*, One America News Network (Apr. 30, 2021), https://web.archive.org/web/20210501165644/https://www.oann.com/newsmax-settles-dominion-lawsuit-issues-retraction-on-2020-coverage/.

in which Sharp claimed that the 2020 election was "actually overthrown" and that those responsible for doing so—like the target of OAN's more-than-eight-month disinformation campaign, Dominion—should face "execution" for committing treason.[297]

> How many people does it take to carry out a coup against the Presidency? And when all the dust settles from the audit in Arizona and the potential audits in Georgia, Michigan, Pennsylvania, Nevada and Wisconsin, what happens to all these people who are responsible for overthrowing the election? ***What are the consequences for traitors who meddled with our sacred democratic process and tried to steal power by taking away the voices of the American people?*** What happens to them? Well, in the past, America had a very good solution for dealing with such traitors: ***Execution***.

While OAN broadcast Sharp's segment calling for the execution of "traitors" like Dominion and its executives, it included a request for its viewers to "support" Mike Lindell by going "to mypillow.com and enter promo code OAN at checkout."



258. Soon thereafter—on July 4, no less—someone threw a brick through the window of a Dominion office.

---

[297] Justin Baragona, *OAN Goes Full Fascist, Calls for Mass Executions Over 'Election Fraud'*, The Daily Beast (June 24, 2021), https://www.thedailybeast.com/oan-goes-full-fascist-pearson-sharp-calls-for-mass-executions-over-election-fraud.

259.     OAN has continued broadcasting its lies up to the filing of this lawsuit, including a June 29 segment featuring Lindell in which Lindell announced a "cyber symposium" in August at which he would present "non-subjective evidence" that votes were "flipped" at the "Dominion level."[298] OAN introduced Lindell as the one who "continues to lead the charge in exposing election fraud," and during the segment ran the chyron, "Lindell Announces Cyber Symposium Exposing Election Fraud Evidence."



260.     On August 4, 2021, Dominion sent OAN yet another retraction demand, asking OAN yet again to correct its continued false and defamatory reporting about Dominion.[299] Still, OAN has not retracted, apologized, or corrected its lies.

### The Lies About Dominion Go Viral

261.     OAN did not just broadcast its false and defamatory statements about Dominion on the air on its cable channel; it also, as a matter of practice, posted and republished its broadcasts

---

[298] *MyPillow CEO Mike Lindell announces details of upcoming cyber symposium*, One America News Network (June 30, 2021), https://rumble.com/vj9ddv-mypillow-ceo-mike-lindell-announces-details-of-upcoming-cyber-symposium.html.
[299] *See* Aug. 4, 2021 Ltr. From S. Shackelford to B. Rhodes (Ex. 377).

across its multiple media platforms via oann.com, its social media accounts, its YouTube and Rumble platforms, and its mobile app.

262.    The OAN channel is available to over 35 million American households via the leading satellite and digital television services and is available to anyone with an internet connection via oann.com and KlowdTV. OAN pulled its highest ratings ever in 2020, and viewership on OAN surged more than 40% in the fourth quarter compared to the third quarter in 2020.[300]

263.    After OAN and its personalities had broadcast defamatory falsehoods into millions of homes and posted those falsehoods on OAN websites and social media accounts, the lies went viral as people tweeted, retweeted, and raged that Dominion had stolen their votes. That was completely foreseeable to—and intended by—OAN.

264.    The harm to Dominion is unprecedented and irreparable because of how fervently millions of people believe OAN—because of OAN's publication, republication, and promotion of the falsehoods about Dominion it used as the foundation for the burgeoning growth of its business in the wake of the 2020 election.

265.    Through this race to the bottom among Fox, Newsmax, and OAN, Dominion has been falsely branded as synonymous with election fraud. Thus, even later generalized references to "election fraud" or similar statements tie back for viewers and readers to OAN's defamatory campaign.

266.    OAN's lies did not simply harm Dominion. They harmed democracy. They harmed the idea of credible elections. They harmed a once-unshakeable faith in democratic and peaceful

---

[300] Lisa Richwine, *Fox News extends streak, sets cable news records in 2020*, Reuters (Dec. 29, 2020), https://www.reuters.com/article/us-media-news-ratings/fox-news-extends-streak-sets-cable-news-records-in-2020-idUSKBN29404F.

transfers of power. They harmed the foundational idea, as stated in the Declaration of Independence, that our country derives its "just powers" from "the consent of the governed."

267. OAN's promotion and endorsement of these lies about Dominion led its viewers to conclude that these baseless and false conspiracy theories were true. OAN fanned the flames, and did not care what else burned down in the process as it spread these malicious falsehoods about Dominion.

### *While Dominion and the Country Suffered, OAN Flourished*

268. The lies about Dominion catapulted OAN into the upper echelon of cable news media.

269. OAN's disinformation campaign about Dominion was a resounding success. On November 28, 2020, OAN President Charles Herring tweeted, "HISTORIC RATINGS: For 4 weeks in a row @OANN has ranked in the TOP 10 of all cable networks."[301]



270. After more than a month of knowingly airing lies that Dominion was designed to and actually did rig the 2020 election, OAN finally cracked the big four of cable news—and was now competing directly with not just Fox News, but the other major cable news providers. On

---

[301] Charles Herring (@CharlesPHerring), Twitter (Nov. 28, 2020, 6:16 PM), https://twitter.com/CharlesPHerring/status/1332825706615607297?s=20.

December 10, Herring tweeted, "5 WEEKS IN TOP 10! @OANN once again performs in the TOP 10 of all national cable channels (all genres)" and was now "running 4th tracking down FNC, CNN & MSNBC" for cable news networks. He even called out Fox News, claiming that "@OANN is running at 41% of FNC. We are thrilled."[302]



271.    For his part, OAN founder and CEO Robert Herring strongly promoted and endorsed the past month of false election fraud coverage on his network, tweeting on December 11, "After the last two weeks, if you have any doubts about President Trump winning the election then you haven't been watching @OANN."[303] Herring followed that up with another tweet on December 16, announcing that OAN "will not recognize Biden as the President-elect as all of our investigations indicate there was fraud in voting." At this point, weeks after OAN began its viral disinformation campaign against Dominion, "fraud in voting" had become synonymous with "Dominion" to OAN viewers.

---

[302]    Charles   Herring   (@CharlesPHerring),   Twitter   (Dec.   10,   2020,   1:17   PM), https://twitter.com/CharlesPHerring/status/1337099084759371776.
[303] https://twitter.com/RobHerring/status/1337520658264145920.



**Robert Herring** @RobHerring · Dec 16, 2020

One America News will not recognize Biden as the President-elect as all of our investigations indicate there was fraud in voting.

There will be no decision until Jan. 6, 2021. @OANN

272.    Herring later bragged: "A massive wave of former Fox News viewers have abandoned Fox and have found a home at OAN."[304] Before the election, OAN was not ranked by Neilson, but after the election, Herring "looked at proprietary data from a major cable provider and saw that OAN was suddenly in the top ten."[305]

273.    On December 17, OAN President Charles Herring tweeted: "Q. How does @OANN outflank Fox News on its right? A. @OANN holds the wheel steady and straight forward as Fox News swerves hard LEFT down one-way roads. Join us @OANN, we won't take you for left turn joy rides. 6th week with record setting ratings."



**Charles**
@CharlesPHerring

Q. How does @OANN outflank Fox News on its right? A. @OANN holds the wheel steady and straight forward as Fox News swerves hard LEFT down one-way roads. Join us @OANN, we won't take you for left turn joy rides. 6th week with record setting ratings.

11:14 PM · Dec 17, 2020 · Twitter Web App

---

[304] Brian Stelter, *Hoax*: *Donald Trump, Fox News, and the Dangerous Distortion of Truth*, Atria Publishing (June 8, 2021) at 360.
[305] *Id.*

274.    On December 18, CEO Rob Herring stated on Twitter: "I think the American people should start a fund to help support House and Senate members who are brave enough to show @realDonaldTrump that they have his back, and are fighting for a fair election. @OANN"[306]

275.    Indeed, after Fox fired Lou Dobbs, CEO Herring tweeted: "One America News would like @LouDobbs to get in contact with us. We may have a position available for you in which you wouldn't be censored for speaking the truth! #OANN."[307]

### Dominion Has Suffered Enormous Harm

276.    As a result of the false accusations broadcast by OAN into millions of American homes, Dominion has suffered unprecedented harm and its employees' lives have been put in danger.

277.    After watching OAN broadcasts, countless Twitter users believed and began spreading OAN's defamatory falsehoods about Dominion across social media.

278.    As a result of the disinformation campaign against Dominion, the company and its employees have been targeted and have received death threats and calls for jail time.

279.    For example, one person posted, "Why isn't every single Dominion employee in jail for their election fraud?!!!!!!!!!"[308]

---

[306]    Robert Herring (@RobHerring), Twitter (Dec. 18, 2021, 4:18 PM), https://twitter.com/RobHerring/status/1340058789861416960.

[307]    Robert Herring (@RobHerring), Twitter (Feb. 8, 2021, 3:07 PM), https://twitter.com/RobHerring/status/1358885146829594624.

[308]    Woody James (@WoodsonTJames), Twitter (Dec. 9, 2020, 12:35 PM), *previously available at* https://twitter.com/WoodsonTJames/status/1336726130771038208 [https://web.archive.org/web/20201209173648/https://twitter.com/WoodsonTJames/status/1336726130771038208].



280.    Another person posted, "jail dominion find them…ask allies to track them down."[309]



281.    One Dominion employee received text messages stating "**we are already watching you. Come clean and you will live**."

282.    One person left the following message on Dominion's customer support line:

> **You're all fucking dead, You're all fucking dead. We're bringing back the firing squad and you fuckers are all dead, everybody involved up against the wall you motherfuckers.** We're gonna have a fucking lottery to fucking give people a chance to shoot you motherfuckers you fucking wait you cocksuckers you commie pieces of shit. **We're going to fucking kill you all you motherfuckers**. After a fair trial of course you pieces of shit. The American people are fucking coming for you this is the end of your fucking line guys your fucking days are numbered you better enjoy your Thanksgiving because you'll never see another one you fucking

---

[309]    Lionslovestrump (@leonkhanin1234), Twitter (Dec. 8, 2020, 9:26 PM), https://twitter.com/leonkhanin1234/status/1336497514598555650.

cocksuckers. You will be gone soon. Happy Thanksgiving. Cock suckers. You're almost done just watch and see what happens. Check out the executive order from September 12, 2018. You'll see what's going to happen. You'll own nothing. You'll be on the fucking 2030 plan because you'll own nothing you fucking cocksuckers. It's coming. Buckle your fucking seatbelts. Watch what's going to happen next.

283.     Another person sent a Dominion employee an email with the subject line, "***Time is up***" and with the message, "***You have 24 hours****...*"

284.     And another person left the following message on Dominion's main office line:

Yeah, good afternoon. Fuck you, fucking scumbags. ***We're gonna blow your fucking building up.*** Piece of fucking shit.

285.     And most recently—on July 4, no less—someone threw a brick through the window of a Dominion office.

286.     Because of these threats and numerous others, Dominion has made significant expenditures to protect its people from harm—including by employing on-site police and security. Since the beginning of the viral disinformation campaign, Dominion has spent more than $600,000 on private security for the protection of its people.

287.     As a direct result of the viral disinformation campaign, Dominion has been forced to make significant expenditures in an attempt to mitigate the harm to its business. To date, Dominion has incurred expenses of more than $700,000 to that end.

288.     Dominion is a for-profit company that provides local election officials with tools they can use to run elections. It generates revenue by selling voting technology, licensing software, and providing related services to elected officials from both political parties. It contracts with state and local governments to provide its voting systems, software licenses, and services in a majority of states across the country. Those contracts are typically multi-year contracts and range from tens of thousands of dollars to over a hundred million dollars, depending on the jurisdiction and scope of the contract. Given the nature of the U.S. election system and the voting services industry,

Dominion's contracts have historically been long-term with high renewal rates. As a direct result of the disinformation campaign, Dominion has suffered enormous and irreparable economic harm.

289.     As illustrated in the examples above, the disinformation campaign unfairly subjected Dominion to the hatred, contempt, and distrust of tens of millions of American voters. The elected officials who are Dominion's actual and potential customers have received emails, letters, and calls from their constituents demanding that they cease and avoid contracting with Dominion or using Dominion machines.

290.     Dominion has suffered harm nationwide. For example, since the beginning of the disinformation campaign against Dominion, state legislators in various states in which Dominion has contracts—including California, Colorado, Florida, Michigan, Ohio and Pennsylvania—are reviewing or have stated their intent to review and reassess those contracts. They have done so because of pressure from constituents and donors as a direct result of the lies peddled by OAN.

291.     For example, prior to the 2020 election, Louisiana had issued Dominion an "Intent to Award Letter," noting its intent to accept Dominion's bid to provide Louisiana with its voting systems beyond the 2020 election. But in March 2021, Louisiana retracted that "intent" and issued a "Notice of Cancellation" on the Request for Proposal on the State's reassessment and bid process, essentially reneging on awarding Dominion the $100-million-plus contract with the state.[310]

292.     This cancellation was due to the lies about Dominion. One Louisiana radio host, Jeff Crouere, declared: "Tell Kyle we don't want a Dominion voting machine lawsuit here like

---

[310] *Louisiana Ends Search for New Voting Machines Amid Criticism*, KATC 3 (Mar. 3, 2021), https://www.katc.com/news/covering-louisiana/louisiana-ends-search-for-new-voting-machines-amid-criticism.

they had in Georgia … Call Kyle and tell him to get honest voting machines."[311] "Kyle" refers to Louisiana's Republican Secretary of State, Kyle Ardoin. Secretary Ardoin attributed the changed circumstances to "the damage to voter confidence done by those who willfully spread misinformation and disinformation."[312] On July 2, Louisiana passed a bill that reworks "Louisiana's method for selecting its next voting system." Trump supporters in Louisiana have called "to block Louisiana's current voting machine vendor, Dominion Voting Systems, from participating in an open bid process for the new multimillion-dollar contract" because they "blame" Dominion "for Trump's loss in key swing states."[313]

293. Because Dominion's contracts are often long-term, the harm to Dominion will continue to play out over the next years. Nevertheless, since the November 2020 election, Dominion already has seen further evidence of damage in addition to the Louisiana contract described above. Indeed, Dominion has not received numerous contracts as a result of the lies spread by OAN and others. As of July 23, 2021, these contracts were worth a combined $90 million over 53 separate potential contracts. Election officials have even told Dominion that Dominion is losing business "because of the 'Dominion' name." Together with the Louisiana contract, these add up to at least $70 million in net profits lost. Even many rational elections administrators who reject the lies are unwilling to deal with the political blowback from many of their constituents— blowback that only exists due to the lies spread about Dominion.

---

[311] Sam Karlin, *How Louisiana's bid for new voting machines fell apart amid baseless fraud allegations*, The Advocate (Mar. 8, 2021), https://www.theadvocate.com/baton_rouge/news/politics/elections/article_fc7c4008-7e14-11eb-b1d7-3734976f1a47.html.

[312] *Id.*

[313] Melinda Deslatte, *Analysis: Louisiana to have new approach for voting machines*, AP News (July 11, 2021), https://apnews.com/article/technology-government-and-politics-louisiana-voting-election-2020-0517ded61aa9bd507240eb593ca995a2.

294.    On June 8, 2021, as a result of the disinformation campaign, the Georgia Republican Party Convention passed a resolution calling for an investigation into Dominion: "1. Formal action shall be taken by the Georgia General Assembly to appoint an independent investigatory committee not controlled by the Executive Branch to conduct an investigation into the procurement, implementation, management and oversight of Dominion Voting machines and their software."[314] The stated goal of the resolution is "[r]eplacing all Dominion voting systems with secure hand marked paper ballots which should be scanned and tabulated using a device that is not connected to the internet, and to do so with the passage of legislation for the governor to sign prior to the start of the candidate qualifying beginning March 7, 2022."[315] Regardless of the ultimate outcome in Georgia, this example illustrates the stark difficulty that Dominion will have in the months and years ahead.

295.    Officials in San Luis Obispo County, California, have also reverted to paper ballots over Dominion machines as a result of the disinformation campaign. As one official wrote in an email: "I don't trust Dominion Voting Systems at all."[316]

296.    These are some examples of the damage Dominion has suffered as a result of the OAN defamation campaign against Dominion. Regardless of the ultimate outcomes, these examples illustrate the stark difficulty that Dominion will have in the months and years ahead.

297.    The damage to Dominion is not limited to the review and potential cancellation of Dominion's contracts, either. OAN's defamatory campaign has spurred sham audits, which

---

[314] *2021 Convention Resolutions Committee Report*, Georgia GOP (June 8, 2021), https://gagop.org/2021-convention-resolutions-committee-report/.
[315] *Id.*
[316] Peter Johnson, *SLO County to revert to 'traditional' election model following supervisor vote*, New Times San Luis Obispo (May 6, 2021), https://www.newtimesslo.com/sanluisobispo/slo-county-to-revert-to-traditional-election-model-following-supervisor-vote/Content?oid=11001664.

continue to harm Dominion. That includes the Arizona sham audit that OAN has been directly funding. OAN's continuing coverage of the sham audit it has helped fund reinforces the harm and emphasizes how Dominion will forever be tainted with false claims of fraud. A recent article noted that an Arizona legislator supporting the sham audit was "exploring alternatives to Dominion voting machines."[317] "'There's a lot of push nationally to get rid of the machines because people feel like they can be manipulated.'"[318] Indeed, in many circles, the word "Dominion" is now falsely associated with election fraud, and the sustained attack on Dominion now means that people falsely relate even general references to "election fraud" or similar phrases to Dominion. Arizona State Senator Wendy Rogers recently tweeted calling for "solitary confinement cells" for "the execs at the fraud machine company":



[319]

298.    As the County Recorder in Maricopa County, Arizona said, "'[O]rdinary people, the ones who are showing up on a Wednesday night at a political meeting, I believe they really

---

[317] Kyra Haas, *Some lawmakers want to eliminate voting machines*, AZ Capitol Times (June 3, 2021),   https://azcapitoltimes.com/news/2021/06/03/some-lawmakers-want-to-eliminate-voting-machines/.

[318] *Id.*

[319]    Wendy    Rogers    (@WendyRogersAZ),    Twitter    (Aug.    2,    2021,    5:40    PM), https://twitter.com/wendyrogersaz/status/1422326523177148416?s=21.

believe it. And that's super sad.'"[320] He also stated: "We can't indulge these insane lies any longer. As a party. As a state. As a country."[321]

299.    Nevertheless, across the country, other jurisdictions are attempting to pursue their own sham audits. For example, Fulton County, Pennsylvania—which Trump won by an "almost seven-to-one" margin over Biden—hired Wake TSI, one of the same technology companies used in Maricopa County with virtually no election auditing experience, to conduct a sham audit of Fulton County ballots.[322] As a result of this sham audit, Pennsylvania's Secretary of State was forced "to decertify" the Dominion machines leased by the County because "the inspection violated state law … was done in a manner that 'was not transparent or bipartisan' and the firm had 'no knowledge or expertise in election technology.'"[323]

300.    In late July 2021, in a Georgia county—Bibb County—a rally was held to begin a sham audit in Georgia. Signs said: "Ditch Dominion." The Bibb County Party Chair "wants to know if [Georgia Secretary of State] Raffensperger will support an investigation into Dominion Voting."[324]

---

[320] Josh Dawsey & Rosalind Helderman, *Trump has grown increasingly consumed with ballot audits as he pushes falsehood that election was stolen*, Wash. Post (June 2, 2021), https://www.washingtonpost.com/politics/trump-2020-election-audits/2021/06/02/95fd3004-c2ec-11eb-8c34-f8095f2dc445_story.html.

[321] *Id.*

[322] Marc Levy & Mark Scolforo, *Pennsylvania decertifies county's voting system after audit*, AP News (July 21, 2021), https://apnews.com/article/technology-joe-biden-business-government-and-politics-pennsylvania-93c5f0b03167971d4dc5919e68949c51.

[323] *Id.*

[324] Ariel Schiller, *Raffensperger hosts meet and greet in Roberta, Bibb County GOP protests*, 41 NBC (July 22, 2021), https://www.41nbc.com/raffensperger-hosts-meet-and-greet-in-roberta-bibb-county-gop-protests/.



301.      In short, Dominion has now become part of both national- and state-level election fraud narratives at Dominion's great expense. Political candidates are running campaign platforms based on the falsities that OAN published and republished.[325] And Dominion's name has become unfairly and inaccurately tarnished as synonymous with fraud. Dominion is now so closely and inaccurately tied to the false claims of election fraud that even general references to "election fraud," a "rigged election," or similar statements—including by OAN—reinforce the false narrative pushed by OAN and indeed that OAN continues to push.

302.      As a result of the radioactive falsehoods spread by OAN, elected officials, insurers, and potential investors have been deterred from dealing with Dominion, putting Dominion's contracts in more than two dozen states and hundreds of counties and municipalities at risk and significantly hampering Dominion's ability to win new contracts. Even landlords are refusing to work with Dominion. In early August 2021, Dominion was told by a prospective commercial landlord that the landlord would not discuss renting to Dominion, citing security concerns relating to the election lies.

---

[325]      Austin    Chenge    (@AustinChenge),    Twitter    (Feb.    2,    2021,    11:21    AM), https://twitter.com/AustinChenge/status/1356638816921128962/photo/1.

303.    Additionally, based on Dominion's historic financial track record, contract pipeline, retention and renewal rates, and new business capture rates, as well as the nature, severity, pervasiveness, and permanence of the viral disinformation campaign, conservative projections show lost profits from existing customers of over $463 million and from potential new customers of over $68 million. In addition, the viral disinformation campaign has irreparably damaged Dominion. It has decimated Dominion's goodwill and destroyed the enterprise value of a business that was worth potentially more than $1 billion (based on updated EBITDA and multipliers of comparable companies) before the viral disinformation campaign.

## COUNT ONE — DEFAMATION *PER SE*
### *(Against All Defendants)*

304.    Dominion repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

305.    Defendants published the following false and defamatory statements of fact about Dominion, including by and through OAN's own agents making the statements themselves; by intentionally providing a platform for guests to appear on OAN programming who Defendants knew would make defamatory statements on the air and by affirming, endorsing, repeating, and agreeing with the statements of guests on their shows; by supervising, directing, and exercising editorial control over the defamatory statements; and by republishing the statements on the air, OAN's websites, OAN's social media accounts, and OAN's other digital platforms and subscription services after the live broadcasts had aired:

> (a) On November 12, 2020, OAN broadcast a segment titled, "REPORT: DOMINION DELETED 2.7M TRUMP VOTES NATIONWIDE," on live television on the OAN TV channel and republished on KlowdTV. The "REPORT" relied on an already debunked report that related to analysis allegedly performed by Edison Research. Although OAN later deleted its claims regarding the Edison Research report, OAN never retracted these statements. Seeing this report, President Trump quickly tweeted out OAN's coverage to his

more than 88 million followers as evidence that Dominion rigged the election and stole it from him: "REPORT: DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE. DATA ANALYSIS FINDS 221,000 PENNSYLVANIA VOTES SWITCHED FROM PRESIDENT TRUMP TO BIDEN. 941,000 TRUMP VOTES DELETED. STATES USING DOMINION VOTING SYSTEMS SWITCHED 435,000 VOTES FROM TRUMP TO BIDEN. @ChanelRion @OANN." President Trump's tweet promoting OAN's false story was entirely foreseeable to and intended by OAN. Specifically, OAN made the following false statements about Dominion in that report:

> Election systems across the country are found to have deleted millions of votes cast for President Trump. According to an unaudited analysis of data obtained from Edison Research, states using Dominion voting systems may have switched as many as 435,000 votes from President Trump to Joe Biden. And the author also finds that another 2.7 million Trump votes appear to have been deleted by Dominion, including almost 1 million Trump votes in Pennsylvania alone. Analysts say that that and destruction of votes are attributed to so-called 'glitches' in Dominion's software, and the extent to which this affected results can be verified by hand recounts of votes in each state.[326]

(b) On the November 13, 2020 broadcast of *The Tipping Point* in a segment titled "The First Tipping Point: Election Results in Question," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

> <u>Chanel Rion</u>: When we talk about Dominion, you're talking about a system that exists—that has been operating in 28 states, proven to have actually glitched in favor of Biden in at least three states, and so that's just one system. The United States is a whole quilt and patchwork of different voting systems, but Dominion really came to the forefront here at the Whitehouse because there were many districts in the United States that were questionable in terms of their results. Prime example is Antrim County in Michigan where 6,000 ballots had been affected by the Dominion voting machines and how they were digitally somehow glitching towards Biden. When they caught this mistake on a software level they were able to change the

---

[326] Colby Hall, *Trump Goes ALL Caps Promoting OAN's Voter Fraud Conspiracy Debunked By the NY Times and Others*, Mediaite (Nov. 12, 2020), https://www.mediaite.com/election-2020/trump-goes-all-caps-promoting-oans-voter-fraud-conspiracy-debunked-by-the-ny-times-and-others/ (Ex. 378).

results, and it turned out the so-called Biden win county was actually a Trump win because of the software glitch.[327]

(c) On the November 14, 2020 broadcast of *Real America with Dan Ball* in a segment titled "Investigating Voter Fraud with Chanel Rion," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

> Chanel Rion: Dominion really popped onto our radar because, just like your whistleblower exhibited in your previous interview, there are some irregularities when it comes to the data that they are sharing. And one thing that we're noticing is this massive swapping of data, and we're not talking about 50 votes here or there. We're talking about swaps in the hundreds of thousands range, we're talking about votes that only go one direction. They go from Biden to Trump, and there's a direct correlation, and we're seeing this in data that is just absolutely alarming—
>
> Dan Ball: Chanel, let me, let me correct you.
>
> Rion: —and we're continuing developing that story.
>
> Ball: Hold on. Let me interrupt real quick. You had said from Biden to Trump. You mean your investigation showed that that hundreds of thousands went from Trump to Biden, switched.
>
> Rion: Sorry, yes.
>
> Ball: I want to get that right.
>
> Rion: So we saw a switch between—
>
> Ball: I wanted to clarify that.
>
> Rion: Yes, thanks. Yes. So, for example—
>
> Ball: Let me ask you a quick question, Chanel, about—
>
> Rion: For example, Pennsylvania.
>
> Ball: Yes, go ahead.
>
> Rion: I just want to quickly look. Pennsylvania is the largest switch that we're noticing in which 220,000 votes went from President

---

[327] *The Tipping Point: Election Results in Question*, One America News Network (Nov. 13, 2020), https://app.criticalmention.com/app/#clip/view/518987a5-d292-4001-bde0-95a8b9bb2999?token=e1bb29b2-fc08-4587-be57-88dd81ea7a3a (Ex. 379).

156

Trump to Joe Biden. And remember the margins that we're dealing with in Pennsylvania. They're not by much. They're only about 50,000 votes that Biden is leading Trump, so this is not an insignificant data glitch or an abnormality. It is certainly something we need to be looking into.

…

<u>Rion</u>: This is a work in progress.

<u>Ball</u>: Okay.

<u>Rion</u>: But the bottom line is votes were switched from President Trump to President—to now Joe Biden, and it happened in dozens of states, and it's a Dominion System software glitch that we are going to dig into.[328]

(d) On a November 16, 2020 broadcast titled "Dominion Exec: Trump Is Not Going To Win, I Made F***ing Sure Of It," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

<u>Chanel Rion</u>: Joe, you infiltrated an Antifa conference call this past September, and accidently came upon a top Dominion Voting Systems executive named Eric Coomer.

Describe that call, and what it led you to find.

<u>Joe Oltmann</u>: It's interesting how—how the call started, somebody says: Who's Eric?

He says: Eric is a Dominion guy.

Someone actually said: Yeah, hey, go ahead; go tell him to continue speaking.

And someone interrupts and says: What are we going to if F'ing Trump wins?

And Eric responds—and I'm paraphrasing this, by the way: Don't worry about the election, Trump is not going to win, I made F'ing sure of that.

---

[328] *Real America with Dan Ball: Investigating Voter Fraud with Chanel Rion,* One America News Network (Nov. 14, 2020), https://app.criticalmention.com/app/#clip/view/1ce55142-8ca2-4e8f-9af7-089bf5edf9d9?token=39a0275b-e88a-4da1-b06b-de6723ac765c (Ex. 380).

And then they started laughing. And somebody: F'ing right.

…

<u>Oltmann</u>: Eric Coomer was this—you know, that he—he was not just Antifa, he was—he was responsible for putting his finger on the—the scales of our election.[329]

(e)  On November 21, 2020, on Twitter, Chanel Rion and OAN made, endorsed, and publicized the following false statements about Dominion:

Yes, they are [corrupt]. They thought they had NC fixed… Trump beat the algorithm by such overwhelming margins there they couldn't fix it fast enough. Ask: Why did NC take so long to call after 98% precincts were reporting a Trump win? ALL votes processed by Dominion must be audited.[330]

(f)  On November 21, 2020, OAN broadcast a 30-minute special it created, edited, and produced titled, "Dominion-izing the Vote." OAN broadcast "Dominion-izing the Vote" live on television on the OAN TV channel and republished it for continuous viewing on KlowdTV. In "Dominion-izing the Vote," OAN went far beyond claiming that Dominion machines can theoretically be hacked. The title of the special, "Dominion-izing the Vote," in and of itself demonstrates that OAN intended to and in fact did endorse the false statements that Dominion committed election fraud by flipping votes from Trump to Biden, manipulating vote counts to steal the election from Trump in favor of Biden, and designing its systems and machines for the express purpose of being hacked in order to rig elections. In support of these false inferences of fact, OAN included in "Dominion-izing the Vote" specific false statements of fact, including that Dominion machines were manipulated to steal votes away from Trump for Biden even though Dominion did not operate in Philadelphia County in 2020, that Dominion employees were trained to reject ballots for Biden, and that a Dominion executive actually admitted to rigging the election.

In further support of these false inferences of fact, Rion, Charles Herring, and OAN promoted the "Dominion-izing the Vote" special repeatedly on social media. For example, on November 17, 2020, OAN posted on Twitter: "How compromised was the 2020 election? Dominion Voting Systems, which is used in 29 states, has had a history of problems. Stolen laptops, 'switched' votes, Clinton ties, Antifa CEOs, undeniable data… Join One America's @ChanelRion

---

[329] *Dominion Exec: Trump Is Not Going To Win, I Made F\*\*\*ing Sure Of It*, One America News Network (Nov. 16, 2020), https://app.criticalmention.com/app/#clip/view/17685220-bb98-4032-ab0a-2aab6370d708?token=039b18a0-39fe-40f1-bee4-7df466d96db1 (Ex. 381).

[330] Chanel Rion (@ChanelRion), Twitter (Nov. 21, 2020) (an archive of the tweet can be found here: http://web.archive.org/web/20201121213935/www.twitter.com/chanelrion) (Ex. 382).

for this exclusive investigation! #OANN."[331] On November 21, OAN and Rion posted a video to Twitter promoting "Dominion-izing the Vote," in which Rion asked the rhetorical questions, "Why are Dominion employees scrambling, hiding, and emptying out offices? Do they know they've been caught?"[332] and "How compromised was the 2020 election?" The promotional tweet likewise promised OAN's viewers that the answer lay with "Dominion Voting Systems, which is used in 29 states" and *"undeniable data"* showing that Dominion was responsible for compromising the election. Finally, on November 22, Charles Herring promoted the scheduled rebroadcast of the special later that night, calling it "MUST Watch" and saying "ALL AMERICANS should be concerned about OUR voting integrity *and the numerous known irregularities. Don't miss it. Join us @OANN*."[333]

OAN made, endorsed, and adopted the following specific false statements in its November 21, 2020 broadcast of "Dominion-izing the Vote" and subsequent rebroadcasts of the same program:

> Chanel Rion: In this edition of One American News Investigates, we look at Dominion Voting Systems and its role in the 2020 presidential elections, glitches, errors, money trails to powerful Democrats. Dominion is just one of three major companies providing voting systems to America. But Dominion captured headlines when it was discovered it had glitched 6,000 votes, giving Biden a fraudulent win. This was not an isolated event.
>
> …
>
> Ron Watkins: So another issue is the keys. The keys to the machine are digital devices. It's unclear what the device is. It might be like an RFID device or USB or something, but it is clear that it's a digital device that holds some kind of cryptographic key on it. If you lose this physical key to the machine, then you lose absolute security of the entire precinct.
>
> Say Philadelphia was storing these keys in a warehouse and they were robbed and the only things stolen were these keys and a laptop. Then you should consider their entire election to be illegitimate because they have lost the physical security of the system.

---

[331] One America News (@OANN), Twitter (Nov. 17, 2020, 9:03 AM), https://twitter.com/OANN/status/1328715483701395458 (Ex. 409).

[332] Chanel Rion (@ChanelRion), Twitter (Nov. 21, 2020, 11:10 AM), https://twitter.com/ChanelRion/status/1330196983966019586?s=20 (Ex. 408).

[333] Charles (@CharlesPHerring), Twitter (Nov. 22, 2020, 12:54 PM), https://twitter.com/CharlesPHerring/status/1330585340424323072 (Ex. 410).

<u>Rion</u>: That's just what happened in Philadelphia one month before election day.

<u>Video Clip</u>: Philadelphia police are investigating after somebody broke into an election machine warehouse and stole a laptop and a USB drive. The theft happened last night at the warehouse on the 3500 block of Scotts Lane and East Falls.

<u>Rion</u>: Officials were quick to declare this theft had nothing to do with the election and was not malicious at all. An odd declaration. You don't catch the criminal, but you decide you know their motive. Interesting judicial logic, Philadelphia. Meanwhile, local reporter posted this video on social media where he seen walking around that same warehouse without being noticed.

<u>Watkins</u>: Whoever stole those keys in Philadelphia has admin access. Do you trust a random thief who has administrative access to the voting machine? They could have theoretically been able to make as many keys as they want for Philadelphia.

<u>Rion</u>: On election night, Donald Trump led Joe Biden by 800,000 votes, major precincts reporting. In the dead of night, that lead disappeared. Biden overtook Trump and took the whole state of Pennsylvania by 60,000 votes. That 60,000-vote bump came from the very Philadelphia County in which the drive and laptop had been stolen.

Watkins' list of concerns about Dominion's vulnerabilities went on. Watkins found it strange that algorithms for ballots with just one candidate on it, called an undervote, were so complicated, and it is unclear what happens to these ballots.

<u>Watkins</u>: The computer may or may not throw out your vote.

<u>Rion</u>: Another concern, right after the 2018 midterms, Pennsylvania made a custom request. They requested Dominion change the system to read a straight Republican or straight Democrat ballot, but oddly read an individual candidate separately from the rest of the straight ticket choices below.

<u>Watkins</u>: I looked at the font they were using and it's part of the Arial family of fonts, Arial, which is a sans serif-font. And with this font family, a capital I and a lower case L are nearly indistinguishable on a piece of paper. The person who designs the ballot and the race could theoretically put a Donald Trump in the Repub-I-can party not the Republican party. And that would be a capital I instead of the L. And then everybody else on the Republican party would just be in the normal Republican party. In that situation,

160

if you vote just straight party for the Republicans, then Trump would not get a vote. And there are a lot of, I've been hearing a lot of issues of, uh, Trump performing poorly in heavily Republican, uh, areas.

. . .

Rion: But even these concerns were minor compared to what Watkins shared with us next. Dominion's algorithm for handling an anomaly, that is a stray mark or bleed through from my Sharpie pen.

Watkins: So this is the big one that I'm most concerned about. If the scanning system detects any anomaly on your ballot, then you are not counted.

Rion: What Watkins reveals next explains one of the strangest mysteries of the 2020 election. We'll be right back.

…

Rion: Ron Watkins' analysis of Dominion Voting Systems is through a singular lens, that of an infiltration hacker. Through that lens, the machines are disastrously vulnerable, but as a systems analyst, the biggest red flag about Dominion was its algorithm where ballots with anomalies bleed throughs or stray marks are set aside and not counted.

Watkins: What happens when your vote is not counted due to an anomaly? Then a scan of your ballot gets saved into a folder on the ICC, the image cast central tabulation system. This allows for those two to six people who were trained by Dominion to go through the folder of anomalies and either delete or verify each of the ballots inside the folder. I believe it's called vote adjudication. These workers can theoretically see which candidates have been marked as votes on these anomalous ballots before they are verified and officially cast, so it's possible they could in theory hand pick a certain party's votes to be verified while throwing out all the others.

Rion: But it's the next point that stuns Watkins most.

Watkins: The biggest issue here is that the system for detecting anomalies can be set up by altering gamma settings on the scanner so that every ballot has an anomaly. Thus, in effect, by altering gamma settings on the scanner so that every ballot has an anomaly this in effect allows those two to six trained people to go through and hand check every single ballot before they're verified and cast into the tabulation system as an actual vote. That last point explains to me how certain candidates can get 130,000 votes at once with zero votes going to the other candidate. It explains to me how or

161

why vote workers in places like Arizona might have given Sharpies to certain voters because they might have wanted that specific vote to be caught by the anomalies system and hand verified at a later time.

. . .

Watkins: Your vote doesn't matter in these districts with the Dominion machines in them, because these two to six people trained by Dominion have ultimate control. It doesn't take a genius to realize that setting the gamma levels incorrectly makes all the battle become anomalies, which you can then go through later and adjudicate. . . .

Rion: Watkins is of the opinion any competent hacker, thief or paid-off poll worker could game the Dominion system and alter hundreds of thousands of votes, but a bigger question lurks. To what extent was this actually designed by the top on purpose.

In September 2020, FEC United founder Joe Oltmann had infiltrated Antifa to uncover journalists who were active members of the Antifa group attacking his company in Colorado.

Joe, you infiltrated an Antifa conference call this past September and accidently came upon a top Dominion voting systems executive named Eric Coomer. Describe that call and what it led you to find.

Joe Oltmann: It was interesting how the call started. Somebody said who's Eric. He said Eric's the Dominion guy. Someone actually said hey, go ahead, told him to continue speaking, and someone interrupts and says what are we going to do if F'ing Trump wins, and Eric responds, and I'm paraphrasing this, by the way, don't worry about the election.· Trump is not going to win. I made F'ing sure of that. And then they started laughing, and somebody says F'ing right.· And so I just put a simple Google search to start, which was Eric, Dominion, Denver, Colorado and Eric Coomer came up immediately under Dominion voting systems.

Rion: Turns out Eric Coomer held a top position at Dominion with a Ph.D. in nuclear physics. Coomer joined Dominion as vice president of engineering and holds several patents with Dominion, insuring users can adjudicate ballots from the machines, the very function Ron Watkins pointed out as a huge red flag. After the election Oltmann was sent an article highlighting Eric Coomer from Dominion.

Oltmann started looking into Eric again. Eric was the director of strategy and security at Dominion, and a shareholder in the company.

<u>Oltmann</u>: When I got into his Facebook page, that's when things really started to come together for me that, you know, that Eric Coomer was this, you know, he was not just Antifa. He was responsible for putting his finger on the scales of our election.

. . .

<u>Rion</u>: In Coomer's case, he was in a position of power to actually act upon his rage against Trump and Trump voters. What does he mean when he says Trump won't win. I made F'ing sure of that.· Nothing?

According to DHS's former cyber security director Chris Krebs, this was our most secure election in history. Nothing to see here. Incidentally, Krebs' now infamous most secure election in history memo was co-written with the endorsement of the election commission. Dominion is on that commission. Dare we dig deeper? We'll be right back.

…

<u>Sidney Powell</u>: There should never be another election conducted in this country, I don't care if it's for local dog catcher, using a Dominion machine and Smartmatic software. We have got to have an American company that uses paper ballots that we can all verify so every one of us can see that our vote is our vote..[334]

(g) On the November 23, 2020 broadcast of *OAN Breaking News Live with Patrick Hussion* in a segment titled "Tech Millionaire Fund Hacking Team: '20 Election 100% Rigged''," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed and adopted numerous false statements. In this segment, OAN went far beyond claiming that Dominion machines can theoretically be hacked. The title of the special quotes Patrick Byrne's statement that the 2020 election was "100% Rigged," which in and of itself demonstrates that OAN intended to and in fact did endorse the false statements that Dominion committed election fraud by flipping votes from Trump to Biden, manipulating vote counts to steal the election from Trump in favor of Biden, and of designing its systems and machines for the express purpose of being hacked in order to rig elections. In support of these false inferences of fact, OAN included in this segment specific false statements of fact, including that voting irregularities in 2018 in Dallas, TX were "rooted in

---

[334] *Dominion-izing the Vote*, One America News Network (Nov. 21, 2020), available at https://www.youtube.com/watch?v=746HTjhFifA (Ex. 383).

Dallas's use of Dominion voting machines" even though Dominion machines were not used in Dallas in 2018, that there were "statistically impossible" dumps of votes for Biden, and that there were "backdoor ways" in Dominion machines to change, manipulate, and delete votes. OAN made, endorsed, and adopted the following specific false statements in that broadcast:

> Chanel Rion: Patrick Byrne, founder and former CEO of Overstock.com has long considered himself a libertarian tech entrepreneur. Byrne now finds himself more than entrepreneur. He's on a mission to save the republic from a deadly virus, widespread machine and software election fraud. He's doing this by funding a niche group of experts and the Trump legal team has been listening. You've put together a group of individuals who are trying to crack down on the fraud that is Dominion. Tell us more about what you've been doing.

> Patrick Byrne: Yes. Well, I funded a team of hackers and cyber sleuths and other people with odd skills. We've been on this since August. One side story to be pursued someday is the DHS was warned of all this in August and September. We tried very hard and it was all crammed down, and I mean from high levels.

> Rion: The experts Byrne is funding is an elite cyber security team that has been hired by the state of Texas to investigate a series of irregularities in the Dallas elections of 2018. The team consisted of members with backgrounds in military intelligence and federal law enforcement. Byrne says the election irregularities in Dallas 2018 was rooted in Dallas' use of Dominion voting machines. This group has been on Dominion's trail over two years.

> Byrne: I've been up there with them since August and expanding and funding further and deeper investigations so we really, I felt, kind of had the answer when everyone woke up November 4th saying what happened. We couldn't quite believe we couldn't get anyone to listen to us.

> Rion: Their findings include a detailed list of impossibilities, Dominion machines processing more ballots than is physically possible, realtime data showing Biden vote dumps that are statistically impossible, and dozens of back door ways in which votes by thousands could be changed, manipulated or deleted.

> Byrne: When you get talking about, you know, thousands of votes in a row for one candidate, just to give you the mathematical odds against it, if you're talking about a group that has a 96 percent affinity for Biden, so imagine we're talking about very heavily Biden ward.

Rion: Right.

Byrne: The chance of having a hundred votes in a row for Biden, if the chance of every vote is 96 percent for Biden, the chance you would have a hundred in a row is about 1.6 percent. The chances that you would have a thousand in a row goes to—it's about like a couple quadrillion to one, and the chances you would have the kinds of numbers we're seeing where they were placed where there were tens of thousands of votes in a row for Biden, the chances are quadrillions and quadrillions against that could ever happen in nature.[335] . . . These are goons.

Rion: I've spoken to your guys behind the scenes. They're very, they seem very knowledgeable and they've pulled incredible data. Are you seeing a clear pattern between the major swing states in this regard?

Byrne: It's more than a clear pattern. We know exactly what happened. . . . It's absolutely clear. There's no shades of gray about this.

Rion: Byrne says the election was 100% rigged . . . .

Byrne: . . . This isn't even close. I want to show people. This isn't even close.[336]

(h) On a December 4, 2020 broadcast of *In Focus with Stephanie Hammill*, which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

Stephanie Hamill: So, Mayor, we were told this was like the most secure election in U.S. history by officials. What do you say to them?

Rudy Giuliani: Either they are the most incompetent officials we've ever had, or they're in bed with Dominion and the phony companies who are involved in getting paid millions to help Biden win.[337]

---

[335] *Tech Millionaire Fund Hacking Team: "2020 Election 100% Rigged"*, One America News Network (Nov. 23, 2020), https://app.criticalmention.com/app/#clip/view/67795b8f-2934-4361-81bd-710b2250575a?token=37f52d99-127d-4b48-b8dc-e5e99babfaaa (Ex. 384).

[336] Steve Toth for Texas, *Tech Millionaire Fund Hacking Team: "2020 Election 100% Rigged"*, Facebook (Nov. 23, 2020), https://www.facebook.com/SteveTothTX/videos/733508567267439/.

[337] *In Focus with Stephanie Hamill*, One America News Network (Giuliani's interview broadcast from Washington, D.C., Dec. 4, 2020), available at https://app.criticalmention.com/app/#clip/view/70ebddad-8d73-4e94-8a7c-

(i) On December 5, 2020, OAN rebroadcast the "Dominion-izing the Vote" segment in full on the OAN TV channel, and republished on KlowdTV. In the rebroadcast, OAN made, endorsed, and adopted the same false inferences of fact and false statements of fact it made in the original broadcast of "Dominion-izing the Vote" on November 21, 2020.[338]

(j) On December 19, 2020, OAN rebroadcast the "Dominion-izing the Vote" segment in full on the OAN TV channel, and republished on KlowdTV. In the rebroadcast, OAN made, endorsed, and adopted the same false inferences of fact and false statements of fact it made in the original broadcast of "Dominion-izing the Vote" on November 21, 2020 and on December 5, 2020.[339]

(k) On the December 24, 2020 broadcast of *OAN Breaking News Live with Patrick Hussion* in a segment titled "President Trump: Election Fraud Is a Proven Fact," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

> Patrick Hussion: Rudy Giuliani says recent forensic audits found Dominion voting machines were programmed to give Joe Biden an automatic advantage over any number of Trump votes.

> Rudy Giuliani: We believe from what we saw in Michigan, that the machines have an inaccurate vote that they're programmed to give somewhere between a two and five percent advantage.[340]

(l) On December 30, 2020, OAN broadcast a segment titled "Powell: Election Fraud Now Obvious Because Pres. Trump's Landslide Victory Broke Dominion 'Vote-Switch' Algorithm," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

> Mike Dinow: Powell says President Trump won a second term in office on election night, and that democratic officials had to use all tools they had to prevent that. She adds that this includes foreign

---

7a1897437d92?token=9667991d-a9cf-4554-89fc-7585a7734f37 (last visited Aug. 7, 2021) (Ex. 385).

[338] *Dominion-izing the Vote*, One America News Network (broadcast Dec. 5, 2020), available at https://app.criticalmention.com/app/#clip/view/b63b99f4-ddc3-458c-902b-e386e0df1550?token=9667991d-a9cf-4554-89fc-7585a7734f37 (transcript of original at Ex. 383).

[339] *Dominion-izing the Vote*, One America News Network (broadcast Dec. 19, 2020) (transcript of original at Ex. 383).

[340] *OAN Breaking News Live With Patrick Hussion: President Trump: Election Fraud Is A Proven Fact*, One America News Network (Dec. 24, 2020), https://app.criticalmention.com/app/#clip/view/edd92632-4c80-4830-9322-cc20537255e2?token=945b87c9-0c2d-4595-99ec-c9c83da5b728 (Ex. 386).

meddling, electronic manipulation of votes, and expelling poll watchers.

Sidney Powell: The flipping of votes by Dominion, they've even advertised their ability to do that, to run a fraction to make a Biden vote count 1.26. and a Trump vote only count 0.74. They've done it before. They've done it in Venezuela. They've done it another foreign countries. They've done it in this country.

Dinow: And Powell goes on to say that voter fraud in this election was so rampant because President Trump's landslide victory was breaking the Dominion algorithm.[341]

(m) On the January 1, 2021 broadcast of *OAN News 8am with Stephanie Myers*, in a segment titled "Giuliani: State & U.S. Local Lawmakers Must Reverse Election Fraud," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

Emily Finn: Well Rudy Giuliani details the meddling with this year's elections by democrat officials and mainland China, who he says used phony ballots and the hacking of Dominion machines. Take a look.

Rudy Giuliani: When nobody was really looking, in the middle of the night, they injected 107,040 votes for Biden at 6:34 a.m. in the morning. Those votes, those votes, were way beyond what those machines could count at that period in time.

Finn: Giuliani says the high number of fake votes overloaded election systems, causing key states to stop their counts on election night. He adds that lawmakers must fulfill their constitutional duty and revoke the fraudulent results.

Giuliani: No matter what happens in terms of the outcome here, whether the legislature's that should do it overturn the certification for Biden and certify Trump, who actually won those particular five states, or not, this voter fraud is going to be part of our history and as time goes by more and more is going be learned about the international nature of it.

---

[341] *Powell: Election Fraud Now Obvious Because Pres. Trump's Landslide Victory Broke Dominion 'Vote-Switch' Algorithm*, One America News Network (Dec. 30, 2020), https://app.criticalmention.com/app/#clip/view/10544fd4-e686-47fa-b76a-62206fd30732?token=3e9c75c0-6f76-413d-baf8-14659794f3ff (Ex. 387).

> Finn: Giuliani says the Democratic Party ran a nationwide conspiracy plot together with Dominion and China and other foreign countries and companies to steal President Trump's victory.[342]

(n)  On the January 2, 2021 OAN broadcast titled "Christina Bobb Interviews Rudy Giuliani," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV, OAN made, endorsed, and adopted the following false statements:

> Rudy Giuliani: Of course, the Dominion machines, which are the machines that we used, were basically built to cheat.[343]

(o)  On January 27, 2021, OAN aired a segment titled "Mathematician: Election Numbers Don't Add Up," which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV. In this segment, OAN intended to and endorsed the false inference of fact that Dominion rigged the 2020 election. It did so by falsely portraying a convicted felon with no college degree as an "Expert Mathematician" in order to falsely assert that the vote count in Fulton County, Georgia—where Dominion machines operate—was statistically impossible. In that segment, OAN made, endorsed, and adopted the following specific false statements:

> Mike Dinow: An expert mathematician says the election results for Joe Biden at the precinct level are, quote, impossible and cannot occur naturally. Here's One America's Christina Bobb.

> Christina Bobb: Edward Solomon, a mathematician, took a closer look at the election results at the precinct level. A specific anomaly occurred rendering the results impossible says Solomon. Joe Biden won exactly the same percentage points across multiple precincts at designated times of day long enough to change the advantage. Mr. Solomon walked me through an example of the precincts in Fulton County, Georgia.

> Edward Solomon: You can see that there's the first precinct there. It's at 12:56 a.m. on November 4th. And then when it abandons that ratio on its next tabulation update, two more precincts, they inherit that ratio on the same time sync. And then after they update their

---

[342] *OAN News 8am with Stephanie Myers: Giuliani: State & U.S. Lawmakers Must Reverse Election Fraud*, One America News Network (Jan. 1, 2021), https://app.criticalmention.com/app/#clip/view/27981d65-ed66-4cee-8cd1-a7ac77b85891?token=76f4002c-113c-4d95-b318-b3fe81b0c8b5 (Ex. 388).

[343] *Weekly Briefing: Christina Bobb Interviews with Rudy Giuliani*, One America News Network (Jan. 2, 2021), https://app.criticalmention.com/app/#clip/view/74ed09be-0f2b-4c14-b9de-0ca0ad59952b?token=76f4002c-113c-4d95-b318-b3fe81b0c8b5 (Ex. 389).

tabulations and abandon that ratio of 1:18, another precinct inherits it.

Bobb: Solomon says that in order for the ratios to be that exact at clearly designated times, computer software must have used an algorithm to change the votes.· Specifically, for roughly 90 minutes at a time for rotating intervals the precincts changed the votes to insure that Donald Trump won only 5.555 percent. After the intervals completed, the precincts returned to a normal vote count.

Solomon: It says that this could only have been done by an algorithm. It can't even by done by humans. So if you had a bunch of human beings that were tried to rig an election and you said hey, listen, I want you to give Trump 15 percent over here and I want you to give Trump 13 and a half percent over here and 5.5 percent over here, even human beings trying to replicate this wouldn't get it this perfect.

Bobb: So what are the chances of this happening naturally? Solomon says that there are not enough stars in the universe to which you can compare.

Solomon: You can use that binomial probability formula, and the chance of that event happening is one over ten to an exponent so large, there's not enough stars in the universe. There's not enough atoms in the universe to explain the number. It can't happen naturally.

Bobb: The numbers produced by this election result can't happen naturally, and humans trying to replicate the results would not be able to produce them this perfectly. This evidence requires election officials to take a closer look and audit their results with real forensic experts. I'm Christina Bobb, One America News, Phoenix, Arizona.[344]

(p) Starting on February 5, 2021 and through February 8, 2021, OAN aired the "docu-movie" Absolute Proof with Mike Lindell, which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV. OAN broadcast and rebroadcast Absolute Proof 13 times on the OAN TV channel during those dates. During these broadcasts, OAN made, endorsed, and adopted the following false statements:

---

[344] *Mathematician: Election Numbers Don't Add Up*, One America News Network (Jan. 29, 2021), https://www.oann.com/recall-effort-against-calif-governor-gavin-newsom-approaches-1-5-million-signatures/ (Ex. 390).

Mike Lindell: Well, the one day—I think it was like January 9th, all the sudden, these people—they brought me some—a piece of evidence that's 100 percent proved, it's like a—a print of—of inside the machine, of a timestamp, that showed another country—other countries attacking us, hacking into our election through these machines, and it—it shows the votes flipped.

And I'm going, wow, I got to get this out there. And from that point on, I started putting it out there, and that—that's when they just started attacking me.

Well, they obviously are hiding something, and tonight you're going to see what they're hiding. You're going to see on this show, we have —we're going to have cyber-forensic experts, we're going to 100 percent—you're going to see all this evidence that by the time you're done seeing it, you're going to go, wow.

100 percent it proves exactly what happened, that these machines were used to steal our election by other countries, including China.

…

Phil Waldron: Then you got to—the machine-level, which is kind what you were talking about, the—

Lindell: Right

Waldron: —the—the algorithms that are directly input into the tabulators. And we have evidence of that in—in Ware County, Georgia, that—you know, X-amount of ballots went through, and they—they basically stole 13 percent of the vote from President Trump and put that 13 percent of the vote into the category for former-Vice President Biden; which made a 26-percent shift in the vote.

…

Waldron: And then if you look at the testing company, the only company that has code-—access to the code and the testing for Dominion is in Shenzhen, China. It's a communist Chinese party company. The U.S. government, the state governments, the county governments, they don't have access to Dominion code. But I think's it's kind of — kind of unique that a Chinese company that's run by the—the CCP does have access to the code, and that's why we started seeing at that strategic level, that third tier, of election manipulation; a lot of movements of votes, directly — direct access to Pennsylvania voting precincts, county tabulation centers, Wisconsin, Michigan, Nevada, Arizona, Georgia—all of that

coming in directly from foreign countries, China being the predominate one and through—through Pakistani ISI proxies.

…

Russell Ramsland: So—what actually happened in this election, this stolen election, we already knew was going to happen. We already had seen it. We knew it was all possible. We knew it was all out there. Now, we didn't know how many foreign servers; you know, before we weren't seeing very many foreign servers come in and change votes. But in this election, of course, we saw thousands from all over the world.

Lindell: Had you seen—you seen thousands—right, you had seen all these—these hacks; have you actually seen that with your own eyes?

Ramsland: We have seen the data --

Lindell: You see --

Ramsland:—that is --

Lindell: All right.

(Talking simultaneously.)

Lindell: So this—the election goes down, you knew it was going to happen; is it exactly what you thought was going to happen?

Ramsland: Yeah. We—we thought it was going to happen on three levels. We thought there would be massive local cheating. We thought there would be cheating through the actual voting companies themselves, whether it's them or someone else manipulating them. And we thought that there would be cheating from votes being injected from overseas. And that's exactly what we saw happen.

Lindell: Wow.

Ramsland: And we developed huge, tons of—of absolute proof on this, but no court case was ever allowed—ever allowed it to be presented. So that sort of gave fodder to this media myth that it didn't exist. But it does exist. It's out there. It's unbelievable. It's massive.

. . .

Lindell: Okay. Now, we've heard about—we alter-—in fact, on this show, the—Antrim County in Michigan, were you guys ever—were you guys—weren't you guys contacted to look into that?

Ramsland: That was our work, yes.

. . .

Lindell: Right. For everybody out there, what—we've heard all this, Antrim County in Michigan, and in the show here we—you know, you've—you've seen it, we've had—we've—this is a—this is—the reason was talked about so much, because this is a small county and it was like 15,000-some people voted and it was 7,000-some votes flipped. . . .

. . .

Lindell: Can I ask you this? So what you seen there is exactly what you knew was going to happen, and now were you able to look at other places, what was different about Antrim County, now that—what we all heard was you know, you were able to get into the—you know, the forensics of it and see all this, were you able—have you been able to do that in any other places in the United States, since then or—or, you know, since this election ended on—in November.

Ramsland: Actually, on—on a limited basis we had been able to go into two other counties, we have not published that information yet. And there are reasons why we aren't publishing that information right now; but both of them have not only confirmed, they have confirmed that it's even worse than in Antrim.

Lindell: Okay. Did everybody hear that? What we have here—and—and Russell can't disclose this, because what—every time something pops up, it gets buried out there. Things happen. I don't—you know, it—this is — this is the most—attack on our country, and I'm telling you, ever. I mean, this is—and that's why—you know, it's getting suppressed every --everywhere.

So what he's saying, two other places—now, is this breaking news right now? You're saying right now you have two other places, and what you're seeing is even worse than you could ever imagine?

Ramsland: Well, it's—it's—it's just like Antrim, only it's worse in many ways. . . . Well, in—in Antrim we found ballot rejection rates of 82 percent. 82 percent.

Lindell: Wow. Wow.

. . .

Lindell: And now—what you're talking about there, is it—this is one of the way these machines cannot—you can—that you can cheat through the—or cheat there, but this does not count what you're talking about earlier, the cyber forensics where the—that goes overseas to these servers that are all based over there, correct?

Ramsland: That does not—that's a different issue altogether.

Lindell: Right. So both of them involve the machines, everybody. One we've talked about in this show is here. But the cyber one is—you just heard from Russell, which he said earlier, this is all the attack by the other countries that hacked in, which we're going to show you that proof now, that Russell doesn't even know, that we have that's going to show who did it, the time they did it, the computer they did it off of, everything.

…

Lindell: Okay. And you've seen this cyber -- the -- the cyber forensics that showed that. We will show that, too.

…

Lindell: Bill Barr, if you're watching -- I mean, what -- why would you say something like that when -- yes, this is – this wasn't just election fraud, this was a historical election fraud. This was coming from a lecture (phonetic) -- from machines, from these machines, a biblical proportions -- of historical proportions, and now this is -- it's all going to get exposed.

…

Matthew DePerno: And if you look at certain townships, like Chestonia Township —

Lindell: Okay.

DePerno: —Joe Biden got a 197 votes on November 3rd.

…

DePerno: That's correct. So you can see Joe Biden on election night got --

Lindell: Right.

DePerno:—197, he got Donald Trump's 197 votes.

…

Lindell: Now—now what we're showing here, you guys, so everyone knows, these are all precincts. I don't know if you can see this here, these are all precincts. So let's just do this precinct — precinct 392, this is done through the machines, and Donald Trump got eight. What? So here is—the 392 to 8, but the real number was 198 to 392.

DePerno: And if you see here, Elk Township, Joe Biden got 392 on election --

Lindell: Right.

DePerno:—in reality, those Donald Trump's votes. Those were the 392.

Lindell: Right. They were just flipped. In order for that to be off, and — and you do the conclusion, which I would right now, 100 percent, how can that be off? It would be something wrong with what?

DePerno: The machine.

Lindell: The machines. The machines. And what we're showing here right now, what you're going to see, all this—what we've been talking about, this massive machine election fraud that went on, where countries hacked into our election, and nationwide—this is one little county in Northern Michigan, and these machines would do it right down to the precinct. . . . And—so what I want to tell y'all, is this is the perfect example—just so you know, right down to the precinct-level what went on with these machines. I want to see one more here. So —

DePerno: Well, you can look at like—Kearney Township --

Lindell: Yeah.

DePerno:—Joe Biden got 744 on election night --

Lindell: Right.

DePerno:—those were Donald Trump's votes. He actually recorded 16 on election night.

. . .

Lindell: Right. So I just want everyone out there to know this before you get into (inaudible) this is just a small county, Northern Michigan, and they ended up flipping—we had 15,718 votes.

DePerno: 15,718 votes.

Lindell: Votes. And 7,060 were flipped from Biden—or Trump to Biden; is that correct?

DePerno: Yeah. And what's more --

Lindell: Wow.

DePerno:—what's even more interesting --

Lindell: By machine. By machines, right?

DePerno: By machine --

Lindell: (Inaudible) done by the machines?

DePerno: Absolutely by machines.

. . .

Lindell: …We're—I'm here to show everyone now the facts and evidence that I have seen, 100 percent. Here's 100 percent. This little county in Northern Michigan, the—look at what the difference was, it was a net of 5,250 votes; is that correct?

DePerno: That's a net for Donald Trump.

Lindell: That's a net for Donald Trump. There was 7,000—that's where you get the 7,060 votes.

. . .

DePerno: . . . [W]e then went in—and I believe it was December 6th --

Lindell: Right.

DePerno:—and with a team of forensic scientists and data collection scientists, we—we captured the forensic images of the Dominion Voting System, the master tabulator, is what we call it, sitting in the county building, along with all of the CF cards, which are the program cards that run the actual software, along with the actual data cards or thumb drives that collect and tally the results in each precinct. We captured the forensic images of all of those items.

175

Lindell: Okay. I want to—I want to say something there: So the people—did you hire these people to do that?

DePerno: Correct.

Lindell: Okay. Were they—and you didn't know them before this, right.

DePerno: We didn't know them before --

Lindell: Right.

DePerno:—but the people got us in contact with them --

Lindell: Contact with — with forensic experts on these particular machines?

DePerno: That's correct.

Lindell: And so—so that's — I just want everyone to know that. This wasn't just some—you know, hey, let's grab somebody from the county and look at these machines. These were experts.

. . .

DePerno: In our case, what we found through the forensic study that was conducted was that on November 4th, at 11:03 p.m., system files, adjudication files, and other source system files were deleted from the Dominion system in Antrim County. We know that for a fact.

Lindell: Wow.

. . .

DePerno: But we do know that those files were removed on November 4th at 11:03 p.m.

. . .

Dr. Shiva Ayyadurai:—but what it is—actually, it's information that if revealed, would show that the CEO of Dominion software, when he testified in front of the Michigan Senate, this information would show that he was not telling the truth about how the Dominion system works.

Lindell: Wow.

DePerno: And here's what we concluded --

176

Lindell: Wow.

DePerno:—when we released the report, this is what it states: We conclude that the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. Now, that's not my words. That's the words of the forensic team --

Lindell: That looked at this?

DePerno:—that looked at the forensic images and came to a conclusion about what they saw.

Lindell: Right. So that --

(Talking simultaneously.)

DePerno: (Inaudible) that's in the report.

Lindell: They concluded that the only reason you would have a machine like this is if you wanted to steal an election?

DePerno: Correct. Because what they also found is that this machine in Antrim County generates errors at the rate of 68 percent based on ballots that you put in the machine.

…

Lindell: I'm going to bring on Mary Fanning to explain how it all happened, and the—show you the 100 percent proof. Mary, thanks for coming on.

Mary Fanning: Thanks, Mike. Today we've been watching cybersecurity experts and they've explained some of the things that happened in the election, some of the election fraud.

But what we're seeing here is—if you look at this chart, is that they were cybersecurity experts who began collecting information on November 1st, and—so this was before, during and after the election, that they were collecting documentation.

In fact, they collected terabytes of information that document the election fraud before an intrusion into our election. This was collected as—in 2995 counties in the United States.

This was collected in real-time. All right. So if you go to the chart, what you will see is the documentation of foreign interference in the election.

177

The first column, if you look at the chart, that shows that on 11/5/2020, at 7:43:38, we had a foreign intrusion. And it shows that the IP address, the Internet protocol address. That is the number of that protocol address of the hacker that entered into our election.

The second column is the owner or source of that IP address. That shows that China Net in Beijing province, entered the election. It shows an ID, that is a unique address of a computer. That shows the exact computer using that IP source that entered into our election.

The next is the target. That's the IP target. That's the Internet protocol address of the target. All right. And the next is the target state. In this case it shows that it's Michigan.

Where in Michigan? That's the next column. It shows that it's in Emmet County, Michigan.

Then the ID target. That is the unique address of another computer in the United States that the hacker has gone into. And then it shows the method of intrusion.

Now, on some cases you're going to see that they used credentials, that means that they have fake credentials, because they were administrators that have been placed on the Secretary of State's computers. False administrators.

In other cases, it shows that they broke through the firewall. In some cases they did both.

Now, in the next column it shows whether it was successful. You're see a Y; that shows that, yes, it was successful.

Now, oftentimes they're not successful and they have to go back and try for another intrusion, and then it shows whether that's, in fact, successful as well.

And then in the final column, what you're seeing are votes changed. Now, in this particular case, when they went into Emmet County, Michigan, the votes that were changed was they stole 3477 votes from Donald Trump. That's what you're looking at.

Now, as you go through this document and you look at all the multiple intrusions into our election, what—what you'll notice that over 60 percent of these intrusions come from China.

So that is over 66 percent is what the number is, over 66 percent of the intrusions into our election came from China.

. . .

Lindell: Yeah. So what—so what you have here is, what—each one of these is its own timestamp that is 100 percent proof, because you have that—not only where it came from, you have—it's basically you have their identification, you have the—who they were attacking, their identification; this is what everybody would want—if you ever looked and did an auditor—wanted to look into a computer and look what went on in cyberspace, this is what you would be looking for, correct?

Fanning: This is forensic evidence of foreign footprints as they entered our election and in a cyber warfare attack on our election. And then it shows exactly what they—you know, where did they come from, which computer exactly, exactly the timestamp, exactly which computer they entered into, and—and what state, which county. The—the ID—the unique ID of the computer that they entered into. And then it shows how they entered using false credentials or breaking through the firewall or both.

Lindell: Wow.

Fanning: Were they successful the first time, the second time. And then it shows the votes that they stole from Donald Trump.

Lindell: Right.

Fanning: This is proof positive this is documentation of a cyber attack, but it also is documentation of the footprints of those who entered our election.

Lindell: Right. Right. And look at it—if everybody notices here, everyone — you don't think this was all put together in one big attack? Every one was Donald Trump down, down, down. This wasn't another country that wanted it the other way. This was a—the biggest attack in history. And you have—and Mary, you have — we have pages and pages, right? Thousands of these pages of every—of every county, right? Of every—or of every single attack?

Fanning: There are thousands of pages of the documented footprints—the foreign intrusion into our elections. We see this as coming from China; in many cases from Huawei from Alabata --

Lindell: Right.

Fanning:—Cloud service, from China Unicom, from Ucloud, from China Mobile Tietong. You know, and this also came and—from Iran as well.

179

Lindell: Right.

Fanning: There—this is the foreign intrusion, this is theft of our vote, but it also is documenting exactly the votes—the vote totals that were stolen from Donald Trump.

. . .

Lindell: . . . This is their—these are the real numbers that were taken off and that were flipped. I mean, this is incredible, everybody. This is—this is historical proof, too. We not only had—this is what we've all been waiting for. And Mary, you said there's a video, too, you want to show?

Fanning: Yeah. This is a documentation, the proof positive, by cyber experts from in this country that began documenting the theft of our election.

Lindell: Wow.

Fanning: They put together the full documentation of every vote, beginning on the November 1st. So again, from before, during and after the election, they documented the footprints of the foreign intrusion into our election. That means that foreign adversaries really, because this was an act of war to come in and steal the election from the American people, and decide who our foreign adversaries were going to put in the White House to rule or to—to be the President of this country.

. . .

Fanning: Well, you're—the video—what you are watching is the surveillance system. In fact, this is the very surveillance system that was built by people inside this country within the cybersecurity battle space, that built some of this document-—built some of these tools that were built to keep this country safe. But what you're watching is the — every line on that drawing, all those moving lines, they represent the IP addresses of what I just showed you on the chart. So—so when you understand the hackers IP address and the IP address of the target and the votes that were stolen, every one of those lines that you're watching move across the chart, and showing whether they were successful and — and how many votes they stole. That documents that. Every red line, as they turn red, as they finish—they'll hang the vote, basically, the red lines are all China. So what you're seeing are the actual files being received and sent. That—that's a documentation of the real-time theft of our elections.

Lindell: Wow.

Fanning: So every—every line on the map, there's a corresponding line on the sheet. And the color and the line types represent the severity of the attack. Now, red has been the most severe attacks. These lines are all coming out of China. Those are the most severe attacks on our election system.

Lindell: Wow.

Fanning: . . . It's important to understand that there are prismatic scoring algorithms that they knew about, that entered the election, and they steal the vote at the transcript points. So at the point where the election — the vote is leaving the Secretary of State's office, and these machines, that is the point at which the vote is stolen at the transfer points. That's what you're watching, those packets moving is what—is—is that's realtime documentation of the theft of the vote from inside this country. And then the number is the last column, those documents exactly the numbers of votes it shows. And some of the cases, Antrim County where the vote was stolen, and exactly the vote stolen at the exact timestamp of when they were stolen.

. . .

Lindell: So, Mary, so what you're saying now is . . . every one of these lines—let's say we did take Antrim County, and we took that, we could pull out the timestamps for that county, and we can show the lines—the country that did it, we can show a line for every single hack or attack that we had in this election?

Fanning: That's right.

Lindell: Wow.

Fanning: So what you're watching is those objects moving are the actual files --

Lindell: Right.

Fanning:—that are being received and sent.

Lindell: These are the (inaudible) —

(Talking simultaneously.)

Lindell:—these are the squares --

Fanning: And every one of these --

181

Lindell:—here that are—that are being sent. So everybody out there, what you're looking at—I mean, this is the proof. So if any — if like Antrim County, that case is still open, you just go here you go. Now you know who did it, how many votes flipped, when they did it, what time they did it, the computer it came from, the country that attacked us. I mean, this is—this is what I have been excited about, and I only seen one—you know, Mary, I've only seen one little line of that, which showed the IP address that—you know, all that stuff that you're showing us. When I found out that you --

Fanning: Right.

Lindell:—had it for every — or that we had it—with—all these people had this, for every single vote that—every single attack, and whether it was successful or not. Look at right now, we've got up on the screen, Georgia is just getting attacked. It was just getting attacked up here at that moment in time. And I—and I suppose, you know, they know what they're doing, they—they did the biggest attack right here. Look it, everybody, Georgia and Michigan, getting bombarded. They—my guess is, that was probably like 3:00 or 4:00 in the morning when they really needed them votes to be flipped. Mary, this is incredible.

Fanning: Yes. Because there is proof positive, there's documentation, of all the foreign interference into our election showing exactly who stole the vote, how they stole the vote, from which computers, access to our election, to which computers they went into. So understand that cybersecurity experts that work for this country, put all this in place before the election even started to make sure that they caught all of this information so that foreign adversaries were not deciding our elections.

. . .

General McInerney: . . . [W]e have not had one audit. This is the closest thing to an audit that has been conducted in America on this important election. . . .

. . .

Lindell: And we've—we've just shown everybody in the world 100 percent evidence that this was an attack on our country, and is still

under attack by China and other countries, through the use of these machines used in our election.[345]

(q) On February 11, 2021, OAN broadcast Absolute Proof again on the OAN TV channel, and repeated, endorsed, and adopted the same false statements again. In this rebroadcast, it also interspersed the film with an interview of Lindell by Steve Bannon, and made, endorsed, and adopted the following additional false statements:

> <u>Mike Lindell</u>: [T]he night of the election, 11:15 it broke the algorithms in the machine … they didn't have enough track left to do the steal because he would have won anyway. … what you see is 100% fact. … Came through the machines and there was a massive flip and you will never have an election again if you use these machines. [T]hey're all liars. They're lying … about it not going online. If you're Dominion… that's been proven 10 times over. … I'm 100% that we have all the proof. … Venezuela … they did it through the use of these machines. … But what they did, they filled up these fobs and they went down and they did a dump. They did … 1,000 dump, boom. Just put into the machines you got you do that online … it was just another way you can cheat with this machine. 770 or something like 7000 votes got flipped. … forensic footprints of the machine, everything that happened that night, here's an interesting fact, though, that flip of 7,000 votes. … [O]ne lie after another, connection to the internet … Here you have evidence. … These machines would have to be online, absolutely 100%. … They showed there were 7,300 votes flipped. … These machines getting found out, it's an attack on our country. … We have the absolute proof and the absolute truth will come out. … They suppressed the machine vote or the machine so much, it's just coming out now … I have 100% proof. … It was the biggest crime against humanity and the world.[346]

(r) On April 3 and 4, 2021, OAN aired the docu-movie Scientific Proof with Mike Lindell, which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV. OAN aired Scientific Proof a total of six times on

---

[345] *Absolute Proof: Exposing Election Fraud and The Theft of America by Enemies Foreign and Domestic*, World View Weekend (Feb. 5, 2021), https://www.worldviewweekend.com/tv/video/mike-lindell-brannon-howse-and-mary-fanning-present-absolute-proof-exposing-election-fraud; Michael J Lindell, Facebook (last visited Feb. 5, 2021), https://www.facebook.com/realMikeLindell/posts/1192536854534936; *Absolute Proof* (Mike Lindell 2020) (Feb. 5, 2021), https://rumble.com/vdlbl7-absolute-proof-mike-lindell-election-documentary-full.html (Ex. 391).

[346] *Absolute Proof: Interview Special with Steve Bannon*, One America News Network (Feb. 11, 2021), https://app.criticalmention.com/app/#clip/view/5904b6d0-e1bd-4ab9-9d42-dacea0738ffa?token=6faa76fc-dc7c-49e6-82ea-25835a3a9759 (Ex. 392).

April 3 and 4. During these broadcasts, OAN made, endorsed, and adopted the following false statements:

Douglas G. Frank: It has to be done by an algorithm.

Mike Lindell: It could not be done by humans.

Frank: It could not be done.

Lindell: I want everybody to know that.

Frank: Yes.

Lindell: What you're going to see is impossible to be done by humans. It had to be done by machines, i.e. computers.

Frank: Absolutely.

Lindell: And they had to be online?

Frank: Absolutely, the whole time, beforehand, during and after.

Lindell: Before, during, and after.

Frank: Yes.

Lindell: In other words you have to plan the attacks?

Frank: Yep.

Lindell: You have to plan the algorithms?

Frank: Yep.

Lindell: Input them?

Frank: Yep.

Lindell: Then it has to be online during?

Frank: Yep, it does.

Lindell: And then afterwards what, they check your work?

Frank: Clean up the mistakes.

Lindell: Clean up the mistakes.

184

Frank: Because computers are stupid. They can't do anything themselves. You have to tell them everything, and what you tell them is a set of instructions. That's called an algorithm. It's just like a recipe.

Lindell: Right.

Frank: A recipe is a set of instructions.

Lindell: Right.

Frank: And so don't be afraid of that word.

Lindell: Right, right.

. . .

Frank: And notice I didn't call them real voters because I don't think a lot of them are.

Lindell: Don't think they aren't. You know they aren't.

Frank: I know they aren't. If I'm a scientist going into it I didn't know, but now I know.

Lindell: Right, right. Let's make that clear. There's no room. This is one hundred percent we know machines did this.[347]

. . .

Lindell: So it couldn't be done by humans.

Frank: No, no, no.

Lindell: It's a hundred percent impossible.

Frank: No, no.

Lindell: Had to be machines?

Frank: Yes.

Lindell: And they had to be online.

---

[347] *Scientific Proof* (Mike Lindell 2021) (clip 1 of 3), https://app.criticalmention.com/app/#clip/view/cc413279-f89b-4782-8c2a-bf49f142b45f?token=d01c5f60-581f-4664-b4ad-0a738ec4f5cb (Ex. 393).

Frank: Constantly online.

Lindell: Constantly online, everybody.

Frank: Beforehand getting the registrations in place so you can use the phantom ballots.

Lindell: Right.

Frank: Because if you think about it, you can have all if machines in the world changes ballots all you want. The problem is that afterwards if they count the ballots, it's got to match.

Lindell: It's got to match.[348]

. . .

OAN Advertisement: One America News is committed to deliver credible, honest, unbiased reporting 24 hours a day, seven days a week from the White House.

. . .

Lindell: You've got to know where you stand, and there has to be some super computer that's doing that.

. . .

Lindell: It's impossible one hundred percent. It can only be done by machines. I can't stress that enough.

Frank: Absolutely.

Lindell: And they all rhyme with Dominion, there's others, Smartmatic, ES&S, you know, all of these, and it's just—you know, I sit here. I want to bring this up. When you found all this—

Frank: Yes.

Lindell:—I mean, what went through your mind? I want people to know.

…

---

[348]    *Scientific    Proof*    (Mike    Lindell    2021)    (clip    2    of    3), https://app.criticalmention.com/app/#clip/view/5e93ce97-870f-4c2a-b146-afa157771044?token=d01c5f60-581f-4664-b4ad-0a738ec4f5cb (Ex. 394).

> Lindell: This is a crime where there's no statute of limitations. This is a crime against every one of us, every person on the planet actually. It goes far and wide into everyone. The whole world is watching. [349]

(s) On April 22, 2021, OAN aired the "docu-movie" Absolute Interference with Mike Lindell, which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV. During that broadcast, OAN made, endorsed, and adopted the following false statements:

> Mike Lindell: ***I have proof, a hundred percent proof that our country was attacked by China, by Communism coming in, this foreign interference to our elections through the machines, Dominion, Smartmatic ES & S, all of them. So every day they're mocking me in the news.***
>
> . . .
>
> Lindell: So the cheating over the decades and centuries that's gone on in our election just graduated now to where it's high tech. [350]
>
> . . .
>
> Lindell: Before we get started on that, what you found, I want everybody to know, this could only have been done through the internet or through machines; is that correct?
>
> Douglas G. Frank: Oh, no question.
>
> Lindell: You could not have done this by hand or—
>
> Frank: No, no.
>
> Lindell: Had to be done through a machine being online or being a hack coming in.
>
> Frank: Absolutely. And there were stages to it. You have to prepare ahead of time.
>
> Lindell: Right.

---

[349] *Scientific Proof* (Mike Lindell 2021) (clip 3 of 3), https://app.criticalmention.com/app/#/report/98d0f6fd-e2b7-4363-b980-ad881adf294a (Ex. 395).
[350] *Absolute Interference* (Mike Lindell 2021) (clip 1 of 3), https://app.criticalmention.com/app/#/clip/view/42d661fe-4711-43db-aafc-08988e6aa4b7?token=740123d8-c29e-4556-8b4d-8f8401d86700 (Ex. 396).

Frank: You have to have access during, and you have to have access afterwards.

Lindell: Did everybody hear that, all three, access before, during and after.

Frank: That's correct.· And by the way, in Pennsylvania proved each of those.

Lindell: Okay.

Frank: You could see. We had forensic evidence.

Lindell: Wow.

Frank: In other words, this isn't just some scientist geek having fun in his laboratory hypothetizing something.

Lindell: Right, right.

Frank: We actually went.

Lindell: You have absolute proof?

Frank: Yes, we did.

Lindell: So you knocked on doors?

Frank: 1600 doors we knocked on.

Lindell: To see if the people actually existed.

Frank: And they don't.

Lindell: They don't exist. By the way, everyone, I'm hearing this for the first time too, the first time. We've never talked about this.

Frank: No. It's a pleasure.

Lindell: I want everyone to know this, and the reason I want to do this is because I'm going to have the same questions you would all have out there. I just heard, Doug, this is going to be an amazing presentation. Why don't we get right into it.

Frank: When I use the word algorithm, a simple way to understand that is it's just like a recipe.

Lindell: Right.

Frank: It's a set of steps, a set of measurements, two teaspoons, whatever. But it's not just numbers. It's also got some steps involved.

Lindell: Right.

Frank: And that's what I figured. I figured how were they doing this. So first thing you need to understand is that every county in the United States has what they call a registration database. It's got the names, it's got when they were registered, when they were born, and it's also got their entire voter history.[351]

. . .

Lindell: Right. And that's what we're going to show in five-six weeks as we dump all the evidence to the public and show the world all the evidence when it—by the time it gets to the door of the Supreme Court, and we put this case there, all nine of them are going to say: Wow.

General McInerney, what happened to our country on January—or on November 3rd?

General McInerney: Well, we had the most massive cyber warfare attack, Mike, in history on our electoral system. It—there's never been anything of that magnitude.

We have precise examples and evidence for the Supreme Court and—and any other court in the whole world, it is very precise. And it shows the magnitude led by the Chinese Communist Party as a foreign entity—

Lindell: **And these machines now—allowing for this foreign interference, we've been all the way back to Venezuela, when the machines first came in and it took only two years for them to completely take Venezuela.**[352]

(t) On April 29, 2021, OAN broadcast a segment titled "One-on-One With Mike Lindell" live on television on the OAN TV channel, and republished on KlowdTV. During that broadcast, OAN made, endorsed, and adopted the following false statements:

---

[351] *Absolute Interference* (Mike Lindell 2021) (clip 2 of 3), https://app.criticalmention.com/app/#clip/view/327aa327-de7b-466e-a897-aed8cb31524a?token=740123d8-c29e-4556-8b4d-8f8401d86700 (Ex. 397).

[352] *Absolute Interference* (Mike Lindell 2021) (clip 3 of 3), https://app.criticalmention.com/app/#clip/view/db1d75ff-6bfd-4516-a316-7855464e1631?token=740123d8-c29e-4556-8b4d-8f8401d86700 (Ex. 398).

Mike Lindell: I wanted to be able to say what I wanted to say about this attack on our country by China through these machines, Dominion, Smartmatic. You can say that here, right?

Natalie Harp: Yes, you can. We're the real news network. Yes, you can.

…

Lindell: China did this, took our election done through these machines. Otherwise our future is over. This isn't a Democrat or Republican thing anymore. This is all of us we need to know that this was an attack. It's real. We have the Absolute Interference you guys have ran here, the movie.

Harp: Right.

Lindell: And in the movie Absolute Interference, everybody, that validates Absolute Proof.

…

Lindell: This is the biggest attack, one of the biggest crimes against humanity in history.[353]

…

Lindell: Here's from a business point. A, we know a hundred percent evidence. If I would not be sitting here, I told Jimmy, I would not be sitting here if I wasn't a hundred percent, just like when I went in for the greatest president ever Donald Trump. I met him before the election. You can't take that from me, and nobody could take it from me. I mean, I knew where his heart was, I knew he had no agenda other than to help, you know, help the United States and help people.

Harp: Right.

Lindell: And, you know, when you do a problem solution and what it manifests to to help people, and so you look at that and A, you've got to take care of the 2020 election. Pull it down. B, you've got to get rid of all machines forever, forever, every machine in the world actually.

---

[353] *One-On-One With Mike Lindell*, One America News Network (Apr. 29, 2021) (clip 1 of 2), https://app.criticalmention.com/app/#clip/view/f42eb2eb-a581-4813-afc0-7567a843e51a?token=36df1a03-68fa-42c8-8019-f0934a74828a (Ex. 399).

…

> Harp: Well, we want to give your My Pillow code again for everyone out there because we don't want you to be canceled. We want you to have the freedom for your employees out there too.

> Lindell: Right. Right.

> Harp: It's like this is their lives and their jobs.

> Lindell: Right.

> Harp: And what you're doing to expose the issues of what happened in 2020—

> Lindell: Right.

> Harp:—is so huge in what you're doing. We want you to come back on and talk about it because I know no one else is and you've been very much shunned by it.[354]

(u) On May 3, 2021, OAN broadcast a segment titled "Mike Lindell Tackles Election Fraud" which OAN broadcast live on television on the OAN TV channel, and republished on KlowdTV. During that broadcast, OAN made, endorsed, and adopted the following false statements:

> Mike Lindell: I've been obviously just fighting every day to tell the nation and everybody, the world, these machines where it got hacked, Dominion, Smartmatic, hell all of them are the same, ES&S. You just say Dominion, but it's all machines. China hacked into our election and flipped millions upon millions of votes.

> We have a hundred percent evidence, so I put out the two—three movies now, Absolute Proof, Scientific Proof—

> …

> Lindell: Did you hear about Dominion and China attacking our country. So I put the voice out there. What these guys were, the evidence was already there, you know, but there were other people trying to get this out there but they didn't have a voice.

> …

---

[354] *One-On-One With Mike Lindell*, One America News Network (Apr. 29, 2021) (clip 2 of 2), https://app.criticalmention.com/app/#clip/view/306710c8-0bfd-4796-ba07-82bf514febe0?token=36df1a03-68fa-42c8-8019-f0934a74828a (Ex. 400).

> Lindell: Now, what happened was, though, all these people after January 9th when I went public with that piece that these guys have gotten me, that piece, Dominion, the cyber attack, when I did that, then these guys trusted me. These guys are whistleblowers. These guys that work inside the government and used to work for the government, these are the guys that have all this information and so they had this. They can't just go out there. They're in danger, but they trusted me, so they brought it to me.[355]

(v) On May 22, 2021, OAN broadcast The Weekly Briefing with Christina Bobb live on television on the OAN TV channel, and republished on KlowdTV. During that broadcast, OAN made, endorsed, and adopted the following false statements:

> Christina Bobb: The only people who had absolute control over the election equipment was Dominion. The county didn't bother to insure that there was no manipulation. They just took Dominion's word for it, despite the fact that there were weird mathematical patterns, and many experts stated the numbers indicated fraud.
>
> …
>
> Bobb: We must clean out the corruption of past elections before we can build up and strengthen our future elections.
>
> It's not enough for state and local officials to say okay, okay, we'll make sure we're good going forward. We cannot move forward until our past is cleaned out. It's important for Americans to get involved and hold their leaders accountable.
>
> There's a lot of emphasis placed on Arizona, Pennsylvania, Georgia and the other contested states, but this matters in every state. What we're finding is that it's possible the fraud was so organized that they manipulated every state, even the states that Trump won to make the fraud less detectable. Look at New Hampshire. Who would have thought that New Hampshire was a place that was manipulated, especially because it was expected to go blue.
>
> It is possible that this fraud is so much bigger than any of us believed that most states were manipulated in some way.[356]

---

[355] *Mike Lindell Tackles Election Fraud*, One America News Network (May 3, 2021), https://app.criticalmention.com/app/#clip/view/73f40fb5-a9ab-4c8b-aa1b-c038474c608f?token=78421a00-fd36-4024-80e9-790adf35eb22 (Ex. 401).

[356] *Weekly Briefing: Maricopa Audit*, One America News Network (May 22, 2021), https://app.criticalmention.com/app/#clip/view/c8867dde-b79c-4f09-8e0e-88c452abd6ff?token=5e040d89-2d4e-48d8-8edf-99be7e0a5556 (Ex. 402).

(w) On June 4, 2021, OAN broadcast a segment entitled "OAN Absolutely 9-0 with Mike Lindell" with the chyron, "Exposing Election-Changing Amounts of Fraud in 2020" on its show, *The Real Story* with Natalie Harp, which OAN broadcast live on television on the OAN TV channel, republished on its Rumble account, and republished on KlowdTV. During that broadcast, OAN made, endorsed, and adopted the following false statements:

> <u>Natalie Harp</u>: Surprise, surprise. Proponents of the big lie that Biden actually won fair and square in November are so frightened that the Maricopa audit is almost complete, and we will see the results for ourselves, that get this, they've already resigned themselves to the outcome. We will find fraud, election changing amounts of fraud. But when we do, they've already got their talking points primed and ready to go.
>
> …
>
> <u>Harp</u>: Joining us now with his reaction, the man himself, the CEO of MyPillow, Mike Lindell.
>
> …
>
> <u>Mike Lindell</u>: What we have now, what you're going to see in my movie, Absolutely 9-0, that's the vote of the Supreme Court when that comes down when we get this to them. But we have something called PCAPs. They're packet cap—PCAPs, and what they are, these are cyber forensics that we have. It's like having a movie of the election the night of the election, like if somebody robbed a bank where you actually have the film of them robbing the bank. So, you know, it is pretty amazing that all the Democrats that bad mouthed the machines and the Dominion machines and Smartmatic, nobody said a word back then, and now if you rerun them, you think all the machines just got legal, just got fine, just got fair? They didn't.
>
> …
>
> <u>Lindell</u>: Yeah. They were the ones that gave us the big warning. And you know, it matches exactly. You know, from January 9th on when I got this evidence of the machine fraud, of this cyber attack with mostly from China using the Democrat Party, you know, what I was saying before, it's like having—what a blessing that we have all this evidence that we have in Absolute 9-0. These are packet captures, and these are something when I asked these—I hired white hat hackers from the government to validate this stuff. So the interesting thing is, when we get to the Supreme Court, when we bring it before them, this isn't subjective. They have to, all of them, say 9-0 that this happened. It doesn't matter, when they talk about that Arizona audit,

when they say oh yeah, you're getting aides, and this person, they're not professionals or whatever. If you have the evidence, it doesn't matter who gets it or how they get it as long as they have it.

What I have is irrefutable, not subjective. It's like having, like I say, a picture of the crime scene. I asked the white hat hacker in the movie, I said so is this like DNA, blood DNA? He said yeah, it's a lot like that, but here we have a whole bucket of blood. You've got the whole case.

So when you get these audits done in Maricopa County, and now we're starting Pennsylvania, all over the country it's going to fall like dominoes, and all these states, the audits they're doing is just going to validate what I already have, what the evidence that we have, this cyber forensic evidence, and it's all coming together and there's nothing—I think last night all over CNN they had it. Mike Lindell says Donald Trump will be back in. Where does he get his information? He has no evidence. Well, yes, I do. Just watch Absolutely 9-0 and you're going to see it. It's like hey, guys. We have the evidence. We just have to show it to a judge and the supreme court judges. They're going to be heroes. It's going to be 9-0. This gives a chance for the Supreme Court to do their job and be heroes. It doesn't matter whether you're a Republican or a Democrat. This country cannot have these machines and we cannot have—we have to have fair elections, and what we had here was the crime of the century. It was the biggest crime against humanity in history because it affects everything.

…

Harp: What makes you think that they're going to take your case now that all this fraud is coming out because they could very easily say no, we're just not. It's a moot point, the election is over since that's what they've done before.[357]

…

Lindell: Back then the Democrats, they really believed that they won. And we didn't have—this evidence that I have was not brought before the Supreme Court. This evidence is an attack by China on our country. Just so happened the winners were the Democrat Party. So the whole thing is yes, they will have to look at this, the pressure on them. They're going to have to look at it. This is all new. And I

---

[357] *The Real Story - OAN Absolutely 9-0 with Mike Lindell*, One America News Network (June 7, 2021), https://rumble.com/vi6w7p-the-real-story-oan-absolutely-9-0-with-mike-lindell.html (Ex. 403).

194

tell you this. There's no statute of limitations on a crime like this, and there is precedence, everybody. Every down ticket, you can look it up, every single down ticket that they find out later okay, the other person won, there was a crime committed, there was election fraud, you give it to the real winner. It doesn't matter if it's a year later, two years later or two minutes later. You rectify. You fix what was the wrong, you put the ones in prison or jail that did it if it was a crime, and the real winner gets put in. It's just never happened that we know it at the presidential level.

So they've got—these nine Supreme Court justices, we're giving them—the evidence that I have with this cyber evidence, we're giving them an easy out because once they get it, we as the people, everyone's going to see this evidence. We dump it every day on FrankSpeech.com. We're putting this evidence out there so if you're a Supreme Court justice we make it very easy for them. All they have to do is look at it and go what? Yep, that's it. It's going to be 9-0.

Harp: And Mike, your episode that's going to air this weekend on OAN, keep us posted on the lawsuit front. We're all watching the audits.

God bless you and the work that you're doing to expose what happened in the last election and keep us posted. We're all watching it.

(x) On June 5, 2021, OAN aired the "docu-movie" Absolutely 9-0 with Mike Lindell, which OAN broadcast live on television on the OAN TV channel twice, and republished on KlowdTV. During these broadcasts, OAN made, endorsed, and adopted the following false statements:

Mike Lindell: Hello, everyone. I'm Mike Lindell, and as you all know on January 9th received evidence of a cyber attack orchestrated by China on our 2020 election. I took that one piece of evidence and I just went all in. This was something different nobody had seen. This was something that came through the machines, the Dominion machines, the Smartmatic and other machines. This was a cyber attack. I didn't know anything about cyber attacks, and I had to learn real fast.

I hired experts to validate this. These guys are white hat hackers that work for the government. But what I'm going to show you tonight is you're going to all know now why I have been one hundred percent sure that when this gets before the Supreme Court it's going to be 9-0, 9-0 to pull this election down and that this was a hundred percent attack by China on our country through these machines.

And with us right now is one of my cyber security experts. These guys are the best, and this guy has over 20 years of experience working in both the private sector and with government law enforcement and intelligent agencies. He has many information and cyber security certifications that specialize in advance adversary detection, mitigation and elimination, and here he is now. Hello.

Speaker: Hello, Mike. Thanks for having me.

Lindell: Thanks for all the work you've done for our country, and thanks for all the work you've done for myself, and I know I've put yourself and many others through a couple months worth of work now just to get everything validated for our country to show that this evidence is real.

So what I'll going to go through, everybody, let's start from January 9th, the stuff that these guys brought to me. These guys were there the night of the election, and it was like taking a movie. I compared it to like taking a movie, and they have all this informational, millions of lines of data. Why don't we show that right now. Can you go ahead and say what we're walking here?

Speaker: Yeah. That's essentially the raw encrypted data. I mean, that would run for the next couple days. You know, that's the amount of data that we're dealing with here.

Lindell: So what this contains here is what? What are these? Is this cyber forensics? What are we looking at? What are these called? I know you had told me before they're called like PCAPs or something.

Speaker: Yeah. So PCAP is just an acronym for packet capture, so it's essentially a moment in time that is captured, and that the transmission of those packets, any information that travels between point A and point B is essentially a packet. And so those packets moving back and forth during the election were captured. But you need to actually record it, and so that's where we're very blessed and fortunate to have, you know, some of these guys that actually recorded the information as it happened.

Lindell: You heard it here, people. You heard it here, everyone. We have—what a blessing it is that we have the evidence. This is what I've been telling everybody for months now since January 9th. These are the actual evidence that was collected the night of the election and a couple days following.

Now, I can't read these, and neither can anyone else that's probably watching unless you're an expert like you guys are.

Speaker: One more piece to that is you can't go back in time and fake a PCAP essentially. You have to capture that packet in realtime, so you need to record it. You don't go backwards and, you know, recreate this, you know, whole chain of events.

Lindell: Wow.

Speaker: It happens and you record it.

Lindell: Okay. So that's a great point. So what he's saying there, everyone, is you can't go back in time and say okay, I'm going to make these up, and also you can't go back and change anything, right? If you have these PCAPs, you can't go change them. It's a blessing we have them here. If we didn't have, everything, that evidence would be long gone, correct?

Speaker: Yeah, it would definitely be gone. You know, luckily somebody pressed record during the entire election.

Lindell: Wow. Yeah, that is a blessing and they brought it to me. Why did they bring it to me? Because at that point on January 9th nobody else—all the other evidence they found for November and December, I call it the organic cheating, you know, dead people voting, nonresidents voting, all this other stuff. Everybody is so focused on that, and these guys—I mean, they're heroes that ended up collecting this the night of the election.

So they bring it to me now everybody, and I'm going okay. I wanted to learn all I could about it, and one of the things is—now, if you take this stuff here—one of the things I asked you and many others because many cyber experts, I'm going is there any way, any way you could go back in time and doctor it, change it I think you compared it to like a forensic scene at a crime scene with like DNA evidence; is that correct?

Speaker: Yeah. So really what you're looking at is, I mean, there's hash values which are unique to each item. Any change to that, it will change the hash, so that's how you verify images or, you know, the PCAP in this case. So when you're looking at, you know, this file, you make sure that it hasn't been doctored or anything's been done to it because when you do the work, it needs to match that original file, and so that's where you start. And then, you know, we work to unencrypt and pull the data out to identify exactly what happened during that period of time.

Lindell: Okay. So now in all your work in twenty years, then, do you work with these PCAPs a lot or do most cyber experts? That's what you work with all the time?

Speaker: Yeah. A lot of the time we do because, you know—well, you—there is the active cyber attack being recorded, and the way you record it is through a PCAP. That's how you capture that traffic. That traffic, when you capture that information, you have the source, you have the destination, you know, you have the files that are being transmitted, and through what protocol, it captures a lot of information and, you know, you go through it and you essentially translate it.

Lindell: Right. That's what took so long. I believe it's been a couple months now that I've had yourself and many others validating and translating these PCAPs. There was literally thousands of hacks, right, from China?

Speaker: Yeah. Well, there were a lot, and there were a lot successful. Some were just doing reconnaissance, and others were flipping votes. And so it would go in and identify where it needed to flip and flip, so there was a lot of activity.

Lindell: So what I had you guys do was go out and get 20—just grab 20 of the PCAPs, 20 of them that you could take that data and translate it into something that was readable for all of us here. So what I did, I said you know what, let's just see, you know, because this was in the millions and millions of votes that were flipped on our election by China from Trump to Biden, okay. So I said well, let's just grab 20 of them so we can make this Absolutely 9-0 video. So we went out and we grabbed 20 of them.

Now it took, I don't know, what did it take, four to six weeks to validate just those 20 PCAPs because I was very particular. I wanted every little thing validated, and one hundred percent foolproof, and these were the five states. These were five states, Michigan, Wisconsin, Pennsylvania, Wisconsin and Georgia. Okay.

So now what I want to do is bring up the data that you took, the PCAPs and translated it for us and showed just these 20 attacks exactly what these PCAPs showed that we can all read. On the first line, if we start on the top here, this was from, if we look at the date, it's 11/3/20, the day of the election at 10:49 p.m. Can you go ahead and take us through this when you talk about the source and take us through us line by line and explain what this is.

Speaker: Yeah. So the source is the IP address from the computer that essentially, you know, changed that vote. So since we focused on the 20, each one of these resulted in votes being changed, so that's the source. Latitude and longitude is essentially within 400 yards of

where that device is located. Beijing, obviously China, Province City.

And then this next part is the network that was pulled out of the PCAP essentially. But, you know, some of these is in Chinese, so when you translate it you just want to make sure and, you know, as you've asked us to do double, triple, quadruple, you know, validate. So we've been going through, making sure the translations and all the information checks out.

Lindell: So what he's saying here, everybody, is what I did is I made them all validate the validation; isn't that correct?

Speaker: Yeah. So we, you know, because we're dealing with other languages, we validated the validation that was validated.

Lindell: So the next line there, which is the network code, what would that be.

Speaker: Yeah. So that's essentially from the registration, the IP. So, you know, most every single IP is registered to somebody. When you look at that network, that network range and, you know, identify who the registered owner is, so that's where it comes up.

Lindell: Okay. So you got all this information from the PCAPs; is that correct?

Speaker: Yeah.

Lindell: The next line, it says target. Now, we just went through, which would be the hacker or the attacker, so to speak, correct?

Speaker: Yeah.

Lindell: And now we're going to get into the target, which is I guess I could pull that out, the target. That would that be the target's IP address, and then again the longitude, latitude, and the state that it was hacked into, correct?

Speaker: Yep.

Lindell: And then we have the entry point. You know, there's Delta County here in this case, and then the network registration. So the network registration, all this stuff came right out of the PCAPs that's preserved in time. You can't change it, and when you have it it's one hundred percent it's nonnegotiable. I mean, here it is. This is what it is; is that correct?

Speaker: Yeah. I think we were saying that this isn't subjective. It's just—it is what it is, information, you know.

Lindell: Right. So before we go to the last couple lines I want to ask you this. If you were going to prove a case, a cyber case, a cyber attack and if you had a wish list, like let's say, you know, obviously when I came to you and others and said hey, I have something that's really going to change the world these guys brought me. I didn't know they were called PCAPs at the time, but I knew they were from the night of the election, what would you say, if you could have your wish list hundred percent prove something, is this what it would be? What would it be in a cyber attack?

Speaker: Yeah. This is one hundred percent, I mean.

Lindell: This is what I you would want?

Speaker: Yeah. A lot of times come you come in, you know, in our line of work we get called in after the attack. So this was something that was captured during the attack. You always want that.

Lindell: You always want that?

Speaker: Yeah. You want to catch the — you know, somebody's robbing a bank, you want to have it on video. That's definitive evidence. This is robbing the bank and having it on video.

Lindell: So I wanted everyone to hear that. This is we have what everyone would ever want to have if there was a crime committed cyberly, a cyber attack. We have the forensic evidence. We have the movie. We have the video of the bank being robbed, so to speak. And right before—I wanted you all to hear that before you look at the last couple lines here. You have the intrusion, how they got in, firewall, credentials, whether they have the credentials, and was it a success. Yes, it was a success. Here it is, everybody, what happened.

In this case Donald Trump, it says down. There were 3,215 votes flipped, and you can go all the way down this list, and every one of them was votes taken from Trump given to Biden. It was a flip. So these cyber hacks and these attacks, are you saying that these numbers here again came right of these PCAPs; is that correct?

Speaker: Yeah. I mean, they're specific numbers, right?

Lindell: Yeah.

Speaker: So you're not just rounding up. It's actual specific like to the vote numbers, PCAPs.

Lindell: That is so awesome. So everybody, do you see what this is? What we have here. You talk about a smoking gun. This is why I've so—everybody, you know, for two months people have attacked me and told me I didn't have the evidence and all this stuff and we made these other movies. But I wanted to get on here and explain to everyone, this was an attack by China on our country through these Dominion and these other machines where they just hacked in, a cyber attack hacked into our election and flipped it to anyone that they wanted to win. In this case it was the Democrat party.

I want to ask you something before we go to the next chart. Going to the Supreme Court, when this gets there, when we bring this to the Supreme Court, so what you're saying because this isn't subjective and you can't change anything, with this evidence and you go in there, what would you expect? Is there any way it could be five to four or six to three that this is real or eight to one, or does it have to be 9-0?

Speaker: No. It's irrefutable.

Lindell: Irrefutable.

Speaker: That's the word.

Lindell: And it's not subjective, right?

Speaker: No, not at all. Sometimes you have little specs of blood, right? This is a bucket of it.

Lindell: Wow. You're so awesome. Now everybody knows why I've got the confidence I've had over the last couple months.

Now I want to show you, I want to show everybody. Remember, these are just 20 of the hacks, everybody, out of thousands that China orchestrated. And so whether you're a Democrat or a Republican, this is the most serious thing that's ever happened. This is the biggest crime against our country and humanity I could think of ever.

So now let's pull up the next chart here. And what it's going to show, everybody, is just remember, we just did -- I just had 20 of the attacks, 20 of the thousands of attacks on our 2020 election by China. I just took 20 of them and I had 20 of them validated and revalidated and revalidated. So right now as we pull up this chart, I'm going to show you what those 20 attacks did. What they did, if you look at Pennsylvania here, it's where it said Biden won by over 80,000. Just with those attacks that we showed you, this small sampling, Donald Trump won by over 107,000. You go to Georgia,

they say Biden would witness by 11,779. Just with this sampling of the attacks, Donald Trump won by over 35,000 votes. Arizona, same story. Over ten thousand votes for Biden, and after you add in these just a small sampling of attacks, Donald Trump wins by almost 37,000.

You go to Michigan, Michigan it says Biden won. Remember we had the big thing in Michigan where they injected votes there. But you have a 54,000 plus votes in Michigan, and with this small sampling of hacks, these 20 attacks, just 20 of them, now Donald Trump wins Michigan by over 48,000 votes.

Now when you go to Wisconsin, you can see Donald Trump lost by over 20,000 votes, but he really wins by over 49,000, almost 50,000 votes. And realize, this was just 20 of the thousands of attacks. This is why when we say that Donald Trump really won this election by almost 80 million to 68 million for Biden, how can you switch tens of millions of votes. It had to be done with computers, it had to be done with the machines, through these Dominion, through all these machines, and China did it. It's a cyber attack of historical proportions.

And I want to ask you now, if you took this into the Supreme Court with all of this, and just with this sampling and brought it in there, could any cyber person that works in cyber, what do you call it, cyber warfare or cyber forensics, they would be able to show these nine justices this evidence. And is there any way that it would not be a 9-0 vote saying this is a hundred percent true?[358]

(y) On June 29, 2021, broadcast an interview of Mike Lindell on its show, OAN Evening News with Shane Althaus, which OAN broadcast live on television on the OAN TV channel and republished on KlowdTV. During that broadcast, OAN ran the chyron, "Lindell Announces Cyber Symposium Exposing Election Fraud Evidence," made, endorsed, and adopted the following additional false statements:

Shane Althaus: As MyPillow CEO, Mike Lindell, continues to lead the charge in exposing election fraud and will soon be holding a cyber symposium on the matter. He joins me now. Hi, Mike.

. . .

Mike Lindell: [A]ll the people that have been suppressing this, and saying it's not real. They're going to hear then. They're going be

---

[358] Mike Lindell, *Absolutely 9-0*, Lindell TV (June 3, 2021), https://lindelltv.com/mike-lindell-presents-absolutely-90/ (Ex. 404).

there on live TV for three days and answer any question because this is non-subjective evidence. You look at it, you're going to go wow, it's over. This is it. It's all inclusive.

We're also going to have one thing going on there, a mock election in another room, a continual mock election where we show the hacks. Here, this is how many you are going to hack at the Dominion level, the county level, the secretary of state's level. We'll hack into the machines whenever they request, and once we're in, when that's done we'll show, hey, look at the votes, look how they flipped.

But we're going to do something even more important. We're going to say okay, we're going to have other people capturing those packets, and then we say here's the packets and we show them, so you're really gonna understand what a packet capture is. It's like taking a picture in let's say the 1970's where you can't alter it. It's not alterable. As long as you have that picture it's a hundred percent evidence, like having blood DNA, having a whole bucket of it. We've got everything. So I'm really looking forward to this finally getting to fruition. No one then, not one person on the planet, can say that this isn't real and that Donald Trump didn't win 80 million to 68 million because he did.

…

Lindell: We've already got a case ready for the Supreme Court, and as soon we do this symposium we are going to take this right to the Supreme Court…. They're gonna pull this 9-0 and say hey, this was an attack on our country. They're going to pull the election down and I hope Donald Trump is in by, you know, the end of August, but I could be off. It could be September.

We've got a right—in our country's history, by the way, there is a precedence for this. Every election ever in this country where you found out later there was a crime committed, i.e. election fraud, the guy that won actually gets put back in if you find that out, and anyone else who was part of it gets arrested or whatever they do with them, but this just never happened at the presidential level, which it did in this election…. That's going to show what we already know just in Maricopa County a hundred thousand votes flipped. Arizona won by almost half a million votes for Donald Trump. Minnesota won, I mean Pennsylvania, all these states, when you show the packet captures it's over.

…

203

> <u>Lindell</u>: You guys are the best, OAN! Where's Fox!? That's what I keep telling people. Why aren't they doing anything? Shame on you, Fox![359]

306.    As set forth above in detail, Defendants published these false statements about Dominion with actual malice, even though OAN and its agents, including Charles Herring, Robert Herring Sr., Chanel Rion, Christina Bobb, Dan Ball, Patrick Hussion, Stephanie Hamill, Stephanie Myers, Shane Althaus, Natalie Harp, Elma Aksalic, Mike Dinow, and Emily Finn (among others), actually knew and recklessly disregarded that they were false.

307.    Defendants' statements are reasonably understood to be statements of fact about Dominion, and were understood by people who saw, heard, and read them to be statements of fact about Dominion.

308.    Defendants' statements are false. Dominion did not rig the election, and Dominion's software did not switch any votes. Far from being created in Venezuela to rig elections for a now-deceased Venezuelan dictatory, Dominion was created in Toronto, and its voting systems are certified under standards promulgated by the EAC, reviewed and tested by independent testing laboratories accredited by the EAC, and were designed to be auditable and include a paper ballot backup to verify results. Because of this backup, independent audits and hand recounts of paper ballots have conclusively and repeatedly disproven the false claim that votes in Dominion machines were flipped, weighted, deleted, or otherwise manipulated by algorithms, software, cyber-attacks, or otherwise. Hugo Chávez's elections were not run by Dominion, but were affiliated with an entirely different company—Smartmatic, a competitor of Dominion's. Dominion was not created in or for Venezuela, has never been located there, and is

---

[359] *MyPillow CEO Mike Lindell announces details of upcoming cyber symposium*, One America News Network (June 30, 2021), https://rumble.com/vj9ddv-mypillow-ceo-mike-lindell-announces-details-of-upcoming-cyber-symposium.html (Ex. 405).

not owned by Smartmatic or Venezuelans. Dominion has never provided machines or software or technology to Venezuela, nor has it ever participated in any elections in Venezuela. It has no ties to the Venezuelan government or Hugo Chávez. Dominion does not use Smartmatic's software or machines, and there was no Smartmatic technology in any of Dominion's voting machines in the 2020 election. Dominion is not a member of the CISA Board of Directors, nor is Dominion run by China or the Chinese Communist Party.

309.    Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

310.    Defendants' defamatory statements, whether taken individually or together in their cumulative impact, damaged Dominion in the various ways described herein.

311.    Dominion is entitled to punitive damages because Defendants' defamatory statements were accompanied with malice, wantonness, and a conscious desire to cause injury. Defendants purposefully made the defamatory statements heedlessly and with reckless and willful indifference to Dominion's rights.

312.    Dominion is entitled to punitive damages because Defendants published their defamatory statements about Dominion with actual malice.

313.    Defendants' statements are defamatory *per se*, as they impute serious criminal conduct to Dominion and also malign Dominion in the conduct of its business or trade. Defendants' statements have exposed Dominion to the most extreme hatred and contempt. Defendants, both directly and through the facially unreliable guests OAN repeatedly hosted on its shows, have accused Dominion of fraud, election-rigging, and conspiracy, which are serious crimes. For Dominion—whose business is producing and providing voting systems for elections—there are no accusations that could do more to damage Dominion's business or to impugn Dominion's

integrity, ethics, honesty, and financial integrity. Defendants' statements were calculated to—and did in fact—provoke outrage and cause Dominion enormous harm.

314. Defendants spread the lies about Dominion throughout OAN's television and digital media platforms to an audience of tens of millions who placed credence in OAN as a news source, and the falsehoods ultimately and foreseeably were republished repeatedly on social media, as Defendants intended. OAN's viewers were led by Defendants to believe the lies. The inevitable effect was severe and permanent damage to Dominion's once-thriving business.

315. Defendants' viral disinformation campaign about Dominion reached millions of people in the United States and worldwide and caused enormous economic harm to Dominion. As a result of that defamatory campaign, Dominion has suffered the following single and indivisible injuries: Dominion employees have been stalked, have been harassed, and have received death threats; Dominion's offices have been attacked; Dominion has been forced to make an expenditure of money to remedy the defamation and to protect the lives of its employees; Dominion has lost profits; Dominion has suffered a loss of goodwill; and Dominion's enterprise value has been irreparably damaged. Dominion is entitled to damages, including presumed economic damages, as a consequence of Defendants' conduct. These presumed damages include but are not limited to the economic harm caused by Defendants in their race to the bottom with Fox and others that now has prevented Dominion from becoming a multi-billion-dollar company.

316. In short, as explained above, Defendants made these false statements of fact with actual malice. At a minimum, Defendants recklessly disregarded the truth. Though not necessary, Defendants also knew these statements about Dominion were false. Defendants acted with actual malice through the people—agents of OAN—who had responsibility for airing these broadcasts and publishing these defamatory statements. They include—but are not limited to—the hosts of

the relevant programs; the producers and editors of those programs; the OAN executives responsible for airing each of those broadcasts; and OAN's owners, Charles and Robert Herring, who also directly manage and oversee OAN.

317. The First Amendment is a cherished cornerstone of our democracy. But the First Amendment is not a get-out-of-jail-free pass and clearly does not extend to Defendants' conduct here. On OAN and various mediums, Defendants repeated, endorsed, adopted, and made up their own narratives accusing Dominion of rigging the election. OAN also invited numerous guests onto its shows whom OAN knew would falsely accuse Dominion of various serious crimes—that was precisely why OAN invited them onto its air. What Defendants did here—promoting, amplifying, and endorsing devastating lies about Dominion, with knowledge of their falsity or reckless disregard for the truth—is not a close case.

318. Defendants had actual knowledge that their defamatory statements about Dominion were false. For example, OAN repeatedly—though secretly—removed broadcasts, segments, and other content from its website that had been publicly debunked. Yet despite knowing that its lies about Dominion were in fact lies, OAN and the other Defendants made the intentional and knowing choice to double, triple, and quadruple down on those lies and repeatedly republish and rebroadcast them, even to this day, successfully duping millions of Americans into believing that Dominion stole the 2020 election from Trump.

319. The false statements broadcast, promoted, manufactured, and amplified by Defendants are inherently improbable. They rest on inherently unbelievable allegations stacked on even more inherently unbelievable allegations. The existence of the auditable trail of paper ballots alone is enough to render the allegations inherently improbable. Moreover, the same Dominion machines that supposedly were to blame for President Trump's loss also were used in states

President Trump won such as Florida and Ohio. And all these same allegations were repeatedly debunked, discredited, and absolutely dismissed by federal judges and numerous Trump allies and administration officials, in addition to 59 independent election security experts who themselves had raised questions previously about hypothetical election vulnerabilities.

320. Defendants knowingly and intentionally relied on and used completely unreliable sources to perpetuate the defamatory lies about Dominion. By the time OAN first aired false and defamatory allegations about Dominion from Sidney Powell, Powell already had been completely discredited—as OAN knew or willfully disregarded. By November 22, even the Trump Campaign had disavowed Powell. Yet OAN continued to invite her on to spew lies. Moreover, by November 19—indeed, at least as early as November 9—numerous hand recounts had confirmed the accuracy of Dominion machines. Yet OAN still aired these lies.

321. Defendants deliberately avoided and turned a blind eye to the truth in the conduct of their investigations, and then deliberately lied about their investigations, by publishing their false and defamatory statements about Dominion while lying about what those investigations purportedly uncovered and then continuing to publish and republish these false statements.

322. Defendants' false and defamatory statements about Dominion were made in furtherance of and to fit within the preconceived storyline OAN and the other Defendants adopted and endorsed, and ultimately even funded. OAN began touting election fraud even before the election. Defendants published their false and defamatory statements and conformed their reporting about Dominion to fit this preconceived false narrative.

323. Defendants' false and defamatory statements were made with inherent bias and ill-will. For example, the two employees OAN primarily tasked with attacking Dominion—Rion and Bobb—are to this day raising funds for the sham Arizona audit and Bobb has been moonlighting

as a Trump campaign advisor providing legal advice on how Trump can overturn the election results, which Defendants concealed from its viewers for almost two months. Defendants also were trying to seek favor from President Trump.

324.    Defendants published their false and defamatory statements to make a profit at Dominion's expense and at the expense of the truth. Defendants' financial motivation to peddle its false narrative and lie about Dominion stealing the election from Donald Trump was substantial. Given the opportunity to transform OAN from a fledgling network consistently rated at or near the bottom of all cable news channels to an actual player in conservative news media and a competitor of Fox News and Newsmax, Defendants recklessly disregarded the truth—indeed, they knowingly lied about Dominion in order to vastly increase OAN's viewers, including its most important viewer then-President Trump. They did so because they knew that if they did, Trump would endorse the network and give it the huge ratings boosts it coveted; and they knew that if they did not—if, instead, Defendants told OAN's viewers the truth about Dominion and the election— Trump would attack the network and send it back to cable news irrelevancy.

325.    OAN, when confronted with the direct facts disproving its lies about Dominion, implicitly admitted that its reporting was false by secretly (and only many months later) removing some of the offending reports and videos from some of its platforms after they had already been viewed by its many viewers. However, OAN repeatedly and quickly repeated and republished those very same lies in subsequent broadcasts to its same and new viewers. In addition, Dominion sent OAN and its agents a total of ten separate retraction demand letters—on December 18, 2020, December 22, 2020, December 29, 2020, February 4, 2021, February 12, 2021, April 16, 2021, May 12, 2021, June 18, 2021, July 13, 2021, and August 4, 2021—demanding the retraction of OAN's defamatory falsehoods about Dominion. Nevertheless, OAN repeatedly doubled down on

its false and defamatory statements by continuing to publish and republish them. Indeed, OAN continues to make its false and defamatory television broadcasts, social media posts, and statements about Dominion available to the public today on OAN's multitude of platforms. And OAN continues to make new false and defamatory statements about OAN on its many platforms to this day.

326.     OAN published its false and defamatory statements not once, but repeatedly over a substantial period of time. OAN carried on its disinformation and defamation campaign against Dominion for months while deliberately ignoring Dominion's specific and repeated warnings that these smears were not true, and despite the ever-growing mountains of evidence conclusively demonstrating that these statements were false. And it wasn't just Dominion notifying OAN that it was airing ridiculous fiction. Multiple people and organizations—from other news outlets to third parties to governmental officials—declared publicly that the falsehoods OAN was spreading were malicious lies and preposterous conspiracy theories. Indeed, Defendants themselves knew these lies were untrue. But Defendants, fully knowing or recklessly disregarding that their false and defamatory statements about Dominion were untrue, continued their deliberate and premeditated campaign to vilify Dominion.

327.     Defendants also cannot truthfully or plausibly claim that they were just reporting on the news of the day, or that they were simply reporting statements of the then-President. To the contrary, Defendants  were manufacturing claims and promoting new content and storylines in support of the false Dominion election fraud narrative, in hopes that it would catch President Trump's eye and persuade him to steer his loyal supporters - to the OAN network.

328.     To be sure, numerous other broadcasters reported at times on debunked election fraud allegations, but many of those broadcasters framed their reporting by noting that the

allegations had been widely debunked. Defendants, however, made a different decision. Using OAN's own voice as a news organization, Defendants made, published, ratified, endorsed, adopted, and amplified attacks on Dominion that they knew were false or acted with reckless disregard for their truth or falsity. Through OAN's most-watched anchors, Defendants promoted lies about Dominion and used OAN's growing influence in American culture to advance the false narrative that Dominion was actively complicit in a fraudulent theft of the 2020 Presidential Election. Defendants made the intentional and knowing choice to publicize the lies about Dominion as truth, creating an alternate reality that continues to dupe millions of Americans into believing that Dominion stole the 2020 election from Trump.

329. Defendants' many lies about Dominion were specific and verifiably false, and therefore not "opinion." Indeed, according to OAN CEO Robert Herring, OAN's "[n]ews anchors are not allowed to express opinions. They simply deliver the news and we leave it up to the viewers to decide."[360] At an absolute minimum, even if Defendants' lies about Dominion could be characterized as opinions, they are nonetheless actionable as mixed opinions because they are based on underlying false facts and/or on undisclosed facts. Defendants used OAN's brand— which it proudly touts as "straight news, no opinion"—in order to push and promote these demonstrable falsehoods as truth.

330. Defendants engaged in this knowing and reckless propagation of these enormous falsehoods in order to profit off these lies. OAN wanted to greatly expand its viewership, increase broadcast ratings, cater to an audience deeply loyal to President Trump that was dissatisfied with

---

[360] Marc Fisher, *An Inside Look at One America News, the Insurgent TV Network Taking 'Pro-Trump' to New Heights*, Wash. Post (July 5, 2017), https://www.washingtonpost.com/lifestyle/style/an-inside-look-at-one-america-news-the-insurgent-tv-network-taking-pro-trump-to-new-heights/2017/07/05/7475f0a4-4fa2-11e7-91eb-9611861a988f_story.html.

other news organizations like Fox after the election, and establish itself as a leading voice in conservative news media. OAN similarly sought to aggrandize certain of its most significant advertisers like Mike Lindell, who were supporters of Donald Trump. Succumbing to these motivations, Defendants—both through the speakers they invited onto OAN's shows and in OAN's own voice through many of its most prominent on-air personalities—defamed Dominion again and again.

331.    In view of the foregoing, Dominion is entitled to actual, presumed, punitive, and other economic damages in an amount to be specifically determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Dominion respectfully requests that the Court enter an award and judgment in its favor, and against all Defendants jointly and severally, as follows:

(a) awarding Dominion general compensatory damages in amount to be determined at trial;

(b) awarding Dominion damages for (1) lost profits of not less than $600,000,000; (2) lost enterprise value (including lost goodwill) of not less than $1,000,000,000; (3) security expenses of not less than $600,000; and (4) expenses incurred combatting the disinformation campaign of not less than $700,000;

(c) awarding Dominion punitive damages in an amount to be determined at trial;

(d) awarding Dominion pre- and post-judgment interest;

(e) awarding Dominion all expenses and costs, including attorneys' fees; and

(f) such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Date:   August 10, 2021

*/s/ Justin A. Nelson*
Justin A. Nelson (D.C. Bar No. 490347)
Brittany Fowler (*pro hac vice* pending)
SUSMAN GODFREY LLP

1000 Louisiana Street, #5100
Houston, Texas 77002
(713) 651-9366
jnelson@susmangodfrey.com
bfowler@susmangodfrey.com

Stephen Shackelford, Jr. (*pending admission*)
SUSMAN GODFREY LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 336-8330
sshackelford@susmangodfrey.com

Davida Brook (*pending admission*)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
dbrook@susmangodfrey.com
bfowler@susmangodfrey.com

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Dustin A. Pusch (D.C. Bar No. 1015069)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com

Rodney Smolla (admission pending)
(DE Bar No. 6327)
4601 Concord Pike
Wilmington, DE 19803
(864) 373-3882
rodsmolla@gmail.com

*Attorneys for Plaintiffs*

# EXHIBIT 1-E

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WASHTENAW

FOX NEWS NETWORK, LLC,

       Petitioner,

v.

J. ALEX HALDERMAN,

       Respondent.

Case No. 18-000100-ZZ
Hon. Carol Kuhnke

| | |
|---|---|
| Jaye Quadrozzi (P71646)<br>YOUNG, GARCIA & QUADROZZI, PC<br>Attorneys for Petitioner<br>27725 Stansbury Blvd.<br>Suite 125<br>Farmington Hills MI 48334<br>(248) 353-8620<br>quadrozzi@youngpc.com | Paul B. Salvaty<br>Scott M. Ahmad<br>Kelly M. Ellis<br>WINSTON & STRAWN LLP<br>Co-Counsel for Petitioner<br>35 W .Wacker Drive<br>Chicago IL 60601<br>(312) 558-5600 |
| Mark S. Demorest (P35912)<br>DEMOREST LAW FIRM, PLLC<br>Attorneys for Respondent<br>322 W. Lincoln Ave.<br>Royal Oak MI 48067<br>(248) 723-5500<br>mark@demolaw.com | Washtenaw County<br>Trial Court<br><br>APR 0 4 2023<br><br>**FILED** |

## ORDER GRANTING
## RESPONDENT DR. J. ALEX HALDERMAN'S MOTION TO QUASH OR IN THE ALTERNATIVE TO MODIFY OUT-OF-STATE SUBPOENA TO A NON-PARTY

At a session of said Court, held in
the City of Ann Arbor, State of Michigan
on_____

PRESENT: Hon._____APR 0 3 2023_____
                         Circuit Court Judge

Respondent, J. Alex Halderman, by his attorneys, Demorest Law Firm, PLLC, having filed

his Motion to Quash or, in the Alternative, to Modify Out-of-State Subpoena to a Non-Party;

1

Petitioner Fox News Network, LLC having filed a response; oral arguments having been heard on March 29, 2023; and this Court being otherwise fully advised in the premises;

IT IS HEREBY ORDERED that Respondent's Motion to Quash or, in the Alternative, to Modify Out-of-State Subpoena to a Non-Party is granted for the reasons stated on the record.

**THIS IS A FINAL ORDER AND CLOSES THIS CASE.**

_____
CIRCUIT COURT JUDGE

APPROVED AS TO FORM, ONLY:

YOUNG, GARCIA & QUADROZZI, PC        DEMOREST LAW FIRM, PLLC

By: _/s/ Jaye Quadrozzi (w/permission)___        By: _/s/ Mark S. Demorest_____
Jaye Quadrozzi (P71646)        Mark S. Demorest (P35912)
Attorneys for Petitioner        Attorneys for Respondent

Primerus/Alex Halderman (1593)/1 Draft Pleadings/2023 03 30 Order Granting Motion to Quash or Modify Subpoena.docx

2

# EXHIBIT 1-F

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| US DOMINION INC., et al., | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:21-cv-02130-CJN |
| Herring Networks, Inc., et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Alex Halderman,  713 West Liberty Street, Apt. 3, Ann Arbor, Michigan 48103

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A.

| Place: Varnum LLP, 101 N. Main St., Suite 525 Ann Arbor, Michigan 48104 | Date and Time: 04/23/2024 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     04/05/2024

|      CLERK OF COURT | OR | |
|---|---|---|
| | | /s/ Bethany Shah |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Defendant
Herring Networks, Inc. d/b/a One America News Network                    , who issues or requests this subpoena, are:
Bethany Shah, bpickett@jw.com, 1401 McKinney Ave, Suite 1900, Houston, TX 77010

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:21-cv-02130-CJN

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____   on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                                *Server's signature*

                                                      _____
                                                                *Printed name and title*

                                                      _____
                                                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

### SCHEDULE A

### DEFINITIONS AND INSTRUCTIONS

1.      "2020 Election" shall mean any election held in the United States on November 3, 2020, including the U.S. Presidential Election and all voting and related events occurring up to the certification of votes on January 6, 2021, and any down-ballot races or primary elections related thereto.

2.      The word "and" includes the disjunctive "or," and the word "or" includes the conjunctive "and." Words in the singular shall be interpreted to include the plural, and words in the plural shall be interpreted to include the singular. A masculine, feminine or neutral form of a word shall be interpreted to include the other genders. The use of any tense of any verb shall be interpreted to include all other tenses.

3.      "Action" refers to the above-captioned litigation.

4.      "Communication" means any written, electronic, or verbal transmission of words or thoughts between or among two or more Persons, including, without limitation, any letter, email, instant or text message, social media post, blog post, web posting, interview, conference, meeting, spoken words, conversation, understanding, agreement, discussion, talks, and reports, whether transmitted orally, in writing, or by any electronic device.

5.      "Defendant" and/or "Herring" shall mean defendant Herring Networks, Inc., d/b/a One America News Network.

6.      "Document" means any writing, graphic matter, or other tangible or digital thing, whether printed, recorded, produced by any process, or written or produced by hand, including, without limitation, agreements, contracts, correspondence, memoranda, letters, reports, Communications (as defined above) and Electronically Stored Information (as defined below), correspondence, telegrams, internal and external memoranda, summaries, records of oral

1

conversations, original or preliminary notes, diaries, calendars, analyses, projections, ledgers, work papers, photographs, tape recordings, applications, video tapes, computer hard drives or disks, statistical statements, logs, graphs, charts, schedules, notebooks, minutes or records of meetings, minutes or records of conferences, lists of Persons attending meetings or conferences, reports and/or summaries of investigations, opinions or reports of investigators, accountants or consultants, studies, appraisals, evaluations, or copies of any of the foregoing if the copy is in any way different from the original now in Your possession, custody or control, or the possession, custody or control of any Your counsel, investors, agents, employees and/or Persons acting on Your behalf.

      7.     "Dominion" shall mean plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation, as well all parents, subsidiaries, related or affiliated entities, successors and predecessors (including but not limited to Sequoia Voting Systems), officers, directors, partners, members, principals, employees, shareholders, agents, representatives, and/or any other Persons acting, or purporting to act, on behalf of Dominion.

      8.     "Electronically Stored Information" or "ESI" shall mean originals and all copies of email; activity listings of email receipts and/or transmittals; voicemail; audio or video recordings of any kind; facsimiles; computer programs (whether private, commercial, or a work-in-progress); programming notes or instructions; social media posts; text messages; instant messages; metadata; output resulting from the use of any software program, including word processing Documents, spreadsheets, database files, charts, graphs, and outlines; operating systems; source code of all types; and electronic files and/or file fragments of any sort, regardless of the media on which they are stored and regardless of whether the data resides in an active file, deleted file, or file fragment. ESI also includes the file, folder tabs, containers or labels appended to any storage device

containing electronic data.  All ESI produced in response hereto should be produced in native format.

9.      "OAN" shall mean One America News Network.

10.     "Other Media Organizations" shall mean other news, media, and other similar organizations, including but not limited to CNN, CBS, ABC, PBS, *The Wall Street Journal*, *The New York Times*, MSNBC, *The Washington Post*, Fox News, Newsmax, *Politico*, *Vanity Fair*, Media Matters, *Bloomberg News*, *The Chicago Tribune*, *The Los Angeles Times*, *The Miami Herald*, the *Times of San Diego* and *National Public Radio*.

11.     "Person" shall mean a natural person or any business, company, corporation, association, partnership organization, or other legal entity.

12.     "Sequoia" shall mean Sequoia Voting Systems, Inc., as well all parents, subsidiaries, related and affiliated entities, successors and predecessors, officers, directors, partners, members, principals, employees, shareholders, agents, representatives, and/or any other Persons acting, or purporting to act, on behalf of Sequoia.

13.     "Smartmatic" shall mean Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited, as well all parents, subsidiaries, related and affiliated entities, successors and predecessors, officers, directors, partners, members, principals, employees, shareholders, agents, representatives, and/or any other Persons acting, or purporting to act, on behalf of Smartmatic.

14.     "Systems" shall mean any elections service product developed, supplied, used, or supported by a voting machine company, including but not limited to Dominion, Sequoia, and/or Smartmatic. This includes but is not limited to software, hardware, source code, firmware, technology, solutions, digital tools, functionalities, devices, scan tabulators, optional modules,

peripherals, Hybrid Activator, Accumulator & Transmitters, audit logs, electronic voting machines, electronic counting machines, vote tabulators, precinct or central management systems, ballot marking devices, voter management, poll worker support, online voting, or election management platforms.

15.     The terms "concerning," "relating to," "regarding," "demonstrating" and "supporting" shall mean having any connection, association or concern with, or any relevance, relation, pertinence or applicability to or any implication bearing on, the subject matter, whether directly or indirectly.

16.     You," "Your," "Yours" and/or "Halderman" shall mean J. Alex Halderman, and shall include any present or former employee, agent, accountant, attorney, expert and/or any other Persons acting, or purporting to act, on behalf of J. Alex Halderman.

17.     Where a claim of privilege is asserted in responding or objecting to any discovery requested herein and information is not provided on the basis of such assertion, You shall, in Your response or objection, identify the nature of the privilege (including work product) which is being claimed.   When any privilege is claimed, You shall, as to the Documents and/or information requested, whether:

(a)     any Documents exist or any Communications took place; and

(b)     provide the following information for each such Document or  Communication in a "privilege log" or similar format:

(i)     the type of Document or Communication;

(ii)     the general subject matter of the Document or Communication;

(iii)     the date of the Document or Communication;

(iv)     the author(s) of the Document or participants in the Communication;

(v)     the addressee(s) and any other recipient(s) of the Document; and

(vi)    the custodian of the Document, where applicable.

18.     Unless otherwise indicated, the relevant time period for these Requests for Production is from January 1, 2015 to the present.

19.     These Requests for Production are continuing in nature and require supplemental response if You obtain further information between the time of compliance and any hearing or trial in the above-captioned case.

## REQUESTS FOR PRODUCTION

**1.**     All Documents and Communications concerning and/or between You and Dominion, including but not limited to Documents and Communications concerning Dominion Systems or Dominion's use or support of any Smartmatic and/or Sequoia Systems or technology, between 2010 and the present.

**2.**     All Documents and Communications concerning and/or between You and Smartmatic and/or Sequoia, including but not limited to Documents and Communications concerning Smartmatic and/or Sequoia Systems or technology.

**3.**     All Documents and Communications concerning and/or between You and Dominion's vendors, including but not limited to ElectionSource, Elkins-Swyers Company, Governmental Business Systems, and LHS Associates, related to Dominion Systems or technology.

**4.**     All Documents and Communications concerning the litigation *Curling v. Raffensperger* (N.D. Ga., Case No. 1:17-cv-02989-AT), excluding information protected by Fed. R. Civ. P. 26(b)(4)(B), (C). This includes but is not limited to (1) Your analysis or assessment of the Report by MITRE entitled "Independent Technical Review: Security Analysis of Georgia's ImageCast X Ballot Marking Devices"; and (2) any oral or written testimony provided in that case.

**5.**      All Documents and Communications concerning Your work, study, analysis, investigation, review, and any draft and final report(s), related to the Dominion ImageCast X Ballot Marking Device (BMD), ImageCast Central, and/or ImageCast Precinct products used in Georgia during any elections between 2015 and the present, including but not limited to lab notebooks (or their equivalent) and notes (paper or electronic).

**6.**      All Documents and Communications concerning Your work, study, analysis, investigation, review, and any draft and final report(s), related to the use of Dominion's ImageCast X BMD, ImageCast Central, and/or ImageCast Precinct products used in Antrim County, Michigan during the 2020 Election, including but not limited to lab notebooks (or their equivalent) and notes (paper or electronic).

**7.**      All Documents and Communications concerning Your work, study, analysis, investigation, review, and any draft and final report(s), related to the use of Dominion Systems or technology in any jurisdiction (outside Georgia and Antrim County) during the 2020 Election, including but not limited to lab notebooks (or their equivalent) and notes (paper or electronic).

**8.**      All Documents and Communications concerning Your assessment of Dominion, Smartmatic, and/or Sequoia Systems hardware or software at or in connection with DEFCON's Voting Village.

**9.**      All Documents and Communications concerning and/or between You and any government entity or agency (including but not limited to U.S. Senators or any Representatives, Congressional Committees, or otherwise exchanged between You and the United States Congress) related to Dominion, Smartmatic, and/or voting Systems used in the 2020 Election.

**10.**     All Documents and Communications regarding any allegations of election fraud, election audits, election hacking, or voting machine vulnerabilities concerning Dominion Systems.

6

**11.**     All Documents and Communications concerning OAN or its coverage in connection with the 2020 Election.

**12.**     All Documents and Communications concerning and/or between You and Other Media Organizations relating to Dominion and/or Smartmatic.

**13.**     Documents and Communications produced, whether by cooperation or in response to any applicable subpoena or other discovery device, related to Smartmatic, Dominion, and/or the 2020 Election.

## ATTORNEYS OF RECORD

Stephen Shackelford, Jr.
sshackelford@susmangodfrey.com
Mark Hatch-Miller
MHatch-Miller@susmangodfrey.com
Zachary Savage
zsavage@susmangodfrey.com
Eve Levin
elevin@susmangodfrey.com
Christina Dieckmann
cdieckmann@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Tel: (212) 336-8330

Davida Brook
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
dbrook@susmangodfrey.com

Jonathan J. Ross
Mary K. Sammons
Laranda Walker
Elizabeth Hadaway
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
jross@susmangodfrey.com
ksammons@susmangodfrey.com
lwalker@susmangodfrey.com
ehadaway@susmangodfrey.com

Edgar Sargent
Katherine Peaslee
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: (206) 516-3880
esargent@susmangodfrey.com
kpeaslee@susmangodfrey.com

Charles L. Babcock
cbabcock@jw.com
Nancy Hamilton
nhamilton@jw.com
John Edwards
Jedwards@jw.com
Joel Glover
jglover@jw.com
Bethany Pickett Shah
bpickett@jw.com
JACKSON WALKER LLP
1401 McKinney
Suite 1900
Houston, TX 77010

Jonathan Neerman
jneerman@jw.com
Carl Butzer
cbutzer@jw.com
Minoo Blaesche
mblaesche@jw.com
JACKSON WALKER LLP
2323 Ross Avenue
Suite 600
Dallas, TX 75201

R. Trent McCotter
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
mccotter@boydengrayassociates.com

*Attorneys for Defendants*

8

Rodney Smolla
164 Chelsea Street
South Royalton, VT 05068
(864) 373-3882
rodsmolla@gmail.com

*Attorneys for Plaintiffs*

# EXHIBIT 1-G

**Daniella P. Stucchi**

| | |
|---|---|
| **From:** | Adam M. Sparks |
| **Sent:** | Wednesday, May 15, 2024 5:30 PM |
| **To:** | Edwards, John |
| **Cc:** | Halsey G. Knapp, Jr.; Daniella P. Stucchi |
| **Subject:** | Re: Subpoena to Dr. Alex Halderman - US Dominion et al. v. Herring Networks et al., No. 1:21-cv-2130-CJN (D.D.C.) |

John,

My client is producing the documents available at the link below in response to your client's subpoena dated April 5, 2024. They bear Bates labels (or their equivalent) of JAH000001 to JAH001015. Of note:

- Documents JAH000001-JAH000351 respond to demands no. 4 and 5, and perhaps others.
- Documents JAH000352-JAH000871 respond to at least demands no. 1, 2, 4, 5, 6, 7, 9, and 10. They are produced as kept in the ordinary course of business.
- Documents JAH000872-JAH001014 respond to at least demands no. 1, 5, 6, 7, 10, 11, 12, and 13. They are designated Confidential under the amended protective order entered in the above-referenced case. They are produced as they were in 2022 response to a subpoena.
- Document JAH001015 responds to demands no. 4 and 5. It is designated Confidential under the amended protective order entered in the above-referenced case.

https://khlawfirm.sharefile.com/d-s5219eae554da44e1b19493d96f2ad421

You may need to create a Sharefile account to access the production. If you have any issues accessing it, please let us know promptly.

Additionally, I am authorized to direct you to Ms. Shannon Welch, court reporter for the Honorable Amy Totenberg, to obtain copies of Dr. Halderman's testimony of January 18 and 19, 2024 at trial in *Curling v. Raffensperger*, No. 1:17-cv-2989-AT (N.D. Ga.). Those transcripts are not yet uploaded to the public docket, but I am informed that they are available through her. You can reach her desk at 404.215.1383 during regular business hours.

I will look out for your next email proposing further narrowing of time parameters and certain search terms, as we briefly discussed on Monday.

Best regards,

KREVOLIN HORST

Adam M. Sparks
Krevolin Saxon Fletcher LLC
O: 404-888-9700
D: 404-835-8067
M: 470-606-9395 (eff. 1/3/2024)
Email: sparks@khlawfirm.com

One Atlantic Center
1201 West Peachtree Street, NW
Suite 3250 | Atlanta, GA 30309
Tel: 404-888-9700
www.khlawfirm.com





*A Member of Primerus International Society of Law Firms*

*The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of client(s) represented by Krevolin & Horst, LLC the particular matter that is the subject of this message, and may not be relied upon by any other party.*

*Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.*

# EXHIBIT 1-H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION,**<br><br>       **Plaintiffs,**<br><br>       **v.**<br><br>**PATRICK BYRNE,**<br><br>       **Defendant.** | Civil Action No.<br>1:21-cv-02131 (CJN) (MAU) |

## MEMORANDUM OPINION

This case arises out of the 2020 U.S. election. Plaintiffs US Dominion Inc., Dominion Voting Systems Inc., and Dominion Voting Systems Corporation ("Dominion") sue Defendant Patrick Byrne ("Byrne") for defamation related to allegedly false statements Byrne made about Dominion's role in that election. Compl. (ECF No. 1) ¶¶ 152–163.[1] Among the statements at issue are those in which Byrne claimed that Dominion ran the 2020 election; Dominion technology was developed by Hugo Chavez in Venezuela; and that Dominion hired a truck to shred "3,000 pounds of ballots." ECF No. 33 at 34. Dominion asserts that these statements are false and not only harmed its reputation and business, but also resulted in serious threats to its employees, their families, and election workers. Compl. ¶¶ 126–51.

---

[1] The other cases that are consolidated or coordinated for discovery are: *Dominion, et al. v. Herring Networks, Inc., et al.* (21-cv-2130); *Dominion, et al. v. MyPillow, Inc., et al.* (21-cv-445); *Dominion, et al v. Powell, et al.* (21-cv-040); and *Dominion, et al. v. Giuliani* (21-cv-0213). The *Giuliani* case is stayed pending bankruptcy proceedings. For all citations not otherwise specified, the Court cites to docket entries in Case No. 21-cv-2131 and page numbers in ECF headers.

This litigation has been ongoing for nearly three years and is currently in discovery. This dispute centers on that discovery process, specifically repeated instances of non-compliance with the Court's Orders governing the disclosure and use of discovery material. From June 2023 until March 2024, all counsel and Parties in the case (including Byrne) seemingly abided by the Amended Protective Order ("Protective Order") governing discovery. ECF No. 46. Before even her first appearance in this case on March 12, 2024, however, Byrne's new counsel, Stefanie Junttila [Lambert] ("Lambert"), began openly violating orders, including by disseminating protected discovery material. ECF Nos. 71; 75; 82; 102; 108; 113. Due to Lambert's actions, thousands of documents ("Dominion's Litigation Documents") which all Parties, including Byrne himself, had agreed to keep confidential, have now been shared widely in the public domain. Lambert and Byrne continue to evade the Protective Order and this Court's March 19, 2024 Order ("Status Quo Order") that prohibits further dissemination until resolution of this Motion. ECF Nos. 75; 77; 82; 102; 105; 108; 113.

Before the Court is Dominion's Emergency Motion for Protective Relief and to Disqualify Counsel. ECF No. 75. Although Byrne has violated the Protective Order as set forth below, the full scope of Byrne's actions is not yet known. And what, if any, sanction Dominion might seek against him is not before this Court at this time.[2] The only questions currently before the Court are whether Lambert violated court orders and rules, and if so, whether she should be disqualified from this case.

The remedy Dominion seeks, Lambert's disqualification from serving as Byrne's counsel in this case, is extraordinary and rarely granted outside of cases involving conflicts of interest.

---

[2]     Dominion has reserved its right to seek additional sanctions against Byrne and requested additional discovery into his conduct, including what led to the ultimate disclosures.

Nevertheless, the record clearly shows that Lambert deliberately violated multiple court rules and orders and continues to do so despite having had ample warning of the consequences and assuring the Court she would comply. Lambert's repeated misconduct raises the serious concern that she became involved in this litigation for the sheer purpose of gaining access to and publicly sharing Dominion's protected discovery. Because Lambert's "truly egregious misconduct" has already and will undoubtedly continue to "infect future proceedings," this is the rare case in which disqualification is warranted. *Koller By and Through Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds, Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). Dominion's motion is **GRANTED**.

## BACKGROUND

The relevant facts are largely undisputed.

### Protective Order

The Court initially entered the Protective Order in three related cases (which are now coordinated or consolidated for discovery) on December 6, 2022. ECF No. 152 in Case No. 21-cv-445 (applying to Case Nos. 21-cv-445; 21-cv-213; and 21-cv-40). On June 8, 2023, Dominion and Byrne jointly moved the Court to enter the December 2022 Protective Order in this case. ECF No. 45. Per the stipulation, Byrne expressly agreed:

> The Order governs the handling of Discovery Materials within the Consolidated Cases and allows the parties to the Order to share Discovery Materials between those three actions—but prohibits persons or entities receiving Discovery Material produced in the Consolidated Cases *from using those Discovery Materials outside of those three cases, except as specifically provided by the Order*.

*Id.* at 1–2 (emphasis added). Dominion and Byrne requested that the Protective Order be entered in this case to "facilitate . . . voluntary discovery coordination." *Id.* at 2. The Court granted the Parties' joint motion and entered the Protective Order in this case on June 16, 2023. ECF No. 46.[3]

The Protective Order states:

1. Any Discovery Material produced in the Litigation will be used, except by the Producing Party, *solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted by this Order and in this Litigation.*

ECF No. 75-7 ¶ 1 (emphasis added).

The Protective Order defines "Discovery Material" as:

[D]ocuments, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom ("Discovery Material"), by or among any Party or non-Party providing Discovery Material (each a "Producing Party") in the Litigation to the party receiving the Discovery Material ("Receiving Party").

*Id.* at 4.

Within the broad prohibition against using any Discovery Material outside of the related litigation, the Protective Order contains additional protections and procedures for the use of Confidential and Attorneys' Eyes Only ("AEO") materials. ECF No. 75-5. The Protective Order also sets forth procedures for how a Party can seek to challenge designations or disclose discovery

---

[3] Dominion attached ECF No. 46 to the Motion at issue because it was the operative Protective Order at the time. ECF No. 75-7. On March 21, 2024, after Dominion filed its Motion, the Court entered an amended Protective Order to which all Parties agreed. ECF No. 79. The Protective Order at ECF No. 79 is now the operative Protective Order but does not alter the relevant provisions of the initial Protective Order that has governed Party conduct in this case since June 16, 2023. To avoid confusion, the Court will use the ECF citation and page numbers for ECF No. 75-7 when citing to the Protective Order going forward.

notwithstanding the order. *Id.* ¶¶ 15, 16. Paragraph 16 sets forth procedures for a Party to object to the initial designation of discovery materials as protected. *Id.* ¶ 16. Specifically, it permits a Party to object to the designation of Discovery Material as Confidential or AEO by sending written notice to and meeting and conferring with the designating Party. *Id.* If this process does not resolve the issue, the objecting Party may file a motion with the Court to strike the designation within twenty-one days of the meet and confer. *Id.* Importantly, while the dispute is pending, the discovery materials "will be treated as Confidential or [AEO] pursuant to [the] order." *Id.*

Paragraph 15 allows a Party to object to the continued restriction on public access to confidential/AEO discovery materials:

> Any Party who objects to the continued restriction on public access to any Confidential or Attorneys' Eyes Only Filing, or any portion thereof, will give written notice of the objection to the Party that designated the Discovery Material as Confidential or Attorneys' Eyes Only ("the Designating Party"). To the extent that the Designating Party seeks to continue the restriction on public access to the Confidential or Attorneys' Eyes Only Filing, or any portion thereof, the Designating Party will file an application with the Court within seven (7) days for a judicial determination as to whether good cause exists for continued restricted access to the Confidential Filing, or any portion thereof.

*Id.* ¶ 15.

Paragraphs 8 and 9 permit Confidential and AEO material to be disclosed to certain people, some of whom must sign an Undertaking to gain access. *Id.* ¶¶ 8, 9. The Party "showing, providing, or disclosing Confidential or [AEO] Discovery Material to any person required to execute an undertaking . . . will be responsible for obtaining such signed undertaking." *Id.* ¶ 10.

Additionally, Paragraph 26 requires that if a person in possession of Confidential or AEO discovery materials that they did not produce receives a subpoena for those materials, they must: 1) give notice of the request to the designating party within three business days (or 24 hours if the subpoena deadline is sooner); and 2) "object to the production of the Confidential or [AEO]

Discovery Material on the grounds of the existence of this Order." *Id.* ¶ 26. If the designating Party opposes enforcement of the demand, the burden of opposing the demand falls to them. *Id.* This provision does not require the person or Party who is subpoenaed to appeal an order enforcing the demand or to otherwise seek relief from compliance. *Id.*

If a Party discloses discovery in violation of the Protective Order, the breaching Party must "immediately inform the Designating and Producing Party" and provide an accounting of the disclosure. *Id.* ¶ 27. Additionally, the order allows a non-breaching Party to seek sanctions against a breaching Party. *Id.* ¶ 29 ("If a Party violates this Order by releasing, leaking, or otherwise disclosing Confidential or [AEO] Discovery Material to persons or entities not entitled to such Discovery Material under this Order, the Court will have authority to impose sanctions under Rule 37(b)(2)(A)(i)–(vi).").[4]

According to Dominion, the Parties negotiated the Protective Order "[g]iven the national security concerns regarding voting machine information and the personal security concerns for Dominion employees—many of whom have been the subject of threats in the past." ECF No. 75 at 7. This concern is one of the reasons why the Protective Order applies to all discovery produced in this litigation regardless of whether it is stamped "confidential" or "[AEO]." ECF No. 75-7 ¶ 1; *id.* at 3–4 (other justifications for the Parties' Protective Order included their "belie[f] that certain information they have produced or will produce may contain information that is proprietary, commercially sensitive, or non-public"). Significantly, after stipulating to it, Byrne

---

[4]     As the plain language of Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi) permits sanctions against *parties* for discovery-related misconduct or disputes, Dominion relies in this Motion on the Court's inherent authority to regulate counsel before it.

never objected to the Protective Order. He never asked the Court to amend or lift the Protective Order until after he and Lambert began disclosing Dominion's Litigation Documents.[5]

In addition to the Protective Order governing all party discovery, Dominion sought and obtained another protective order in the *MyPillow* litigation specifically related to third-party discovery. *See* ECF Nos. 145; 147; 149; 153; 154; 156; 157; 159 in Case No. 21-cv-445. This was "in response to certain third party subpoenas issued by Defendants Michael J. Lindell and MyPillow, Inc." ECF No. 145 at 1 in Case No. 21-cv-445. After several rounds of briefing, the Court entered the separate protective order governing third-party subpoenas in the *MyPillow* litigation ("Third-Party Protective Order"). ECF No. 159 in Case No. 21-cv-445.

### Lambert Enters the Case

Lambert first formally entered her appearance as Byrne's counsel on March 12, 2024. ECF No. 71. Byrne's prior counsel, attorneys at McGlinchey Stafford PLLC ("McGlinchey"), withdrew the same day. ECF No. 72. Although Lambert did not appear in the case until March 2024, it is undisputed that she had been working with Byrne and his team for some time prior to that date, unbeknownst to Dominion. ECF No. 75 at 3. McGlinchey and Lambert have both acknowledged that Lambert "had access to Confidential Discovery Material as an attorney for Patrick Byrne who was assisting in this litigation" prior to her formal entry of appearance in March 2024. ECF No. 75-8 at 2. Neither Lambert nor McGlinchey has provided an exact date for when Lambert began serving as Byrne's attorney in this matter. That said, the record is clear that McGlinchey gave Lambert access to Dominion's Litigation Documents after she signed the Undertaking pursuant to the Protective Order on December 12, 2023. ECF Nos. 75-9; 103 at 27:10–19. In signing the Undertaking, Lambert guaranteed that she had "read the Protective Order

---

[5]    Byrne filed a Motion to Lift Protective Order on April 18, 2024. ECF No. 90.

of June 16, 2023," and would "undertake to access and use Discovery Material, Confidential Material, and Attorneys Eyes Only Material *only as the Order permits*." ECF No. 75-9 (emphasis added). Lambert does not dispute that she executed the Undertaking months before she disclosed the documents in March 2024. ECF No. 103 at 58:25–59:6.

Dominion did not have notice that Lambert had access to its discovery and had signed the Undertaking until McGlinchey notified Dominion of the alleged breach on March 11, 2024. ECF Nos. 75-8 at 2; 78 at 20:13–17 ("MS. LAMBERT JUNTTILA: And for the record, your Honor, I did not provide that [the Undertaking] to counsel. That must have been provided by Mr. Byrne's previous counsel."). In fact, it appears that Dominion did not even know Lambert was involved in this case until after she had released countless Dominion discovery documents to a third party and inflicted damage Dominion could not undo. ECF Nos. 75 at 3; 75-8 at 2.

### Lambert Publicly Disseminates Confidential Discovery Material

On March 11, 2024, McGlinchey notified Dominion that Lambert had publicly disclosed its discovery. ECF No. 75-8 at 2. McGlinchey told Dominion "[w]e had no advance knowledge of this use. We only became aware of the public disclosure by virtue of the below tweet." *Id.*



**EIF** **Election Integrity Force**
@Real_EIF
⚡ Just in: Stefanie Lambert turns up the heat in MI's legal scene with a fiery Emergency Motion for a Stay. Read the explosive internal Dominion communications here: [illegible] #ElectionIntegrity #BREAKING
10:37 AM · Mar 11, 2024 · **5,488** Views

*Id.* McGlinchey notified Dominion that Lambert had disclosed Dominion's Litigation Documents in two ways. First, Lambert included the documents in a public filing as part of a Michigan criminal case in which she had been indicted on four felony counts related to the 2020 U.S.

election. *Id.* (citing *People of the State of Michigan v. Stefanie Lynn Lambert Junttila*, Michigan Case No. 2023-285759-FH).[6]  Lambert filed a *pro se* motion in that case on March 8, 2024 and attached Dominion's Litigation Documents as an exhibit. *Id.* at 5–63.  Second, Lambert shared the documents with Barry County, Michigan Sheriff Dar Leaf ("Leaf"), an individual who has no role in this litigation, who went on to disseminate and discuss the documents in public. *Id.* at 2.

That same day, March 11, 2024, Dominion counsel responded to McGlinchey to request more information on the breach and to confirm that Lambert no longer had access to Dominion's Litigation Documents.  ECF No. 75 at 11–12.  McGlinchey withdrew from the case before responding. *Id.*  When Lambert entered her appearance, Dominion counsel emailed Lambert and McGlinchey to again request information about the scope of the breach. *Id.* at 12.  Lambert responded, but refused to provide the requested information.  ECF No. 75-3.  Instead, she wrote:

> Hi [Dominion Counsel],
>
> I had assumed that you, as counsel, were unaware of the criminal acts contained in discovery. These acts include, but are not limited to, perjury, fraud is [sic] services, wire fraud, and international interference in an election.
>
> If you were aware of the criminal acts, I will need to address fraud on the court and potentially accessory after the fact with threats of violating a protective order that does not extend to criminal acts committed by your client.
>
> My client insisted the evidence of criminal acts be provided to law enforcement.
>
> I'm happy to address this with the court.
>
> Please let me know if you need anything else.

---

[6]    Lambert currently faces two sets of felony criminal charges in Michigan for allegedly attempting to interfere with voting equipment.  On August 3, 2023, Lambert was indicted in Muskegon County, Michigan on four felony charges related to alleged tampering with voting systems following the 2020 U.S. election.  ECF Nos. 75 at 14, 75-17, 75-18.  Then, on May 8, 2024, Lambert and her client, Stephanie Scott, a clerk in Adams Township, Michigan, were indicted on felony charges related to allegedly "mishandling voter data without authorization in search of fraud."  ECF Nos. 102-16 at 5; 101-1 at 1.  Lambert's conduct described above occurred in the first of these criminal cases against her.

Sincerely,
Stefanie

*Id.*

Neither Lambert nor McGlinchey gave Dominion information about the scope of the alleged breach or provided any assurances that Lambert could no longer access Dominion's Litigation Documents. *Id.* On March 14, 2024, Dominion counsel sent letters to managers of document databases that Byrne used for discovery, with a copy to Lambert. ECF Nos. 75-13; 75-14. Dominion notified those database managers of Lambert and Byrne's alleged breach and requested that the managers not allow Byrne and his legal team to access Dominion's Litigation Documents. ECF Nos. 75-13; 75-14. Lambert wrote the database managers on March 15, 2024 and insisted on maintaining access. ECF Nos. 75-15; 75-16. Lambert threatened that "any entity that collaborates with [Dominion] to withhold discovery and to interfere with the disclosure of evidence in the case would be obstructing justice, and would therefore be accessories after the fact to criminal acts." ECF Nos. 75-15; 75-16.

Between December 12, 2023 when Lambert signed the Undertaking and March 12, 2024, Lambert made no effort to raise with Dominion or the Court that she believed the documents were evidence of the "most serious national security crimes that have ever been committed on U.S. soil," as she now claims. ECF No. 103 at 35:7–9, 29:24–25, 46:6–8. Nor did she notify Dominion or the Court that she intended to turn over this "evidence" to "law enforcement[,]" referring to Leaf. *Id.* at 40:17–22 ("Everyone can go to law enforcement and report crimes, and I have an oath and obligation to do that."), 59:11–18. McGlinchey confirmed at the May 16, 2024 hearing ("May Hearing") that, while serving as Byrne's prior counsel, it never sought to lift the Protective Order,

to de-designate any documents that were protected under the Order, or to "seek any relief whatsoever from the [P]rotective [O]rder on behalf of Mr. Byrne." *Id.* at 29:7–13.

Instead, Lambert and Byrne unilaterally decided to disclose thousands, if not millions, of Dominion's Litigation Documents to third parties and then promote the public dissemination of the documents through those third parties. *See generally* ECF Nos. 75; 82; 102; 108; 113.

### Dominion's Motion and the March 2024 Hearing

On March 12, 2024, Dominion notified the Court of Lambert and Byrne's alleged breaches and sought the Court's permission to raise this issue at a forthcoming discovery hearing on March 18, 2024 ("March Hearing"). On March 15, 2024, Dominion filed this Motion. ECF No. 75. Dominion only sought relief based on Lambert's actions, but reserved the right to seek additional sanctions based on Byrne's conduct. *Id.* On March 18, 2024, Lambert filed an opposition on behalf of Byrne, shortly before the March Hearing. ECF No. 76. Although Byrne reserved the right to supplement his response, he did not file a timely supplement or seek leave to file a supplement out of time. On March 22, 2024, Dominion filed its Reply. ECF No. 82. Byrne then waited more than a month and ultimately sought leave to file a Sur-Reply on April 24, 2024. ECF No. 93. Over Dominion's objection, the Court granted Byrne's request for leave to file a Sur-Reply. ECF No. 97.

Hours before the March Hearing, Lambert posted the following on X:



ECF No. 82-5.

At the March Hearing, Lambert did not dispute that she: 1) signed an Undertaking verifying that she would comply with the Protective Order; 2) gained access to Dominion's Litigation Documents; and 3) disseminated those documents in the manner Dominion alleged.  ECF No. 78 at 18:1–15, 19:8–25:18.  She also disclosed details about the scope of her alleged breach for the first time.  *Id.* at 31:19–32:4.  She reported that she not only gave Leaf documents, but that she also *gave him a username and password to the entire repository of Dominion's Litigation Documents. Id.*  Lambert did not represent that she asked Leaf to sign an Undertaking pursuant to the Protective Order.

After Leaf gained access to Dominion's Litigation Documents, Leaf created an X (formerly Twitter) account and shared links so that the public could download the documents.  ECF No. 82 at 6–7.  Leaf's posts sharing the documents remain publicly available.  ECF No. 103 at 18:3–12,

51:4–7. Leaf also sent a letter to House Judiciary Committee Chair Jim Jordan (R-OH) asking him to investigate Dominion's alleged illegal acts. ECF No. 82-6. As of the date Dominion filed its Reply on March 22, 2024, Leaf's post with this letter and the link to "Traunche [sic] One" had been viewed 473,000 times. ECF No. 82 at 8. According to Lambert, Byrne had reportedly also provided Dominion's Litigation Documents to a U.S. Attorney and possibly others. ECF No. 78 at 23:21–24:5. Although Lambert claimed she did not know the full extent of Byrne's actions, it became apparent that her accounting to the Court of her own actions was incomplete as well. *Id.* at 23:21–24:25.

Importantly, at no point did Lambert herself notify the Court, Dominion counsel, or McGlinchey that she intended to or had already disclosed Dominion's Litigation Documents.

**Status Quo Order**

At the March Hearing, the Court ordered temporary protective relief to prevent any further dissemination of Dominion's Litigation Documents and other discovery while the Court considered this Motion. ECF No. 77. Among other things, the Court ordered Byrne and Lambert to "*immediately desist from sharing, distributing, providing access to or discussing any discovery material*" received in this case and the consolidated/coordinated cases. *Id.* ¶ 1 (emphasis added). The Court ordered Lambert to ensure that any individual who had access to Dominion's Litigation Documents or notes Lambert took on them not access or disseminate those materials, and that she sequester and secure the documents and any of her notes. *Id.* ¶¶ 4. 6. The Court ordered Lambert to "immediately confer with her counsel" in her Michigan criminal case regarding Dominion's Litigation Documents and "undertake every reasonable effort to remove such documents from the public record and file them under seal instead." *Id.* ¶ 3.

Further, the Court ordered Lambert, Byrne, and McGlinchey to "preserve all documents and communications relating to the issues raised by Dominion's motion, including but not limited to, the release of any Dominion Litigation Documents in this case to any other entity or individual." *Id.* ¶ 7. Additionally, the Court ordered that, if Dominion's Litigation Documents existed in any form not already accounted for, including with any "associate or affiliate" of Lambert or Byrne, the "relevant party, party's attorney, or party's former attorney must immediately notify the Court." *Id.* ¶ 6.

Finally, the Court ordered that Byrne and Lambert file a "verification . . . that they have and will comply with each of their obligations in this Order until further Order of the Court" no later than March 21, 2024 at 5:00 PM EST. *Id.* ¶ 8. Both of them missed this deadline. *See generally* Docket in Case No. 21-cv-2131. On March 22, 2024, after the deadline had passed, Byrne and Lambert sought to extend the deadline to file their verifications. ECF No. 81. Byrne and Lambert asked the Court to extend this deadline to 5:00 PM on March 26, 2024. *Id.* The Court granted Byrne and Lambert's request but set the deadline at 12:00 PM on March 26, 2024. Again, Byrne and Lambert missed not only the Court-ordered deadline of 12:00 PM, but also their requested deadline of 5:00 PM. Lambert and Byrne did not file the verifications until 8:55 PM that day. Receipt for ECF No. 84. Though belated, Lambert and Byrne submitted statements in which each "verif[ied] that [they] have and will comply with the obligations set forth in the Court's March 19, 2024 Order (Docket No. 77) until further Order of the Court." ECF No. 84.

### Conduct After the March Hearing

Neither the Court's March Hearing nor the Status Quo Order deterred Lambert or Byrne's continued misconduct. Lambert and Byrne continued to discuss and disseminate the documents

and, in some cases, actively sponsored others' dissemination of the documents.[7] For example, on March 19, 2024, the day after the March Hearing, Lambert made the following statements to ABC News:

> There was no leak of data . . . I provided evidence of criminal acts to law enforcement. *The Dominion file contained evidence of perjury by John Poulos, Dominion CEO, Honest Service Fraud, Wire fraud, etc.* I'm on my way back to Michigan, and I look forward to truth and transparency for everyone.

ECF No. 82 at 14, n.2 (emphasis added).[8]

Moreover, on March 22, 2024, Lambert appeared alongside Leaf on an interview that was posted on X. *Id.* at 14. During the episode of Joe Oltmann's podcast with Conservative Daily News, Oltmann encouraged all listeners to download the Dominion documents Lambert had released to Leaf and send them to every county in the United States. ECF No. 103 at 13:3–17. As Dominion counsel recounted at the May Hearing:

> [O]n March 22nd, Ms. Lambert sat for an interview on Joe Oltmann Live, and, in that interview, Mr. Oltmann turns to her at 42:25 and he says, 'We have evidence from Dar Leaf, and way more that has not been released,' and when he starts to discuss the evidence, he hesitates and he turns to Ms. Lambert and he says, quote, 'Stefanie, I didn't get it from you, I got it from Twitter, X,' end quote. And Ms. Lambert does nothing to stop him from then launching into a discussion of the documents. In fact, Ms. Lambert follows up by telling Mr. Oltmann that he should have Dar on the show himself, because he can go through the investigation. And when Mr. Oltmann asks Ms. Lambert if Sheriff Dar Leaf is allowed to discuss his investigation and evidence, Lambert says, 'Sheriff Dar Leaf can do whatever he wants, it's his investigation.'

---

[7]    At the May Hearing, Dominion chronicled instances in which Lambert and Byrne continued to share and discuss the documents after the Status Quo Order. ECF Nos. 103 at 12–13; 102-3; 102-12; 102-13; 102-14; 102-15. Lambert and Byrne do not dispute the authenticity of their posts; they merely argue their conduct is permissible. *See e.g.*, ECF No. 103 at 34:17–25.

[8]    "Laura Romero and Luke Barr, *Pro-Trump lawyer arrested on warrant after court hearing in separate case on Dominion leaks*, ABC News, https://abcnews.go.com/US/lawyer-election-denier-center-dominion-voting-systems-leak/story?id=108270385 (March 19, 2024)."

ECF Nos. 103 at 13:3–17; 102-9 at 29.  After the Court gave her ample opportunity to explain her conduct, Lambert never contested that she made or shared any of the posts at issue, participated in any of the interviews, or otherwise engaged in the conduct that Dominion asserts violates the Protective and Status Quo Orders.  No. 103 at 34:2–25.

Further, Lambert did not remove or make any meaningful attempt to file under seal the copies of Dominion's Litigation Documents that she had attached to a publicly-available *pro se* filing in one of her Michigan criminal cases.  ECF Nos. 77 ¶ 3; 103 at 10:1–11:12.  Lambert claimed that she raised the issue with her counsel, Daniel Hartman ("Hartman"), but that Hartman "stated that he could not ask the Court in good faith, that the documents contained some of the serious crimes in national history and are a matter of national security."  ECF No. 103 at 29:20–25, 30:4–15.  Lambert did not inform the Court that she failed to comply with this requirement.

For his part, Byrne reposted and continued to emphasize posts on X about Dominion's Litigation Documents despite also promising that he would comply with the Status Quo Order.  On March 18, 2024, he shared Leaf's letter to Rep. Jordan that referenced the documents:



← **Post**

**Patrick Byrne** ✓
@PatrickByrne

**Subscribe**  …

This is no mincing PC-Sheriff. Three more coming.

# Barry County Sheriff's Office

1212 West State Street • Hastings, Michigan 49058

*Sheriff Dar Leaf*

March 17, 2024

The Honorable Jim Jordan
2056 Rayburn House Office Building
Washington, DC, 20515-3504

Dear Congressman Jordan,

My office is investigating criminal acts related to elections in Barry County, the State of Michigan, and the United States. I am in possession of evidence involving voting machines. Additionally, I have recently received a subpoena from Prosecutor D.J. Hilson of Muskegon County for my file. D.J. Hilson worked with the Michigan Attorney General to bury the Muskegon fraud investigation that was initially reported by the Muskegon local clerk. Not one person was charged related to the Muskegon fraud despite confessions, and physical evidence. Considering this, I am going to provide portions of my file to Congress for immediate review and investigation.

My office has come into possession of evidence that foreign nationals have accessed electronic voting machines in Michigan and other states. This evidence demonstrates that electronic voting machines and electronic election systems used for elections in Michigan and throughout the United States are not secure and an immediate investigation is needed by Congress.

Business (269) 948-4806 • Jail (269) 948-4804 • Fax (269) 948-4831

4:23 PM · Mar 19, 2024 · **89.1K** Views

ECF No. 82-6.

On March 19, 2024, Byrne reposted a video on X that was originally posted by Tina Peters ("Peters"), a former County Clerk of Mesa County, Colorado who was indicted for allowing unauthorized access to Dominion machines.[9]  ECF No. 82-10.  In that post, Peters used the name

---

[9]      Although the Court does not grant Dominion leave to file a third supplement, the Court acknowledges that Dominion alleges that in addition to representing Lambert in one of her criminal

and photo of a Dominion employee in Belgrade, Serbia. *Id.* Dominion asserts, and Lambert does not dispute, that this is a reference to Dominion's Litigation Documents. ECF No. 82 at 12.

On March 20, 2024, Byrne shared another post on X that named a Serbian Dominion employee and claimed connections between Dominion, vote counting software, and Serbia. ECF No. 82-12. Shortly after, Byrne responded to another X post about the source code protocol entered in this case. ECF No. 82-13 (Byrne: "And what is going to be REALLY interesting is comparing that code to the SmartMatics [sic] source code. If only we could get it.").

### May Hearing

On May 16, 2024, the Court held a hearing to entertain more fulsome argument on Dominion's Motion, which had not been fully briefed at the time of the March Hearing. At the May Hearing, Dominion chronicled Lambert and Byrne's actions and argued that Lambert's actions violated the Protective and Status Quo Orders and her ethical obligations as Byrne's counsel. ECF No. 102. This included a detailed presentation in which Dominion offered a timeline of Lambert and Byrne's misconduct using social media posts, interviews and other statements. *Id.*[10] Although Lambert disagreed about Dominion's characterizations of these actions, she did not dispute either the underlying conduct or the authenticity of any of the documents Dominion cited in its presentation. ECF No. 103 at 33:10–35:24.

The Court reminded Byrne and Lambert that the Status Quo Order expressly prohibits them from "sharing, distributing, providing access to or discussing any discovery material received" from Dominion in this case. ECF No. 103 at 60:11–62:25. The Court made clear that the

---

cases, Hartman also represents Peters in her Colorado criminal case and has allegedly sought to introduce Dominion's Litigation Documents as evidence in that case. ECF No. 122.

[10]     The Court ordered Dominion to file its presentation and supporting evidence on the docket by the end of the following day. ECF Nos. 102-1; 103 at 65:13–66:6.

"discovery material" referenced in the Status Quo Order is the same broad definition of discovery material in the Protective Order. *Id.* The Court confirmed with both Byrne and Lambert on the record that they understood these orders and would comply with them, especially the provisions prohibiting them from sharing, disseminating, or discussing discovery material. *Id.* Both Lambert and Byrne agreed. *Id.* The Court also gave both of them multiple opportunities to ask questions about the scope of the orders. *Id.* Lambert had no questions. *Id.* The only question from Byrne was what he should do if he "is requested by Congress or the DOJ or law enforcement to cooperate with an investigation." *Id.* at 62:12–14. The Court reiterated that Byrne and Lambert must come to this Court first. *Id.* at 62:15–18. The Court warned the Parties that some of the actions purportedly taken in the name of law enforcement "aren't entirely supported" and reiterated that they "need to follow the strict guidelines of Judge Nichols' order to come to the Court if there are any such requests." *Id.* at 62:15–23. Lambert thanked the Court and neither Lambert nor Byrne had any additional questions or apparent reservations. *Id.* at 62:24.

### Conduct After the May Hearing

Despite assuring the Court that they understood and would comply with all of its orders, Lambert and Byrne continued to disregard them.

For example, the morning after the May Hearing, Byrne shared a post on social media that included screenshots and discussions of Dominion's Litigation Documents. ECF No. 105.[11] On May 21, 2024, Dominion notified the Court of Byrne's actions. *Id.* On May 28, 2024, Lambert

---

[11]     In the post, the user claimed that Dominion "*authenticated* all of the data released by @SheriffLeaf" in the May Hearing and included screenshots of Dominion's Litigation Documents. ECF No. 105 at 3 n.1 (https://x.com/pjcolbeck/status/1791259014124187903), n.2 (https://x.com/PatrickByrne/status/1791344198215500027),   4   n.3 (https://x.com/pjcolbeck/status/1791290146647593410).

submitted a response on Byrne's behalf. ECF No. 106. Lambert did not dispute that Byrne shared

the posts containing Dominion's Litigation Documents, instead arguing:

> Dr. Byrne's posts were nothing more than the reposting of information that had
> already been posted, and did not constitute a violation of this Court's orders,
> precisely because the orders [sic] did not disseminate further information beyond
> that which the Court has already taken account of in its previous orders . . . *Dr.
> Byrne did not post any new information, and the reposts constituted information
> that was already in the public sphere.* Thus, not only has Mr. Byrne not violated
> the court's direct orders, but he has also not disseminated or published any *new
> information* in contravention thereof.

*Id.* at 1–2 (emphasis added).[12]

In other words, because the documents were already in the public domain *due to Lambert's

own unilateral actions*, Lambert argued that they were no longer subject to the strictures of the

Protective Order. In making the argument, Lambert relied on an exception to the Protective Order

that did not exist. Nothing in the Court's Status Quo or Protective Orders shields a Party from

sanctions for reposting or sharing documents already made public due to that Party's own violation

of those Orders. Moreover, Lambert did not come to the Court to raise this question despite

promising to do so at the May Hearing. ECF No. 103 at 44:6–22, 45:14–23, 46:3–12. Instead,

she continued to assert a right to decide unliterally when she and Byrne could share Dominion's

Litigation Documents notwithstanding repeated Court Orders to the contrary.

Lambert did not stop there. In addition to attempting to excuse Byrne's violations of Court

orders after the May Hearing, Lambert continues to attempt to disclose Dominion's Litigation

Documents and other discovery herself. ECF Nos. 108; 113. These events are described in

---

[12]    Lambert claims that Dominion "previously sent only to the Court" its "notice of filing of a
letter" raising this alleged violation. ECF No. 106 at 2. This is incorrect, as the ECF receipt from
Dominion's filing shows Lambert received notice of the letter. Receipt for ECF No. 104. The
Clerk rejected Dominion's initial filing for being in the wrong format—a letter instead of a
motion—and instructed it to refile, which it did the following day. ECF Nos. 104; 105.

Dominion's July 5, 2024 Motion to Enforce the Protective and Status Quo Orders ("Motion to Enforce") and its July 23, 2024 Supplement to its underlying Motion for Protective Relief and to Disqualify Counsel and Motion to Enforce ("Supplement"). ECF Nos. 108; 113. Notably, Byrne and Lambert do not dispute the facts in these briefs.[13]

First, Lambert attempted or threatened to disclose Dominion's Litigation Documents in response to a subpoena in Colorado's criminal case against Peters, *State of Colorado v. Tina Peters*, Case No. 2022-CR-371 (Colo. Dist. Ct.) ("Peters Criminal Case"). ECF No. 108 at 2. On July 1, 2024, Lambert notified Dominion that Peters' attorney subpoenaed Lambert to testify and produce documents in the Peters Criminal Case. *Id.* Paragraph 26 of the Protective Order sets forth procedures for how a Party must handle such a request. ECF No. 75-7 ¶ 26. Dominion responded and asked Lambert to confirm that she and her client would abide by the Protective and Status Quo Orders and not produce documents or other discovery materials to anyone. ECF No. 108 at 3. Lambert disagreed with Dominion's reading of the Protective Order and asserted that it was up to *Dominion* to file objections to the subpoena within forty-eight hours if it wanted to halt her compliance. *Id.* Dominion again pointed Lambert to the plain language of the Protective Order and asked her to confirm that she would comply with the requirement that she object to the subpoena. *Id.* Lambert repeatedly refused to confirm that she had and would comply with her obligations to object. *Id.* at 4. During these email exchanges, Lambert also argued that the

---

[13]       In a one-page response to ECF No. 108, Lambert merely claimed that Dominion fails to request any new relief in its Motion to Enforce; she does not rebut any of the factual grounds for Dominion's Motion. ECF No. 111. Even though she gave no justification for her request, the Court permitted Lambert to file a sur-reply to ECF No. 108 by July 26, 2024. Lambert belatedly filed the sur-reply and vaguely asserted she has and would comply with the Court's Orders but refused to provide confirmation based on privilege. ECF No. 117. The Court permitted Lambert to file a response to Dominion's supplement at ECF No. 113 by July 26, 2024, but Lambert did not file any response, seek any extension, or otherwise indicate she would respond. 07/23/2024 Minute Order.

materials were improperly labeled confidential or AEO, though she had not previously raised that argument in accordance with the process set forth in the Protective Order. ECF No. 108-12.

Second, Lambert attempted to disclose deposition testimony from Dominion CEO John Poulos ("Poulos") in response to a request from a Michigan State Representative, James DeSana. ECF No. 113 at 7–8. On July 12, 2024, Lambert notified Dominion that she received a request from DeSana for Poulos' deposition testimony. *Id.* Dominion objected to Lambert sharing the testimony on the same grounds as the first subpoena, as depositions clearly fall within the definition of protected discovery materials in the Protective Order. *Id.* In response, Lambert asserted that this situation was different as it was "not a person requesting the transcript in his individual capacity. This is a request by the government. The Michigan legislature." *Id.* She also asked Dominion to specify which portions of the deposition it objected to her sharing with DeSana, evidently still contesting that the Protective and Status Quo Orders apply to all discovery materials, despite the Court ordering otherwise. ECF No. 113-9 at 2–3.

As Dominion lays out in its Supplement, this request does not appear to be from the Michigan Legislature through any formal process or request, but instead is an email from an individual legislator. ECF No. 113.[14] Dominion also pointed out that even if the request were from a member of the government, that would not "vitiate" the Protective and Status Quo Orders, as the Court expressly warned at the May Hearing. *Id.*; ECF No. 103 at 62:12–24. Because Lambert again would not confirm that she would comply with the Protective Order and object to the subpoena, Dominion sought the Court's assistance on July 12, 2024. The Court entered a minute order reiterating what it had previously ordered: that no discovery materials may be shared

---

[14]    Dominion points out that the Michigan Attorney General already dismissed a request by DeSana and others for the Attorney General to bring a criminal complaint against Dominion three months before. ECF No. 113 at 8.

to unauthorized individuals without expressly obtaining the Court's permission.   07/12/2024
Minute Order.   The Court expressly prohibited Lambert from sharing Poulos' deposition with
DeSana without obtaining Court approval.   *Id.*   Lambert has not filed any request to lift the
Protective and Status Quo Orders for this purpose.[15]

Finally, it recently came to light that John Case ("Case"), another attorney who represents
Peters in the Peters Criminal Case, is also assisting Lambert with Byrne's defense in this case.
ECF No. 113 at 3.   Lambert never notified Dominion or the Court that Case is at all involved in
this litigation.   Dominion discovered this fact for the first time because Case filed a declaration in
the Peters Criminal Case on July 10, 2024 stating:

> I am assisting Stefanie Lambert in her defense of Patrick Byrne in 1:21-cv-02131.
> I signed Exhibit A to Protective Order, the "Undertaking" in which I agreed to
> "access and use Discovery Material, Confidential Material, and Attorneys Eyes
> Only Material only as the [Protective] Order permits." I reviewed emails produced
> by Dominion in 1:21-cv-02131. The emails appear to be mis-labeled
> "Confidential," because their contents do not meet the definition of "Confidential
> Material" in paragraph 2 of the Protective Order 6/16/23.

ECF No. 113-4 at 3.   Lambert refused Dominion's request for information about when Case joined
Byrne's defense and what discovery he has accessed because of "privilege/work product."   ECF
No. 113-5.   She even objected to providing the Undertaking that Case supposedly signed to gain
access Dominion's Litigation Documents.   *Id.*   Nor has Lambert provided any details to the Court
about Case's involvement, despite the Court directly requiring Lambert to give a full accounting
of who had access to Dominion's Litigation Documents.   ECF Nos. 77 ¶¶ 1, 6; 78 at 35:8–36:16.

Case's involvement in this litigation is not only striking because Lambert hid this
information from the Court.   Case has also attempted to use processes from other judicial

---

[15]      Instead, on July 19, 2024, Lambert filed a motion for leave to file an emergency motion to
lift the Protective Order for the specific purpose of producing documents in the Peters Criminal
Case. ECF Nos. 110 (not attaching the proposed motion to her filing); 116.

proceedings, such as the Peters Criminal Case, to access and release Dominion's discovery materials from this litigation. ECF No. 113 at 3. This includes the subpoena to Lambert that is the subject of Dominion's Motion to Enforce. ECF No. 108. In summary, while Case is ostensibly working with Lambert to advise Byrne on this case and signed an Undertaking to comply with the Protective Order, he is also seeking to use Dominion's Litigation Documents and other discovery in contravention of this Court's orders. Lambert is at least justifying, if not also facilitating, his efforts.

### Impact of Lambert and Byrne's Actions

Because of Lambert and Byrne's actions, Dominion's Litigation Documents are now widely available to the public. As Dominion points out, the documents and related commentary have been viewed hundreds of thousands of times. ECF No. 82. For example, on March 18, 2024, former U.S. National Security Advisor Michael Flynn retweeted Leaf's letter to Rep. Jordan. ECF No. 82-14. As of Dominion's March 22, 2024 filing, Flynn's tweet was viewed 887,200 times. ECF No. 82 at 15. In a March 18, 2024 tweet, the Election Integrity Force shared a link to Dominion's Litigation Documents. *Id.* This tweet was viewed 121,600 times as of March 22, 2024. *Id.* (citing ECF No. 82-15). Another tweet suggesting Lambert's arrest after the March 18, 2024 hearing was related to her leak of the Dominion documents instead of her open bench warrant in Michigan has more than one million views. *Id.* (citing ECF No. 82-16); *see also* ECF No. 102-3 at 10 (Byrne: "Stefanie gave a whiff of that to Sheriff Dar Leaf in a criminal investigation and she ended up leaving the court in leg iron.").

Lambert and Byrne's actions have led to serious threats to Dominion and its employees. For example, a Dominion employee in Belgrade was "doxed" in a video posted to X which Byrne

retweeted. ECF No. 82 at 16–17 (citing ECF No. 82-10).[16] Another Dominion employee's work address in Denver was posted online after being pulled from the leaked documents. *Id.* at 17. Another X user shared a letter from Leaf and added:

> HUGE!! We'll be adding to this over the weeks. Dominion President John Poulos [,] you're going to be arrested, tried and if convicted by a jury, hung for sedition. I dare you to sue me you crook. Dominion voting machines rig elections - we have proof.

ECF No. 75-2. As Lambert and Byrne continue to promote the dissemination of Dominion's Litigation Documents and other discovery, threats persist:



ECF Nos. 113 at 7; 113-7.

### Lambert's Prior Election-Related Conduct and Admonishments

Dominion asserts that Lambert has a "vendetta against Dominion and . . . disregard for the rule of law." ECF No. 75 at 13. Regardless of Lambert's motivations, it is clear that before she entered her appearance in this case, she has shown a concerning pattern of conduct that gives the Court further pause that she would follow its orders.

For example, in Pennsylvania, Lambert was involved in litigation related to two Fulton County commissioners' decision to allow unauthorized access to and copying of voting systems and data. *Cnty. of Fulton v. Sec'y of Commonwealth*, 292 A.3d 974 (Pa. 2023). Lambert was

---

[16]     "To dox someone means to release their personal or private information that may prove harmful or embarrassing." Rob Lever, *What Is Doxxing?*, U.S. NEWS & WORLD REPORT (Dec. 16, 2021) https://www.usnews.com/360-reviews/privacy/what-is-doxxing.

never admitted as counsel in the case because the court repeatedly rejected her *pro hac vice*

applications. *Id.* In its decision affirming sanctions for other attorneys, the Pennsylvania Supreme

Court remarked:

> Attorney Lambert may be every bit as culpable as Attorney Carroll, at least in the
> pattern of non-compliance that has led us to impose upon him joint and several
> responsibility with the County. That said, perhaps ironically, we must conclude that
> the failure by the two lawyers to convince the Special Master that Attorney Lambert
> should be admitted pro hac vice precisely because she failed to satisfy the
> requirements for applying for that status protects her from sharing responsibility
> with Attorney Carroll and the County. Had she gained admission, the result might
> have been different.
>
> But we are not powerless to call attention to Attorney Lambert's own role in the
> misconduct highlighted above. In *King*, the judge referred Attorney Lambert and
> co-counsel to disciplinary review both in Michigan and anywhere else they were
> licensed. We will do the same, transmitting a copy of this Opinion to the Michigan
> Attorney Grievance Commission.

*Id.* at 1018–19.

In Georgia, Lambert was mentioned in litigation related to the 2020 election and Dominion

Voting Systems. *See Curling v. Raffensperger*, Case No. 1:17-cv-2989-AT, 2023 WL 7463462,

at *23–24 (N.D. Ga. Nov. 10, 2023). Advocacy organizations and voters challenged state and

county officials' implementation of new voting systems and ongoing use of other voting systems,

software, policies, and practices as infringing their right to vote and have their ballots be reliably

counted under the First and Fourteenth Amendments. *Id.* at *1–5. The U.S. District Court for the

Eastern District of Georgia found that Lambert had directed the transmission of a disc drive with

material from the Coffee County Elections Office, which uses Dominion systems, to a private

investigator and digital security firm. *Id.* Due to these and similar actions, a cybersecurity expert,

Dr. Alex Halderman, opined that it was "impossible to determine the number of people or entities

that [had] copies of the Coffee County software and data . . . *Id.* at *24. As a result, "because of

these outside groups and individuals copying and distribution of the proprietary software that

operates Georgia's election system and specific system configurations the risk that a future Georgia election will be attacked has materially increased." *Id.* (internal quotation marks omitted).

Lambert's conduct in these cases reflects a concern that she has a personal stake in advancing her claims against Dominion, and that personal stake overrides her regard for court orders and rules even in the face of such admonishment.

## ANALYSIS

Dominion argues that Lambert and Byrne flagrantly and repeatedly disregarded court orders by leaking Dominion's Litigation Documents to the public; there is no justification for these acts; these acts have continued to harm Dominion and its employees; and that, importantly, Lambert's continued involvement in this case would infect future proceedings, including by making it impossible to continue the discovery process. ECF Nos. 75; 78; 82; 103; 105; 108; 113; *see also Koller*, 737 F.2d at 1056. As a result, Dominion asks the Court to disqualify Lambert from this case as a sanction for her misconduct. ECF Nos. 75; 82; 108; 113. Lambert and Byrne dispute these arguments, asserting they did not violate any orders or rules and that, even if they did, their actions were justified. ECF Nos. 76, 97, 106, 111, 117.

There are four questions for the Court: 1) whether the Protective Order applies to the documents Lambert and Byrne disclosed to third parties; 2) whether and to what extent Lambert violated any rules, law, or Court orders; 3) whether—if Lambert did violate rules, law, or orders—there is any justification for her actions; and 4) whether to disqualify Lambert. The Court bases its conclusions below on Lambert's conduct. Byrne's conduct, however, is relevant because Lambert refuses to ensure he complies with the Court's orders and, instead, attempts to justify his blatant violations with meritless and rejected arguments.

## I.  Scope of Protective Order

### A.  Legal Standard

Federal Rule of Civil Procedure 26(c) provides that a court may enter a protective order upon motion if there is good cause. Fed. R. Civ. P. 26(c); *see also Münchener Rückversicherungs-Gesellschaft Aktiengesellschaft in München v. Northrop Grumman Risk Management Inc.*, 312 F.R.D. 686, 690 (D.D.C. 2015) [hereinafter *Münchener*] ("Protective orders both facilitate efficient pre-trial discovery and prevent parties from abusing Rule 26's liberal discovery provisions."); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).

This Court enforces protective orders consistent with their language. *See, e.g.*, *Pigford v. Veneman*, 307 F. Supp. 2d 51, 55 (D.D.C. 2004) (holding that class counsel violated a protective order by disclosing certain documents to pro bono counsel when the protective order only permitted disclosure of documents from the government). If a protective order "broadly prohibits disclosure of *any* materials obtained during discovery for any purpose other than litigation and to any person other than those associated with the litigation," disclosure of documents beyond that scope violates the protective order. *Dialog Information Servs., Inc. v. American Chemical Soc.*, Case No. 90-cv-1338, 1991 WL 283718, at *2 (D.D.C. Dec. 19, 1991).

### B.  The Protective Order Covers Dominion's Litigation Documents

There is no reasonable dispute that the Protective Order governs Dominion's Litigation Documents. Byrne and Lambert concede that a protective order is generally interpreted according to its plain language. ECF No. 76 at 20. They assert, however, that because Dominion discussed needing to protect trade secrets and proprietary information in a motion requesting a separate protective order, the Third-Party Protective Order, the Court should interpret the operative Protective Order in this case *inconsistent* with its plain language. *Id.* at 21 (citing ECF No. 145 in

28

Case No. 21-cv-445) (asserting that "Dominion's motion for a protective order targets a very specific situation and sought to encompass only very specific, technical information – 'trade secrets,' 'proprietary information,' and 'confidential information' pertaining thereto."). Dominion responds that Byrne and Lambert's argument is based on a fundamental misunderstanding of the two separate protective orders. ECF No. 82 at 21–22.

The Court agrees with Dominion. It is clear from the record that, after the Parties negotiated a comprehensive Protective Order that applies to any Party-produced discovery, Dominion asked the Court to enter a separate protective order in the *MyPillow* litigation tailored to third-party discovery. *Compare* ECF Nos. 152 *with* 159 in Case No. 21-cv-445. There is no support for the conclusion that the *MyPillow* Third-Party Protective Order displaces this Protective Order or limits its scope. If there were any doubt, it would be resolved by Byrne's own stipulation and Joint Motion asking the Court to enter this Protective Order, noting that it "prohibits persons or entities receiving Discovery Material produced in the Consolidated Cases from using those Discovery Materials outside of those three cases, except as specifically provided by the Order." ECF No. 45 at 2–3. Moreover, prior to sponsoring Lambert's dissemination of documents subject to the Protective Order, Byrne never took the position that the Order was limited in any way.

Lambert and Byrne's argument here is not only meritless, it borders on frivolous, purposefully ignores contrary evidence and authority, and contradicts Byrne's own representations to the Court in his June 2023 stipulation.[17]

---

[17]   Byrne and Lambert have had ample opportunity to correct their clearly implausible argument. ECF Nos. 86; 90; 97. Instead of addressing what can generously be seen as a misunderstanding of the docket, Byrne and Lambert have doubled down. ECF No. 116. They did so even after Dominion explained how Byrne's reliance on ECF No. 145 in 21-cv-445 was plainly wrong. ECF No. 82. Lambert even continued to advance this theory at the May Hearing and claimed: "My client did not agree to false labels being placed on the documents by Dominion." ECF No. 103 at 37:7–8. This is again clearly contradictory to the joint stipulation.

## II.    Violations of Rules, Laws, and Orders

### A. Lambert Has Violated the Court's Orders

Dominion asserts that, through her actions, Lambert violated multiple rules and court orders, including D.C. Rule of Professional Conduct ("DCRPC") 3.4(c), DCRPC 8.4(d), the Protective Order, and the Status Quo Order. Lambert does not dispute that she committed the acts at issue; she argues instead that that her actions were permissible. Apart from the alleged violations of DCRPC 8.4(d), Dominion discussed these violations in its briefing at ECF Nos. 75, 82, 96, 105, 108, and 113. Specifically, Dominion alleges that Byrne and Lambert violated ¶¶ 1, 8, 11, 15, 26, and 27 of the Protective Order, and ¶¶ 1, 3, 6, 7, and 8 of the Status Quo Order. Because Lambert's alleged violations have been ongoing, Dominion introduced recent evidence of such actions at the May Hearing and have supplemented with additional evidence since then. ECF Nos. 102-1; 105; 108; 113. At the May Hearing, Dominion also discussed how Lambert allegedly made multiple misrepresentations to the Court, conduct which violates DCRPC 8.4(c). The Court has permitted Lambert to respond to these allegations, and Lambert continues to maintain that her actions were permissible, justified, and necessary to report evidence of an allegedly grave crime. ECF Nos. 76, 97, 106, 111, 117. In the past two weeks, Dominion has sought leave to file two additional supplements detailing additional alleged misconduct. ECF Nos. 118; 122. Despite the severity of the conduct alleged therein, the Court denies Dominion's latest motions to supplement in the interests of ending the ongoing cycle of alleged misconduct by resolving this underlying Motion.

### 1. Violations of Protective Order

Lambert and Byrne have violated a number of the provisions of the Protective Order. ECF No. 77 ¶¶ 1, 8, 11, 15, 16, 26, and 27.

First, Lambert and Byrne disclosed and promoted the public dissemination of Dominion's Litigation Documents in a manner the Protective Order does not authorize. ECF Nos. 75 at 9–12, 82 at 6–17. The Protective Order prohibits disclosure of discovery outside of the Parties to the litigation and, even within those parameters, limits the purposes for which confidential material may be used. ECF No. 75-7 ¶¶ 1, 8. Lambert violated these provisions by attaching to a pleading in her criminal case in Michigan a declaration from Leaf that included Dominion's Litigation Documents as exhibits, providing Leaf with access to the document repository, and sharing social media posts that include the disclosed documents. *Id.*

Second, they did not notify Dominion that they intended to disclose any Confidential Discovery Material prior to disclosing it or schedule a time to meet and confer on the proposed objections to the documents.[18] These were documents Dominion had produced that it reasonably believed would be handled pursuant to the terms of the Protective Order. ECF No. 75-7 ¶¶ 15, 16. Third, Lambert and Byrne failed to come to the Court, as the Protective Order expressly requires in the event of an objection, to seek an Order de-designating the documents or allowing Lambert to disseminate these documents to a third party. *Id.*

Fourth, Byrne and Lambert did not immediately notify Dominion once they disclosed Dominion's Litigation Documents. ECF No. 75 at 12–13. It is notable that Lambert and Byrne even failed to notify McGlinchey—who represented Byrne at the time they began to make the disclosures—that Byrne or Lambert planned to and ultimately did disclose Dominion's documents. McGlinchey only learned about Byrne and Lambert's actions when they saw a social media post

---

[18] There is no dispute that Lambert and Byrne disclosed "Confidential" documents, in addition to other documents covered by the Protective Order. First, Lambert admits to giving Leaf access to the *entire repository* of Dominion's Litigation Documents. ECF No. 78 at 31:19–32:4. Second, all of the documents attached to Leaf's declaration that Lambert filed *pro se* in her Michigan criminal case were stamped "Confidential." ECF No. 75-8 at 5–63.

about Dominion's Litigation Documents. It was not until this point that McGlinchey, not Lambert or Byrne, notified Dominion of the breach. *Id.* In addition, Lambert refused to answer Dominion's questions about the scope of her breach. *Id.*; ECF No. 75-3. Instead, she threatened that "if [Dominion counsel] were aware of the criminal acts, I will need to address fraud on the court and potentially accessory after the fact with threats of violating a protective order that does not extend to the criminal acts committed by your client." ECF No. 75-3. Lambert and Byrne's conduct here violates Paragraph 27 of the Protective Order. ECF No. 75-7. Lambert only provided information about the scope of her possession and disclosures of the documents when the Court questioned her at the May Hearing. And now, it is clear that Lambert has still not disclosed the full list of individuals with whom she shared Dominion's Litigation Documents. ECF No. 113 at 3 (describing Case's involvement in this litigation); ECF No. 113-4 at 3.

Fifth, Lambert has apparently refused to object to subpoenas that she has received for Dominion's Litigation Documents. ECF Nos. 108 at 2, 3; 113 at 7, 8. Even though the Protective Order clearly requires a person to object to subpoenas on the grounds of the Order's existence, Lambert has repeatedly refused to confirm that she would do so. ECF Nos. 77 ¶ 26; 108 at 2, 3; 113 at 7, 8. Lambert does not assert that she has objected to these subpoenas. Instead, she vaguely maintains that she will comply with the Protective Order. ECF Nos. 108-8; 117. This promise instills little confidence moving forward, as Lambert continues to rely on an interpretation of the Protective Order that the Court has rejected.

### 2. Violations of Status Quo Order

Lambert and Byrne have also violated the Court's Status Quo Order, despite both verifying that they had and would comply with it. ECF No. 84. The Court will save for another day the absurdity of needing to require a barred attorney to independently verify that she will follow a

Court Order. To date, Lambert and Byrne have violated at least five of the eight specific requirements of the Status Quo Order: ¶¶ 1, 3, 6, 7, 8.

First, as discussed, Lambert and Byrne missed multiple deadlines to submit their verifications. Notably, they only asked for an extension after their first deadline had passed. The delay in submitting the verification matters because Byrne continued to publicly discuss and share Dominion's documents in that time (and after). ECF Nos. 102-1 at 20; 103 at 11:13–12:14. And the delayed failure to comply with the Court's deadline is another example of Lambert and Byrne's cavalier disregard for the judicial process in this case.

Second, regarding the filing in one of her criminal cases, Lambert did not "immediately confer with her counsel in that matter and undertake every reasonable effort to remove such documents from the public record and file them under seal instead." ECF Nos. 77 ¶ 3; 103 at 10:1–11:12, 29:20–25, 30:4–15 (claiming that her counsel was unwilling to remove Dominion's Litigation Documents from the public docket in Michigan because he believed, like Lambert, they should remain publicly available.). Lambert made no effort herself to remove the documents from public access or raise the issue with the Michigan court, despite having filed them *pro se*. ECF Nos. 102-2; 103 at 10:1–11:12, 29:20–25, 30:4–15. Nor did she notify the Court or Dominion of her unilateral decisions to keep the documents on that public docket. ECF Nos. 77 ¶ 3 (Status Quo Order requirement); 84 (verifying Lambert had and would comply with all Status Quo Order requirements); 103 at 10:1–11:12 (explaining how Dominion learned Lambert did not remove the documents from the public docket).

Third, Byrne and Lambert have continued to share or sponsor the dissemination of the documents publicly. ECF Nos. 77 ¶ 1; 103 at 12:15–22. For example, on March 19, 2024, Lambert discussed the documents with ABC News, which quoted her as saying "[t]he Dominion file

contained evidence of perjury by John Poulos, Dominion CEO, Honest Services Fraud, Wire Fraud, etc." ECF Nos. 102-1 at 21; 103 at 12:23–13:2. On March 22, 2024, Lambert was a guest on a podcast during which host Joe Oltmann discussed the documents. ECF Nos. 102-1 at 22; 103 at 13:3–17. When Oltmann asked whether Leaf was allowed to discuss his "investigation," which is based on Dominion's documents, Lambert said Leaf could go through whatever he wanted. ECF No. 103 at 13:3–17, 45:11–13. On April 7, 2024, Lambert gave an interview on "The Joe Hoft Show" on FrankSpeech. ECF Nos. 102-1 at 23; 103 at 13:18–14:7. The title of the episode was "Surviving Attacks for Standing Up for Fair Elections with Stefanie Lambert," and Lambert again discussed the documents she had disseminated. ECF Nos. 102-1 at 23; 103 at 13:18–14:7.

These actions remain ongoing. Immediately after Lambert and Byrne promised they would follow the Protective and Status Quo Orders, claimed to understand when the Court reiterated the broad scope of the Orders, and promised to seek Court guidance if there was any confusion, Byrne continued to share social media posts with and about the documents and Lambert attempted to justify his conduct. ECF Nos. 105; 106; *see also* ECF Nos. 108; 113. Significantly, neither Lambert nor Byrne meaningfully contest any of Dominion's evidence in support of its Motion. Lambert and Byrne do not, for example, contest the authenticity of their posts or re-posts on social media, interviews, appearances on various interviews or podcasts, etc. Nor have they argued that they did not participate in the conduct alleged or that any of the posts or statements are taken out of context.

Fourth, Lambert failed to "preserve all documents and communications relating to the issues raised by Dominion's motion, including but not limited to, the release of any Dominion Litigation Documents in this case to any other entity or individual." ECF No. 77 ¶ 7. Lambert admitted at the May Hearing that she viewed part of a video that Byrne posted on social media on

April 3, 2024, in which Byrne ostensibly discussed this case and/or Dominion's Litigation Documents. ECF No. 103 at 47:2–48:10. Lambert represented to the Court that she directed Byrne to remove the video from social media. *Id.* Lambert did not ensure that she or Byrne preserved the video and has not provided the video to Dominion despite repeated requests. *Id.* By the time of the May Hearing, it appeared that the video no longer existed. *Id.* Lambert's failure to preserve the video she directed her client to remove from social media renders the Court unable to assess whether Byrne's statements violated the Court's Orders. Based on her conduct and lack of candor with the Court, it appears this is entirely what Lambert was hoping to achieve. *Id.* at 48:6–10 (Lambert stating that she does not have time to "babysit" Byrne's social media).

Fifth, Lambert failed to notify the Court if any other associate or affiliate had access to Dominion's Litigation Documents, as required in Status Quo Order ¶ 6. On July 10, 2024, Case submitted a declaration in the Peters Criminal Case representing that he was an attorney assisting with Byrne's defense in this litigation, had signed an Undertaking to comply with the Protective Order, and had reviewed Dominion's Litigation Documents. ECF No. 113-4 at 3. Lambert did not notify the Court of Case's involvement or access to Dominion's Litigation Documents. Instead, after Dominion independently discovered that Case had access to its documents, Lambert refused to provide any details about Case's involvement. ECF No. 113 at 5.

### B. Lambert Has Violated the Rules of Professional Conduct

#### 1. Standard

The DCRPC, as adopted by the District of Columbia Court of Appeals, govern attorney conduct in this Court. LCvR 83.15(a). Attorneys practicing in this Court are subject to discipline for violations thereof. *Id.* DCRPC 3.4(c) prohibits a lawyer from "[k]nowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no

valid obligation exists." D.C. R. Prof. Conduct 3.4(c). DCRPC 8.4(d) prohibits a lawyer from "[e]ngag[ing] in conduct that seriously interferes with the administration of justice." D.C. R. Prof. Conduct 8.4(d). The D.C. Court of Appeals has interpreted DCRPC 8.4(d) to require showing: (1) an attorney's conduct was improper; (2) it "bears directly upon the judicial process"; and (3) it taints the judicial process in more than a de minimus way, or "at least potentially impact[s] upon the process to a serious and adverse degree." *In re Dobbie*, 305 A.3d 780, 809–10 (D.C. 2023) (internal quotations omitted). DCRPC 8.4(c) prohibits attorneys from making misrepresentations to the court. D.C. R. Prof. Conduct 8.4(c).

### 2. Lambert's Misrepresentations to the Court

Lambert has made many misrepresentations and misstatements to the Court. First, during the March Hearing, Lambert represented that her attorneys had publicly filed the motion in her Michigan criminal case attaching Dominion's Litigation Documents, when in fact it was Lambert herself who filed the motion *pro se*. ECF No. 78 at 46:6–21 (clarifying how the documents were submitted: "THE COURT: Okay. So they were filed by your counsel? MS. LAMBERT JUNTTILA: Correct."). This misrepresentation is significant, as Lambert attempted to mischaracterize the facts to reflect that she was less involved in one of the first public disclosures of Dominion's documents. *Id.* at 43:24–44:4 ("That was not my filing; that was an affidavit from the Sheriff.").

Second, at the March Hearing, Lambert represented to the Court that the only two people who had access to the relevant materials—Dominion's documents and her related notes—were her "assistant" Stephanie Scott and Russell Newman, another attorney in Lambert's office. ECF No. 78 at 35:8–36:16. The Court and Dominion learned through McGlinchey's filing on March 29, 2024, nearly two weeks later, however, that another alleged attorney for Byrne named Michael

Smith also had access. ECF No. 85 at 4. The Court also later learned that Lambert failed to advise the Court that Ms. Scott was not just an assistant to Ms. Lambert, but is also the former Clerk of Adams Township, Michigan and Lambert's co-defendant in her pending felony criminal case in Hillsdale County, Michigan. Ms. Scott and Lambert face charges for allegedly "mishandling voter data without authorization in search of fraud." ECF Nos. 102-16 at 5; 101-1 at 1.

As discussed above, the Court learned through Dominion's Supplement that there is another attorney assisting with Byrne's defense, Case. ECF No. 113. If Case was involved at the time of the March and May Hearings, Lambert misrepresented to the Court the entire universe of people with whom she shared Dominion's Litigation Documents. ECF No. 78 at 35:1–36:23. If Lambert gave Case access to Dominion's Litigation Documents after those hearings, she violated the Status Quo Order. ECF No. 77 ¶¶ 1, 6. Because Lambert refuses to provide any information on Case's involvement, the Court has no way of assessing which is true. In either scenario, however, Lambert has made material omissions to the Court.

Third, in her verification that she and Byrne had and would comply with all provisions of the Status Quo Order, Lambert misrepresented that she and her client had complied with the Order. ECF No. 84. Lambert ultimately filed the verification on March 26, 2024, after engaging in much of the conduct described above. *Id.* For example, Lambert represented that she had and would "undertake every reasonable effort to remove such documents from the public record and file them under seal instead" in one of her criminal prosecutions in Michigan. ECF Nos. 77 ¶ 3; 84. Yet, Dominion presented evidence from the prosecutor in that case that neither Lambert nor her counsel attempted to place the documents under seal. ECF No. 102-2. Only after Dominion brought this matter to the Court's attention did Lambert admit that she did not remove this public filing. ECF No. 103 at 29:16–30:15 (asserting her counsel told her not to remove it). Even if Lambert had a

legitimate reason to disregard the Court's order (the Court has yet to hear one), she still misrepresented to the Court that she had complied with this requirement. ECF Nos. 77, 84.[19]

In addition, Lambert represented that she had and would comply with the requirement in the Status Quo Order that she not share, distribute, provide access to, or discuss the documents. ECF Nos. 77 ¶ 1; 84. But Lambert signed this verification after she had already violated it by giving an interview in which she discussed the evidence she believed existed in the Dominion documents. ECF Nos. 102-1 at 21; 103 at 12:23–13:2. After signing the verification, Lambert continued to publicly discuss the documents. ECF Nos. 102-1 at 23; 103 at 13:18–14:7.[20]

Finally, as discussed above, Lambert assured the Court at the May Hearing that, going forward, she would come to the Court if there were any questions about what she or her client could do with the documents under the Protective and Status Quo Orders. ECF No. 103 at 44:6–22, 45:14–23, 46:3–12. Byrne was physically present at this hearing and ostensibly heard Lambert's promises, having himself agreed to comply with the Orders moving forward. *Id.* at 61:20–25. Only one day later, however, Byrne reposted screenshots of Dominion's Litigation Documents to his hundreds of thousands of followers on X. ECF Nos. 105, 106. Byrne has not removed this post as of the issuance of this Memorandum Opinion. Lambert not only did nothing to address Byrne's blatant violation, she has continued to justify his actions. ECF No. 106.

---

[19]     Even if Lambert had offered legitimate grounds to keep the motion from her criminal case itself publicly available, this still does not explain why she would need to keep the attachment of Leaf's affidavit with Dominion's Litigation Documents included as exhibits also publicly accessible. As Dominion argues, Lambert's conduct here also implicates DCRPC 3.3, which imposes upon counsel a duty of candor to the Court. ECF No. 103 at 53:23–54:14.

[20]     As the Court reminded the Parties at the hearing, the Protective and Status Quo Orders do not prevent the Parties or Counsel from discussing or criticizing the case in general, whatever their views may be. Therefore, the Court did not fault or prohibit Byrne from making statements related to issues presently before this Court, about the Court, Dominion, or this litigation generally.

The Court will not belabor this point by chronicling Lambert's other apparent misrepresentations. Suffice it to say that Lambert's misrepresentations reflect a deeply concerning pattern that does not appear to have any sign of stopping. *Compare* ECF No. 75-3, *with* ECF No. 102-3 at 10 (differing accounts of whether it was Lambert or Byrne that insisted on disclosing Dominion's Litigation Documents); *compare* ECF No. 25, *with* ECF No. 103 at 45:5–9 (differing representations of whether Byrne anticipated Dominion's Litigation Documents would unveil evidence of national security or election crimes).

### 3. Lambert's Conduct Violates the DCRPC

First, DCRPC 3.4(c) prohibits an attorney from "[k]nowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." D.C. R. Prof. Conduct 3.4(c). As discussed above, Lambert repeatedly violated the Court's the Protective Order and Status Quo Orders. Those violations likewise constitute violations of Rule 3.4(c) for all the same reasons discussed above. Specifically:

- Lambert failed to notify Dominion that she planned to disclose any of Dominion's Litigation Documents prior to disclosing them and arranging a time to meet and confer, as required by the Protective Order. ECF No. 75-7 ¶¶ 15, 16.

- Lambert failed to raise her objections with the Court and seek an order de-designating documents or allowing her to disclose the documents to a third party, as the Protective Order permits. *Id.*

- Lambert publicly disclosed and promoted public dissemination of Dominion's Litigation Documents in a manner not permitted by the Protective Order. *Id.* ¶ 1.

- Lambert refused to confirm that she would object to subpoenas as required by the Protective Order. *Id.* ¶ 26.

- Lambert failed to immediately, or even at all herself, notify Dominion, McGlinchey, or the Court after she disclosed the documents, as required by the Protective Order. *Id.* ¶ 27.

- Lambert failed to provide information about the scope of her actions and the breach as required by the Protective Order. *Id.* ¶ 27.

- Lambert failed to timely sign and file a verification she had and would comply with the Status Quo Order, as required by that Order. ECF Nos. 84; 77 ¶ 8.

- Lambert failed to immediately confer with her counsel and undertake every reasonable effort to remove Dominion's Litigation Documents from the public docket in one of her criminal cases in Michigan, as required by the Status Quo Order. ECF No. 77 ¶ 3.

- Lambert continued to "shar[e], distribut[e], provid[e] access to or discuss[]" Dominion's Litigation Documents, as prohibited by the Status Quo Order. *Id.* ¶ 1; ECF Nos. 102-1 at 21–23; 103 at 12:15–14:7, 45:11–13.

- Lambert failed to preserve all documents related to the issues raised by Dominion's motion, as required by the Status Quo Order. ECF No. 77 ¶ 7.

- Lambert failed to immediately notify the Court that other associates or affiliates had access to the documents, as required by the Status Quo Order. *Id.* ¶ 6.

Although Lambert may argue that she violated the orders based on her assertion that no valid objection existed, any such argument is unavailing. As discussed below, Lambert has never offered a valid objection to either Order. Lambert has squandered any opportunity to defend her actions, claiming that she has no authority to support her conduct because there are no cases which stand for the proposition that "water is wet." ECF No. 103 at 40:7, 46:23, 59:15. Even if a valid

objection to the Orders existed, Lambert at the very least acted in bad faith in the manner in which she disclosed the materials. If she had a valid objection, she would have first raised her objections with the Court instead of waiting until she caused irreparable damage by releasing Dominion's Litigation Documents. Moreover, she confirmed at the May Hearing that she would comply with all of her obligations going forward and did not dispute the provisions in the Status Quo Order, further underscoring her lack of any valid objection to the orders. ECF No. 103 at 60:11–62:25. As set forth above, she promptly disregarded that Order shortly after making that statement.

Second, DCRPC 8.4(c) prohibits attorneys from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation. D.C. R. Prof. Conduct 8.4(c); *see also In re Ukwu*, 926 A.2d 1106, 1111–14 (D.C. 2007) (holding that an attorney violated DCRPC 8.4(c) by conduct including "directing a client to file with the IRS a letter containing representations that [the lawyer], at a minimum, should have known were false . . ."). As chronicled above, Lambert has repeatedly made misrepresentations to this Court by:

- Representing that her attorney filed a motion with Dominion's Litigation Documents on a public docket in Michigan instead of her having filed the materials *pro se*. ECF No. 78 at 46:6–21.

- Representing that only two people had access to Dominion's Litigation Documents through working with her, when in fact at least a third attorney also had access. *Id.* at 35:8–36:16; ECF No. 85.

- Representing that she had informed the Court of any "associate or affiliate" who had access to Dominion's Litigation Documents and would immediately inform the Court if others had access to the documents while withholding Case's involvement from the Court. ECF Nos. 77 ¶ 6; 84; 113-5.

41

- Representing that she and Byrne had and would comply with all of the provisions of the Status Quo Order, despite the numerous violations discussed above. ECF No. 84.

- Representing that she would come to the Court to seek guidance if she thought an exception to the Protective Order or Status Quo Order existed *before* she or her client took any action on the proffered exception, but failing to follow through on the promise. ECF Nos. 103 at 44:6–22, 45:14–23, 46:3–12; 105; 106.

Third, DCRPC 8.4(d) prohibits attorneys from "engag[ing] in conduct that seriously interferes with the administration of justice." D.C. R. Prof. Conduct 8.4(d). The Comment to DCRPC 8.4(d) includes failing to comply with court orders as conduct that seriously interferes with the administration of justice under DCRPC 8.4(d). Comment to D.C. R. Prof. Conduct 8.4(d) ("Paragraph (d)'s prohibition of conduct that 'seriously interferes with the administration of justice' . . . include[s] acts by a lawyer such as . . . failure to obey court orders"). As explained above, Lambert's conduct was clearly improper in that she repeatedly violated court orders and made misrepresentations to this Court. *See In re Dobbie*, 305 A.3d at 809–10. Lambert's conduct bears directly on the judicial process, including the Court and Parties' abilities to oversee and engage in discovery, presume other attorneys will comply with their ethical obligations, and rely on Parties following court orders. *Id.* The impact that Lambert's misconduct has had on this proceeding is severe, compounding, and shows every sign of continuing if she were permitted to remain counsel in this case. *Id.*[21]

---

[21] Although there is limited case law in this Court about when a DCRPC 8.4(d) violation occurs, especially under similar facts to the present case, the D.C. Court of Appeals has recognized violations for less serious conduct, for example, failing to appear at a hearing or interview when an attorney knew or should have known that they would be expected to appear. *See In re Ukwu*, 926 A.2d at 1143–44.

To put it simply, given her conduct, the Court has no confidence that Lambert will comply with the Court's Orders past or future. The record amply supports the Court's serious concern that, instead, Lambert will continue to engage in tactics which taint and disrupt this judicial process. And it is not only the Court who cannot trust her tactics moving forward. Other Parties to the litigation cannot be sure that she will abide by the very agreements her client made (such as the Protective Order), having already flouted them in the most egregious manner.

## III.   Lambert's Justification for Violating Court Orders

None of the justifications Lambert has offered for her conduct, which as noted above is largely undisputed, excuse her actions as Byrne's counsel of record.

### A.   Lambert's Arguments

Lambert first argues that Dominion brought this Motion in bad faith to target her. ECF No. 76 at 26. She claims that this is a "'tactical' effort to stifle the truth and to prevent undersigned counsel who has introduced and presented corroborating expert analysis of the deficiencies in Dominion voting systems, and now has fulfilled her ethical duty to report the discovery of potential criminal violations to law enforcement." *Id.* Lambert asserts that Dominion seeks to disqualify her "because of her combined knowledge and the information she possesses from litigating cases in multiple jurisdictions," her "expertise and knowledge, including multiple expert analyses of the deficiencies in Dominion voting systems' product," and "to prevent her from using her expertise and knowledge to defend Mr. Byrne . . ." *Id.*[22] Lambert describes Dominion's motion as "puffery" and an "effort to downgrade" her with "*ad hominem* attacks." *Id.*; ECF No. 103 at 32:18–33:3.

---

[22]   Lambert cites to expert reports she purportedly obtained related to Dominion's voting machines, ECF Nos. 76-5; 76-6. It does not appear that these reports have anything to do with this Motion.

Lambert argues that neither she nor Byrne violated the Protective Order because the information was not covered by the Order. ECF No. 76 at 28. As explained above, this argument is meritless. Lambert asserts, alternatively, that any breach is justified under two "exceptions": (a) disclosure to law enforcement; and (b) the "*public interest* exception[,] which even the judiciary has a constitutional obligation to acknowledge." *Id.* at 28, 23 ("On this latter note, and equally, if not more, important, the information in the production contains information concerning criminal conduct and collusion and conspiracy with and by foreign nationals in the conducting of U.S. elections and therefore fall within an exception for matters of national security and constitutional important (sic), which have always enjoyed a robust 'tradition of accessibility' in this country.").

Lambert claims that Dominion's documents provide evidence of "some of the most serious crimes in national history and are a matter of national security." ECF No. 103 at 29:24–25. According to Lambert, this includes election fraud. ECF No. 76 at 30–32 (citing 52 U.S.C. § 10308, but no authority supporting its relevance or application here). She asserts that "foreign nationals are entering election systems in the United States before certification of the 2020 election," which "the public has a right to know" and "Dominion is complicit" in these events. *Id.* at 29. She further claims that "Dominion has filed this lawsuit . . . to hide these facts from the American public and to create a false narrative." *Id.*

Lambert cites no authority for these broad and significant assertions. Although she references cases that recognize the fundamental right to vote and articulate the general elements of alleged crimes, she cites no authority for the proposition that she was justified as a matter of law in taking the actions she did. ECF No. 103 at 40:17–22; ECF No. 76 at 25–45 (failing to offer any authority to support there is (a) an exception to protective orders for reporting what an attorney suspects is evidence of crime to law enforcement; b) an exception for disseminating what an

44

attorney believes is evidence of election interference, or another topic of grave national interest; or c) because attorneys have an obligation to report such evidence of alleged criminal wrongdoing, it would have been improper for her to first seek review in a "civil" court).[23]  Instead, Lambert vaguely claims that her oath to the Constitution as an attorney required her to take the actions she did.  ECF No. 130 at 36:5–13.  When pressed, Lambert's only answer to the Court for failing to cite any relevant authority was simply, and repeatedly, that the fact that her actions are justified is as obvious as the proposition that "water is wet."  ECF No. 103 at 40:7, 46:23, 59:15.  The Court addresses each of her arguments in turn.

### B. Lambert's Disclosures Were Not Limited to Law Enforcement

As an initial point, Lambert's primary justification for her disclosures in violation of the Protective Order turns on she and Byrne having disclosed the documents to "law enforcement" akin to generally reporting evidence of a crime.  ECF No. 103 at 34:17–25.  Lambert cites no authority for this proposition or when such an exception may apply.  This argument is flatly rejected.

Even if Lambert had authority for this argument, it would still not justify her actions. Lambert and Byrne apparently did disclose the documents to some law enforcement officials— Sheriff Dar Leaf and an unnamed Assistant U.S. Attorney—the extent of their disclosures is much broader.  Lambert and Byrne have both publicly disseminated and discussed the documents to advance their theories about the 2020 election.  This includes Lambert submitting an affidavit from Leaf in her *pro se* filing in one of her own criminal cases in Michigan.  Both Lambert and Byrne

---

[23]     Lambert does not cite to any controlling authority in her discussion of the legal standard for disqualification.  ECF No. 76 at 25 (citing cases from the Eleventh, Fifth, Second, and Sixth Circuits).  Lambert repeatedly uses quotation marks or otherwise implies she is directly citing a source without actually citing a source.  *Id.* at 15, 20, 29.

have publicized Leaf's efforts to share the documents widely to non-law enforcement audiences. Accordingly, her argument that she was duty-bound to disclose the documents to law enforcement rings hollow in light of her subsequent actions.

### C. Lambert Fails to Substantiate Her Arguments About Evidence of Crime

Lambert has failed to substantiate any of her conclusory allegations that Dominion's Litigation Documents contain evidence of national security crimes. She has not, for example, pinpointed certain documents and made an argument that they meet the elements of any particular crime. Nor has Lambert explained why, when faced with these documents supposedly reflecting serious crimes of national importance, she chose to disclose them to a single county sheriff in Michigan as opposed to a national law enforcement agency such as the Federal Bureau of Investigation or Department of Justice. To the contrary, Lambert continues to advance these allegations despite being unable to point to any court authority that substantiates them.

Lambert also argues that Dominion is engaging in "honest services fraud" in violation of 18 U.S.C. § 1846. ECF No. 76 at 33. Specifically, she argues that Dominion gets paid for providing voting machines and systems for U.S. elections, but has colluded with foreign nationals to give them access to these elections in "betrayal of public trust" and as part of "a deeper deception that would appear to include honest services fraud." *Id.* at 33. Relatedly, Lambert claims Dominion *may have* engaged in honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. *Id.* at 34 (claiming without authority that Serbia conspired to interfere in elections in Michigan and Pennsylvania). Further, Lambert argues Dominion engaged in a conspiracy to commit an offense against the United States or to defraud the United States, in violation of 18 U.S.C. § 371. *Id.* at 35–36. Per Lambert, Dominion did so by conspiring to impair "lawful government functions," specifically the "regulat[ing] and monitor[ing]" of "participation of

foreign nationals in the American electoral process" and "impairing the requisite 'transparency in the American political process.'" *Id.* at 36 (alteration in original, but citing no source).[24] Beyond her own speculation, Lambert does not substantiate these legal arguments in any way.  And in any event, she still fails to offer any legal support for the proposition that, notwithstanding her alleged discovery of criminal activity, she could unilaterally disregard and bypass the Protective Order.

### D.  Right to Vote Cases Do Not Provide Authority for Lambert's Position

Lambert proclaims that "[n]o constitutional right is more fundamental than the right to vote," but neglects to put forward any evidence for how *her* unilateral actions further that right. *Id.* at 40.  She discusses at length cases that recognize the fundamental right to vote, and there is no dispute that this right is fundamental. *Id.* at 32–45.  But Lambert points to no authority for the proposition that these cases somehow authorize her to violate any court order just because *she* believes she has evidence of a vast criminal attempt to subvert this right. *Id.*

Lambert's principal case, *Ex Parte Yarborough*, does not get her there.  Lambert asserts that *Ex Parte Yarborough* held that "[voting rights] are recognized and justiciable in any forum and in any matter in which they may be properly pled." *Id.* at 32, 40 (citing *Ex parte Yarborough*, 110 U.S. 651, 661–63 (1884) ("[A]ny public inquiry into the deprivation of the fundamental right to vote is actionable, and the judiciary has an express obligation to abide because it has a duty to ensure that the Constitutional rights of American citizens to vote and to have their votes properly

---

[24]    Lambert makes various other arguments without citing any legal authority, including that: 1) the Court should consider Dominion as a state actor, without providing any authority for how Dominion would clear the high bar the Supreme Court has set for such analyses; 2) all Dominion communications should be subject to FOIA; and 3) Dominion CEO John Poulos committed perjury in his testimony before the Michigan Legislature on December 15, 2020.  ECF No. 76 at 37.  On the third point, Lambert claims that "[t]he fact that the voting systems and machines have the capacity to connect to the internet *and* the software was created and engineered by foreign nationals acting in concert with and for Dominion is sufficient in itself to lift the protective order and to allow disclosure of these email communications." *Id.* at 38.

counted are secured.").[25]   *Yarborough* was a habeas action in which the Court recognized Congress's authority to enact criminal laws to punish voter interference, not a case where a private attorney in a civil lawsuit took unilateral action to "expose" confidential documents subject to a protective order. *See Ex parte Yarborough*, 110 U.S. at 662.   Lambert's reliance on the case to support her conduct is unreasonable and borders on frivolous.

Lambert's other right to vote cases are similarly irrelevant to the questions before this Court.   In *Reynolds v. Sims*, the Supreme Court struck down voting districts in Alabama for violating the Equal Protection Clause of the Fourteenth Amendment by not apportioning districts on a population basis. 377 U.S. 533, 583–87 (1964).   In *Yick Wo v. Hopkins*, the Supreme Court recognized that, although it is not enumerated as an express grant in the Constitution, the right to vote is fundamental because it is "preservative of all rights." 118 U.S. 356, 370 (1886).   The Supreme Court has repeatedly affirmed this holding. *See e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).   Again, nothing in these cases excuses Lambert's actions.

Finally, even if Lambert had a valid reason to disclose Dominion's Litigation Documents, she still has offered no viable, let alone meritorious, argument to justify all of her other misconduct. Her purported justifications do not excuse her other violations of the Protective Order, including the fact that she: a) did not notify Dominion of her intent to disclose the documents; b) did not seek Court approval to disclose the documents; c) refused to provide an accounting of the extent of her breach when Dominion requested it; and d) threatened Byrne's document database

---

[25]   In *Yarborough*, seven members of the Ku Klux Klan attacked a Black man to prevent him from exercising his recently-recognized right to vote. 110 U.S. at 657–67. The KKK members were convicted of violating federal laws protecting the right to vote, and they subsequently filed habeas petitions challenging their convictions. *See id.* The Supreme Court rejected the petitioners' arguments, holding that Congress properly acted within its authority to pass criminal penalties for certain conduct interfering with the right to vote. *See id.*

management company with criminal penalties if they impeded her access to the documents. Nor do they address her subsequent misconduct and violations of court orders, despite her repeated assurances to the Court that she understood her obligations and would comply with the Court's orders.

## IV.    **Disqualification**

Because the Court concludes that the Protective Order governed the documents, Lambert repeatedly violated that and other court orders, and that there is no justification for her actions, the Court now considers whether to disqualify Lambert.

### A. Legal Standard

A district court has "wide discretion in the exercise of its duty to supervise members of the bar appearing before it." *Koller*, 737 F. 2d at 1054 (citing *Groper v. Taff*, 717 F.2d 1415, 1418 (D.C. Cir. 1983)); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (discussing the court's longstanding inherent authority to sanction misconduct before it); *United States v. Philip Morris Inc.*, 347 F.3d 951, 955 (D.C. Cir. 2003). "Motions to disqualify are governed by two sources of authority. First . . . the local rules of the court in which they appear . . . Second, because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying the standards developed under federal law." *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008) (internal quotation marks omitted) (citing case law from the Tenth, Fifth, and Eleventh Circuits).

The D.C. Circuit has held that disqualification should be granted rarely absent circumstances in which an attorney's prior representation compromises her ability to zealously represent a current client. *See Koller*, 737 F.2d at 1056. As the Circuit has held, "*[e]xcept in cases of truly egregious misconduct likely to infect future proceedings*, other means less prejudicial to

the client's interest than disqualifying the counsel of [his] choice are ordinarily available to deal with ethical improprieties by counsel." *Id.* (emphasis added). In so stating, the D.C. Circuit cited with approval language in a Second Circuit decision:

> Indeed, we see much wisdom in the view expressed by Judge Mansfield in concurrence:

> 'The attorney is the client's choice. Disqualification is wasteful and time-consuming. Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud. Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.'

*Id.* (citing *Board of Education of New York City v. Nyquist*, 590 F.2d 1241, 1247–48 (2d Cir.1979) (internal quotations omitted).

Although it is rare, the D.C. Circuit has not "*prohibit[ed]*" disqualification outside of the two enumerated circumstances." *Paul*, 571 F. Supp. 2d at 24 (emphasis in original); *see also Koller*, 737 F.2d at 1064 (holding that "questionable activities . . . [that] *do not* clearly violate a disciplinary rule and taint future proceedings" should be remedied by means other than disqualification) (emphasis added).

## B. Disqualification is Warranted

Dominion acknowledges that disqualification is an extraordinary remedy. ECF No. 75 at 21. Dominion argues, however, that disqualification is necessary here because "lesser sanctions will not protect the integrity of this litigation." *Id.* In support, Dominion cites to Lambert's "well-documented historical efforts to obtain and misuse Dominion confidential information, her pattern of disregard for judicial rules, and her willful and ongoing violation of the Protective Order in this case." *Id.* Dominion asserts that Lambert's "truly egregious misconduct . . . has already and will continue to infect this, and frankly, all of Dominion's other proceedings." ECF No. 103 at 5:19–21. According to Dominion, although Lambert's conduct clearly meets the requirements for a

contempt citation—violating a "definite and specific court order" of which the party is aware—contempt is insufficient because Lambert has repeatedly shown she will violate court orders without regard for the consequences. ECF No. 75 at 21–22 (citing *Pigford*, 307 F. Supp. 2d at 55–56). Additionally, Dominion argues that it cannot entrust Lambert with highly sensitive and confidential information that impacts "its business, and the safety of its own employees and our nation's election workers." *Id.* Lambert, on the other hand, has no meaningful response as to what would be appropriate if the Court finds sanctions are warranted. ECF Nos. 76; 97; 106; 111; 117.[26]

There is no question that disqualification is a rare sanction. *See Koller*, 737 F.2d at 1056. This, however, is one of those rare cases where the circumstances of Lambert's misconduct are "truly egregious" such that her continued involvement would "infect future proceedings." *Id.* The Court agrees with Dominion that no lesser sanction will suffice. There are at least five reasons that illustrate why Lambert's conduct meets the high bar for disqualification: 1) Lambert's breach of the Protective Order was intentional, had significant consequences, and was without justification; 2) Lambert has since repeatedly violated court orders and made misrepresentations to the Court; 3) Lambert's prior conduct and admonishment undermines her argument that she acted in good faith and reflects her disregard for the Court's orders and rules; 4) Lambert has not refuted Dominion's argument that if the Court should impose a sanction, disqualification is the most appropriate; and 5) Lambert's conduct has already severely tainted this proceeding and will continue to do so if she remains counsel in this case.

---

[26]    Byrne's first sur-reply raises a new procedural argument that Dominion improperly combined a motion for protective relief and disqualification in a single filing. ECF No. 97. Byrne has no excuse for waiting to raise this until six weeks after Dominion filed its Motion, and not in his first response. Byrne also alleges that Dominion improperly raised certain additional issues *ex parte*, such as the continued impact of Byrne and Lambert's breaches, without Byrne having an opportunity to respond. *Id.* As detailed herein and on the docket for this case, Byrne and Lambert have had ample opportunities to respond to Dominion's assertions.

### 1. Nature and Severity of Lambert's Initial Misconduct

The record is clear that Lambert's initial breach of the Protective Order—disclosing anywhere between thousands and nearly three million of Dominion's Litigation Documents before she even entered her appearance in this case—was massive and intentional. ECF No. 96 at 3 (describing how many documents Dominion has produced in discovery). Most, if not all, of the documents were stamped "Confidential." ECF No. 82 at 20. Lambert was only allowed to access the documents after she signed the Undertaking confirming that she would comply with all provisions of the Protective Order. ECF No. 75-9. Yet she blatantly disregarded this Order and her guarantee that she would comply with it. This is not a case of an inadvertent breach or good faith disclosure; it is unfathomable for Lambert to believe she could do whatever she wanted with Dominion's Litigation Documents. Lambert's actions were intentional and clearly meant to inflict the harm that has resulted. Moreover, there is no dispute that the dissemination of the documents has led to individuals, including Dominion's CEO and employees, facing severe threats.

The Court also notes that this is not a case in which Lambert's conduct could be excused on the grounds that she was engaging in zealous representation of her client within the bounds of the rules and orders governing attorneys in this Court. If anything, it appears she was zealously pursuing her client's goals (and clearly her own goals as well), *outside* those boundaries.

### 2. Lambert's Repeated and Remorseless Misconduct

Even if Lambert's initial actions could be excused in some way, her repeated violations of numerous provisions of the Protective and Status Quo Orders since then demonstrate that the Court cannot trust her to follow orders if she were permitted to remain in this case. Lambert's actions are particularly concerning given her representations—both orally and in writing—that she understood her obligations and would abide by them. The Court has no reason to believe Lambert

when she promises she will comply with the Court's Orders in the future, having already broken this promise repeatedly. *See, e.g.*, ECF No. 103 at 44:18–19 ("I will follow all specific orders that the Court gives."), 45:14–23. Not only does Lambert maintain that she did nothing wrong and that her actions were necessary, she clearly believes that following the Court's Orders and procedures will result in greater harm than proceeding according to her own view of the world:

> If I were to go to the counsel for the criminals and let them know that I believe there is evidence of a crime that I want to report to the police, that could result in a destruction of evidence, criminal actors fleeing, hiding.

*Id.* at 59:15–18. Lambert has even implied that this Court is obstructing her ability to comply with the law, remarking that "[i]f the Court were to rule that I was not able to report criminal acts with ongoing investigations already in place with Congress, law enforcement, prosecutors' offices, *that would be obstruction.*" *Id.* at 39:22–40:1 (emphasis added). Even after being repeatedly warned and promising she would comply with Court orders or seek Court guidance if she had any confusion, Lambert continues to openly disregard court orders. At the May Hearing, Lambert even began to discuss the contents of Dominion's documents that she alleges evidence crime until the Court abruptly stopped her because the courtroom had not been sealed. *Id.* at 37:21–38:13. As noted, after the May Hearing, Lambert continued to make baseless claims about the scope of the Protective Order and allow herself and Byrne to violate the Order repeatedly. ECF No. 106.

This Court has recognized that a "clear violation of . . . the District of Columbia Rules of Professional Conduct" can merit disqualification. *Paul*, 571 F. Supp. 2d at 27.[27] Moreover, this

---

[27] In *Paul*, this Court acknowledged that the D.C. Circuit had not determined whether violation of an ethical rule itself would be sufficient for disqualification, or if the conduct must also somehow "taint" the underlying trial. *Paul*, 571 F. Supp. 2d at 26–27. This question did not impact the Court's outcome in that case because the rule that the attorney violated, Rule 1.9, "creates an irrebuttable presumption that its violation will taint the underlying trial." *Id.* at 26. Here, there is ample evidence that Lambert has violated her ethical obligations *and* that her continued involvement would taint the proceedings moving forward.

Court views intentional violations of its orders as severe misconduct. *Münchener*, 312 F.R.D. at 686–89 (discussing an attorney's egregious misconduct including "knowingly violat[ing] the obligations imposed" in a protective order); *Stone v. U.S. Embassy Tokyo*, Case No. 19-cv-3273, 2021 WL 1110735, at *1–4 (D.D.C. Mar. 23, 2021) (describing how a *pro se* litigant's conduct in intentionally and publicly disclosing provisions of a protected government document and indicating he would not comply with court orders was severe enough to warrant dismissal as a sanction if the case were not already dismissed); *Young v. Office of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 70 (D.D.C. 2003) (concluding that a plaintiff's repeated misconduct in discovery made it "extremely unlikely" that the plaintiff would obey a protective order going forward). Lambert clearly views compliance with Court Orders with which she does not agree as optional, which is incompatible with our judicial system. Allowing Lambert to continue as Byrne's counsel when she has already demonstrated a willingness, if not determination, to do whatever it takes to advance her theories infects this proceeding and jeopardizes this Court's ability to depend on counsel and parties adhering to their rules, obligations, and the law.

### 3. Prior Conduct and Admonishment

Lambert's conduct in her brief time representing Byrne in this litigation is sufficient by itself to warrant the sanction of disqualification. That said, in considering sanctions in other contexts (i.e., Rule 11), this Court has held that it may consider prior instances of misconduct outside of the case before it. *See Atkins v. Fischer*, 232 F.R.D. 116, 121–22, 129–30 (D.D.C. 2005) (internal citations omitted) ("It has long been held that in considering the implementation of sanctions against a party or a counsel to a litigation, a district court may consider all the circumstances surrounding the alleged violation. The totality of the circumstances can include events which did not occur in the case proper but occurred in other cases and are, by their nature, relevant to the pending controversy.").

Although this Court has not answered the same question with respect to questions of disqualification, Lambert herself has referenced her conduct in other proceedings as being relevant to resolving Dominion's Motion. ECF Nos. 76 at 9–10, 24 (arguing that Dominion is engaged in a conspiracy to prevent Lambert from being involved in such cases with others including the Michigan Attorney General); 103 at 32:24–33:3 (claiming that she has "won" every time Dominion and others attack her), 41:19–42:12 (claiming that Dominion is only seeking to disqualify her because of her work on election cases). Despite Lambert's claim that she has "won" every time she encountered any sort of grievance or discipline, the Pennsylvania and Georgia courts' opinions paint a concerning picture of her conduct in those cases nonetheless. ECF No. 103 at 32:24–33:3; *Cnty. of Fulton*, 292 A.3d at 1018–19; *Curling*, 2023 WL 7463462, at *23–24. Both her prior admonishment and conduct in this case cast doubt on Lambert's claim that she "did everything in good faith" and is committed to following Court orders going forward. ECF No. 103 at 46:1–2.

### 4. Lambert's Concessions

"It is well understood in this Circuit that when a [Party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [other Party], a court may treat those arguments that the [Party] failed to address as conceded." *Hopkins v. Women's Div., General Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd* 98 Fed. Appx. 8 (D.C. Cir. 2004). Dominion has put forth a compelling case for why the Court should disqualify Lambert and why lesser sanctions are insufficient. ECF No. 75. Lambert did not address Dominion's arguments about the insufficiency of any lesser sanction beyond disqualification, and she has not otherwise asked the Court to consider any lesser sanction. *Cf.* ECF No. 76.

In fact, Lambert herself has acknowledged that disqualification might be an appropriate sanction. At the May Hearing, while Lambert was assuring the Court that she would come to it first in the future with any questions about the scope of the Court's orders, she noted that if the Court did not disqualify her based on her conduct to date, it could always do so in the future. ECF No. 103 at 49:2–15, 59:20–24 (". . . but the Court needs to understand my mindset was in good faith, and the Court does have the ability to issue sanctions or remove me from the case should I do anything inconsistent moving forward with a Court order."). As set forth above, Lambert continues to violate the Court's Orders to this day and her actions undermine her claim that she has done everything in good faith.

### 5. Lambert's Egregious Misconduct Has and Will Infect These Proceedings

Finally, as discussed extensively in this Memorandum and summarized below, Lambert's conduct has already substantially infected and will continue to infect these proceedings. In her short time as counsel in this case, Lambert has caused exponential harm that cannot be undone. The Court's only meaningful option to mitigate the specific risk of future harm Lambert poses is by removing her from this case.

First, Lambert's conduct has significantly hampered discovery in at least Byrne's specific case, if not also the coordinated/consolidated cases. ECF No. 81 at 5 ("Defendant needs additional time to comply with the discovery scheduling due to the fact that he and undersigned are effectively unable to prepare for depositions and further preparation in light of the Court's current order (Docket No. 77), prohibiting any access to discovery materials and documents produced by Dominion (Dominion Discovery Materials)."). It is remarkable how issues relating to Lambert's misconduct completely subsumed what were supposed to be the final two months of discovery. ECF No. 60 (setting a discovery deadline of May 30, 2024); 06/13/2024 Minute Order (updating

the discovery deadline to September 30, 2024). Lambert did not enter her appearance as Byrne's counsel until March 12, 2024. ECF No. 71. Five days later, this Court entered the Status Quo Order that prevented Lambert and Byrne from accessing Dominion's discovery. ECF No. 77. Since then, Byrne has reportedly been at an "insurmountable disadvantage for the preparation of depositions and further litigation concerning Dominion's claims." ECF No. 81 at 6.

Dominion's counsel has represented that Lambert's continued role in this case has also impacted their ability to zealously represent their client. ECF No. 103 at 20:3–10. Dominion's counsel reports that for "every document [they] produce" and "every person [they] put up for deposition," they have "no good faith reason to believe that the . . . attorney on the other side is going to follow the Court's orders." *Id.* As for the Court, Lambert's conduct has prevented it from considering other discovery issues in the consolidated or coordinated cases, as it has had to first address Lambert and Byrne's continuing violations of the Court's Orders. The Court has now held two multi-hour hearings and reviewed over 2,500 pages of briefs and exhibits related to the violations of the Protective and Status Quo Orders and Lambert's other misconduct. *See* ECF Nos. 75; 76; 78; 81; 82; 84; 85; 90; 92; 93; 94; 95; 96; 97; 98; 99; 100; 101; 102; 103; 105; 106; 108; 110; 111; 112; 113; 114; 116; 117.[28]

Second, Lambert refuses to take any responsibility for her client repeatedly violating court orders. For example, the Court does not know the contents of a video Byrne posted to a social media platform on April 3, 2024 because Lambert directed Byrne to take down the video and did preserve a copy pursuant to the Status Quo Order and her obligations as his counsel. ECF No. 103

---

[28]    This list is nowhere near exhaustive. For example, the Court does not include ECF No. 86 or ECF No. 87, which are prior motions that Lambert, on behalf of Byrne, erroneously filed and the Court rejected for failing to comply withs the Local and Federal Rules. Nor does it include other docket entries that the Court considered in the *Lindell* litigation. *See e.g.*, ECF Nos. 145; 147; 149; 152; 153; 154; 155; 156 in Case No. 21-cv-445.

at 47:2–48:10. Lambert stated that she only saw part of the video, so she could not answer

questions about whether Byrne discussed Dominion's documents in the video. *Id.* She represented

that, from the portions she did see, Byrne "was addressing that he wanted to comply with what the

Court is ordering and that he believed that we hadn't done anything wrong." *Id.* It is difficult to

fathom how, if that was the extent of Byrne's video, Lambert would feel the need to advise her

client to remove it from public view and fail to keep a copy. When asked about other social media

posts, Lambert remarked:

> [M]y client posts frequently about many, many topics. I do not have time, nor do I
> want to bill him for babysitting his social media.

*Id.* at 48:6–10. Indeed, the day after the May Hearing at which Byrne expressly affirmed that he

understood and would comply with the requirements in the Protective and Status Quo Orders, he

again violated these orders by sharing social media posts that included Dominion's Litigation

Documents. *Id.* at 61:23–25 ("THE COURT: And are you prepared to comply with [the Orders],

sir? MR. BYRNE: Yes."); ECF No. 105.

Byrne has made clear he has no intention of following this Court's orders and Lambert has

made clear she does not feel responsible for ensuring he does so. On April 2, 2024, the day before

he posted the video that he later deleted, Byrne said the following in another video on X:

> It's absolutely incorrect, Judge, to tell us we have to honor that agreement to keep
> these crimes secret. And I'm telling you here, and Judge, with all due respect, you
> decide what you want. *We're giving you the honor this time of going through the
> steps that Stefanie evidently was supposed to do last time. But there's no chance
> in hell I'm not going to make this public.*
>
> This is crazy, what we have. We got to go through all this Kibuki dance. But we
> are giving him the respect this time of allowing him the opportunity to unseal this.
> *But I'm affirmatively saying, I don't care. I have it now. I have it on my machine.*
> I'm not in the country. This stuff doesn't get unsealed, *I'm just going to make it
> public.* You can throw me in jail. Because we know we're right, and you're
> covering up if you don't let this – the whole nation hinges on this. You obviously
> have a duty, Your Honor, to unseal this Dominion case. And *I'm going to do it*

> *anyway if you make the wrong decision and you throw me in prison.* And I mean that.

ECF No. 102-3 at 11 (emphasis added). Byrne added:

> *I'm going to make this stuff public.* So I hope you make the right decision, but I'm not going to keep this quiet. I'm going to give you time to make the right decision. And if you make the wrong decision, I'm just going to do the right thing anyway and you throw me in jail. Fuck you . . . I shouldn't say fuck you to a judge . . . but I'm saying fuck you to the judicial system.

*Id.* (emphasis added). Lambert's refusal to ensure her client's compliance with the Court's Orders will no doubt continue to disrupt these proceedings.

Third, permitting Lambert to remain Byrne's counsel would both minimize the severe consequences of their actions and risk continued harm. Byrne—with Lambert's support—has made expressly clear that he plans to follow through on his promise to do whatever it takes, including risking jail time, to disseminate Dominion's Litigation Documents. *Id.*; ECF Nos. 105; 106. Byrne and Lambert's acts have not only fueled theories of widescale election fraud and crime—which Dominion describes as xenophobic for being purely based on Dominion's employment of Serbians—they have resulted in real harm and threats to Dominion employees. ECF Nos. 75; 82; 108; 113. Byrne and Lambert were on notice that their actions could result in harm, as that is part of Dominion's underlying suit against Byrne. It was abundantly foreseeable that similar statements to those at issue in the Complaint could lead to similar results.

Finally, the reasoning behind the D.C. Circuit's high bar for disqualification due to egregious misconduct would lead to an untenable result if Lambert were permitted to remain counsel here. The main justification for limiting disqualification to extreme circumstances (absent conflicts of interest) is our system's recognition of the importance of litigants being able to choose their counsel. This principle cannot mean that courts must protect such a choice that is based on the counsel's willingness to engage in such egregious misconduct or to facilitate their client's

similarly extreme and egregious misconduct. *See* ECF No. 75-3 ("My client insisted the evidence of criminal acts be provided to law enforcement.").[29]

Dominion has raised a plausible narrative that Lambert became involved in this litigation so that she could gain access to Dominion's documents and use them for improper purposes. ECF No. 75 at 3, 21–22. After thoroughly reviewing Lambert's conduct, responses, and representations to this Court, the Court does not disagree. It is undisputed that Lambert entered the case without giving notice for months, gained access to Dominion's documents, shared the documents with Leaf and used them in her own criminal case while hiding these actions from even McGlinchey, all before she entered her formal appearance. Lambert has failed at every opportunity to show the Court that she will act in accordance with its rules and requirements.

Lambert's conduct in the past few weeks continues to exacerbate this concern. At best, Lambert failed to inform the Court and Dominion that Case, another attorney, had access to Dominion's Litigation Documents and, at some point, became involved in this litigation. ECF No. 113. This failure is severe, as the Court clearly and repeatedly prohibited Lambert from sharing Dominion's Litigation Documents with anyone else, and at the very least required her to inform the Court if anyone else gained access to the documents. But even more troubling, Dominion has put forth another plausible narrative that Lambert and Case have orchestrated a series of new moves to disseminate Dominion's Litigation Documents and other discovery publicly in contravention of this Court's orders. ECF Nos. 108; 113. According to Dominion, Lambert has clearly enabled Case to access Dominion's Litigation Documents and Case seeks to use the documents outside this litigation. ECF Nos. 113 at 3–7; 113-4 at 3. But even more concerningly,

---

[29]    *See also In re BellSouth Corp.*, 334 F.3d 941, 946–47 (11th Cir. 2003) (rejecting a mandamus petition to review a disqualification ruling as not immediately appealable when a court disqualified counsel for "act[ing] with the purpose of forcing [a judge] to disqualify" himself).

Lambert and Case now seek to publicly release Poulos' deposition—which is not yet, as far as the Court is aware, publicly available. ECF Nos. 108 at 2–10; 113 at 3–7; 116 at 25. Dominion's well-founded concern about Lambert's continued involvement in this litigation was that she would find other ways to circumvent Court orders. It now appears that is exactly what she has done. Lambert has no response to this theory. ECF Nos. 111, 117.

Despite that no party, particularly Lambert, has made any meaningful argument in favor of lesser sanctions, the Court has considered whether there is an available sanction less severe than disqualification that could mitigate the harm Lambert has and continues to inflict on the judicial process. As set forth above, however, no order, rule, warning or prohibition has stopped her misconduct in this case. For example, after the period of time following the Status Quo Order, she could have complied strictly with both Orders and given the Court *some* faith that she would cease her misconduct. Instead, she continued to violate the Orders, put forth baseless arguments to excuse Byrne's continued flagrant misconduct, and create fire drills for Dominion and the Court by refusing to be forthright with the Court.

The bottom line is that, in her short time as counsel, Lambert has repeatedly shown that she has no regard for orders or her obligations as an attorney before this Court. *See e.g.*, ECF Nos. 103 at 40:6–14 ("I have an obligation to report criminal acts that I reviewed in this discovery that are black and white and clear. I can see fraud of services in these documents. I can see conspiracy in these documents."); 106. Lambert's blatant disregard for this Court and her obligations is unending; her actions have already severely infected this proceeding. There is no doubt that they would continue to do so if she were permitted to remain counsel in this case.[30] This Court cannot

---

[30]     As noted, in the past two weeks Dominion sought leave to file two additional supplements detailing even more incidents of alleged misconduct by Lambert, highly concerning remarks from Byrne, and efforts to use Dominion's Litigation Documents in the Peters Criminal Case. ECF

allow such intentional, dangerous, and relentless misconduct to continue.  Lambert is immediately

disqualified from serving as counsel in this case.

## CONCLUSION

For the foregoing reasons, Dominion's Motion is **GRANTED**.

Date: August 13, 2024

_M. A. Upah_
_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

---

Nos. 118; 122.  The Court appreciates efforts to supplement as the Court previously requested, but
it resolves this Motion without addressing these latest incidents because it appears that any other
approach will only continue the cycle of alleged misconduct while this Motion is pending.

# EXHIBIT 1-I

 An official website of the United States government  Here's how you know

**CYBERSECURITY & INFRASTRUCTURE </> SECURITY AGENCY**

**Menu**

*America's Cyber Defense Agency*

NATIONAL COORDINATOR FOR CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**SHARE:**

ICS ADVISORY

# Vulnerabilities Affecting Dominion Voting Systems ImageCast X

**Last Revised:**  June 03, 2022        **Alert Code:**  ICSA-22-154-01

# 1. SUMMARY

This advisory identifies vulnerabilities affecting versions of the Dominion Voting Systems Democracy Suite ImageCast X, which is an in-person voting system used to allow voters to mark their ballot. The ImageCast X can be configured to allow a voter to produce a paper record or to record votes electronically. While these vulnerabilities present risks that should be mitigated as soon as possible, CISA has no evidence that these vulnerabilities have been exploited in any elections.

Exploitation of these vulnerabilities would require physical access to individual ImageCast X devices, access to the Election Management System (EMS), or the ability to modify files before they are uploaded to ImageCast X devices. Jurisdictions can prevent and/or detect the exploitation of these vulnerabilities by diligently applying the mitigations recommended in this advisory, including technical, physical, and operational controls that limit unauthorized access or manipulation of voting systems. Many of these mitigations are already typically standard practice in jurisdictions where these devices are in use and can be enhanced to further guard against exploitation of these vulnerabilities.

# 2. TECHNICAL DETAILS

## 2.1 AFFECTED PRODUCTS

The following versions of the Dominion Voting Systems ImageCast X software are known to be affected (other versions were not able to be tested):

- ImageCast X firmware based on Android 5.1, as used in Dominion Democracy Suite Voting System Version 5.5-A

- ImageCast X application Versions 5.5.10.30 and 5.5.10.32, as used in Dominion Democracy Suite Voting System Version 5.5-A

  - **NOTE:** After following the vendor's procedure to upgrade the ImageCast X from Version 5.5.10.30 to 5.5.10.32, or after performing other Android administrative actions, the ImageCast X may be left in a configuration that could allow an attacker who can attach an external input device to escalate privileges and/or install malicious code. Instructions to check for and mitigate this condition are available from Dominion Voting Systems.

Any jurisdictions running ImageCast X are encouraged to contact Dominion Voting Systems to understand the vulnerability status of their specific implementation.

## 2.2 VULNERABILITY OVERVIEW

**NOTE:** Mitigations to reduce the risk of exploitation of these vulnerabilities can be found in Section 3 of this document.

### 2.2.1   IMPROPER VERIFICATION OF CRYPTOGRAPHIC SIGNATURE CWE-347 <https://cwe.mitre.org/data/definitions/347.html>

The tested version of ImageCast X does not validate application signatures to a trusted root certificate. Use of a trusted root certificate ensures software installed on a device is traceable to, or verifiable against, a cryptographic key provided by the manufacturer to detect tampering. An attacker could leverage this vulnerability to install malicious code, which could also be spread to other vulnerable ImageCast X devices via removable media.

CVE-2022-1739 has been assigned to this vulnerability.

### 2.2.2   MUTABLE ATTESTATION OR MEASUREMENT REPORTING DATA CWE-1283 <https://cwe.mitre.org/data/definitions/1283.html>

The tested version of ImageCast X's on-screen application hash display feature, audit log export, and application export functionality rely on self-attestation mechanisms. An attacker could leverage this vulnerability to disguise malicious applications on a device.

CVE-2022-1740 has been assigned to this vulnerability.

### 2.2.3   HIDDEN FUNCTIONALITY CWE-912

<https://cwe.mitre.org/data/definitions/912.html>

The tested version of ImageCast X has a Terminal Emulator application which could be leveraged by an attacker to gain elevated privileges on a device and/or install malicious code.

CVE-2022-1741 has been assigned to this vulnerability.

### 2.2.4   IMPROPER PROTECTION OF ALTERNATE PATH CWE-424

<https://cwe.mitre.org/data/definitions/424.html>

The tested version of ImageCast X allows for rebooting into Android Safe Mode, which allows an attacker to directly access the operating system. An attacker could leverage this vulnerability to escalate privileges on a device and/or install malicious code.

CVE-2022-1742 has been assigned to this vulnerability.

### 2.2.5   PATH TRAVERSAL: '../FILEDIR' CWE-24

<https://cwe.mitre.org/data/definitions/24.html>

The tested version of ImageCast X can be manipulated to cause arbitrary code execution by specially crafted election definition files. An attacker could leverage this vulnerability to spread malicious code to ImageCast X devices from the EMS.

CVE-2022-1743 has been assigned to this vulnerability.

## 2.2.6   EXECUTION WITH UNNECESSARY PRIVILEGES CWE-250

<https://cwe.mitre.org/data/definitions/250.html>

Applications on the tested version of ImageCast X can execute code with elevated privileges by exploiting a system level service. An attacker could leverage this vulnerability to escalate privileges on a device and/or install malicious code.

CVE-2022-1744 has been assigned to this vulnerability.

## 2.2.7   AUTHENTICATION BYPASS BY SPOOFING CWE-290

<https://cwe.mitre.org/data/definitions/290.html>

The authentication mechanism used by technicians on the tested version of ImageCast X is susceptible to forgery. An attacker with physical access may use this to gain administrative privileges on a device and install malicious code or perform arbitrary administrative actions.

CVE-2022-1745 has been assigned to this vulnerability.

## 2.2.8   INCORRECT PRIVILEGE ASSIGNMENT CWE-266

<https://cwe.mitre.org/data/definitions/266.html>

The authentication mechanism used by poll workers to administer voting using the tested version of ImageCast X can expose cryptographic secrets used to protect election information. An attacker could leverage this vulnerability to gain access to sensitive information and perform privileged actions, potentially affecting other election equipment.

CVE-2022-1746 has been assigned to this vulnerability.

## 2.2.9   ORIGIN VALIDATION ERROR CWE-346

<https://cwe.mitre.org/data/definitions/346.html>

The authentication mechanism used by voters to activate a voting session on the tested version of ImageCast X is susceptible to forgery. An attacker could leverage this vulnerability to print an arbitrary number of ballots without authorization.

CVE-2022-1747 has been assigned to this vulnerability.

# 2.3 BACKGROUND

- **CRITICAL INFRASTRUCTURE SECTORS** Government Facilities / Election Infrastructure
- **COUNTRIES/AREAS DEPLOYED:** Multiple
- **COMPANY HEADQUARTERS LOCATION:** Denver, Colorado

# 2.4 RESEARCHER

J. Alex Halderman, University of Michigan, and Drew Springall, Auburn University, reported these vulnerabilities to CISA.

# 3. MITIGATIONS

CISA recommends election officials continue to take and further enhance defensive measures to reduce the risk of exploitation of these vulnerabilities. Specifically, for each election, election officials should:

- Contact Dominion Voting Systems to determine which software and/or firmware updates need to be applied. Dominion Voting Systems reports to CISA that the above vulnerabilities have been addressed in subsequent software versions.

- Ensure all affected devices are physically protected before, during, and after voting.

- Ensure compliance with chain of custody procedures throughout the election cycle.

- Ensure that ImageCast X and the Election Management System (EMS) are not connected to any external (i.e., Internet accessible) networks.

- Ensure carefully selected protective and detective physical security measures (for example, locks and tamper-evident seals) are implemented on all affected devices, including on connected devices such as printers and connecting cables.

- Close any background application windows on each ImageCast X device.

- Use read-only media to update software or install files onto ImageCast X devices.

- Use separate, unique passcodes for each poll worker card.

- Ensure all ImageCast X devices are subjected to rigorous pre- and post-election testing.

- Disable the "Unify Tabulator Security Keys" feature on the election management system and ensure new cryptographic keys are used for each election.

- As recommended by Dominion Voting Systems, use the supplemental method to validate hashes on applications, audit log exports, and application exports.

- Encourage voters to verify the human-readable votes on printout.

- Conduct rigorous post-election tabulation audits of the human-readable portions of physical ballots and paper records, to include reviewing ballot chain of custody and conducting voter/ballot reconciliation procedures. These activities are especially crucial to detect attacks where the listed vulnerabilities are exploited such that a barcode is manipulated to be tabulated inconsistently with the human-readable portion of the paper ballot. (**NOTE:** If states and jurisdictions so choose, the ImageCast X provides the configuration option to produce ballots that do not print barcodes for tabulation.)

This product is provided subject to this Notification </notification> and this Privacy & Use </privacy-policy> policy.

# Vendor

Dominion Voting Systems

# Please share your thoughts

We recently updated our anonymous product survey; we'd welcome your feedback.

# Related Advisories

**MAY 02, 2024**   **ICS ADVISORY | ICSA-24-123-01**

## CyberPower PowerPanel

</news-events/ics-advisories/icsa-24-123-01>

**MAY 02, 2024**   **ICS ADVISORY | ICSA-24-123-02**

## Delta Electronics DIAEnergie

</news-events/ics-advisories/icsa-24-123-02>

**APR 30, 2024**   **ICS ADVISORY | ICSA-24-121-01**

## Delta Electronics CNCSoft-G2 DOPSoft </news-events/ics-advisories/icsa-24-121-01>

**APR 25, 2024**   **ICS ADVISORY | ICSA-24-116-02**

## Hitachi Energy MACH SCM

</news-events/ics-advisories/icsa-24-116-02>

Return to top

**Topics** </topics>   **Spotlight** </spotlight>   **Resources & Tools** </resources-tools>

**News & Events** </news-events>   **Careers** </careers>   **About** </about>

**CISA Central**

1-844-Say-CISA        SayCISA@cisa.dhs.gov

CISA.gov

An official website of the U.S. Department of Homeland Security

| | | |
|---|---|---|
| About CISA </about> | Accessibility </accessibility> | Budget and Performance <https://www.dhs.gov/performance-financial-reports> |
| DHS.gov <https://www.dhs.gov> | FOIA Requests <https://www.dhs.gov/foia> | No FEAR Act </cisa-no-fear-act-reporting> |
| Office of Inspector General <https://www.oig.dhs.gov/> | Privacy Policy </privacy-policy> | Subscribe |
| The White House <https://www.whitehouse.gov/> | USA.gov <https://www.usa.gov/> | Website Feedback </forms/feedback> |