UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. ALEX HALDERMAN,

               Plaintiff,               Case Number 24-51057

v.                                               Honorable David M. Lawson

HERRING NETWORKS, INC., CHARLES
HERRING, ROBERT HERRING, SR., and
CHANEL RION,

               Defendants.
_____/

**OPINION AND ORDER GRANTING MOTION TO QUASH
OR MODIFY NON-PARTY SUBPOENA**

In the aftermath of the 2020 presidential election, certain news outlets made demonstrably false statements about the integrity of certain voting equipment systems and their accuracy of tallying votes correctly. Those statements led to various defamation lawsuits, at least one of them now pending in the United States District Court for the District of Columbia. *See U.S. Dominion, Inc. v. Herring Networks, Inc.*, No. 21-02130 (D.D.C.). Plaintiff J. Alex Halderman, a resident of Washtenaw County, Michigan and an election security expert who has investigated and written about the safety and security of voting machines, was subpoenaed by the Herring Network defendants here to testify at a deposition scheduled in the D.C. District Court case. Arguing that the defendants are attempting to conscript him as an expert witness — involuntarily and without pay — Dr. Halderman has moved to quash the subpoena. He also says that his anticipated testimony would trench upon a protective order issued by another federal court in separate election-related litigation. Finally, Dr. Halderman contends that compelling his testimony would be unduly burdensome. The defendants insist that Dr. Halderman is a fact witness, and that is the only basis upon which they seek his deposition. Fact witnesses, they say, have no right to refuse to testify.

It is apparent that Dr. Halderman possesses specialized knowledge that qualifies him as an expert in election cybersecurity, and that he no doubt can contribute relevant information to the underlying lawsuit. But it is equally apparent that he acquired that information through investigations that he was hired in other matters to perform in his expert capacity, and by his own research, not as a first-hand observer. And his more pointed testimony would be in the form of opinions formulated on the results of his investigations. Expert witnesses cannot be compelled to share such information involuntarily. And none of the exceptions to this general proposition can be found in this case. The motion to quash the subpoena will be granted.

I.

The present dispute has its origins in conspiracy theories that affected the nation's political discourse in the wake of the 2020 election. On August 10, 2021, Dominion Voting Systems, Inc. and its related companies, which sell voting equipment to numerous states and municipalities, filed the underlying case in the United States District Court for the District of Columbia, pleading a single count of defamation *per se* against defendants Herring Networks, Inc., Charles Herring, Robert Herring, Sr., Chanel Rion, and Christina Bobb, seeking more than $1 billion in damages. Around the same time, Dominion filed similar lawsuits against other individuals and entities who allegedly made defamatory statements about its business, including Sidney Powell, Mike Lindell, Patrick Byrne, and Rudolph Guiliani. *See US Dominion, Inc. v. Powell*, No. 21-00040 (D.D.C), *US Dominion, Inc. v. My Pillow, Inc.*, No. 21-00445 (D.D.C), *US Dominion, Inc. v. Byrne*, No. 21-02131 (D.D.C), *US Dominion, Inc. v. Giuliani*, No. 21-00213 (D.D.C). The cases have been consolidated for discovery.

The defendants contend that Alex Halderman has knowledge about the information and misinformation that the defendants allegedly disseminated, and they want to see if what he knows

may help their defense. Dr. Halderman filed a motion in this Court to quash the deposition subpoena on September 10, 2024. He is the Bredt Family Professor of Computer Science and Engineering, the director of the Center for Computer Security and Society, and the director of the Software Systems Laboratory at the University of Michigan, where he has been on faculty since 2009. Halderman decl. ¶ 1, ECF No. 1-2, PageID.400. He is a noted researcher on election cybersecurity and has published widely on security issues affecting electronic voting systems used by American states and other countries. *Ibid.* His work extends beyond the classroom: he serves as co-chair of Michigan's Election Security Advisory Commission and has been retained as an expert witness in multiple lawsuits related to Dominion voting equipment, including by the Michigan Attorney General in *Bailey v. Antrim County*, No. 2020-009238-CZ (Antrim Circuit Court) to investigate errors in the County's November 2020 election night results, and by certain plaintiffs in *Curling v. Raffensperger*, No. 17-2989 (N.D. Ga.) ("Curling"), which challenges the constitutionality of Georgia's election system on security grounds. *Id.* ¶¶ 2-3. He also serves as a testifying expert for Dr. Eric Coomer, Dominion's former director of product strategy and security, in defamation lawsuits pending in Colorado. *Id.* ¶ 4.

Herring Networks owns OAN, a cable news company, which also maintains an online presence at OANN.com. Robert Herring is the CEO of OAN, and his son, Charles Herring is the president of the network. Rion is the network's chief White House correspondent; Bobb is the former host of the network's "Weekly Briefing" program. In their answer to the complaint, the defendants assert, among other things, that their statements were true or substantially true and that the statements did not cause the plaintiff's damages. Ans. ¶¶ 82, 88.

Discovery in any lawsuit is governed by Civil Rule 26(b), which permits "[p]arties [to] obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense

and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Since relevance is the north star, it is useful to review the allegations in the pleadings to see what this case is about.

The events surrounding the 2020 election night vote tabulation in Antrim County are one flashpoint in the underlying litigation. Dominion alleges that defendants Byrne and Guiliani participated in efforts to create a "forensic report" falsely accusing Dominion of switching votes in Antrim County to Joe Biden from Donald Trump. Compl. ¶ 41. According to Dominion, the reality is more banal. It alleges that Michigan officials attributed the erroneous reporting to an error on the part of the county clerk, not an equipment or software malfunction. *Id.* ¶ 77. However, on November 21, 2020, OAN aired a 30-minute special titled "Dominion-izing the Vote." *Id.* ¶ 132. During the special, OAN's Chanel Rion stated that "Dominion captured headlines when it was discovered it had glitched 6,000 votes, giving Biden a fraudulent win. This was not an isolated event." *Ibid.* On December 16, 2020, OAN aired a segment relying, in part, on a report produced by researcher Russell Ramsland making more claims about Antrim County, which should have been regarded as flawed based on information publicly available since November 7, 2020. *Id.* ¶¶ 162-63. Ramsland maintained that his team performed a "forensic duplication of the Antrim County Election Management Server running Dominion Democracy Suite 5.5.3-002." *Id.* ¶ 165. But this "research" was beset by issues. According to Dominion, there is no Democracy Suite 5.5.3-002; Ramsland appeared to refer to the ImageCast Precinct machine, which tabulates and stores paper ballots, not the election management software. *Ibid.* The report also falsely asserted that "adjudication log entries" were missing and were "manually removed," but the County had never purchased, used, or possessed adjudication software, so no log entries ever existed. *Id.* ¶ 166. The same day Ramsland released his "report," Michigan Attorney General

Dana Nessel and Secretary of State Jocelyn Benson released a press statement confirming that the report contained falsehoods, but OAN still spread the false information three days later. *Id.* ¶ 167.

On December 16, 2020, President Donald Trump tagged OAN in a tweet asserting that "Dominion Machines shifted 2-3% of Trump votes to Biden. Far More votes than needed to sway election"; OAN retweeted the statement the next day. *Id.* ¶ 169. On December 18, 2020, Dominion sent a retraction demand letter to OAN, which, among other things, outlined the flaws and lies in Ramsland's Antrim County report. *Id.* ¶ 171. OAN did not respond to the letter and in fact rebroadcast its "Dominion-izing the Vote" segment the next day. *Id.* ¶ 173. Dominion sent another retraction demand, but OAN persisted; employee Patrick Hussion asserted that "recent forensic audits found Dominion voting machines were programmed to give Joe Biden an automatic advantage over any number of Trump votes," and OAN rebroadcast a clip of a press conference led by Rudolph Giuliani where he stated that Dominion's voting machines were programmed "to give somewhere between a 2 and 5 percent advantage" to Joe Biden. *Id.* ¶ 177. On December 24, 2020, Dominion received a letter from OAN declining to engage on the falsity of its reports, *id.* ¶ 179, but OAN continued to publish various broadcasts accusing Dominion of election fraud, *id.* ¶ 182. These broadcasts included a February 2021 program produced by Mike Lindell detailing the Ramsland report about Antrim County. *Id.* ¶¶ 200, 207. Among other things, the program stated that 7,060 votes were "flipped from Trump to Biden . . . by the machines." *Id.* ¶ 213. Dominion also sent similar retraction letters to Christina Bobb. *Id.* ¶ 229. OAN and its associates' reports about Antrim County also later were contradicted by the Michigan Senate Oversight Committee's report determining that there had been no flaws. *Id.* ¶ 252. The complaint lists numerous other examples of false statements related to the Antrim County results. Dr. Halderman was retained by the Michigan Attorney General to investigate the reporting problems in Antrim County and produced a report on March 26, 2021, outlining his finding that "[a]tlthough vulnerabilities in election technology are well documented . . .,

the Antrim County incident was not caused by a security breach." J. Alex Halderman, *Analysis of the Antrim County, Michigan November 2020 Election Incident* 3 (March 26, 2021).

Another flashpoint is Dr. Halderman's work on behalf of the plaintiffs in the *Curling* litigation pending in the Northern District of Georgia. There, months before the November 2020 election, he conducted security research on Dominion equipment under the auspices of the Georgia court, subject to strict confidentiality protocols. Halderman decl. ¶ 9, ECF No. 1-2, PageID.403. He identified several vulnerabilities and testified about his findings at a closed hearing in September 2020. He also submitted a final expert report on July 1, 2021. This report only was unsealed in a redacted format in June of 2023. *Ibid.* Dr. Halderman states that his research uncovered no evidence that any of the vulnerabilities he located actually were exploited to affect any elections. *Id.* at ¶ 10.

The defendants noticed Dr. Halderman's deposition for September 25, 2024, although they had begun efforts to seek documents and testimony from him in May 2024. On September 10, 2024, Dr. Halderman filed the present motion to quash or modify the non-party subpoena. ECF No. 1. On September 16, 2024, the Court issued a temporary protective order suspending the scheduled deposition. ECF No. 2. The litigation in the D.C. District Court has been pending since August of 2021. It appears that that the discovery period concluded on December 13, 2024. ECF No. 218, No. 21-02130, (D.D.C).

The Court originally set a hearing on the plaintiff's motion for October 24, 2024, but the hearing was adjourned at the parties' request until November 13, 2024. On October 28, 2024, the Court denied the defendants' motion to for leave to file their response brief under seal; the defendants therefore filed an updated response brief on October 30, 2024. *See* E.D. Mich. LR 5.3(b)(3)(C)(iii)(2).

II.

Dr. Halderman presents three main arguments supporting his request to quash the deposition subpoena. First, he says that testifying under the subpoena would be unduly burdensome because the defendants in the underlying case are likely to seek information that might infringe on his confidentiality obligations in *Curling v. Raffensperger*, No. 17-02989 (N.D. Ga.), and to other courts. Second, he suggests that he has no information that would be relevant to the underlying dispute, because his opinions on the presence or absence of vulnerabilities in Dominion's systems have no bearing on the truth or falsity of the defendants' alleged defamatory statements that Dominion *caused* the exploitation of those vulnerabilities. And last, he objects that the deposition seeks free expert testimony by treating him as a fact witness, which he is not.

The defendants respond that a deposition would not unduly burden Dr. Halderman because he routinely speaks publicly about his work, there is no general right for a witness to decline to testify to confidential matters, the Court cannot assess the propriety of his claim of confidentiality absent the context of specific questions, and the protective order in the D.C. litigation addresses his concerns. They also dispute that Dr. Halderman is an unretained expert, arguing instead that he is a percipient fact witness. They point to the fact that he is quoted in one of their allegedly defamatory broadcasts stating that individuals like him could hack into Dominion's electronic voting systems; in private correspondence immediately following the tabulation incident in Antrim County, he surmised that the incorrect report was due to a "software defect," and he later analyzed the incident as a consultant for the state; and in the *Curling v. Raffensperger* litigation in the Northern District of Georgia, he signed a declaration concluding that, based on his examination, the Dominion system in use "contains multiple severe security flaws" that could be exploited by attackers. The defendants say that they seek Dr. Halderman's "factual knowledge" about

Dominion's electronic voting systems and his knowledge underlying public statements he made around the 2020 election. His testimony, they submit, would be relevant to their "substantial truth" defense and damages.

Parties seeking to compel a reluctant witness to give testimony frequently turn to the famous bromide penned by Dean Wigmore that "the public . . . has a right to every man's evidence." 8 J. Wigmore, Evidence § 2192, p. 64 (3d ed. 1940). Nevertheless, "[c]ertain exemptions from attending or, having attended, giving testimony are recognized by all courts." *United States v. Bryan*, 339 U.S. 323, 331 (1950). Some of those exemptions have been codified in the Rules of Civil Procedure. There is the limitation on the scope of discovery in Rule 26(b), mentioned above. And there are several conditions set forth in Rule 45, which governs subpoenas. For one, the party seeking a subpoena "must take reasonable steps to avoid imposing undue burden or expense." Fed. R. Civ. P. 45(d)(1). Also, the party seeking the testimony must allow the witness "a reasonable time to comply" with the subpoena, may not require the witness to appear "beyond [certain] geographical limits," and cannot "require[] disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(i)-(iii). Most relevant here, the court may quash or modify a subpoena that requires "disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B). The Court believes that this last provision governs the present dispute.

Dr. Halderman's contention that the subpoena poses an undue burden is founded on his concern that responding to the defendants' questions during the deposition would expose him to the risk of violating protective orders governing the release of confidential information in various cases in which he has been retained as a witness, including in Georgia, Michigan, Colorado, and

the District of Columbia. He says that the defendants' assurances that they will avoid certain topics are insufficient because it would be difficult for him to determine during live testimony whether his answer might violate his obligations to another court. But those concerns would not require a wholesale quashing of the subpoena. Dr. Halderman's publicly available report detailing his research in the *Curling* matter, which is the main focus of his concern, spans approximately 96 pages and appears to contain approximately 20 redactions in total, many of which consist of only a few words. *See* ECF No. 1681, *Curling v. Raffensperger*, No. 17-02989 (N.D. Ga.). Most of the redactions appear intended to hide especially sensitive, highly technical information about Dominion's software, like filenames and formulas, which a malevolent actor could use to recreate Dr. Halderman's findings. It seems altogether unlikely that a potential deposition in this defamation case would get into that granular level of detail. Moreover, "a confidentiality agreement does not make material 'protected matter' for purposes of Rule 45," *Fusion Elite All Stars v. Varsity Brands, LLC*, 340 F.R.D. 255, 262 (W.D. Tenn. 2022); *see also In re Application of O'Keeffe*, No. 14-01518, 2016 WL 2771697, at *4 (D. Nev. April 4, 2016) (collecting cases holding that "a general interest in protecting confidentiality does not equate to privilege"), although a protective order issued by another court deserves respect.

Dr. Halderman's relevancy arguments likewise are unpersuasive. True, it is the party seeking discovery who must demonstrate relevance. *Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 309-10 (W.D. Tenn. 2008) (citing *Allen v. Howmedica Leibinger*, 190 F.R.D. 518, 522 (W.D. Tenn. 1999)). But "relevance, for purposes of discovery, is an extremely broad concept," *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004) (citations omitted), which presents a "relatively low threshold," *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) (citing *Zyprexa Injunction*, 474 F. Supp. 2d 385, 421 (E.D.N.Y. 2007). Dr. Halderman's

research and investigation in other cases apparently has generated information upon which he has based his opinions that Dominion's vote tallying systems are vulnerable to hacking by malicious actors. Certainly, that conclusion does not validate the defendants' assertions that votes were flipped in the 2020 presidential election. But proof that election fraud was *possible* can make the ultimate consequential act more likely than not. *See* Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact . . . of consequence in determining the action . . . more or less probable than it would be without the evidence.") (cleaned up). Similarly, as the defendants point out, if Dr. Halderman's opinions about back doors in Dominion's election software code circulated in the public sphere, any damage to Dominion's business reputation could be attributable to that source instead of the defendants' defamatory statements.

Dr. Halderman's most compelling argument is that the defendants' deposition subpoena impermissibly would require him to give uncompensated expert testimony. Rule 45(d)(3)(B)(ii) prohibits that. The defendants could avoid the strictures of that rule if they could show that the expected testimony "describe[s] specific occurrences in dispute," *ibid.*, it did not involve expert entanglement and was in actuality fact testimony, or "a substantial need for the testimony or material that cannot be otherwise met without undue hardship," Fed. R. Civ. P. 45(d)(3)(C). The defendants have come up short on each of these arguments.

Rule 45's bar against subpoenas compelling unretained expert testimony "was designed to provide 'appropriate protection for the intellectual property of the non-party witness' because 'compulsion to give evidence may threaten the intellectual property of experts denied the opportunity to bargain for the value of their services.'" *Erdman Co. v. Phoenix Land & Acquisition, LLC*, No. 12-50, 2014 WL 4273622, at *2 (E.D. Mo. Aug. 29, 2014) (quoting Fed. R. Civ. P. Rule 45, Advisory Committee Note); *In re Public Offering PLE Antitrust Litig.*, 233 F.R.D.

70, 76 (D. Mass. 2006). "[C]ourts consistently have held that Rule 45(d)(3)(B)(ii) protects information that results from an expert's study. This type of information is not purely factual information." *Mylan Inc. v. Analysis Grp., Inc.*, No. 18-209, 2018 WL 5043157, at *7 (D. Kan. Oct. 17, 2018).

Rule 45 does not cover an expert's observations of "specific occurrences in dispute"; as such, courts have distinguished between materials that comprise the "(1) the factual record compiled by the expert and (2) the opinion and analysis performed by the expert." *Daggett v. Scott*, No. 15-00065, 2015 WL 3407314, at *2 (D. Colo. May 26, 2015). The latter is protected by Rule 45(d)(3)(B)(ii), while the former may not be. *See also In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 242 (E.D. Pa. 2014) ("This distinction is evident in the rule itself: the rule extends only to expert information 'that does not describe specific occurrences in dispute.'") (quoting Fed. R. Civ. P. 45(d)(3)(B)(ii). As courts have recognized, "nothing in Rule 45(d)(3)(B)(ii) protects a fact witness — one whose testimony is based on personal knowledge under Federal Rule of Evidence 701 rather than specialized opinion under Federal Rule of Evidence 702 — from providing compulsory testimony simply because the witness happens also to be an expert." *Stone v. High Mountain Mining Co., LLC*, No. 19-1246, 2022 WL 1183724, at *4 (D. Colo. Apr. 21, 2022). "The relevant inquiry is whether the testimony sought concerns information that was obtained directly through the observations of the witness rather than information that the witness came to learn from his or her own study." *In re Schaefer*, 331 F.R.D. 603, 609 (W.D. Pa. 2019).

The defendants insist that all the information they seek falls into the fact witness category. They do not make a persuasive showing. First, they point to the fact that they quoted Dr. Halderman in one of the alleged defamatory broadcasts. Dr. Halderman points out that the clip is

misleading, as he was never named, the defendants broadcast it after the claims were debunked, and it is taken out of context from an April 2018 video essay published by the New York Times featuring voting equipment manufactured by a different company. Dr. Halderman's rejoinder is compelling. It is not clear what fact he would testify to regarding the quote that would not trench upon his status as an election security expert, and the defendants do not further develop this argument. If Dr. Halderman were to explain this quote, he would be doing so based on his expert knowledge, and it would have nothing to do with any occurrence disputed in this case. Rather, he would be elucidating his opinion.

The defendants next cite Dr. Halderman's involvement in the investigation of the 2020 vote count in Antrim County, Michigan. They say that in the aftermath of the Antrim County incident, Dr. Halderman, in private correspondence, attributed the mis-tabulation to a "software glitch." According to the defendants, he then reached out to Dominion executives to offer help countering various "conspiracy theories" about the vote counting and also posted a series of tweets detailing his view that the counting error was a result of human error. ECF No. 21, PageID.1559. He then was retained by Michigan officials to conduct an investigation and issue a report about the errors. The defendants do not explain what relevance Dr. Halderman's private statements in the immediate aftermath of the Antrim County incident would have for any of their claims or defenses in the underlying litigation. They certainly do not contend that they relied on his private correspondence in support of their alleged defamatory statements. At best, Dr. Halderman's private statement is potential impeachment material if he were to be called as a witness by the plaintiff and testify that the Antrim County incident was caused by human, rather than software error. There is no suggestion in the motion papers that Dr. Halderman has been retained as an expert in this case. And his involvement in studying the Antrim County election process amply

demonstrates his expert status. Dr. Halderman's information-gathering activity all occurred *post hoc*; he had no role as a consultant before the election and he had no personal knowledge of the activity in that county during the vote tabulation. His complete information base came "from his . . . own study," not directly from contemporaneous, direct observation. *Schaefer*, 331 F.R.D. at 609.

The defendants argue that some of Dr. Halderman's opinions were posted to Twitter about a month before he was retained by the Michigan Attorney General to prepare a report on Antrim County, but one does not need to be under contract to have the status of an expert. *See* Fed. R. Evid. 702 (stating that an expert may be qualified by "knowledge, skill, experience, training, or education"). Many experts post or publish the results of their own research or investigations. That does not make them fair game for unretained expert duty. Innumerable authorities publish the results of their research and investigations in journals and learned treatises. Sharing such information — both the opinions and the facts on which they are based — does not expose those authors to the risk of compelled, involuntary testimony in a lawsuit by strangers.

The defendants also posit that Dr. Halderman is a fact witness because his involvement in the Georgia litigation led him to sign a declaration stating that based on his examination of Dominion's systems, the Dominion system in use in Georgia "contains multiple severe security flaws" that attackers could exploit "to install malicious software, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems"; and that "such malware, once installed could alter voters' votes while subverting all the procedural protections practiced by the State." ECF No. 21, PageID.1560 (quoting Decl. of J. Alex Halderman ¶ 4, *Curling v. Raffensperger*, No. 17-2989, ECF 1304-3 (N.D. Ga. Feb. 3, 2022)). They emphasize that in his declaration, Halderman stated that he has "expert opinion *and related*

*factual knowledge* about the security of Dominion voting equipment that stems from my expert work in the *Curling* matter." *Ibid.* (quoting ECF No. 1-2, PageID.403) (emphasis added). Again, it is readily apparent that Dr. Halderman's conclusions in the Georgia litigation are drawn from his expert study, not from personal observation as a lay witness. The testimony the defendants seek from Dr. Halderman — apparently to support their theory that Dominion's systems are in fact vulnerable — undoubtedly is expert in nature.

As far as the record establishes here, Dr. Halderman has no "personal knowledge" of any information sought by the defendants. *See* Fed. R. Evid. 602 & Advisory Committee Note ("'[T]he rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact' is a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information.'") (quoting McCormick, *Evidence*, § 10, p. 19 (1st ed., 1954). Anything Dr. Halderman knows about the Dominion voting systems comes from his study and investigation, which he conducted for his own research or because of his retention in other matters as an expert with superior scientific and technical skill. He is not a percipient fact witness by any account.

Halderman's status as an expert does not completely foreclose the defendants' right to depose him. Again, Rule 45 authorizes quashing a subpoena that "[r]equires disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(B)(ii). The advisory committee notes add that, in exercising its discretion, the Court should consider "the degree to which the expert is being called because of his knowledge of facts relevant to the case rather than in order to give opinion testimony; the difference between testifying to a previously formed or expressed opinion and forming a new one; the possibility that, for other reasons, the

witness is a unique expert; the extent to which the calling party is able to show the unlikelihood that any comparable witness will willingly testify; and the degree to which the witness is able to show that he has been oppressed by having continually to testify. . . ." Rule 45 Adv. Comm. Notes (quoting *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976)).

The defendants contend that Dr. Halderman's anticipated testimony would "describe specific occurrences in dispute," mainly the Antrim County vote tallying. The Court disagrees based on other precedents that distinguish between situations where an expert has knowledge of "specific occurrences in dispute" and situations where an expert merely has relevant knowledge. As one example, a court ordered a deposition of an attorney and author to proceed in an anti-trust case where he participated as counsel in seven of the disputed transactions and wrote an article suggesting that he had factual knowledge that the defendants fixed their prices based on his observations. *See In re Pub. Offering PLE Antitrust Litig.*, 233 F.R.D. 70, 77 (D. Mass. 2006). Compare *In re Schaefer*, 331 F.R.D. 603 (W.D. Pa. 2019). There, the court quashed the government's deposition subpoena directed to a political scientist who prepared an influential study regarding transgender servicemembers in the military, but who did not participate in the policy study at issue in the underlying litigation. *Id.* at 611. Likewise, in *Glaxosmithkline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, No. 05-36, 2007 WL 1051759 (D. Utah Apr. 2, 2007), a court rejected the defendant's attempt to compel a researcher to testify that the medication at issue did not work, which would have supported its theory that it was not liable for damages to the plaintiff. *Id.* at *3. The court indicated that the researcher was not a participant in the industry; although his testimony might help the defendant, the non-party was not an "an observer of facts giving rise to liability." *Ibid.*

Dr. Halderman's information aligns more closely with the *Schaefer* and *Glaxosmithkline* cases. He was not involved in the actual transactions in Antrim County or Georgia — either the system implementation or the voting counting. He came along in Antrim County as the dust was settling as a hired investigator. In Georgia, he was asked to perform a security assessment months before the election even occurred. The defendants have offered no reason why they couldn't hire their own expert to evaluate the data available in either of these fora. In fact, the defendants have not even attempted to demonstrate "a substantial need" for Halderman's testimony "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(3)(C)(i).

But the defendants apparently want Dr. Halderman to repeat under oath an opinion that a number of votes in Antrim County were "flipped" because of a software defect, that the incorrect vote tally there was not due to human error, and that the Dominion systems in use in Georgia had security flaws. These statements are not facts. They plainly are opinions. Dr. Halderman has stated that he reached these opinions after research and investigation that he was hired to perform. These were not previously formed, historical opinions. (Moreover, Halderman also opines that he never had discovered any evidence that those vulnerabilities were exploited to affect the outcome of any past election. Halderman decl., ECF No. 1-2, ¶ 10.). These factors favor quashing the subpoena. *See Kaufman*, 539 F.2d at 822.

Finally, even if the defendant could establish that the subject of their deposition inquiry will focus on the "specific occurrences in dispute" in their case, the information they seek plainly "results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B).

The defendants have not overcome Rule 45(d)(3)(B)(ii)'s proscription against compelling by subpoena the testimony of an unretained, uncompensated, and unwilling expert witness.

III.

Although the anticipated testimony of Dr. Alex Halderman likely would be relevant to the case, the witness has shown that the burden of providing uncompensated expert testimony justifies quashing the deposition subpoena. If the defendants want Dr. Halderman to testify about his opinions and the factual information that results from his study and investigation, *see Mylan*, 2018 WL 5043157, at *7, then they should retain him as their expert witness.

Accordingly, it is **ORDERED** that the motion to quash the subpoena (ECF No. 1) is **GRANTED**.

It is further **ORDERED** that the motion to strike the plaintiff's Exhibit ECF 25-1 (ECF No. 26) is **DENIED as moot**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated:   January 24, 2025