UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. ALEX HALDERMAN,

             Plaintiff,

v.

HERRING NETWORKS, INC., *et al.*,

             Defendants.

No. 2:24-mc-51057

Hon. David M. Lawson
Mag. David R. Grand

## RULE 62.1 MOTION FOR INDICATIVE RULING
## BY DEFENDANTS

The OAN Defendants respectfully request an indicative ruling based on newly discovered evidence recently produced by the Michigan Department of State as to whether it would alter its order quashing the nonparty subpoena directed to J. Alex Halderman, R.28, PageID.1859–1875, and enforce the subpoena. Fed. R. Civ. P. 62.1.

The OAN Defendants noticed an appeal from that order on February 4, 2025. R.29, PageID.1876. A notice of appeal generally transfers jurisdiction from the district court to the circuit court. *Lewis v. Alexander*, 987 F.2d 392, 394 (6th Cir. 1993). A district court may, however, indicate whether it would reconsider its judgment if the case were remanded for that purpose on timely motion of a party. Fed. R. Civ. P. 62.1(a)(3).

If the Court still possessed jurisdiction, the substance and timing of this motion would be governed under Rule 59(e). Parties seeking reconsideration of final orders or judgments must file a motion under Federal Rule of Civil Procedure

59(e) or 60(b).  E.D. Mich. LR 7.1(h)(1).  A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.  Fed. R. Civ. P. 59(e).  The Court entered quashal on January 24, 2025.  R.28, PageID.1875.  The twenty-eighth day after that date will be February 21, 2025.  This motion is timely for purposes of Rule 62.1 because it was filed before that date.

This motion is grounded upon newly discovered evidence recently produced by the Michigan Department of State.  At oral argument on the motion to quash the subpoena, the Court presciently asked if a deposition of Halderman would be appropriate to explore whether he was pressured to change his opinion regarding the causes of the vote miscount in Antrim County.[1]  See Motion Tr. 35:15–36:3, R.24, PageID.1803–1804.  On January 30, 2025—six days after the Court quashed the subpoena—the Michigan Department of State produced to the OAN Defendants *inter alia*: (1) a draft report by Halderman dated March 23, 2021, which attributed the Antrim County vote miscount to the design of Dominion's "software" as a "contributing factor;"[2] and (2) two Outlook calendar invites for conference calls to be held on March 24, 2021, and March 26, 2021, between Halderman and agents

---

[1]   Dominion is suing the OAN Defendants for publishing statements about Antrim County involving a 6,000-vote switch caused by a Dominion software glitch. Dominion contends after November 7, 2020, it was known via a MDOS press release that the Antrim County vote miscount was due to human error, not a Dominion software issue.  *See, e.g.*, Compl. ¶ 77, R.1-1, PageID.130, and at-issue statement made by OAN reporter Chanel Rion on November 21, 2020: "But Dominion captured headlines when it was discovered it had glitched 6,000 votes giving Biden a fraudulent win.  This was not an isolated event."  R.21, PageID.1558.

[2]   **Ex. 1**, Draft Rpt. of J. Alex Halderman (Mar. 23, 2021), MDOS 0000214-270.

of the Michigan Department of Attorney General ("MDAG") and the Michigan Department of State to discuss the report ("MDOS").[3]  The OAN Defendants timely requested records from MDOS but did not receive them until after the Court issued its ruling.

On the day of the second conference call (March 26, 2021), Halderman issued a final report that fundamentally changed his draft in at least four ways germane to Dominion's defamation claim against the OAN Defendants.[4]  MDOS issued a press release with the report to publicly advance its preferred narrative that "***because of human error***, the unofficial results were reported incorrectly."[5]  A redline comparison showing key differences is produced here for convenience:

| March 23 Draft Report | March 26 Final Report |
|---|---|
| Although human error was the root cause of the Antrim County incident, the design of the Dominion software was a contributing factor. | Although human error was the root cause of the Antrim County incident, the design of the Dominion software was a contributing factor. |
| I conclude that the incident in Antrim resulted from a series of operator errors, which were compounded by inadequate procedures and insufficiently defensive software engineering. | I conclude that the incident in Antrim resulted from a series of operator errors, which were compounded by inadequate procedures and insufficiently defensive software engineering. |

---

[3]   **Ex. 2**, MDOS Calendar Invite (Mar. 24, 2021), MDOS 0000208; MDOS Calendar Invite (Mar. 26, 2021), MDOS 0001601.

[4]   **Ex. 3**, Redline Comparison of Draft Rpt. of J. Alex Halderman (Mar. 23, 2021) and Final Rpt. of J. Alex Halderman (Mar. 26, 2021).

[5]   **Ex. 4**, MDOS Press Release (Mar. 26, 2021), https://perma.cc/DM4H-UXKF. (emphasis added).

| March 23 Draft Report | March 26 Final Report |
|---|---|
| The explanations provided by the county and the Department of State are correct that the inaccurate results were a consequence of human errors. However, as I will explain, the problems were more complex than initially understood. The human errors were also compounded by gaps in election procedures and their adherence and by the design of the election software. | The explanations provided by the county and the Department of State are correct that the inaccurate unofficial results were a consequence of human errors. However, as I will explain, but the problems were somewhat more complex complicated than initially understood. The human errors that initiated the incident were also compounded by gaps in election procedures and their adherence and by the design of the. The election software also could have done more to help election staff avoid making mistakes that could lead to erroneous results. |
| Following the November 3, 2020, general election, Antrim County, Michigan published inaccurate election results, attracting national attention | On the night of the November 3, 2020, general election, Antrim County, Michigan published inaccurate unofficial results, attracting national attention |

The MDOS press release represented to the public that human error was solely to blame for the incorrect report of election results in Antrim County and stated that the "tabulators counted the ballots in the presidential contest properly."[6] In other words, MDOS was pressing a narrative at odds with Halderman's report, which bolsters the idea that he was asked to water down his initial conclusion about a Dominion software problem being a contributing factor.[7]

---

[6]   *Id.*

[7]   **Ex. 1**, at 3, 7-20, Figure 4, MDOS 0000216, 220–232.

Despite diluting his final report in terms of Dominion software being a "contributing factor" to the vote miscount in Antrim County, Halderman expressed this same focus on Dominion's software at a virtual "Brews and Views" event hosted by the League of Women Voters, two weeks after issuing the final report.[8]  It is relevant to understand the facts that led him to remove this significant description of Dominion software from his final report—a report that was provided to the public as assurance that Antrim County's vote miscount was solely due to human error.

As the Court acknowledged at oral argument, the cause of the vote flipping experienced in Antrim County election night results is relevant to the substantial truth defense as to the falsity element of a defamation claim.[9]  Dominion alleges that the OAN Defendants' reporting that Dominion's software was responsible for miscounting and flipping votes was untrue and known from public reports by the MDOS.[10]  Yet, Halderman, the **only**[11] person to have examined Antrim County

---

[8]   **Ex. 5**, Transcription of Excerpted Video of J. Alex Halderman Addressing the League of Women Voters "Brews & Views" Audience (Apr. 12, 2021).  This exhibit is a media file that requires leave of the Court to file.  E.D. Mich. LR 5.1(d)(1); E.D. Mich. ECF R.19(c).  The defendants have filed a separate motion for leave and have attached the transcription to this filing as required under E.D. Mich. ECF R.19(c)(3) (second numbered list).

[9]   Motion Tr. 18:22–19:13, R.24, PageID.1786–1787.

[10]   See, *e.g.*, Compl. ¶308, R.1-1, PageID.296.

[11]   Even Dominion and its Vice President of Engineering did not have access to the facts that Halderman personally observed and obtained via his access to Antrim County machines and software, and had to rely on Halderman's report to provide relevant information.  *See, e.g.*, **Ex. 8**, Deposition of Nick Ikonamakis 200:1–5; 287:19–288:4 (Oct. 4, 2020).

machines and Dominion software used there, seemed to think as of March 23, 2021, "the design of the Dominion software was a contributing factor,"[12] but he changed his mind after a call with agents of the State of Michigan three days later. Why?  Perhaps he has a reasonable explanation.  Or perhaps he was pressured to change his report to conform to the preferred narrative advanced by Dominion and the State of Michigan (and the basis on which Dominion is suing the OAN Defendants).  The facts—and any fruit derived from that inquiry—may doom a substantial portion of Dominion's claim.  When the amount in controversy is $1.75 billion, allowing the OAN Defendants to get to the bottom of this is a matter of fundamental fairness.

The OAN Defendants also ask the Court to alter its determination that Halderman's findings are opinions.  Rule 59(e) is a vehicle to correct mistakes of fact.  *Miller v. William Beaumont Hosp.*, 121 F.4th 556, 557 (6th Cir. 2024).  For the reasons argued in their brief in support of this motion, the Court should more finely distinguish between the facts Halderman learned (as the sole individual granted access to examine Antrim County vote tabulators, the machine logs, and Dominion software used by the County) about Dominion's software and the conclusions he drew from those facts based on his specialized knowledge.  Simply because Halderman is an expert does not cloak all facts that he alone personally observed in investigating the Antrim County vote miscount, or conversations with Dominion or Michigan State officials, that are highly relevant to the ultimate determination of truth and falsity in this case.  This request is independent of the

---

[12]  **Ex. 1**, at 51, MDOS 0000264.

newly discovered evidence, although the OAN Defendants submit that the newly discovered evidence underscores the importance of better distinguishing between facts and opinions.

Counsel for the parties held a concurrence conference by telephone on February 12, 2025, at 4:30 p.m., during which counsel for the defendants explained the legal bases for this motion and requested but did not obtain concurrence in the relief sought.  E.D. Mich. LR 7.1(a)(2)(A).

Respectfully submitted,

BUTZEL LONG, P.C.

Dated:  February 12, 2025

/s/ *Joseph E. Richotte*

Joseph E. Richotte (P70902)
Jennifer A. Dukarski (P74257)
101 N. Main St. #200
Ann Arbor, MI  48104
(734) 995-3110
richotte@butzel.com
dukarski@butzel.com
*Counsel for Defendants*

200100680.3

JACKSON WALKER, LLP

Dated:  February 12, 2025

/s/ *Charles L. Babcock*

Charles L. Babcock
Texas Bar No. 01479500
Christina M. Vitale
Texas Bar No. 24077610
1401 McKinney St. #1900
(713) 752-4200
cbabcock@jw.com
cvitale@jw.com
*Counsel for Defendants*

– 7 –

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. ALEX HALDERMAN,

        Plaintiff,

v.

HERRING NETWORKS, INC., *et al.*,

        Defendants.

No. 2:24-mc-51057

Hon. David M. Lawson
Mag. David R. Grand

**BRIEF IN SUPPORT OF
RULE 62.1 MOTION FOR INDICATIVE RULING
BY DEFENDANTS**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES........................................................................ ii

ISSUES PRESENTED............................................................................. iv

CONTROLLING AND PRINCIPAL AUTHORITY ................................v

INTRODUCTION ..................................................................................1

STANDARDS OF DECISION ................................................................1

ARGUMENT ..........................................................................................4

    1.    The degree to which Halderman is being called because of his
knowledge of the facts relevant to the case rather than to give
opinion testimony ........................................................................5

    2.    The difference between testifying to a previously formed or
expressed opinion and forming a new one ................................13

    3.    The possibility that Halderman is a unique expert....................14

    4.    The extent to which the defendants can show the unlikelihood
that any comparable witness willingly testify ..........................14

    5.    The degree to which Halderman can show that he has been
oppressed by having continually to testify ...............................15

CONCLUSION .....................................................................................15

# INDEX OF AUTHORITIES

*Cases*

*Burnett v. Alt*,
    224 Wis.2d 72 (1999) ........................................................................5

*Carney-Hayes v. Northwest Wisconsin Home Care, Inc.*,
    284 Wis.2d 56 (2005) ........................................................................5

*Dep't of Env't Quality v. City of Flint*,
    296 F. Supp. 3d 842 (E.D. Mich 2017) ............................................2

*Doering v. Koppelberger*,
    No. 343196; 2019 WL 4732725 (Mich. App. Sept. 26, 2019) ........6, 7

*Friedland v. The Industrial Co.*,
    No. 04-cv-01263; 2006 WL 2583113 (D. Colo. Sept. 5, 2006) ..........8

*In re Schaefer*,
    331 F.R.D. 603 (W.D. Penn. 2019) ..................................................7

*Kaufman v. Edelstein*,
    539 F.2d 811 (2d Cir. 1976) ................................................. 3, 13, 14

*Kissel v. Nelson Packing Co.*,
    87 Mich. App. 1, 4 (1978) ................................................................6

*Klabunde v. Stanley*,
    384 Mich. 276 (1970) .......................................................................6

*Miller v. William Beaumont Hosp.*,
    121 F.4th 556 (6th Cir. 2024) ..........................................................2

*Newman v. Howard Univ. Sch. of Law*,
    715 F. Supp. 3d 86 (D.D.C. 2024) ...................................................4

*Wright v. Jeep Corp.*,
    547 F. Supp. 871 (E.D. Mich. 1982) ................................................6

*Rules*

E.D. Mich. ECF R.19 ..........................................................................12

E.D. Mich. LR 5.1 ................................................................................................12

E.D. Mich. LR 7.1 ..................................................................................................1

Fed. R. Civ. P. 45 ...............................................................................................2, 7

Fed. R. Evid. 801 ..................................................................................................8

Fed. R. Evid. 802 ..................................................................................................8

Fed. R. Evid. 804 ..................................................................................................8

Fed. R. Evid. 807 ..................................................................................................8

### *Other Authorities*

8 Wigmore, Evidence §2192, at 72 (McNaughton rev. 1961) ...................................3

BLACK'S LAW DICTIONARY (12th ed. 2024) ............................................................8

Rule 45 Adv. Comm. Notes (1991) ..........................................................................3

## ISSUE PRESENTED

Should the Court issue an indicative ruling that it would alter its opinion and order quashing the nonparty subpoena directed to J. Alex Halderman, R.28, PageID.1859–1875, and enforce the subpoena, in light of newly discovery evidence recently produced by the Michigan Department of State that shows relevant facts in Halderman's personal knowledge not known previously?

## CONTROLLING AND PRINCIPAL AUTHORITY

Fed. R. Civ. P. 45(d)

Fed. R. Civ. P. 59(e)

Fed. R. Civ. P. 62.1

*Kaufman v. Edelstein*, 539 F.2d 811 (2d Cir. 1976)

The OAN Defendants submit this brief in support of their motion for an indicative ruling under Rule 62.1.  E.D. Mich. LR 7.1(d)(1).

## INTRODUCTION

The OAN Defendants agree with the Court's ruling that they seek relevant information from Halderman.  Mem. Order, at 9–10, R.28, PageID.1867–1868. They respectfully disagree, however, with the Court's overbroad ruling that facts known to Halderman (and only Halderman) were transformed into expert opinions simply because he was retained as an expert [13] and drew conclusions about those facts.  *Id.*, at PageID.1874.  The newly discovered evidence highlights the unique case here with Halderman being the *only* person to have access to the Antrim County voting machines, the logs, and Dominion software used and the need to make a finer distinction between facts within his personal knowledge that cannot be recreated by anyone else and opinions, and supports enforcement of the subpoena.

## STANDARDS OF DECISION

"A party seeking relief under Rule 59(e) must show one of four things: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice."  *Mich. Dep't of Env't*

---

[13]  MDOS, however, enlisted Halderman in a dual-purpose role—not simply as an expert for the *Bailey v. Antrim County* (No. 2020-009238-CZ) litigation but also for "other related matters as assigned by the Attorney General[.]"  Exhibit 1-O, R.21-17, PageID.1742.  The MDOS utilized his fact finding and final report as assurance to the public there was no issue with the Dominion software or the vote tabulation in Antrim County in the November 2020 election.  **Ex. 4**, MDOS Press Release (Mar. 26, 2021), https://perma.cc/DM4H-UXKF.  This was separate and apart from the *Bailey* litigation.

*Quality v. City of Flint*, 296 F. Supp. 3d 842, 846 (E.D. Mich 2017) (Lawson, J.)

(quotation and citation omitted). Rule 59(e) motions are also vehicles for litigants

to ask a court to correct a mistake a law or fact." *Miller v. William Beaumont*

*Hosp.*, 121 F.4th 556, 557 (6th Cir. 2024). When a Rule 59(e) motion is grounded

on newly discovered evidence, the evidence must have been previously unavailable

and would probably produce a different result. *Ibid.* The OAN Defendants timely

requested records from MDOS but did not receive them until after the Court issued

its ruling. These records were unknown to the OAN Defendants and unavailable

until production by MDOS last week.

The OAN Defendants seek a different result on Halderman's motion to quash

their subpoena due to this newly discovered evidence produced by the MDOS. A

court may quash or modify a subpoena that requires "disclosing an unretained

expert's opinion or information that does not describe specific occurrences in

dispute and results from the expert's student that was not requested by a party."

Fed. R. Civ. P. 45(d)(3)(B). In its opinion, the Court emphasized the advisory

committee's note that, in exercising its discretion, a court should consider "[1] the

degree to which the expert is being called because of his knowledge of facts

relevant to the case rather than to give opinion testimony; [2] the difference between

testifying to a previously formed or expressed opinion and forming a new one; [3]

the possibility that, for other reasons, the witness is a unique expert; [4] the extent to

which the calling party is able to show the unlikelihood that any comparable

witness willingly testify; and [5] the degree to which the witness is able to show

that he has been oppressed by having continually to testify[.]" Rule 45 Adv. Comm.

Notes (1991) (quoting *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976)).

A few other remarks from *Kaufman* are also salient here.  The court "admit[ted] there is no constitutional or statutory privilege against the compulsion of expert testimony, and [it] perceive[d] no sufficient basis in privilege or precedent for holding that the common law recognizes any general privilege to withhold … expert knowledge." *Kaufman*, 539 F.2d at 820.  Giving such testimony is "not to be regarded as a gratuity, or a courtesy, or an ill-required favor.  It is a duty not to be grudged or evaded … *all privileges of exemption from this duty* [of giving testimony] *are exceptional*." *Ibid.* (quoting 8 Wigmore, Evidence §2192, at 72 (McNaughton rev. 1961)) (emphasis added by *Kaufman*).

The *Kaufman* standard is "civic duty" oriented and takes a jaundiced view of allowing experts to duck subpoenas for reasons of convenience or lucre.  "[T]he enormous range of 'expert' knowledge in modern life," risks "seal[ing] off too much evidence important to the just determination of disputes." *Kaufman*, 539 F.2d at 820–821.  The court also firmly opposed exempting experts wholesale from being examined about facts over which they personal knowledge, the development of techniques, the stage they had reach, and opinions already formulated and expressed (all in contrast to asking experts to express opinions about of which they have no personal knowledge based on hypothetical questions). *Ibid.*

The court acknowledged the concern that an expert might be summoned to testify so often that the public interest might favor quashal to ensure that society isn't deprived of the expert's expertise. *Id.*, at 821.  It gave as an example the public interest in having a world-renowned surgeon spend most of his time saving

– 3 –

lives in an operating theatre instead of testifying in courtrooms.  Yet the tenor of the analysis communicates the limited and extraordinary nature of the public interest exception.  With due respect to Halderman, his expertise, while valuable in this case, isn't comparable to a surgeon.  Lives will not be sacrificed if he is compelled to sit for a deposition.  In addition, Halderman possesses facts in his personal knowledge that no one else possesses given the direct access only he was given to Antrim County's voting machines, the logs, and the Dominion software used.

## ARGUMENT

In the underlying civil action, Dominion has sued the defendants for defamation *per se*.  R.1-1, PageID.246; *US Dominion v. Herring Networks, Inc.*, 1:21-cv-2130, R.1, PageID.154.  Among the statements at issue is that Dominion's system glitched in favor of Biden in multiple states including Michigan, with a prime example being Antrim County, where 6,000 ballots were "digitally somehow glitching towards Biden."  R.1-1, PageID.247–248, ¶305(b) (Rion statement).  See also R.1-1, PageID.248–249, ¶305(c).  As the Court knows, substantial truth is a defense to a defamation claim.  *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 112 (D.D.C. 2024) (a statement is not actionable if the substance, gist, or sting is true).  Thus, evidence that Dominion software (not just human error) tabulated votes for the wrong candidate—*i.e.*, a candidate other than the one for whom a voter cast his vote—is of critical importance to the defendants' defense of the case.  The OAN Defendants were not given access to Antrim County machines, the logs, or the Dominion software used by the County – Halderman (and only Halderman) was.  Dominion's VP of Engineering even relied on Halderman's

report to gain information[14]

1.  **The degree to which Halderman is being called because of his knowledge of the facts relevant to the case rather than to give opinion testimony.**

The purpose of the deposition is to explore the facts Halderman (and only Halderman) learned while investigating the Antrim County election controversy by being granted direct access to the Antrim County voting machines, logs, and Dominion software the machines used and if he was pressured to change his report to fit the narrative that MDOS and Dominion were asserting. This access to Antrim County machines and software was only granted to Halderman—not Dominion, and not OAN Defendants. Moreover, as recently discovered through a production by the MDOS, Halderman may have been asked to change his observations and conclusions to fit a public narrative being asserted by Dominion and the MDOS. These facts are only known to Halderman and are squarely within his personal knowledge, not his expertise (*e.g.,* what was said to him, what was discussed on the phone call prior to him changing his report). His expected testimony is thus "unique" and "irreplaceable." *Carney-Hayes v. Northwest Wisconsin Home Care, Inc.*, 284 Wis.2d 56, 76 (2005) (citing *Burnett v. Alt*, 224 Wis.2d 72, 89 (1999)).

Importantly, Dominion is suing the OAN Defendants on the basis that it was publicly known (via the MDOS press releases) by November 7, 2020, that the Antrim County vote miscount was solely due to human error and not a software

---

[14] **Ex. 8**, Deposition of Nick Ikonomakis 200:1-5, 287:19-288:4 ("it gave me a lot of information … that I didn't understand completely until he had investigated what happened and provided the report."

glitch.  Yet Halderman possesses facts that led to him thinking, as late as March 23, 2021, that Dominion software was a "contributing factor."  Halderman also possesses facts occurring between March 23 and March 26, 2021, that led him to remove this language from his final report and soften any discussion of Dominion software.  The OAN Defendants are asking to obtain those facts that only Halderman possesses.  It is inherently unfair (and no support in the case law) that the mere event of retaining him as an expert cloaks all facts that he learned from discovery.  "Sometimes, however, witnesses called as experts are not called solely as experts, but do have first-hand knowledge of facts relevant to the litigation… This principle notwithstanding, courts may compel an unwilling expert to testify in unusual circumstances, such as where the expert has unique factual knowledge essential to the fair determination of a dispute."  *See Klabunde v. Stanley*, 384 Mich. 276, 280, 282 (1970); see also *Doering v. Koppelberger*, No. 343196; 2019 WL 4732725 (Mich. App. Sept. 26, 2019) (citing *Wright v. Jeep Corp.*, 547 F. Supp. 871 (E.D. Mich. 1982) (compelling testimony from an eminent crash researcher with material relevant to the dispute, but also holding that he was entitled to a reasonable fee for his testimony and could only be deposed in the county of his residence).  Notably, the OAN Defendants offered to compensate Halderman for his time and depose him in his county of residence.

   *Doering* is informative here in that a medical expert, Dr. Kneiser, examined plaintiff of injuries sustained at work.  Upon examining plaintiff, Dr. Kneiser "became a witness to the nature and extent of [plaintiff's] injuries." *See, e.g., Kissel v. Nelson Packing Co.*, 87 Mich. App. 1, 4 (1978) (holding that the physician who

conducted an independent medical examination in a premises liability case "became a witness to the nature and extent of [the plaintiff's] injuries"). The *Doering* court determined that "[b]ased on first-hand knowledge obtained from her examination of plaintiff, Dr. Kneiser could describe plaintiff's physical condition and the expert opinions she derived therefrom." *Doering,* 2019 WL 4732725, at *3.

Similarly, Halderman examined the Antrim County machines, logs, and Dominion software (the patient in this case) and became a witness to the nature and extent of the software's effects on the vote tabulation and errors experienced in the November 2020 election.  Simply because Halderman has expertise and was retained as an expert does not completely shield him when he obtained relevant facts to the case.  The newly discovered evidence further illustrates this point.  No other experts could provide this relevant fact information.

In light of the newly discovered evidence and given the fact that Halderman was the only individual to have been granted access to the Antrim County tabulators, logs, and Dominion software used, *In re Schaefer* is also informative. There, the court concluded that, even though most of the testimony that the Government sought in that case from the expert "is plainly expert rather than factual testimony[, that] is not necessarily fatal to the Government's position. Dr. Schaefer may be subpoenaed to appear if the Government can demonstrate that it has a substantial need for her testimony that cannot otherwise be met without undue hardship." *In re Schaefer*, 331 F.R.D. 603, 609 (W.D. Penn. 2019) (citing Fed. R. Civ. P. 45(d)(3)(C)(i)).  "To establish undue hardship, [a] party must show that the substantial equivalent cannot be obtained through other means." *Friedland v. The Industrial Co.*, No. 04-

– 7 –

cv-01263; 2006 WL 2583113, at *3 (D. Colo. Sept. 5, 2006). The OAN Defendants will not be able to obtain this factual information through other means besides deposing Halderman.

Additionally, Halderman's report, standing alone, is inadmissible hearsay if offered to prove that Dominion's software contributed to the bad tabulation—flipping—of votes, Fed. R. Evid. 801(c); Fed. R. Evid. 802, unless the U.S. District Court for the District of Columbia were to rule that his draft and expert reports are admissible under the residual exception, Fed. R. Evid. 807(a).  The only way for the OAN Defendants to secure the admission of the purely factual information in Halderman's possession without the risk of an adverse ruling under Fed. R. Evid. 807(a) is to depose him, so that his deposition testimony can be used if he is unavailable for trial.  Fed. R. Evid. 804(b)(1).

The Court held that Halderman "is not a percipient witness by any account." R.28, PageID.1872.  This is incorrect.  A percipient witness is one who has perceived things about which he testifies.  BLACK'S LAW DICTIONARY (12th ed. 2024). Halderman was not simply given hypothetical facts by MDOS and MDAG and asked for an opinion.  Those organs of state government retained him to perform a forensic investigation.[15]  His investigation involved accessing and reviewing data of and concerning the 2020 Presidential Election in Antrim County.  No one, not even Dominion, had this direct access.  Halderman's reports—draft and final—are

---

[15]  R.21-7, PageID.1617 ("The Michigan Secretary of State and the Department of Attorney General asked me to perform a forensic investigation of the incident [in Antrim County] in order to answer [a series of questions stated in his report].").

replete with facts concerning his investigative work. He is a percipient witness as to the observations he made and actions he undertook in accessing and reviewing the very election data that produced the election results that gave rise to news reports at issue in Dominion's defamation action against the OAN Defendants—separate and apart from whatever expert opinions he formed based on his investigation. Thus, the OAN Defendants seek to depose Halderman about factual information concerning the specific occurrences in Antrim County that form the basis of the parties dispute over the truth or falsity of the news reports at issue in the defamation action (*i.e.*, whether after November 7, 2020, the OAN Defendants' reporting of the Antrim County vote miscounts was caused by more than just human error is true or false).

Although the OAN Defendants should not be required to front their questions and disclose strategy, the Court asked what they wanted to ask of Halderman, Motion Tr. 29:21–25; R.24, PageID.1797, and the OAN Defendants interpret the Court's opinion to quash the subpoena at least in part for want of a lack of concrete examples of fact-based questions. To address the Court's apparent concerns further, the OAN Defendants offer a small sample of questions about facts that only Halderman could answer, particularly in light of the recently-discovered new evidence produced by MDOS. These include but are not limited to:

(a)  Did Dominion, MDOS, or MDAG ask, suggest, or inform him to change his March 23 draft report?

(1)  If so, who specifically? What did that person ask him to change? Was he told why the change was requested? If so, what reason was given? If not, why did he accede to the request?

– 9 –

(2)    If not, then why did he change the report from March 23, 2021, to March 26, 2021?  Did he receive or discover new information that caused him to change his mind?  If so, what was that factual information?

(b)    How was he able to access Antrim County's election management system without the county's passwords?  Although his draft report offers a general explanation,[16] he did not supply the finer details of how he circumvented the password protection.  Also, why did he circumvent the password protection instead of obtaining the necessary passwords from the state or county?

(c)    Halderman's draft report states that he found no evidence of an attack on the Antrim County election management system.[17]  He also says there was no evidence that weak authentication and access control mechanisms and the lack of important security patches were exploited in Antrim County.[18]  Albeit with respect to a different voting system, Halderman previously testified before Congress that he has been able to successfully attack an election system to "invisibly cause any candidate to win."[19]  Did he look for evidence of an attack on Antrim County's system?

(1)    If so, what did he look for and how, if at all, did he account for the possibility of undetectable access?  Did his own circumvention of the password protection, for example, leave detectable access?

(2)    If not, what was the basis for including the "no evidence" statement in his report?  Did he include it of his own volition, or was he asked to include it (and if so, by whom and why)?

---

[16]  **Ex. 1**, at 10, n.5, MDOS 0000223.

[17]  *Id.*, at 29, MDOS 0000242.

[18]  **Ex. 1**, at 51, MDOS 0000264.

[19]  U.S. Senate Select Comm. on Intelligence, Expert Testimony by J. Alex Halderman, Prof. of Computer Science, University of Michigan (Jun. 21, 2017), at 2–3, https://perma.cc/4SYY-MVZJ.

(d)    Did he have communications with Dominion in November–December 2020?[20] If so, what was the purpose of those communications and what, if anything, did he learn from Dominion?  Why did he not disclose the occurrence of those communications in his report?  Did he include any of the information learned from those communications or include the information gained from them in his analyses?

(e)    Did he speak with ElectionSource, as Dominion wanted?

(f)    Was he told about or aware of similar issues experienced in Isabella County, Michigan in the November 2020 election?  If so, who told him about those issues? If he was aware of them, did he investigate those issues to determine their relevance, if any, to his Antrim County investigation (and if so, what did he learn)?  If not, why not?

(g)    Was he told about similar issues that ElectionSource and Dominion had experienced in the past with Dominion software renumbering the sequence of candidate ID numbers and causing vote miscounts?

As these sample questions show, the OAN Defendants are interested in learning and exploring the facts known to Halderman, not to solicit opinion testimony from him.

In addition, the OAN Defendants wish to understand why Halderman has repeatedly changed his views as to whether the Antrim County controversy was caused by a software problem or human error.  For example:

- On November 6, 2020, at 4:19 p.m., he said "If incompatible software versions on the tabulators and EMS [electronic management system] can result in badly wrong results, *that seems like a serious bug*."[21]

- On November 6, 2020, at 7:51 p.m., reportedly after speaking to MDOS State Election Director Jonathan Brater, Halderman said: "Calling this 'human error' places the blame on election officials, but under these facts,

---

[20]  This was discussed extensively at oral argument but included for completeness.

[21]  R.21-9, PageID.1693 (emphasis added).

– 11 –

I'm saying it should instead be considered *a software defect*, albeit on that's only triggered when operators miss an important step.  The software should protect election workers (and the public) from such an occurrence."[22]

- On November 6-7, 2020, MDOS issues a press release calling the bad tabulations "accidental" and the result of "user error," and declaring that the "software did not malfunction."[23]

- On November 7, 2020, a day after characterizing the problem as a software defect, Halderman tweeted the MDOS press release and adds his own statement that the problem "has *nothing* to do with the version of the Dominion software in use."[24]

- Halderman was retained by MDOS on December 14, 2020.  When he issues his draft report on March 23, 2021, he goes back to his original rendition of: the "design of Dominion's software was a contributing factor." [25]

- On March 26, 2021, three days later after speaking with MDOS and MDAG, he issues a final report that deletes that statement and softens any discussion of Dominion software.[26]

- On April 12, 2021, Halderman again expressed his earlier view that the problem traced back to a "quirk" of Dominion's software at a virtual "Brews and Views" event hosted by the League of Women Voters.[27]

---

[22] *Id.*, at PageID.1692 (emphasis added).

[23] **Ex. 6,** MDOS Press Release (Nov. 6. 2020), https://perma.cc/66RE-EFLU.

[24] R.21-9, PageID.1611 (emphasis added).

[25] **Ex 1**, at 5, MDOS 0000264.

[26] See R.21-7, PageID.1661–1662.

[27] **Ex. 5**, Transcription of Excerpted Video of J. Alex Halderman Addressing the League of Women Voters "Brews & Views" Audience (Apr. 12, 2021).  This exhibit is a media file that requires leave of the Court to file.  E.D. Mich. LR 5.1(d)(1); E.D. Mich. ECF R.19(c).  The defendants have filed a separate motion for leave and have attached the transcription to this filing as required under E.D. Mich. ECF R.19(c)(3) (second numbered list).

A timeline of these events is annexed to this motion.[28]  There are reasons for these vacillations—facts learned, conversations had—and the OAN Defendants should be allowed to ask about them.

### 2.    The difference between testifying to a previously formed or expressed opinion and forming a new one.

*Kaufman* explained that an expert called to answer questions about a previously formed or expressed opinion cannot complain about uncompensated work, as compared to the expert called to form a new opinion.  *Kaufman*, 539 F.2d at 821.  It is wrong to "assume[] that the only purpose in calling an expert is to ask him to express an opinion about facts of which he has no personal knowledge … [because o]ften the inquiry may be about the development of techniques, the stage they had reached, [and] opinions already formulated or expressed … To clothe all such expert testimony with privilege solely on the basis that the expert 'owns' his knowledge free of any testimonial easement would be to seal off too much evidence important to the just determination of disputes." *Ibid.*

Just so here.  The defendants do not seek to depose Halderman for the purpose of having him form new opinions.  Rather, they seek to depose him to get at the facts of his forensic investigation into the 2020 elections in Antrim County, as shown in the previous section from the sample questions.  Granted, the facts Halderman learned during his information informed the opinions he expressed in his reports, and the OAN Defendants' questions about those facts may (or may not) bolster or undermine his opinions, but the OAN Defendants are not asking him to

---

[28]  **Ex. 7**, Timeline of Events.

form new opinions on hypothetical facts—an important distinction under *Kaufman* not recognized in the Court's opinion.

### 3. The possibility that Halderman is a unique expert.

Halderman is a unique expert. He is the *only* individual who has had direct forensic access to Antrim County's election management system, the voting machines, and to the flash drives that programmed the ballot scanners, as confirmed by Dominion's Vice President of Engineering, Nick Ikonomakis, in a deposition taken in the matter of *US Dominion v Powell*, 1:21-cv-00040 (D.D.C.).[29]

### 4. The extent to which the defendants can show the unlikelihood that any comparable witness willingly testify.

This factor is closely related to the uniqueness factor. *Kaufman* recognized that "[t]he task of determining whether the country contains a voluntary expert who is really as qualified and useful as the witness sought to be compelled would be an almost impossible one." *Kaufman*, 539 F.2d at 821. It included this as a factor to consider, but held that this was not a controlling factor—it would be an "unworkable" "necessity principle" that it saw no reason to adopt. *Ibid.* Here, no person other than Halderman has had access to the forensic data. And no person other than Halderman had conversations with Dominion, MDOS, and MDAG regarding the facts learned, the content of his reports, and the changes he made

---

[29] **Ex. 8**, Deposition of Nick Ikonomakis 199:19–200:5; 286:15–287:4; 287:19–288:4 (Oct. 4, 2024) (testifying that he relied on Halderman's report to determine the root cause of tabulation error (from Dominion's perspective) because Halderman had "direct access to the projects, the system" that Ikonomakis lacked).

after phone calls with the MDOS and MDAG.  Given this, the OAN Defendants could not reasonably be expected to find a comparable witness.

**5.   The degree to which Halderman can show that he has been oppressed by having continually to testify.**

On the record before the Court, Halderman has not been oppressed by being continually summoned to testify.  On the OAN Defendants' read of *Kaufman*, this factor is calibrated to *involuntary* and *uncompensated* participation in the judicial process.  An expert who consents to an engagement and is compensated for his testimony cannot credibly claim oppression.  The record identifies no other instances in which Halderman has been subpoenaed to testify at deposition or trial as a reluctant, uncompensated witness.

**CONCLUSION**

For these reasons, the OAN Defendants ask the Court to indicate that it would alter its judgment under Rule 59(e) if the Sixth Circuit were to remand the case for entry of such an order.

Respectfully submitted,

BUTZEL LONG, P.C.

Dated:  February 12, 2025

/s/  *Joseph E. Richotte*

Joseph E. Richotte (P70902)
Jennifer A. Dukarski (P74257)
101 N. Main St. #200
Ann Arbor, MI  48104
(734) 995-3110
richotte@butzel.com
dukarski@butzel.com
*Counsel for Defendants*

200100680.3

JACKSON WALKER, LLP

Dated:  February 12, 2025

/s/  *Charles L. Babcock*

Charles L. Babcock
Texas Bar No. 01479500
Christina M. Vitale
Texas Bar No. 24077610
1401 McKinney St. #1900
(713) 752-4200
cbabcock@jw.com
cvitale@jw.com
*Counsel for Defendants*