UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. ALEX HALDERMAN,

        Plaintiff,                                    Case Number 24-51057

v.                                                                          Honorable David M. Lawson

HERRING NETWORKS, INC., CHARLES
HERRING, ROBERT HERRING, SR., and
CHANEL RION,

        Defendants.
_____/

**OPINION AND ORDER ON DEFENDANTS' MOTION FOR INDICATIVE RULING**

      The defendants in this case, who have been sued for defamation in a case pending in the United States District Court for the District of Columbia, sought to take the deposition of J. Alex Halderman, an election security expert who has investigated and written about the safety and security of voting machines. Dr. Halderman, a Michigan resident who has not been retained as an expert witness by any party or otherwise named as a witness in the underlying litigation, moved to quash the deposition subpoena. The Court granted the motion because the defendants did not overcome Civil Rule 45(d)(3)(B)(ii)'s proscription against compelling by subpoena the testimony of an unretained, uncompensated, and unwilling expert witness. The defendants appealed. The appeal is still pending, but the defendants want the Court to reconsider its decision. They call attention to information that they characterize as "newly discovered," consisting mainly of certain draft reports presumably authored by Dr. Halderman. Those drafts, read in context, are unremarkable and do not furnish a basis to conclude that the Court made a mistake when it quashed the subpoena. Because the defendants merely seek to rehash arguments made and rejected in the earlier ruling, the Court would not reconsider its earlier decision.

I.

The facts of the case were discussed in detail in the Court's previous opinion and need not be repeated here. *See Halderman v. Herring Networks*, 348 F.R.D. 305, 307-09 (E.D. Mich. 2025). The Court ultimately granted Dr. Halderman's motion to quash the subpoena on January 24, 2025, reasoning that the defendants sought his testimony on his opinions as an unretained expert, and they had not adequately explained why failing to permit a deposition of Dr. Halderman would cause them undue hardship. *Id.* at 313 ("[T]he defendants apparently want Dr. Halderman to repeat under oath an opinion that a number of votes in Antrim County were 'flipped' because of a software defect, that the incorrect vote tally there was not due to human error, and that the Dominion systems in use in Georgia had security flaws. These statements are not facts. They plainly are opinions. Dr. Halderman has stated that he reached these opinions after research and investigation that he was hired to perform. These were not previously formed, historical opinions. (Moreover, Halderman also opines that he never had discovered any evidence that those vulnerabilities were exploited to affect the outcome of any past election.) Halderman decl., ECF No. 1-2, ¶ 10.). These factors favor quashing the subpoena.") (citing *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976)). The defendants subsequently appealed that decision, ECF No. 29, but approximately two weeks later they filed a motion for an indicative ruling in this Court, ECF No. 32.

The defendants say that they obtained several new pieces of evidence from the Michigan Department of State approximately six days after the Court issued its decision quashing the subpoena. The records primarily concern Dr. Halderman's preparation of his report concerning the Antrim County vote tabulation issues and consist of a draft of his report dated March 23, 2021, ECF No. 32-2, and two Outlook calendar invites for conference calls on March 24, 2021 and March

26, 2021 between Dr. Halderman and employees of the Michigan Attorney General and Secretary of State (the entities that retained him to produce his expert report in the case in state court), ECF Nos. 32-3. The defendants believe that certain changes between the draft and final report, along with the timing of the conference calls, might lead to the conclusion that Dr. Halderman altered his conclusions to minimize the role played by Dominion's software in causing the incident. They point to four specific changes, although they say there are others of significance; a table summarizing these is reproduced below.

| March 23 Draft Report | March 26 Final Report |
|---|---|
| Although human error was the root cause of the Antrim County incident, the design of the Dominion software was a contributing factor. | Sentence removed. |
| I conclude that the incident in Antrim resulted from a series of operator errors, which were compounded by inadequate procedures and insufficiently defensive software engineering. | Sentence removed. |
| The explanations provided by the county and the Department of State are correct that the inaccurate results were a consequence of human errors. However, as I will explain, the problems were more complex than initially understood. The human errors were also compounded by gaps in election procedures and their adherence and by the design of the election software. | The explanations provided by the county and the Department of State are correct that the inaccurate <u>unofficial</u> results were a consequence of human errors. ~~However, as I will explain,~~ but the problems were somewhat more ~~complex~~ <u>complicated</u> than initially understood. The human errors <u>that initiated the incident</u> were also compounded by gaps in election procedures and their adherence ~~and by the design of the.~~ <u>The</u> election software <u>also could have done more to help election staff avoid making mistakes that could lead to erroneous results.</u> |
| Following the November 3, 2020, general election, Antrim County, Michigan published inaccurate election results, attracting national attention | <u>On the night of</u> the November 3, 2020, general election, Antrim County, Michigan published inaccurate <u>unofficial</u> results, attracting national attention |

ECF No. 32, PageID.1883-84. In their reply brief, the defendants cite an additional example from the recommendations section of Dr. Halderman's report:

> 11. 12. Dominion should ~~modify~~ enhance D-Suite to verify that the election definition on ~~any~~ a memory card being loaded ~~matches the election definition~~ is compatible with the one used by the EMS.

ECF No. 38, PageID.2180.

Although the defendants suggest that these edits might lead one to conclude that Dr. Halderman intentionally sought to minimize Dominion's role, when read in context, the examples cited by the defendants on that point are not compelling. For instance, the defendants make much of the fact that the final report no longer states that Dominion's software was a "contributing factor" to the miscount. It is true that Dr. Halderman's final report omits a sentence stating that the software was a "contributing factor," but the defendants neglect the surrounding paragraph, which reads "There is no credible evidence that the Dominion system was deliberately designed to induce errors, but there were *missed opportunities for the software to do more* to election staff [sic] avoid making mistakes . . ." Redlined Report, ECF No. 32-4, PageID.2088 (emphasis added). The report recommends that the software be changed to flag that election worker errors would cause problems. Likewise, the second alteration cited by the defendants is hardly the smoking gun they make it out to be. That sentence was part of draft report's abstract. That it was removed is unsurprising as the final report contains *no abstract at all*. ECF No. 21-7. And in the eventual peer-reviewed copy of the analysis published in the Proceedings of the 31st USENIX Security Symposium, where Dr. Halderman did include an abstract, it expressly stated that the incident was at least partially attributable to "insufficiently defensive software design." ECF No. 21-8, PageID.1671.

The defendants also point to a transcript of Dr. Halderman's comments at a League of Women Voters event on April 12, 2021, two weeks after he issued his final report, as further

evidence that he may have more complex views of Dominion's responsibility for the Antrim County mis-tabulation. During the event, Halderman described the cause of the Antrim County incident. He explained that Dominion's election system works by assigning every potential ballot option a sequential number. In Antrim County, workers "went in and corrected one of the[] races," which added a new choice "that pushed down by one spot all the later sequence numbers of the different . . . places you could make a mark." ECF No. 32-6, PageID.2109. This change ultimately led votes to get assigned to the wrong candidates in certain precincts. *Ibid.* He described this encoding mechanism as a "quirk of the Dominion system." *Ibid.* It is not clear whether these comments are "new evidence." The transcript was not presented in the parties' original briefing on the motion to quash, and the defendants do not state that it was unavailable to them previously.

In any event, the defendants ask the Court to indicate that it would revisit its prior ruling in light of newly discovered evidence, which they say suggests that Dr. Halderman possesses factual information relevant to their substantial truth defense in the underlying defamation action — information that plainly "results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B).

II.

Following the Court's earlier ruling, the defendants filed a notice of appeal. A notice of appeal generally transfers jurisdiction of a case from the district court to the circuit court. *Lewis v. Alexander*, 987 F.2d 392, 394 (6th Cir. 1993) ("As a general rule, the district court loses jurisdiction over an action once a party files a notice of appeal, and jurisdiction transfers to the appellate court.") (citing *Cochran v. Birkel*, 651 F.2d 1219, 1221 (6th Cir. 1981)). However, Federal Rule of Civil Procedure 62.1 permits a district court to state that it would reconsider its judgment if the case were remanded for that purpose. That rule states that, upon a timely motion,

the Court may "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a)(3). Otherwise, the court may either defer ruling on the motion or deny it. *Ibid.*

A.

Before addressing any of those options, there is a procedural issue that the plaintiff has raised. In their motion for an indicative ruling, the defendants ask this Court to indicate whether it would grant relief under Civil Rule 59(e), which allows a court to amend or alter a judgment if there is "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)). The plaintiff argues that before a court can indicate under Rule 62.1 whether it would afford relief if the case were remanded for that purpose, the party seeking such an indication first must file a separate motion actually seeking that relief.

Although formalistic, there is some support for that argument. For instance, Rule 62.1 refers to "a timely motion . . . made for relief," although it does not require that the motion for relief be separate from the motion for an indicative ruling. Dr. Halderman cites *Lopez Dominguez v. Gulf Coast Marine & Associates*, 607 F.3d 1066 (5th Cir. 2010), and *United States v. Ocampo*, No. 06-20172-01, 2013 WL 686922, at * 1 (E.D. Mich. Feb. 26, 2013), but those cases do not compel the result he seeks. In *Lopez Dominguez*, the plaintiffs appealed a trial court's decision dismissing the case but later sought remand so that they could file a Rule 60(b) motion to vacate the court's judgment. 607 F.3d at 1073. The defendants opposed the request on the ground that the court of appeals could not remand for the district court to consider a motion that had not yet been filed. *Ibid.* Explaining that the plaintiff's request was unusual, the Fifth Circuit stated that

although "an effective notice of appeal strips district courts of jurisdiction to *grant* a . . . motion [for reconsideration], it does not prevent litigants from filing them in the district court while an appeal is pending." *Id.* at 1073-74. That proposition is sound as a matter of procedure and perhaps supports the idea that the defendants *could* have filed a motion for relief after they filed their notice of appeal, but it does not support Dr. Halderman's argument that the reconsideration motion *must* have been filed separately from the Rule 62.1 motion. *Ocampo* cannot be interpreted to fill that logical gap. In that case, the district court denied a habeas petitioner's motion that invoked Rule 62.1 where the movant had not filed a motion for relief under Rule 59 but stated that his motion was "forthcoming." *Ocampo*, 2013 WL 686922, at *1. Unlike that case, the defendants' motion here included all their substantive arguments for reconsideration.

It is true that some district courts appear to have adopted the position that there must be a separate, predicate motion for relief. *E.g.*, *Medgraph, Inc. v. Medtronic, Inc.*, 310 F.R.D. 208, 210 (W.D.N.Y. 2015) ("[P]rocedurally there is no basis for an independent, free-standing Rule 62.1 motion"); *see also Rowe v. Gary, Williams, Parenti, Watson & Gary, P.L.L.C.*, 2017 WL 10398767, at *2 (N.D. Ga. July 14, 2017) ("Rule 62.1 is intended to be used in conjunction with a separate motion seeking relief, such as a Rule 60(b) motion to vacate a judgment that is pending on appeal."). But the majority approach "accept[s] a 'freestanding' Rule 62.1(a) motion if the moving party sufficiently states the merits of its substantive argument in its briefs." *Index Newspapers LLC v. City of Portland*, No. 20-1035, 2022 WL 72124, at *2 (D. Or. Jan. 7, 2022) (collecting cases); *see also McKnight v. Uber Techs., Inc.*, No. 14-05615, 2022 WL 19975447, at *2 (N.D. Cal. Sept. 13, 2022).

The majority approach is more sensible where, as here, the Rule 62.1 motion includes all the arguments in support of the underlying relief — here, reconsideration of the appealed ruling

— and the motion is timely under the rule that provides the basis for the underlying relief — here, Rule 59(e). Moreover, that approach avoids unreasonably elevating form over substance and is consistent with the maxim that the Rules of Civil Procedure are to be interpreted to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

B.

In support of their request for an indicative ruling, the defendants point to certain differences between Dr. Halderman's draft report and his final report, as well as information about two meetings between Dr. Halderman and state officials, as evidence that he potentially altered his conclusions about the cause of the Antrim County incident. They ask to be able to explore these topics with Dr. Halderman in a deposition. What's left unexplained is why this evidence, even if new, affects the merits of the Court's original decision. Even if it were true that Dr. Halderman somehow altered his conclusions at the state officials' or Dominion's request (although there is no evidence that Dominion participated in his meetings with state officials), this would not change the Court's conclusion that the defendants have not shown a need for his uncompensated expert opinion testimony, and that information about why he changed his opinion — if he did at all — would only be useful as impeachment evidence.

Instead, the defendants ask the Court to re-decide whether to permit Dr. Halderman's deposition based on arguments that already were litigated. The defendants clearly argued in their initial briefing that Halderman was a fact witness, not an expert, based on his work investigating the Antrim County incident for the state. *See* ECF No. 21, PageID.1558-59. The Court explicitly rejected that theory in its original opinion:

> Dr. Halderman's information aligns more closely with the *Schaefer* and *Glaxosmithkline* cases. He was not involved in the actual transactions in Antrim County or Georgia — either the system implementation or the voting counting. He came along in Antrim County as the dust was settling as a hired investigator. In

- 8 -

> Georgia, he was asked to perform a security assessment months before the election even occurred. The defendants have offered no reason why they couldn't hire their own expert to evaluate the data available in either of these fora. In fact, the defendants have not even attempted to demonstrate "a substantial need" for Halderman's testimony "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(3)(C)(i).
>
> But the defendants apparently want Dr. Halderman to repeat under oath an opinion that a number of votes in Antrim County were "flipped" because of a software defect, that the incorrect vote tally there was not due to human error, and that the Dominion systems in use in Georgia had security flaws. These statements are not facts. They plainly are opinions. Dr. Halderman has stated that he reached these opinions after research and investigation that he was hired to perform. These were not previously formed, historical opinions. (Moreover, Halderman also opines that he never had discovered any evidence that those vulnerabilities were exploited to affect the outcome of any past election. Halderman decl., ECF No. 1-2, ¶ 10.). These factors favor quashing the subpoena. *See Kaufman*, 539 F.2d at 822.

*Halderman v. Herring Networks, Inc.*, 348 F.R.D. 303, 313 (E.D. Mich. 2025) (citing *In re Schaefer*, 331 F.R.D. 603 (W.D. Pa. 2019); *Glaxosmithkline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, No. 05-36, 2007 WL 1051759 (D. Utah Apr. 2, 2007)).

The defendants offer no explanation for how Dr. Halderman has any factual knowledge that is relevant for purposes other than impeachment or that is otherwise distinct from his expert work that is pertinent to any issue in the underlying case, as is further discussed below. Stale arguments dressed up with "new evidence" are not a permissible basis to grant reconsideration under Rule 59(e).

To support the merits of their contention that the defendants seek to inquire of Dr. Halderman about factual issues, the defendants rely mainly on two Michigan state cases, *Klabunde v. Stanley*, 384 Mich. 276, 282, 181 N.W.2d 918, 921 (1970), and *Doering v. Koppelberger*, No. 343196, 2019 WL 4732725 (Mich. App. Sept. 26, 2019). Neither of those cases — which are factually distinguishable — has any bearing on *Federal* Rule of Civil Procedure 45(d)(3)(B)(ii), which was a fundament of the Court's original decision. That rule authorizes a court to quash a subpoena that "[r]equires disclosing an unretained expert's opinion or information *that does not*

*describe specific occurrences in dispute* and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B)(ii) (emphasis added).

As the Court explained previously, Dr. Halderman's opinions about the causes of the Antrim County incident plainly are expert in nature. The defendants maintain that that is not dispositive because his report is "replete with facts concerning his investigative work" in the Antrim County incident. ECF No. 32, PageID.1902. In its prior opinion, the Court explained that courts interpreting Rule 45 have drawn a distinction between "(1) the factual record compiled by the expert and (2) the opinion and analysis performed by the expert." *Halderman*, 2025 WL 296600, at *7 (quoting *Daggett v. Scott*, No. 15-00065, 2015 WL 3407314, at *2 (D. Colo. May 26, 2015)).

The defendants insist that what they seek from Dr. Halderman are his factual observations about the Dominion voting software that was used in Antrim County. But the example questions that they have put forth, *see* ECF No. 32, PageID.1902-04, plainly seek information about Dr. Halderman's expert opinion as to the *causes* of the mis-tabulation of the election results in Antrim County. As the Court explained in its original opinion, these sorts of inquiries may yield useful "impeachment material if he were to be called as a witness by the plaintiff and testify that the Antrim County incident was caused by human, rather than software error." *Halderman*, 348 F.R.D. at 312. But there is no suggestion that Dr. Halderman has been retained by any party such that impeachment would be necessary. *See ibid.*

It is apparent that the defendants seek Dr. Halderman's testimony because they see in his Antrim County report — and potentially in his statements made before and after the report was released — *opinions* that might buttress their substantial truth defense to Dominion's defamation claims. Because he has not been retained as an expert in the underlying litigation, the defendants

are not automatically entitled to a deposition to probe these opinions further. Nor does the information presented in their motion alter the conclusion that the defendants failed to demonstrate a "substantial need" for the testimony "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(3)(C)(i). To illustrate that point, it may be useful to examine the so-called *Kaufman* factors in greater detail. *See* Rule 45 Adv. Comm. Notes (quoting *Kaufman* 539 F.2d at 822).

*1. Is Dr. Halderman being called for his opinion testimony or for his knowledge of facts relevant to the case?* The defendants insist that they seek Dr. Halderman's deposition to explore his knowledge of facts relevant to the defamation lawsuit. For the reasons explained above, that plainly is not the case. This factor weighs against the defendants.

*2. Is he being asked to form a new opinion or merely express a previously formed opinion?* The second *Kaufman* factor assesses whether Dr. Halderman would be required to form a new opinion for purpose of responding to the subpoena or merely would be repeating an existing one. This factor weighs in favor the defendants, who are interested in Dr. Halderman's *past* work analyzing the causes of the vote tabulation incident in Antrim County in 2020. It appears that Dr. Halderman completed all of his work on this incident by 2022. Nevertheless, "the fact that [his] testimony will primarily concern previously formed opinions is not sufficient, on its own, to demonstrate a substantial need for [his] subpoenaed testimony." *In re Schaefer*, 331 F.R.D. 603, 612 (W.D. Pa. 2019).

*3 & 4. Is Dr. Halderman a "unique" witness and is it unlikely that a comparable witness willingly will testify?* This question addresses the third and fourth *Kaufman* factors. The defendants contend that Dr. Halderman's expertise and knowledge pertaining to the Antrim County incident make him a unique witness and that they are unlikely to find another willing

witness. In their present motion, the defendants emphasize that the primary purpose of his testimony would be to buttress its substantial truth defense based on at least one alleged defamatory statement that votes in Antrim County were "digitally somehow glitching towards Biden." ECF No. 32, PageID.1897 (citing Compl. ¶ 305(b)). And they assert that without his deposition, they likely would be unable to use his report in the underlying litigation to demonstrate that Dominion's software "glitched" unless it were admitted via the residual hearsay exception in Rule 807.

This defense likely is of somewhat limited utility given that this statement is only one of many allegedly defamatory statements regarding Dominion made by the defendants according to the complaint in the underlying case. *See generally* Compl. ¶ 305(a)-(y) (listing statements). And it likely is a weak defense on the merits. Dr. Halderman did not conclude in his report that Dominion's machines "glitched." He attributed the mis-tabulation to "human errors" that were "compounded by gaps in election procedures and their adherence." ECF No. 21-7, PageID.1617. As for the election software, he commented that it "could have done more to help election staff avoid making mistakes that could lead to erroneous results." *Ibid.* The new information, at best, suggests that Dr. Halderman saw the software as a contributing factor to the incident, but when read in its entirety, it is clear that his prior draft faulted the software for not flagging the election workers' own errors, not "glitching."

This does not necessarily defeat the defendants' quest for his testimony about the incident if he truly has unique information or a unique perspective. On that score, they emphasize that Dr. Halderman was the only individual who had "direct forensic access" to Antrim County's election management system, including the voting machines and the flash drives that programmed the ballot scanners. For his part, Dr. Halderman disputes that he was the only individual with such access, pointing out that the plaintiff in the *Bailey v. Antrim County* case in Michigan state court

had his own experts who accessed the same data and produced their own reports. The record is not clear on who had access to what and when; it is only obvious that Dr. Halderman prepared the investigation of the Antrim County incident at the behest of the state and in the immediate aftermath of the incident. But that only makes him "unique" in the sense that he was involved early and was engaged by a government entity. Presumably, the defendants — through discovery in the underlying case — can obtain the source code in use by Antrim County at the time of the incident and hand it over to a retained expert for evaluation. They do not represent that these materials are unavailable or explain why the materials Dr. Halderman examined are somehow irreplicable. If their contention is that Dominion's software is flawed, they should be able to have a retained expert examine it. Software is not like a crime scene where access at particular time points matters a great deal. Dr. Halderman did not watch the software and election system function in real time; he likely drew inferences about the causes of the incident after the fact based on data that presumably still exist. That is what expert witnesses do. In his motion to quash the subpoena, Dr. Halderman cited a letter co-signed by 59 election security specialists. ECF No. 1, PageID.25. That there are a substantial number of practitioners in this area suggests that his expertise and skills are hardly unique. Nor have the defendants established that they would be unable to find another witness capable of opining on these issues. These factors therefore weigh against the defendants.

    *5. Degree to which Halderman has been oppressed by having to repeatedly testify.* This factor does not weigh decisively in favor of either party. Although Halderman's original motion suggested there was cause to believe that he *might* be harassed by participating in a deposition, he does not maintain that he has been forced to testify repeatedly on this subject.

    Once again, as the Court previously determined, the factors weigh in favor of the conclusion the Court reached in its prior opinion: that the defendants are not entitled to Dr.

- 14 -

Halderman's uncompensated expert testimony. The defendants have not articulated a cogent basis for revisiting that holding.

### III.

The defendants have not shown that the Court's previous decision quashing the deposition subpoena amounted to a clear error of law, or that there is any newly discovered evidence of consequence, or an intervening change in controlling law, or that there is a need to prevent manifest injustice.

Accordingly, it is **ORDERED** that the defendants' motion for an indicative ruling (ECF No. 32) is **GRANTED**. If the court of appeals were to remand the case, this Court would not grant a motion to alter or amend the previous judgment.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  May 19, 2025